# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NATHANIEL MORRIS, JR.,      :
                                :

             Plaintiff.      :
                                :

             v.            :     Civil Action No. 06-290-SLR
                                :

KENT GENERAL HOSPITAL,      :
                                :

           Defendant.    :

## APPENDIX TO THE OPENING BRIEF IN SUPPORT

## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated:  July 2, 2007

**STEVENS & LEE**
Joseph Grey (No. 2358)
Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, Seventh Floor
Wilmington, DE 19801
Tel:  (302) 654-5180
Fax:  (302) 654-5181
E-mail: jg@stevenslee.com
tgw@stevenslee.com

Kenneth D. Kleinman, Esquire
John F. Ward, Esquire
620 Freedom Business Center
Suite 200
P.O. Box 62330
King of Prussia, Pennsylvania 19406
(610) 205-6000

Counsel for Defendant Bayhealth Medical Center, Inc.

**INDEX**

| PAGE(S) | DESCRIPTION |
|---------|-------------|
| P1-P56 | Transcript of Plaintiff's Deposition, June 4, 2007 |
| P57-P60 | Morris Deposition Exhibit 1, Job Offer Confirmation dated 11/7/2000 and Reports |
| P61 | Morris Deposition Exhibit 2, General Orientation Record dated 11/13/2000 |
| P62-P64 | Morris Deposition Exhibit 3, Personnel Action Request Form dated 4/24/2001 |
| P65-P76 | Morris Deposition Exhibit 4, Position Description/Performance Review Form for Control Center Operator |
| P77-P89 | Morris Deposition Exhibit 5, Position Description/Performance Review Form for Constable |
| P90 | Morris Deposition Exhibit 6, Healthcare Security Badge |
| P91-P105 | Morris Deposition Exhibit 7, Performance Appraisal Summary Sheet dated 5/4/2003 |
| P106-P119 | Morris Deposition Exhibit 8, Performance Appraisal Summary Sheet dated 5/2/2004 |
| P120 | Morris Deposition Exhibit 9, Letter dated 5/23/2005 from M. Hanson, DELJIS Security Manager to D. Freeman, Bayhealth Security Dept. |
| P121 | Morris Deposition Exhibit 10, Plaintiff's Criminal Record as of 12/7/2000 |
| P122-P125 | Morris Deposition Exhibit 11, Employment Report |
| P126-P143 | Morris Deposition Exhibit 17, Bayhealth Corrective Action Policy, Rev. Date 6/9/2005 |
| P144-P146 | Morris Deposition Exhibit 18, Resolution of Work Related Issues/Concerns Form dated 4/21/2005 |

SL1 733874v1/011425.00106

| | |
|---|---|
| P147-148 | Morris Deposition Exhibit 19, Resolution of Work Related Issues/Concerns Form dated 5/16/2005 |
| P149-P153 | Morris Deposition Exhibit 20, Complaint |
| P154-P161 | Affidavit of Marvin Lands |
| P162-P164 | Exhibit 1 to Affidavit of Marvin Lands, Report (Morris Deposition Exhibit 14) |
| P165-P166 | Exhibit 2 to Affidavit of Marvin Lands, Disciplinary Action Notes (Morris Deposition Exhibit 15) |
| P167-P171 | Exhibit 3 to Affidavit of Marvin Lands, iSeries Records (Morris Deposition Exhibit 3) |
| P172-P174 | Exhibit 4 to Affidavit of Marvin Lands, Employee Corrective Action Record dated 4/25/2006 (Morris Deposition Exhibit 16) |
| P175-P180 | Exhibit 5 to Affidavit of Marvin Lands, Department Staffing Reports |
| P181-P182 | Affidavit of Jeffrey M. Lewin |
| P183-P185 | Affidavit of Ashley Fulcher |
| P185A-P186 | Exhibit 1 to Affidavit of Ashley Fulcher, Handwritten Notes |
| P187-P188 | Deleted |
| P189-P190 | Affidavit of David Freeman |
| P191-P193 | Exhibit 1 to Affidavit of David Freeman, Memorandum dated 4/18/2005 regarding Interview (Morris Deposition Exhibit 12) |

SL1 733874v1/011425.00106

Dated:  July 2, 2007

**STEVENS & LEE**

By: _____
Joseph Grey (No. 2358)
Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, Seventh Floor
Wilmington, DE 19801
Tel:  (302) 654-5180
Fax:  (302) 654-5181
E-mail: jg@stevenslee.com
tgw@stevenslee.com

Kenneth D. Kleinman, Esquire
John F. Ward, Esquire
620 Freedom Business Center
Suite 200
P.O. Box 62330
King of Prussia, Pennsylvania 19406
(610) 205-6000

Counsel for Defendant Bayhealth Medical Center,
Inc.



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Morris

### v.

# Bayhealth Medical Center

## C.A. # 06-290 SLR

---

### Transcript of:

### Nathaniel Morris, Jr.

### June 4, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Morris v. Bayhealth Medical Center

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

NATHANIEL MORRIS, JR.,               )
                                     )
          Plaintiff,                 )
                                     )
v.                                   ) Civil Action
                                     ) Number 06-290 (SLR)
BAYHEALTH MEDICAL                    )
CENTER,                              ) TRIAL BY JURY
                                     ) DEMANDED
          Defendant.                 )

          Deposition of NATHANIEL MORRIS, JR., taken
pursuant to notice at the law offices of Stevens &
Lee, 1105 North Market Street, Wilmington, Delaware,
beginning at 10:31 a.m., on Monday, June 4, 2007,
before Julie H. Parrack, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public.

APPEARANCES:

          R. STOKES NOLTE, ESQUIRE
          NOLTE & ASSOCIATES
            1010 North Bancroft Parkway, Suite 21
            Wilmington, Delaware  19805
            On behalf of Plaintiff

          JOHN F. WARD, ESQUIRE
          STEVENS & LEE
            620 Freedom Drive, Suite 200
            King of Prussia, Pennsylvania  19406
            On behalf of Defendant

ALSO PRESENT:  JEFFREY M. LEWIN
               Director, Human Resources, Bayhealth

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

**2**

1      NATHANIEL MORRIS, JR.,
2      the deponent herein, having first been duly
3      sworn on oath, was examined and testified as
4      follows:
5           MR. WARD: And we'll go with the usual
6      stipulations?
7           MR. NOLTE: What are they?
8           MR. WARD: Okay, basically all objections
9      except as to the form of the question reserved until
10     trial.
11          MR. NOLTE: We don't do that in Delaware.
12          MR. WARD: Oh, you don't do that?
13          MR. NOLTE: No, just typically just note
14     objection as to form on the record.
15          MR. WARD: Okay, fair enough. I would
16     like Mr. Morris to read and sign.
17          MR. NOLTE: That's my option, not his.
18          MR. WARD: Don't do that either?
19          MR. NOLTE: No.
20          MR. WARD: Okay, fine.
21     BY MR. WARD:
22     Q. Mr. Morris, my name is John Ward. I am an
23     attorney with the law firm of Stevens & Lee. We
24     represent Bayhealth Medical Center in the employment

**3**

1      discrimination lawsuit that you filed against
2      Bayhealth in the Federal District Court in the
3      District of Delaware.
4           We're here to take your deposition today.
5      The purpose of a deposition is to discover information
6      that's relevant to your claims or Bayhealth defenses
7      in this lawsuit.
8           And as you know, the court reporter has
9      just administered an oath to you. Although this is an
10     informal setting, as opposed to being in a courtroom,
11     it's important that you understand that the deposition
12     testimony that you give is still subject to the same
13     oath, the same penalties that would apply if you were
14     testifying in court. Do you understand that?
15     A. Yes, I do.
16     Q. And the purpose of the deposition today is to
17     obtain truthful and accurate answers to the questions
18     that I ask you. If at any point during the deposition
19     you think of something that's relevant to one of my
20     previous questions, information that would be
21     responsive to that question, then please feel free to
22     advise me of that and give me that information, okay?
23     A. Yes.
24     Q. All right. Now, today I'm going to be asking

**4**

1      you a series of questions. I'd like you to listen to
2      my questions and answer them to the best of your
3      ability. If I ask you a question that you're not
4      clear on, that you're not really sure what I'm asking,
5      just simply let me know that you don't understand the
6      question and I'll either rephrase the question so it's
7      more easily understood or I'll ask you a different
8      question.
9      A. All right, sir.
10     Q. Okay?
11     A. Yes, sir.
12     Q. All right. And if you answer my question, I
13     will assume that you understood it. Is that clear?
14     A. Yes, sir.
15     Q. And if you don't understand my question, I'm
16     going to assume that you didn't understand it and I'll
17     ask you a different question, okay?
18     A. Yes, sir.
19     Q. Now, as you can see, your testimony and my
20     questions are both being taken down by the court
21     reporter. And it's important that you answer
22     questions verbally as opposed to with a physical
23     gesture or using sounds like uh-uh or um-hum so she
24     can take down your responses. So, in other words, you

**5**

1      would want to say yes or no as opposed to um-hum or
2      uh-uh.
3           And the court reporter would have a
4      difficult time taking down your testimony and my
5      questions if we both speak at the same time. So what
6      I'd ask you to do is even if you think you know what
7      I'm going to ask you, please just wait until I finish
8      the question before you give your answer. Okay?
9      A. Okay.
10     Q. And in the same regard, I won't speak while
11     you're talking.
12          And if you need to take a break at any
13     point in time today, just let me know and we'll take a
14     break, okay?
15     A. Yes, sir.
16     Q. Now, is there anything about your physical,
17     mental or emotional health that would interfere with
18     your ability to testify truthfully today?
19     A. No, sir.
20     Q. Have you consumed any drugs within the last 24
21     hours?
22     A. No, sir.
23     Q. How about any alcohol?
24     A. No, sir.

2 (Pages 2 to 5)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

6

1     Q.  Now, if I ask you a question that requires you
2   to give an estimate or a recollection that may not be
3   crystal clear to you today, we would ask that you
4   provide us with whatever your recollections on that
5   subject might be.  Okay?
6     A.  Yes, sir.
7     Q.  And you understand that it would be an
8   untruthful response to say that you don't recall if
9   you in fact do recall, correct?
10    A.  Yes, sir.
11    Q.  Do you have any questions before we proceed?
12    A.  No, sir.
13    Q.  Where do you currently reside, Mr. Morris?
14    A.  Dover.
15    Q.  How long have you lived in Dover?
16    A.  I've lived in Dover 24 years.
17    Q.  And what is your date of birth?
18    A.  October 24 of 1958.
19    Q.  Have you ever given a deposition prior to
20  today?
21    A.  No, sir.
22    Q.  Are you currently employed?
23    A.  Yes, sir.
24    Q.  Who is your employer?

7

1     A.  Wal-Mart.
2     Q.  I'm sorry?
3     A.  Wal-Mart.
4     Q.  Wal-Mart?  What's your position with Wal-Mart?
5     A.  I work in receiving department, distribution
6   center.
7     Q.  And which Wal-Mart store do you work at?
8     A.  It's 7034 Smyrna, Delaware.
9     Q.  How did you prepare for this deposition?
10    A.  How did I prepare for it?
11    Q.  Yes.
12    A.  Just tried to go back and remember the things
13  that occurred to this situation.
14    Q.  Did you review any documents at all in
15  preparation for your deposition?
16    A.  I read over the, my report that I had written
17  to myself.
18    Q.  The report that you had written to yourself?
19    A.  Well, it's a document that I wrote about this
20  situation that happened to me.  You don't understand?
21    Q.  Did you give a copy of that document to your
22  attorney?
23    A.  Sure, sure.  He has a copy.
24        MR. WARD:  Did we receive that in response

8

1   to a document request?  I don't recall having seen
2   such a document.
3        MR. NOLTE:  I don't know if you have the
4   Department of Labor file or not, but what he's talking
5   about is a document dated January 16, 2006 that he
6   supplied to the department as part of their
7   investigation.  I can certainly provide you with a
8   copy.
9        MR. WARD:  I'd appreciate that.
10       MR. NOLTE:  If you want to make copies,
11  that's fine.
12       (A brief recess was taken.)
13  BY MR. WARD:
14    Q.  Mr. Morris, other than the document that your
15  attorney has just given me, did you review any other
16  documents in preparation for your deposition?
17    A.  No, sir.
18    Q.  You began your employment with Bayhealth
19  Medical Center effective November 11, 2000, correct?
20    A.  Correct.
21       MR. WARD:  Would you please mark this
22  document as Morris 1.
23       (Morris Exhibit No. 1 was marked for
24  identification.)

9

1     Q.  Have you finished reviewing the document,
2   Mr. Morris?
3     A.  Yes, sir.
4     Q.  You were hired as a security officer in
5   Bayhealth's Department of Security, Safety and Auto
6   Services, correct?
7     A.  Yes, sir.
8     Q.  Bayhealth has two hospitals, Kent General
9   Hospital and Milford Memorial Hospital, correct?
10    A.  Yes.
11    Q.  And Kent is located in Dover, Delaware, and
12  Milford is located in Milford, Delaware, right?
13    A.  Yes.
14    Q.  And you were assigned to work at Kent General,
15  correct?
16    A.  Yes.
17    Q.  You initially were assigned to a pay grade 19;
18  is that correct?
19    A.  I'm not sure what pay grade I was assigned to.
20    Q.  So you're not sure one way or the other,
21  correct?
22    A.  No.
23    Q.  You were classified as a full-time employee who
24  was scheduled for 80 hours every biweekly pay period,

3  (Pages 6 to 9)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

10

1  correct?
2     A.  Yes.
3     Q.  So you were scheduled for 40 hours a week,
4  right?
5     A.  Yes.
6     Q.  And you were eligible for overtime, right?
7     A.  Yes.
8     Q.  And in fact, you did work a number of overtime
9  shifts, didn't you?
10    A.  Yes.
11    Q.  And you received time and a half for all hours
12 that you worked in excess of 40 per week, right?
13    A.  Yes.
14    Q.  Now, you also received annual merit increases
15 throughout your employment, correct?
16    A.  Annual?
17    Q.  Merit increases, in other words, a raise?
18    A.  Yes, yes.
19    Q.  And if you turn to page 2 of Morris 1, that
20 shows four merit increases, doesn't it?
21    A.  Yes, I see four merit increases, yes.
22    Q.  You don't have any reason to believe that the
23 information on page 2 of Morris 1 is inaccurate in any
24 way, correct?

11

1     A.  Could you repeat your question?
2     Q.  Do you have any reason to believe that the
3  information on page 2 of Morris 1 is inaccurate?
4        MR. NOLTE:  As to his merit increases?
5     Q.  As to the merit increases and the amounts of
6  the merit increases.
7     A.  Well, really, I don't understand how to read,
8  read the increase, I guess I don't.
9     Q.  Okay, well let's look at the one on the top.
10 That appears to be dated May 2nd, 2004, correct?
11    A.  Yes.
12    Q.  And it's listed as a merit increase, correct?
13    A.  Yes.
14    Q.  If you look at the right side of the document,
15 it shows your previous pay as $10.66 an hour, correct?
16    A.  Yes.
17    Q.  And it shows your new pay as $11.03 per hour,
18 correct?
19    A.  Yes.
20    Q.  So what that shows is that you received a merit
21 increase from $10.66 to $11.03, correct?
22    A.  Okay, all right.  Yes.
23    Q.  And that would be the same for the, same
24 analysis for each of the other three merit increases

12

1  on this document, correct?
2     A.  Yes.
3     Q.  So let me ask you again.  Do you have any
4  reason to believe that the amounts that are stated on
5  this document for your merit increases are incorrect?
6     A.  They seem to be accurate.
7        MR. NOLTE:  And just for purposes of the
8  record, the second page of Morris 1 appears to show
9  six different changes in his pay scale, although four
10 of them are marked as merit increases, and your
11 question has been technically correct.  I just don't
12 know if that's causing my client confusion in trying
13 to follow the question.
14    Q.  Mr. Morris, I was just asking you about the
15 four changes that are listed on page 2 of Morris 1
16 that are marked as merit increases.  I wasn't asking
17 you about the other three changes.  Understand that?
18    A.  That's the four merit increases.
19    Q.  Right.
20    A.  Okay.
21    Q.  Okay.  Now, your employment with Bayhealth when
22 you were first hired was contingent on a number of
23 checks and clearances, correct?
24    A.  Could you repeat that?

13

1     Q.  When you were first hired at Bayhealth, your
2  employment was contingent upon certain checks and
3  clearances as to your background, correct?
4     A.  Yes.
5     Q.  One of those checks was a criminal history
6  record check, right?
7     A.  (Nodded affirmatively.)
8     Q.  And another was the check to ensure that you
9  had a valid Delaware driver's license, correct?
10    A.  No.
11    Q.  No?
12    A.  No, no, no.  I don't recall no one asked -- at
13 the time when I was hired, human resource asked for ID
14 and I showed my ID.
15    Q.  What form of ID did you show them?
16    A.  Delaware ID.
17    Q.  Do you mean Delaware driver's license?
18    A.  No, Delaware ID.  Delaware identification card.
19 That's what I had.  And that's what I showed -- what
20 is her name?  I cannot remember her name.  She took my
21 identification card and made a copy of it and that's
22 it.
23    Q.  Would this be someone who worked in human
24 resources department?

4 (Pages 10 to 13)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

---

**14**

1    A.  Yes, yes.

2    Q.  And did you at any point in time show a copy of

3    your driver's license to anyone at Bayhealth?

4    A.  No.

5    Q.  Now, you were scheduled to attend new employee

6    orientation on November 13th of 2000, correct?

7    A.  I was scheduled to?

8    Q.  Attend new employee orientation on November

9    13th of 2000?

10   A.  I can't remember the date, but if that's the

11   date that you're telling me.

12   Q.  Take a look at the first page of Morris 1 in

13   the center of the document where it says "Orientation

14   Information," and just let me know if that refreshes

15   your memory at all?

16   A.  Okay, I see that.  As far as me remembering the

17   exact date for me to sit here and say yes, I cannot

18   say I remember the exact date of the orientation.

19   Q.  Now, you did attend a new employee

20   orientation --

21   A.  Sure, I did.

22   Q.  Just let me finish.

23   A.  I'm sorry.

24       MR. NOLTE:  Make sure he finishes his

---

**15**

1    question because the court reporter is going to get

2    mad at all of us.

3        THE WITNESS:  I'm sorry.

4    Q.  You did attend new employee orientation at some

5    point shortly after you were hired, didn't you?

6    A.  Yes.

7    Q.  And during your orientation you received

8    briefings about relevant Bayhealth personnel policies,

9    human resources topics and that sort of thing,

10   correct?

11   A.  Yes.

12       MR. WARD:  Would you please mark this as

13   Morris 2.

14       (Morris Exhibit No. 2 was marked for

15   identification.)

16   Q.  Mr. Morris, the document we've just marked as

17   Morris 2 is titled "General Orientation Record,"

18   correct?

19   A.  Yes.

20   Q.  And this document is designed to memorialize

21   your attendance at your general orientation, correct?

22   A.  Yes.

23       MR. NOLTE:  Objection as to form, but he

24   can answer.

---

**16**

1    Q.  Did you print your name at the top of the

2    document?

3    A.  Yes.

4    Q.  And did you sign your name at the bottom of the

5    document?

6    A.  Yes.

7    Q.  And did you write in 11-13-00 next to your

8    signature?

9    A.  Yes, I would say I did.

10   Q.  And does the document that we've marked as

11   Morris 2 accurately list the various topics that were

12   discussed with you during your general orientation?

13   A.  Yes.

14   Q.  Now, on May 6, 2001, Bayhealth promoted you to

15   the position of Control Center Operator, correct?

16   A.  Once again, with the date, I cannot say I exact

17   remember it, the date.  But by the document, okay.

18       MR. NOLTE:  You're referring to the second

19   page of Morris 1?

20   Q.  Mr. Morris, if you go to the second page of

21   Morris 1 and go to the line with the No. 6 --

22   A.  Yes.

23   Q.  -- in parentheses next to it --

24   A.  Yes.

---

**17**

1    Q.  -- that indicates a promotion on May 6, 2001,

2    correct?

3    A.  Yes.

4    Q.  Do you have any reason to believe that date is

5    inaccurate?

6    A.  No, I have no reason to believe that.

7    Q.  So it's true, isn't it, that you received a

8    promotion just about six months after you were hired,

9    correct?

10   A.  Yes.

11   Q.  And you held that position until your

12   discharge, right?

13   A.  Yes.

14   Q.  Your shift was from 3:45 p.m. to 11:45 p.m.,

15   correct?

16   A.  Yes.

17       MR. WARD:  Please mark this as Morris 3.

18       (Morris Exhibit No. 3 was marked for

19   identification.)

20   Q.  Mr. Morris, have you ever seen any of the

21   documents that we've marked as Morris 3 prior to

22   today?

23   A.  I cannot really say that I really remember

24   seeing it.

---

5   (Pages 14 to 17)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

---

18

1  Q.  So are you not sure one way or the other?
2  A.  I'm not sure, no, I'm not.  No, I'm not sure
3  that I've seen this.
4  Q.  You received an increase in your pay grade as
5  the result of being promoted to control center
6  operator, didn't you?
7  A.  Yes, I did.
8  Q.  And you received an increase in salary,
9  correct?
10  A.  Yes.
11  Q.  Now, do you recognize the signature at the
12  bottom of the first page of Morris 1 next to the
13  heading "Department Head"?
14  A.  The signature -- are we talking about this
15  document here?
16  Q.  Yes.
17  A.  The signature next to the letterhead?
18  Q.  It's under the bold heading "Authorization,"
19  and there is a heading to the left that says
20  "Department Head."
21  A.  Right.
22  Q.  There is a signature there, right?
23  A.  Yes.
24  Q.  Do you know whose signature that is?

---

20

1  that question.
2  Q.  So you don't know one way or the other whether
3  Mr. Lands approved or did not approve your annual
4  merit increases, correct?
5  A.  No, can't say I do.
6  Q.  But Don Tinnel authorized your annual merit
7  increases, correct?
8  A.  Pretty much, yes, sir.
9  Q.  And after David Freeman became your supervisor,
10  he was the one who authorized any annual merit
11  increases you received, correct?
12  A.  Yes.
13  Q.  Do you recall when Mr. Freeman became your
14  supervisor?
15  A.  No, not exactly.
16  Q.  Do you recall the year?
17  A.  No.
18  Q.  Now, to the best of your knowledge, Marvin
19  Lands was also the individual who ultimately made the
20  decision to terminate your employment, correct?
21  A.  Yes.
22      MR. WARD:  Please mark this as Morris 4.
23      (Morris Exhibit No. 4 was marked for
24  identification.)

---

19

1  A.  It look like, it look like it should be Marvin
2  Lands'.
3  Q.  Now, Marvin Lands was the head of Bayhealth
4  Department Security, correct?
5  A.  The director, yes, he was.
6  Q.  And he was the head of that department during
7  the entire period of your employment with Bayhealth,
8  wasn't he?
9  A.  Yes, he was.
10  Q.  And as department head, Mr. Lands authorized
11  your promotion to control center operator just six
12  months after you were hired, correct?
13  A.  Him being the director, if I received
14  promotion, I would say that he approved it, yes.
15  Q.  And Mr. Lands, as director of the security
16  department, also authorized your annual merit
17  increases, didn't he?
18  A.  Okay, my supervisor at the time of my hire was
19  Tinnel, Don Tinnel.  And him being my supervisor,
20  pretty much everything that I recall I dealt with Don
21  Tinnel.  As far as Marvin Lands, because he would take
22  the paperwork to Marvin Lands, but as far as me
23  dealing with Marvin Lands, and you asked me questions
24  about him signing and approving stuff, I cannot answer

---

21

1  Q.  Have you had a chance to look at Morris 4,
2  Mr. Morris?
3  A.  Yes, I looked over it, yes.
4  Q.  Now, Morris 4 is a position description and
5  sample performance review for the position of control
6  center operator, correct?
7  A.  Yes.
8  Q.  And that's the position you held from May 2001
9  through your last day of employment at Bayhealth,
10  correct?
11  A.  Yes.
12  Q.  Would you agree with me that the section of
13  this document on page 1 that is headed "Position
14  Summary" accurately summarizes your duties and your
15  responsibilities as a control center operator?
16      MR. NOLTE:  Just put a note on the record
17  that I think the document that you're asking
18  Mr. Morris to review indicates that it was revised May
19  5 of '05, which would have been after the date of his
20  termination.  But he can answer the questions if he's
21  able.
22  Q.  Mr. Morris, would you like me to restate the
23  question?
24  A.  Yes.

---

6 (Pages 18 to 21)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

22

1    Q. Would you agree with me that the section of
2  Morris 4 on page 1, top third of the page that is
3  titled with the bold, italicized heading "Position
4  Summary" accurately summarizes your duties and
5  responsibilities as a control center operator?
6    A. Yes, pretty much.
7    Q. And would you agree with me that the section
8  that starts on page 1 and carries over to page 2
9  titled "Position Qualifications" accurately states the
10  qualifications required to hold the position of
11  control center operator?
12    A. Okay, I understand you said position
13  qualification, it goes over to page 2.
14    Q. Right.
15    A. And you want me to look at what area?
16    Q. Okay, if you'll just look at the boxes under
17  the heading "Position Qualifications," would you agree
18  with me that the information set forth in those boxes
19  accurately states the qualifications necessary to be a
20  control center operator?
21    A. Okay, I'm reading what it says as far as
22  qualifications, I understand what it says.
23    Q. Would you agree that those are the
24  qualifications that you need to have in order to be a

23

1  control center operator?
2    A. Would I agree that they are the qualifications
3  that you need? Not necessarily.
4    Q. Okay. Which of these qualifications do you
5  feel were not necessary to hold the position of
6  control center operator?
7    A. Well, where it says two years previous law
8  enforcement or -- oh, okay. "Must have taken and
9  passed the International Association Healthcare
10  Security & Safety Basic course," I may not necessarily
11  agree with that.
12    Q. Well, you were informed, weren't you --
13    A. Oh, yes.
14    Q. Hang on, let me finish. You were informed,
15  weren't you, that you needed to take a basic training
16  course that was administered by the International
17  Association of Healthcare Security & Safety, correct?
18    A. Yes.
19    Q. And Mr. Lands informed you of that?
20    A. No, Don Tinnel did.
21    Q. Don Tinnel did.
22    A. Yes.
23    Q. So why do you believe that wasn't a
24  qualification to hold the position of control center

24

1  operator?
2    A. The question I perceived that you asked me was
3  do I think that this, these qualifications are
4  necessary. That's the way I perceived your question.
5    Q. I understand what you're saying. I'm not
6  asking you to give your opinion as to whether or not
7  these were qualifications that you personally feel
8  were necessary.
9    A. Okay.
10    Q. What I'm really asking is, were these the
11  qualifications that Bayhealth felt were necessary to
12  hold the position?
13    A. Yes, they were.
14    Q. Okay. Now, on page 2 of Morris 4, on the
15  right-hand side in the second box on the right, it
16  lists under the category of "Computer/Software,
17  experience with Microsoft Word, Lotus Notes and the
18  Delaware Criminal Justice Information
19  System (DELJIS)." Correct?
20    A. Correct.
21    Q. And you could use DELJIS, for example, to run
22  plates on a suspicious vehicle in the parking lot,
23  correct?
24    A. The way I understand it, that that's what you

25

1  could do with that, that's what I was told.
2    Q. Now, you weren't required to be a commissioned
3  constable in order to be qualified for the position of
4  control center operator, correct?
5    A. Need you to repeat that, sir.
6    Q. You were not required to be a commissioned
7  constable in order to hold the position of control
8  center operator, correct?
9    A. No.
10    Q. And in fact, you've never been a constable
11  commissioned in the State of Delaware, have you?
12    A. No.
13    Q. And you never held the position of constable at
14  any time during your employment with Bayhealth Medical
15  Center, right?
16    A. No.
17    Q. Never worked any shifts as a constable?
18    A. No.
19    Q. And there's nothing on this document that we've
20  marked as Morris 4 that indicates you needed to be a
21  constable, correct?
22    A. No, I do not see anything where it called for
23  qualification of being a constable to work control,
24  no, I did not see anything.

7 (Pages 22 to 25)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

26

1    Q. Now, directing your attention to page 5 of the
2  document we've marked as Morris 4 -- excuse me. Let's
3  go to page 6 of Morris 4, specifically "Part VII -
4  Position Standards." Do you see where that is on page
5  6?
6    A. Okay, yes.
7    Q. Would you agree that Part VII of Morris 4
8  accurately sets forth your various individual duties
9  and responsibilities as a control center operator?
10   A. So you want me to go over 1 through 5 and give
11  you an answer do I feel that the ratings was accurate?
12   Q. No, what I want you to do, please, is read
13  through numbers 1 through 17 --
14   A. Okay.
15   Q. -- and just let me know whether you believe the
16  duties that are set forth here were the duties that
17  you performed as a control center operator?
18   A. Yes, I do.
19   Q. Mr. Morris, could you please tell me in your
20  own words what you did during a typical shift as the
21  control center operator, starting with your arrival at
22  work?
23   A. Well, give you the best that I can recollect.
24  As when I arrived to work, I get briefed by the

27

1  off-going control officer of what's been going on
2  throughout the day. After that, after he leave, I
3  fill in my logbook, find out what officers is working
4  where so I know how to log it in my computer log that
5  we keep throughout the night. Check the cameras and
6  make sure that they're not locked in one position when
7  they should be rotating. And any other duties that
8  the, that the manager may give me prior to him leaving
9  between 4 and 5:00.
10   Q. Now, one of the things that you did was to
11  monitor the television screens that are at the control
12  center, correct?
13   A. Yes.
14   Q. And if you saw something that you thought
15  needed attention on one of those screens, you could
16  then direct either a security officer or a constable
17  to go to that scene, correct?
18   A. Yes.
19   Q. So one of your duties was to direct and
20  coordinate the activities of both the security
21  officers and the constables, right?
22   A. Yes.
23   Q. And in order to do that, you needed to be
24  familiar with the duties and responsibilities of those

28

1  two positions, correct?
2    A. Well, that would be correct. I'm trying to
3  think when did that -- I was trying to think what year
4  that the constables actually started. Because the
5  question you just asked me pertaining to the
6  constables, they had different, different obligations
7  than just a regular security officer. So --
8    Q. That was a different position entirely than a
9  security officer, correct?
10   A. Yes. They actually went to school for a
11  certain time and then came back and worked under that,
12  worked under that title as constable. So what their
13  protocol was to certain things, I may not have been
14  aware of, of just being a regular security
15  officer/control officer.
16       MR. WARD: I'd like to mark this document
17  as Morris 5.
18       (Morris Exhibit No. 5 was marked for
19  identification.)
20   Q. Mr. Morris, I understand that you never held
21  the position of constable, but based on your own
22  personal knowledge, do you believe that the document
23  we've marked as Morris 5 accurately states the
24  responsibilities of the position of constable?

29

1    A. Well, I would have to read over this whole
2  document, sir, to answer that question.
3    Q. Why don't we, to save time, just concentrate on
4  the section on page 1 that's marked "Position
5  Summary."
6    A. Okay.
7    Q. Would you agree that the section that is titled
8  "Position Summary" actually summarizes the duties and
9  responsibilities of the position of constable?
10       MR. NOLTE: Objection as to form, but he
11  can answer.
12   A. I'm not sure.
13   Q. So you're not sure one way or the other?
14   A. From what I'm reading and what I recall that
15  the constables done, I can agree with the position
16  summary.
17   Q. Is there any duty mentioned in the paragraph
18  marked "Position Summary" that you believe constables
19  did not perform?
20   A. On Bayhealth property you're talking about?
21   Q. Correct.
22   A. No.
23   Q. Mr. Morris, if you'll turn to page 2 of Morris
24  5, in the upper right-hand corner of page 2 it

8 (Pages 26 to 29)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

---

30

1  indicates that in order to be a constable for
2  Bayhealth, you must be a commissioned constable,
3  correct?
4      MR. NOLTE: Objection as to form, but if
5  he can answer.
6    A.  Okay.  Could you repeat that?
7    Q.  On page 2 in the upper right-hand corner --
8    A.  Yes.
9    Q.  -- it lists on page 2 as a qualification that
10  an individual must be certified as a commissioned
11  constable, correct?
12    A.  That's what it says.
13    Q.  And you --
14      MR. NOLTE: Let me interrupt for a second,
15  because the document itself indicates on page 1 that
16  the "Position Qualifications" is "Preferred," and then
17  on page 2 it says "Commissioned Constable."  So since
18  he's never seen the document before today, drawing the
19  conclusion that it is a requirement I think is
20  factually incorrect.
21      MR. WARD: I would agree with you.
22    Q.  Mr. Morris, would you agree with me that there
23  is a preference that an individual be a commissioned
24  constable in order to hold the position of constable?

---

31

1      MR. NOLTE: And what we're trying to
2  distinguish is between what the document says and what
3  your recollection, if you have any factual
4  recollection, would be.
5    A.  I'm confused somewhere of what you're really
6  asking me.
7    Q.  Do you know what the term commissioned
8  constable means?
9    A.  No.
10    Q.  Now, after you were promoted to control center
11  operator, you still occasionally continued to work
12  shifts as a security officer, right?
13    A.  Yes.
14    Q.  And as a security officer or a control center
15  operator, you didn't have the authority to enforce
16  Delaware criminal codes or traffic codes, did you?
17    A.  No.
18    Q.  Tell me in your own words what you did during a
19  typical shift as a security officer.
20    A.  We continually made rounds of all the floors,
21  checked fire exits.  This is inside, because you have
22  an inside and you have an outside duty.
23          Inside you continually make rounds of the
24  whole hospital.  You may be called for a code where

---

32

1  you have to assist.  But basic throughout the night is
2  just continually making rounds and checking the areas
3  and fire exits not blocked, and maybe sitting in the
4  ER with a patient that has to be seen by a doctor for
5  psych, psychiatric evaluation, things like that,
6  combative patients, people just in the hospital for no
7  reason, sleeping, or just, just ongoing "monitoration"
8  of the hospital throughout the night.
9    Q.  Now, your duties when working as a control
10  center operator or a security officer didn't involve
11  making arrests of individuals, did they?
12    A.  No, no.
13    Q.  And you were not authorized or permitted to
14  conduct personal searches of individuals, were you?
15    A.  Personal searches.  Well, yes, in the ER we had
16  to sit with a patient -- the rule kept changing where
17  you checked the patient, make sure they don't have no
18  weapons or anything.  We would have to just pat them
19  down, make sure they did not have any weapons on them.
20  But other than that, outside the emergency room, I
21  don't recall really making no searches on anyone.
22    Q.  Your duties as a control center
23  operator/security officer did not include serving
24  subpoenas, did they?

---

33

1    A.  No.
2    Q.  Now, while you were employed at Bayhealth
3  Medical Center, Bayhealth also employed a constable by
4  the name of Harvey Scott; is that correct?
5    A.  Yes.
6    Q.  And Harvey Scott is Caucasian, isn't he?
7    A.  Yes.
8    Q.  Now, Mr. Scott resigned from Bayhealth in late
9  March 2005, about a month before your discharge,
10  didn't he?
11    A.  I'm not sure about the time, but I know he
12  resigned because he was trying to get another position
13  as a police officer.
14    Q.  Would you agree that he resigned prior to the
15  termination of your employment?
16    A.  Yes.
17    Q.  So when he resigned, his resignation would have
18  created a vacant constable position, wouldn't it?
19    A.  I would say so, yes.  I don't know what number
20  of constables they had to have.
21    Q.  Now, you didn't apply for the vacant constable
22  position, did you?
23    A.  No.
24    Q.  Do you know who, if anyone, applied for that

---

9  (Pages 30 to 33)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

**34**

1  position?
2  A. No, I don't.
3  Q. Do you know who, if anyone, replaced Mr. Scott?
4  A. I don't know if anyone replaced Mr. Scott. No,
5  I don't know.
6  Q. Now, during the period of your employment with
7  Bayhealth, there was another individual named Blaine
8  Brown who held the position of security officer,
9  correct?
10  A. Yes.
11  Q. Mr. Brown worked relief shifts, didn't he?
12  A. Yes.
13  Q. Mr. Brown's an African-American male, isn't he?
14  A. Yes.
15  Q. And in 2001, about a year after you were hired,
16  Bayhealth hired an individual by the name of Alyn
17  Pearis as a security officer, correct?
18  A. Yes, I remember Alyn Pearis. When he was
19  hired, I could not say when.
20  Q. But you do recall that he worked as a security
21  officer for Bayhealth at the same time, or during the
22  period that you worked as a security officer, correct?
23  A. Yes, yes.
24  Q. Or a control center operator.

**35**

1  A. Um-hum.
2  Q. And Mr. Pearis was full time, wasn't he?
3  A. Yes.
4  Q. And he was an African-American male as well,
5  correct?
6  A. Yes.
7  Q. And during the period of your employment with
8  Bayhealth, the hospital also hired an individual by
9  the name of Doyne Harris as a security officer,
10  correct?
11  A. Yes.
12  Q. And Mr. Harris is an African-American male,
13  isn't he?
14  A. Yes. He was not full time, he was --
15  Q. He was relief like Mr. Brown, correct?
16  A. Yes.
17  Q. Now, you indicated that as a security officer
18  you would patrol Bayhealth's grounds, correct?
19  A. Yes.
20  Q. And you say there was an inside position and an
21  outside position?
22  A. Yes.
23  Q. Did the person who held the outside position
24  drive a Bayhealth vehicle?

**36**

1  A. At times.
2  Q. Now, when you first started working as a
3  security officer, you drove a Bayhealth security
4  vehicle, didn't you?
5  A. I'm trying to think if whether at the
6  beginning, at the beginning whether I drove around or
7  not. I think I tried to, I tried to walk pretty much
8  the grounds as possible.
9  Q. Do you recall whether you ever drove one of the
10  Bayhealth security vehicles?
11  A. Oh, sure, I have.
12  Q. Now, at some point during your employment with
13  Bayhealth, you were informed that you would no longer
14  be permitted to drive the Bayhealth security vehicles,
15  correct?
16  A. Yes.
17  Q. And the reason for that was that you had been
18  dropped from Bayhealth's automobile insurance policy,
19  right?
20  A. Yes.
21  Q. You were informed, weren't you, that the reason
22  that you were dropped from Bayhealth's automobile
23  insurance policy was because of suspensions of your
24  driver's license, correct?

**37**

1  A. Right.
2  Q. So once you were dropped from the insurance
3  policy, you could only patrol on foot, correct?
4  A. Correct.
5  Q. So if a security officer assigned to the
6  vehicle patrol called in sick, you could not replace
7  that person and drive the vehicle, could you?
8  A. No, I could not. But what you would normally
9  do is the amount of officers that's on a shift at the
10  time, we among ourselves, we would discuss who was
11  going to go where and do what. That's how we equalled
12  out who was working where.
13  Q. You would agree, wouldn't you, that if the
14  person who was assigned to drive the vehicle called
15  out sick, someone other than yourself would have to
16  drive the vehicle, right?
17  A. Someone other than myself, right.
18  Q. So Bayhealth had limited flexibility in
19  assigning you, correct?
20  MR. NOLTE: Objection as to form. You can
21  answer.
22  Q. Let me try and make that a little clearer for
23  you.
24  The other security officers who were

10 (Pages 34 to 37)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

38

1  permitted to drive the security vehicles could be
2  assigned either to foot patrol or vehicle patrol,
3  right?
4      A.  Sure, yes.
5      Q.  You could only be assigned to foot patrol,
6  correct?
7      A.  Foot patrol or control.
8      Q.  Or control center operator.
9      A.  Yes.
10     Q.  Okay.
11     A.  That's why I say, we discussed among ourselves
12 who is going to do what to balance out who's going to
13 work where, and it was never a problem.
14     Q.  I understand.  Now, when you were hired as
15 security officer, you were advised that you were
16 required to take a basic training course in healthcare
17 security and then pass an examination, correct?
18     A.  Yes.
19     Q.  And you were supposed to do that within the
20 first 12 months of your employment, right?
21     A.  Of my employment?  I don't know if it was told
22 to me of when it had to be done.
23     Q.  But you were told that you had to do it, right?
24     A.  Yes.

39

1      Q.  And that course is administered by the
2  International Association of Healthcare Safety &
3  Security, which is known as the IAHSS, correct?
4      A.  Correct.
5      Q.  And even after you were promoted to control
6  center operator, you were still required to take that
7  basic training course, correct?
8      A.  Well, that test was taken and it was given to
9  Don Tinnel after completing the test.  After I
10 completed the test, it was given to Don Tinnel.  He
11 was in charge at the time when I took the test.
12     Q.  So you're saying that you did take the test?
13     A.  Oh, yes, I am.
14     Q.  Were you ever informed that you had passed the
15 test?
16     A.  No, I was not given any information about the
17 test.
18     Q.  Do you know why not?
19     A.  No.
20     Q.  Did you ever ask whether you had passed the
21 test?
22     A.  It was discussed that, it was discussed
23 between -- I'm trying to think when it was discussed.
24 I don't know if it was around the time when this

40

1  incident went on, but it was discussed with someone
2  about it.  But I didn't -- I never asked about it, no.
3  I just know it was a qualification that I had to do
4  and I done it.
5      Q.  Now, isn't it true, Mr. Morris, that at
6  Bayhealth security officers are given a 5 percent
7  raise upon passing the basic training course?
8      A.  I guess so, I'm not sure.  I was told that, and
9  in the discussion of -- see, my freshest recollection
10 of this test and 5 percent, I'm only remembering this
11 being discussed prior to me going over to Mr. Lewin's
12 office when all this was discussed about my, my
13 background.  It all stems from -- I'm trying to
14 explain this the best way I can.
15     Q.  Sure.
16     A.  This DELJIS that we were discussing awhile ago,
17 my name was put in for clearance, you have to have a
18 clearance to operate the DELJIS computer.  And when my
19 name was put in, I guess my name was not accepted.  So
20 I then recall being called by my director to go over
21 to Mr. Lewin's office where they discussed that.  He
22 asked me a question, do I recall something that
23 happened in Maryland in such and such a year, I don't
24 remember the exact year.  And I explained to them what

41

1  happened, and that it was thrown out of court.
2         And during all of this, at this time when
3  these things was explained to me about this test that
4  I had taken that they said that I hadn't taken.  This
5  is what I recollect at the time discussing this.
6      Q.  Do you recall when you took the basic training
7  test?
8      A.  It was shortly after I was promoted to control
9  officer.
10     Q.  And is it your testimony that you were not
11 aware that you would receive a raise if you passed
12 that test?
13     A.  I'm not so much aware of the 5 percent raise.
14 I just know it was a requirement that I had to do it,
15 and Don said it had to be done by a certain time.
16     Q.  So your testimony is that you took the test and
17 then handed him the test, correct?
18     A.  Right.  At the time it was written, and then
19 later changed to computer.  But at the time when I
20 took it, it was not computerized, it was taken, you
21 had to do it on paper.
22     Q.  Now, isn't it true that certificates of
23 completion were handed out for this basic training
24 course at departmental meetings?

11  (Pages 38 to 41)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

42

1    A. I wasn't familiar with that.
2    Q. You never saw anyone being given a certificate
3  of completion --
4    A. At --
5    Q. Let me finish.
6    A. I'm sorry.
7    Q. Are you testifying that you never saw anyone be
8  handed a certificate of completion during a
9  departmental meeting?
10    A. No, I'm not testifying that. Afterwards, later
11  on, I did see, closer to my termination I seen where
12  one or two people had received a -- in fact, one of
13  the people was a guy named Jose, I don't remember what
14  his last name was. But he talked about he had
15  received one, I believe it was Jose, and I said I
16  never received one of those. And that was it.
17    Q. Now, when you spoke with Mr. Lands about the
18  issue of the basic training course, you told him
19  initially that you had taken the training course and
20  passed it, correct?
21    A. I don't recall if I told him I passed it. I
22  recall telling him that I had taken it, because Don
23  told me that I had to take it by a certain time.
24    Q. And isn't it true that Mr. Lands later spoke

43

1  with you and told you at that time that he had checked
2  with the IAHSS and that they had said that there was
3  no record of you having ever taken the test?
4    A. Yes, I remember him telling me that. But once
5  again, this was around the time of, that I recollect
6  around the time of going over to Jeff Lewin's office
7  about the situation about my background about
8  something that happened in Maryland. All this is
9  coming together, all this stuff was being discussed at
10  that time prior to my termination.
11    Q. Do you have any explanation for why the IAHSS
12  might not have records of you completing the test if
13  you completed it?
14    A. Do I have any -- could you repeat that?
15    Q. Sure. Do you have any explanation for why the
16  IAHSS might not have records of you completing the
17  test if you actually took it?
18    A. Well, if I turned my test in to Don Tinnel, it
19  would be Don Tinnel's responsibility to turn it in to
20  wherever it needed to go. I don't know where it went
21  from there. He turned it in to Marvin Lands, did he
22  turn it in to IAHH, or whatever the initials was you
23  just gave, I don't know where it go from there. I was
24  told to take the test and give it back to him. If I'm

44

1  not mistaken, I recall him putting it in his box in
2  the back after I gave it to him. But after that, I
3  don't know where it went.
4    Q. Now, Don Tinnel was your supervisor during the
5  first two years of your employment; is that right?
6    A. Again, like I said awhile ago, I don't know
7  what year Dave came and Don Tinnel had to go down to
8  officer, I'm not sure what year it was. But he was,
9  Don Tinnel was in charge at the beginning of my hire;
10  in fact, he's the one that hired me. Well, he is the
11  one that evaluated me prior to my hire and everything
12  and he was my supervisor once I started, he was my
13  supervisor when I became control officer. I received
14  my orders from him.
15    Q. So just to make sure I understand your
16  testimony, you were never informed that you had passed
17  the basic training course, correct?
18    A. No, I was not.
19    Q. If you had passed, you would have been
20  certified by the IAHSS, correct?
21    A. Okay, you're saying I would have been certified
22  as what? What are you --
23    Q. Certified as a healthcare security officer,
24  correct?

45

1    A. I don't know what happened after I take the
2  test. I took the test, I don't know what happened
3  after that.
4    Q. I understand. But that isn't my question. My
5  question, you understood, didn't you, that if you
6  passed the test you were considered to be certified by
7  the IAHSS, correct?
8    A. If I passed the test then I would be certified.
9  I guess you would. I'm not sure.
10    Q. So if you were never informed that you had
11  passed the test, you understood that you had not been
12  certified by the IAHSS, correct?
13    MR. NOLTE: Objection as to form.
14    A. I'm not really understanding. All I'm saying
15  is I was required to take the test and I had not
16  received any information back after I took the test.
17    Q. As you sit here now, today, do you have any
18  reason to believe that you were ever certified as a
19  healthcare security officer by the IAHSS?
20    A. If you're saying that you're supposed to get a
21  certificate or anything, I have not received any
22  certificate. I have not heard anything back after I
23  took the test. So therefore, I was never certified.
24    Q. So as far as you know, you were never

12 (Pages 42 to 45)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

46

1  certified, correct?
2  A. Apparently not.
3      MR. WARD: Could you please mark this as
4  Morris 6.
5      (Morris Exhibit No. 6 was marked for
6  identification.)
7  Q. Now, Mr. Morris, the document we've marked as
8  Morris 6 is a copy of a patch that Bayhealth security
9  officers wore on their uniforms, correct?
10  A. Correct.
11  Q. And the patch indicates that the wearer is
12  certified in healthcare security by the IAHSS,
13  correct?
14  A. Correct.
15  Q. And you wore a patch like this on your uniform,
16  didn't you?
17  A. I don't recall wearing a patch like that.
18  Q. Are you testifying that you did not wear a
19  patch like that, or that you may have worn a patch
20  like that?
21  A. I am really thinking, we changed over to new
22  uniforms and I'm trying to think for sure. I know
23  some people wore the blue and white patch like that.
24  I'm not sure if I had that on my uniform. I did have

47

1  a patch, which was Bayhealth, my left arm, I believe
2  left arm. But as far as that blue and white patch
3  there, I am not sure if I had that on my uniform.
4  Q. So it's possible that you did have the patch
5  that we've marked as Morris 6 on your uniform,
6  correct?
7  A. I want to say that I did not, but I am not
8  sure.
9  Q. Okay. So you're not sure one way or the other,
10  correct?
11  A. No, no.
12  Q. All right. Now, when you were promoted to
13  control center operator, you were also required to
14  take a supervisory training course that was
15  administered by the IAHSS, correct?
16  A. I'm not, I'm not familiar with that.
17  Q. Are you aware that you were supposed to take a
18  second course of any kind after you were promoted to
19  control center operator?
20  A. I am — best of my recollection would be,
21  again, this was discussed near and around the time of
22  my determination. I remember that being stated about
23  some other test, but as far as, as far as me knowing,
24  you know, I'm not sure about that.

48

1  Q. Now, just to further clarify the record, when
2  you said around the time of your determination, you
3  meant your termination, correct?
4  A. Yes.
5  Q. Okay.
6  A. Well I'm speaking prior to. Prior to my
7  determination.
8  Q. Shortly, shortly after the termination of your
9  employment, correct?
10  A. Yes, yes, these things were discussed to me,
11  yes.
12  Q. So you're saying that shortly before the
13  termination of your employment, you were told
14  something about having to take a second course,
15  correct?
16  A. I was asked about it, yes. I recall --
17  Q. And just tell me -- I'm sorry, go ahead.
18  A. I'm thinking roughly that these things was
19  discussed to me or asked, asked to me -- see, I went
20  through an appeal after my termination, and like I
21  say, prior to my determination, all kinds of things, I
22  was being called to the office, to the director's
23  office, to, one time to Mr. Lewin's office, and
24  discussed so much. And then after my termination, my

49

1  appeal, so a lot of the stuff that was discussed is
2  running together. I'm not sure exactly when these
3  things was discussed. But I know close to my
4  determination all these things started coming up.
5  Q. Okay. I'm just asking you about the training
6  course issue now, okay?
7  A. I'm not sure about a second test. I'm not.
8  Q. Are you saying you're not sure that you were
9  ever told that you needed to take a second test?
10  A. I'm saying I don't remember being told about
11  the second test, that's what I'm saying.
12  Q. Now, earlier in your testimony I understood you
13  to say that shortly before your termination Mr. Lands
14  raised this issue of taking a second course. Is my
15  understanding incorrect?
16  A. I am talking about the blue book, IAHS test
17  that I had to take. That's the only test I'm familiar
18  with.
19  Q. Okay. So that would be the first test,
20  correct? The basic training test?
21  A. Basic training, the blue book, I guess if you
22  say that's the first test, you're saying that there's
23  two. You say there was a second one. I can't say
24  that I'm familiar with the second one.

13 (Pages 46 to 49)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

50

1   Q.   So your testimony is -- I'm sorry, go ahead.
2   A.   I'm familiar with the blue book, the thick blue
3   book that we had to read.  They gave us a book to read
4   and then you take a test from that.  That's the one I
5   remember.
6   Q.   The fact is that you never did take any second
7   training course authorized by the IAHSS, correct?
8   A.   Not that I recall.
9        MR. WARD:   Could you please mark this as
10  Morris 7.
11       (Morris Exhibit No. 7 was marked for
12  identification.)
13  Q.   Mr. Morris, have you ever seen the document
14  that we've marked as Morris 7 before?
15  A.   It appears to be another evaluation that I had,
16  yes.
17  Q.   Your signature appears on the first page of the
18  document, correct?
19  A.   Yes.
20  Q.   And it also appears on the last page of the
21  document, correct?
22  A.   Yes.
23  Q.   And you indicate on the last page of the
24  document, that being page 11, that you have reviewed

51

1   your job description and agree that it is current,
2   correct?
3   A.   Yes.
4   Q.   Do you know who prepared this evaluation?
5   A.   It would be, I believe it would be Dave
6   Freeman, it says April 2003.
7   Q.   Okay.  So can we agree that by April 22nd of
8   2003, Mr. Freeman had become your supervisor?
9   A.   Yes.
10  Q.   He replaced Mr. Tinnel, right?
11  A.   Correct.
12  Q.   And he gave you an overall performance rating
13  of "meets expectations," correct?
14  A.   Yes.
15  Q.   And if you'll turn to pages 5 through 7, it's
16  true, isn't it, that Mr. Freeman rated you as meets or
17  above expectations for each of the individual ratings
18  in the appraisal, correct?
19  A.   That's 5 through what, sir?
20  Q.   Pages 5 through 7, numbers 1 through 18 on
21  those pages.
22  A.   Correct, correct.
23  Q.   Now, turning back to the first page of Morris
24  7, Mr. Lands also signed this document as department

52

1   director, correct?
2   A.   You said Marvin Lands signed it?
3   Q.   Yes.
4   A.   Yes, it looks as he signed it, yes.
5        MR. WARD:   Please mark this as Morris 8.
6        (Morris Exhibit No. 8 was marked for
7   identification.)
8   Q.   Now, Mr. Morris, as with the previous document,
9   this is a performance appraisal, correct?
10  A.   Yes.
11  Q.   And it's your performance appraisal for the
12  period ending May 2nd, 2004, right?
13  A.   Yes.
14  Q.   And as with the previous document, your
15  signature appears on the first and last pages, right?
16  A.   Yes.
17  Q.   And Mr. Freeman has signed as evaluator,
18  Mr. Lands has signed here on page 1 as department
19  director, correct?
20  A.   Yes.
21  Q.   Now, Mr. Freeman gave you a more favorable
22  rating for the period ending May 2nd, 2004 than he did
23  for the previous year, correct?
24  A.   Yes, I guess it looks that way.

53

1   Q.   For the period ending 2003, you were rated as
2   meets expectations, correct?  I'm referring to the
3   overall rating on the first page.
4   A.   Okay, yes.
5   Q.   And he increased your overall rating to above
6   expectations, correct, in 2004?
7   A.   Yes.
8   Q.   And turning again to pages 5 through 7 of the
9   appraisal, it's true, isn't it, that Mr. Freeman rated
10  you as above expectations in 14 out of the 17
11  categories, correct?
12  A.   Yes, looks that way, yes.
13  Q.   And turning to page 10 of the performance
14  appraisal that we've marked as Morris 8, Mr. Freeman
15  inserted a comment here in the middle of page 10,
16  didn't he?
17       MR. NOLTE:   Where are you referring to?
18       MR. WARD:   I am looking at the middle of
19  page 10 of the 2004 performance appraisal.
20  A.   The rater's area?
21  Q.   Yeah, part 11.
22  A.   Okay.
23  Q.   And it appears that this is obscured somewhat
24  by a Post-It note, right?

14  (Pages 50 to 53)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

54

1    A.  Yes.
2    Q.  But it starts off, "Officer Morris is an
3    asset," correct?
4    A.  Yes.
5    Q.  And by "it," I mean the comment by Mr. Freeman,
6    correct?
7    A.  Yes.
8    Q.  And Mr. Freeman further indicates that you're
9    always willing to work overtime when needed, correct?
10   A.  Yes.
11   Q.  So overall, you'd have to agree, this is a
12   pretty positive appraisal, isn't it?
13   A.  Well, I would say it was.  I always tried to do
14   my best.
15   Q.  And if Mr. Freeman rated you as above
16   expectations, he must have thought pretty highly of
17   your work, didn't he?
18   A.  Who did you say?
19   Q.  If Mr. Freeman rated you as above expectations,
20   he must have thought pretty highly of your work,
21   correct?
22   A.  I thought so.  I thought so.
23   Q.  Now, your contention is that Mr. Freeman was
24   racially prejudiced against you; is that correct?

55

1    A.  To be honest with you, Mr. Freeman, I did not
2    really hear or see too much of Mr. Freeman during this
3    termination.  It was more so Mr. Lewin and Mr. Lands.
4    Q.  So your feeling is that Mr. Lewin and Mr. Lands
5    are racially prejudiced against you; is that correct?
6    A.  I somewhat feel that way, yes.
7    Q.  Okay.  Can you think of any reason why
8    Mr. Lands would have approved such a positive review
9    if he wanted to get rid of you?
10       MR. NOLTE:  Objection as to form.  You can
11   answer.
12       THE WITNESS:  Did you say that --
13       MR. NOLTE:  You can answer.  He's asked
14   you --
15   Q.  Mr. Morris, let me ask you another question.
16   Were you aware that Mr. Lands approved the performance
17   appraisals after they were prepared by Mr. Freeman?
18   A.  Once again, when, during these evaluations I'm
19   called in to Mr. Freeman's office, he goes over them
20   with me.  After we go over them, I sign it.  And what
21   happens after that, I don't know what happens to it
22   after that.
23       I've never paid any mind whether Marvin
24   Lands signed it before I go over it -- before he goes

56

1    over it with me or after.  I don't know when Mr. Lands
2    signed it.
3    Q.  So all you know is that he did sign the
4    performance appraisal, right?
5    A.  By looking at it right now, yes.
6    Q.  And you don't know one way or the other whether
7    he had to approve it or not?
8    A.  No.
9    Q.  Now, if you turn to page 10 of Morris 8,
10   directing your attention to the top center under the
11   heading "Challenge," it says here, "Take a Delaware
12   Criminal Justice Information System class, so you may
13   access DELJIS in your performance of your duties as
14   security controller," correct?
15   A.  Correct.
16   Q.  Did you ever take that class?
17   A.  DELJIS class?
18   Q.  Yes.
19   A.  I don't recall taking the DELJIS class.  I
20   really don't recall taking it.
21   Q.  If you had taken it, you'd remember, wouldn't
22   you?
23   A.  Yeah, I would think so.
24   Q.  So the answer to my question is no, isn't it?

57

1    A.  My answer is, like I say, I've taken all kinds
2    of tests.  I've tried to do what I'm required to do.
3    Being a controller and security officer, I have taken
4    various tests.  But to tell you on DELJIS whether I
5    completed it or not, I don't recollect for sure
6    whether I did or didn't.
7    Q.  So you don't know one way or the other whether
8    you ever took a DELJIS class?
9    A.  No, I do not.
10   Q.  You understood that accessing DELJIS was
11   something that was part of the performance of your
12   duties as a security officer, correct?
13   A.  Once again, this issue came in effect close to
14   the time of my termination.
15   Q.  It's true, isn't it, that your supervisors
16   informed you that they wanted you to have DELJIS
17   access, correct?
18   A.  Yes.
19   Q.  And it's true that if you couldn't access
20   DELJIS, you couldn't fully perform the duties of your
21   position as control center operator, correct?
22   A.  Well, I could.  There was times when I was
23   control operator where if it was something I needed
24   through DELJIS, normally there's a constable on duty,

15  (Pages 54 to 57)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

58

1  and I may call one of them in to go through the
2  computer to get anything I need as far as if he would
3  call for the DELJIS.
4      Q.  So if you needed DELJIS information, you would
5  simply go to someone else to get that information?
6      A.  If I really need it, yes.
7      Q.  And there were times when you did need DELJIS
8  information in performing your duties as control
9  center operator, right?
10     A.  Sure.
11     Q.  And you're aware that Bayhealth submitted an
12  application on your behalf for DELJIS access, correct?
13     A.  Could you repeat that?
14     Q.  You are aware that Bayhealth submitted an
15  application for DELJIS --
16     A.  Yes.
17     Q.  -- access on your behalf, right?
18     A.  Yes.
19         MR. WARD:  Please mark this as Morris 9.
20         (Morris Exhibit No. 9 was marked for
21  identification.)
22     Q.  Mr. Morris, have you ever seen the document
23  that we've marked as Morris 9 prior to today?
24     A.  I don't recall ever seeing that document, no.

59

1      Q.  Is it true that Mr. Freeman advised you that
2  DELJIS had denied your application for access
3  privileges?
4      A.  I'm not sure if it was Mr. Lands or -- you said
5  Mr. Lands or Freeman?  I'm sorry.
6      Q.  I believe I said Mr. Freeman.
7      A.  I'm not sure if it was Lands or Freeman.
8      Q.  Are you pretty sure that it was either
9  Mr. Lands or Mr. Freeman that told you?
10     A.  Pretty much, pretty much, yes.
11     Q.  So someone at Bayhealth told you that Bayhealth
12  had denied your privileges for DELJIS information,
13  correct?
14     A.  Well, if I'm not mistaken, it was during the
15  time when I was called to Mr. Lands' office, Mr. Lands
16  and I both left from his office and went to
17  Mr. Lewin's office.  And this is the time when they
18  asked me, do I know any reason why I would be, not be
19  accepted or my name would, did not get cleared for
20  this DELJIS, and they asked me do I remember anything.
21  I was trying to think, whatever it was, I was puzzled
22  because at the time, I did not.  And then he, one of
23  them mentioned, may have been Mr. Lewin, mentioned
24  Wicomico County or something down there.  And then it

60

1  dawned on me, and I discussed the situation with them
2  and they had me to sign a piece of paperwork for them
3  to retrieve the information that they needed that I
4  said was thrown out of court.
5         And at the time when this information came
6  back and it was checked by Mr. Lewin and Mr. Lands, I
7  was called back into Mr. Lands' office.  And when I
8  went into his office, he says, "There are two things."
9  And I was like, "What's that?"  He said, "The first
10  thing is this information that we sent out for, it
11  came back, you were right of whatever you told us."
12  And I was like, okay, so that's clear.  He said the
13  second thing is, you was -- "Someone reported that you
14  were seen taking a soda, not paying for it," or
15  something like that.  And I just laughed.  But his
16  facial expression never changed.  So I said, "Are you
17  serious?"  He said, "Yes, I'm serious."
18         And from this time forward, that's when
19  everything just went downhill.
20     Q.  So you're saying that Mr. Lewin was the
21  individual who told you that you were suspected of
22  stealing a soda or Mr. Lands?
23     A.  No, Mr. Lands.
24     Q.  Mr. Lands, okay.  Now, you don't have any

61

1  reason to believe that Bayhealth was involved in any
2  way in the decision by DELJIS to deny you DELJIS
3  access privileges, correct?
4      A.  Could you repeat that?
5      Q.  You don't have any reason to believe that
6  Bayhealth was involved in DELJIS's decision to deny
7  you access privileges, right?
8      A.  I cannot say that, I cannot say that.  I mean I
9  don't know what requirements is.  Okay, I don't know
10  what requirement is as far as require, putting my name
11  in for DELJIS, all that.  All I know is that I was
12  told that my name was rejected and they discussed any
13  reasons in Mr. Lewin's office about the situation.
14     Q.  Well it's true, isn't it, that Bayhealth, your
15  supervisor at Bayhealth wanted you to have DELJIS
16  access, right?
17     A.  Oh, yes, in order to be a control operator,
18  yes.
19     Q.  Okay, you allege in your complaint that you
20  were asked about your driver's license suspensions and
21  another incident that occurred in Maryland involving a
22  stolen rental car, correct?
23     A.  (Nodded affirmatively.)
24         MR. NOLTE:  You have to say yes or no for

16 (Pages 58 to 61)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

62

1   the court reporter.
2   A. I'm sorry, yes.
3   Q. I'm sorry, yes or no.
4   A. That was the conversation that was discussed
5   over Mr. Lewin's office when Mr. Lands took me over
6   there when he asked me about an incident that happened
7   in, I don't know what he said, Wicomico, Salisbury,
8   whatever. And then I remembered, yes, I told him it
9   was a situation that happened where a friend of mine
10  had a rental car and he hadn't paid his bill. So when
11  they ran the tags, it come back stolen car, because he
12  had rented the car, but because he hadn't paid the
13  bill, the current bill for him to have it at the time,
14  that's the way it came back. That's why it was thrown
15  out of court.
16  Q. Okay. So you're testifying that the rental
17  company must have reported the car as stolen because
18  your friend didn't pay the bill; is that right?
19  A. That's what I was told, yes.
20  Q. Okay. And how did it come to pass that the
21  plates were run? Were you pulled over?
22  A. Yes.
23  Q. Were you driving the car or a passenger?
24  A. I was driving.

63

1   Q. You were driving the car?
2   A. Yes, I was.
3   Q. Was your friend with you at the time?
4   A. Yes.
5   Q. Were you charged with any crime as a result of
6   the stop?
7   A. Was I charged with any crime. I don't recall
8   being charged. I just remember going to court for it
9   and it got thrown out. That's what I recall. It got
10  thrown out because I was not involved in -- okay,
11  okay, the reason why we was pulled over was because
12  the cop said I was speeding. Whether I got a ticket
13  or not, I don't recall. Probably sure if I was
14  speeding I got a ticket, but I don't recall being
15  charged for anything other than that.
16  Q. Were you arrested at the time you were stopped?
17  A. Oh, yes. They took both of us in, yes.
18  Q. But ultimately, to the extent that any charges
19  may have been issued against you, they were dismissed,
20  correct?
21  A. Right.
22      MR. WARD: Please mark this as Morris 10.
23      (Morris Exhibit No. 10 was marked for
24  identification.)

64

1   Q. Mr. Morris, have you ever seen the document
2   that we've marked as Morris 10 before?
3   A. I believe I have.
4   Q. When did you see it?
5   A. Maybe prior to having to get a copy of my
6   driving record or something, I do believe.
7   Q. Did Mr. Lands show you this document?
8   A. I can't say I remember Mr. Lands showing it to
9   me.
10  Q. Do you remember who showed you the document?
11  A. No, I don't.
12  Q. Do you remember where the document came from?
13  A. No. I was thinking it was a copy of my driving
14  record, but it looks as if -- revocation.
15  Q. Well, it says in the upper left that this is a
16  criminal record, doesn't it?
17  A. Upper left. Right, yes.
18  Q. Correct?
19  A. That's what it says, correct.
20  Q. Do you recall Mr. Lands ever showing this to
21  you and going over it with you?
22  A. No. No, I don't. Be honest with you, I don't.
23  Q. How about Mr. Lewin, do you recall Mr. Lewin
24  ever addressing your criminal record with you?

65

1   A. No, I don't. I don't remember, no.
2   Q. Is it true that you were arrested on December
3   23rd, 1995?
4       MR. NOLTE: Can I note an objection to the
5   line of questioning to the basis on which you're
6   asking -- it's a relevancy objection for one, and a
7   foundation objection, two. Could you give me a
8   proffer?
9       MR. WARD: We could probably cut to the
10  chase on this.
11  Q. Mr. Morris, does this document that's marked as
12  Morris 10 accurately state your criminal record during
13  the period from December 23rd, 1995 to December 22nd,
14  1998?
15  A. Because it's a document that says what it says,
16  I would say that it's correct.
17  Q. Now, isn't it true that all these entries on
18  Morris 10 relate to failure to pay child support?
19  A. Correct, yes.
20  Q. And one of the consequences of these charges
21  was that your driver's license was suspended, correct?
22  A. For child support, correct.
23  Q. Okay. And Mr. Lands did discuss with you the
24  suspensions of your driver's license, right?

17 (Pages 62 to 65)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

66

1    A. Again, I say I don't recall either one of them,
2  Freeman or Lands, discussing, I don't recall it.
3    Q. Is it possible that anyone in Bayhealth
4  security department asked you about your driver's
5  license suspensions?
6    A. At the time when they told me that I could no
7  longer drive the vehicles? Yeah, yeah. Yes.
8        MR. WARD: Please mark this as Morris 11.
9        (Morris Exhibit No. 11 was marked for
10  identification.)
11    Q. Now, Mr. Morris, you contend in your complaint
12  that you were called in to Mr. Lewin's office on April
13  15, 2005 and informed that your criminal history
14  record check came back clear, right?
15    A. The date, I'm not really aware of the date.
16  But yes, I was called in to Mr. Lands' office, and
17  yes, he told me that the information that was asked in
18  Mr. Lewin's office when he was present came back that
19  it was clear, yes.
20    Q. Okay. So you were actually called in to
21  Mr. Lands' office, not Mr. Lewin's office, when you
22  were informed that the record check came back clear?
23    A. Mr. Lands, correct.
24    Q. Right, not Mr. Lewin's office.

67

1    A. No.
2    Q. Now, Bayhealth never took any adverse action
3  against you relating to your inability to get DELJIS
4  access privileges, correct?
5    A. Could you repeat that?
6    Q. Bayhealth never took any adverse action against
7  you of any kind because you were denied DELJIS
8  privileges, right?
9    A. I feel they did. They terminated me. That's
10  the way I feel about it.
11    Q. So you feel one of the reasons that you were
12  terminated was because you failed to get DELJIS
13  access?
14    A. Somewhat. For the simple fact, okay, they —
15  I'm not really familiar with the dates, what happened
16  first. But around the same time, Mr. Lands called me
17  to his office and stated to me that it was reported to
18  him that someone wasn't charging me the full price of
19  my food or something like that when I go to the
20  cafeteria. That, I don't know if that happened first
21  or whether I was called into Mr. Lewin's office about
22  this first. I don't know. Somewhere around the same
23  area of time.
24        And then after he asked me about that,

68

1  then I'm called about this, and then I'm told that I
2  was seen taking a soda. It had me to wonder, what's
3  going on? I had to wonder that. Because all this
4  going, happening, and then I get terminated for a
5  soda, it made me wonder.
6    Q. So did you wonder whether the real reason you
7  were terminated was because you were unable to get
8  DELJIS privileges?
9    A. I'm trying to wonder why I was terminated. I'm
10  still trying to wonder to this day why I was
11  terminated.
12    Q. You were told you were terminated because a
13  co-worker observed you stealing a soda, correct?
14    A. I understand that. I understand that. That's
15  untrue, so I want to know the real reason.
16    Q. But you understand that there was a report
17  given to Mr. Lands that you were seen taking a soda,
18  not paying?
19    A. Yes, I do understand that, yes, I did.
20    Q. And you also understand that if Bayhealth
21  received information that you were denied DELJIS
22  privileges because you'd been arrested previously,
23  that Bayhealth had an obligation to at least ask you
24  about that?

69

1    A. Oh, I understand that yes, sure, ask me about
2  it. But as I said, they had me to sign paperwork so
3  they could check it. They checked it and it come back
4  that it was cleared. So then what?
5    Q. And Bayhealth informed you that it was clear,
6  right?
7    A. Okay, yes. So then what?
8    Q. Now, Mr. Morris, you typically took your dinner
9  meal with one or more of your co-workers at Bayhealth,
10  correct?
11    A. Well, I normally sit with somebody. I always,
12  I mean I get along with people. So when I go to eat,
13  I don't sit over by myself. I always sit with
14  someone.
15    Q. That's understandable. And you took your meals
16  in the Bayhealth cafeteria, right?
17    A. Ninety percent of the time I did. There was
18  times where, depending on what was going on, that I
19  may get my food from the gift shop.
20    Q. Now, Ashley Fulcher is a Bayhealth employee,
21  held the position of cashier in the cafeteria,
22  correct?
23    A. Correct.
24    Q. And when you went to dinner, you would select

18  (Pages 66 to 69)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

---

**70**

1  your food items, put them on your tray, and then
2  proceed to the cashier station, correct?
3    A.  Correct.
4    Q.  And then if Miss Fulcher was working as cashier
5  that night, she would ring up your order, tell you how
6  much you owed, right?
7    A.  Correct, whoever the cashier was, yeah, once I
8  go by, past cashier, yes, they ring me up and tell me
9  what I --
10    Q.  And then you would pay her and if necessary
11  she'd make change, right?
12    A.  Correct.
13    Q.  Now, you didn't know Miss Fulcher personally,
14  did you?
15    A.  No.
16    Q.  You never socialized with her outside of work,
17  right?
18    A.  No.
19    Q.  And you never engaged in any extended
20  conversations with her, did you?
21    A.  No.
22    Q.  You didn't really know her at all, did you?
23    A.  Not really, no.  Not other than she was a
24  dietary worker.

---

**71**

1    Q.  And you never had any dispute with her prior to
2  mid-April 2005, did you?
3    A.  No.
4    Q.  And in fact, when you were interviewed by
5  Mr. Lands and Mr. Freeman, you admitted that you had a
6  professional and basically cordial relationship with
7  Miss Fulcher, right?
8    A.  No, other than anybody else, I conduct myself,
9  I try to conduct myself as, conduct myself to the best
10  of my ability as being a security officer with
11  respect. I don't disrespect nobody. I try to treat
12  everybody fair, right.
13    Q.  You're not aware of any personal motive that
14  Miss Fulcher might have had for making a false report
15  that you had stolen a soda, are you?
16    A.  No, I don't -- I wouldn't know about that. And
17  then when she made the statement that, that she had
18  seen me taking a soda two or a couple weeks or
19  something prior to that, that really blowed me out of
20  the water. Because if that was the case, why wasn't
21  it reported then? So I'm just curious why the double
22  clutch, why the -- I didn't understand that.
23    Q.  Now, you don't have any information
24  establishing that Mr. Lands or Mr. Freeman or anybody

---

**72**

1  else at Bayhealth ever instructed Ashley Fulcher to
2  file a false report that you had stolen a soda, do
3  you?
4    A.  I don't know what happened. All I know, as a
5  human being I can only be one place at a time. So
6  what was conducted, wherever it was conducted, I don't
7  know. I can't even answer that question.
8    Q.  Well, you don't have any information that
9  establishes that Mr. Lands told Miss Fulcher to file a
10  false report against you, right?
11    A.  No, I do not have any information that they got
12  together and discussed it, no.
13    Q.  And you don't have any information that
14  Mr. Freeman ever told Miss Fulcher to file a false
15  report against you?
16    A.  No, I don't have no information of that.
17    Q.  And you don't have any information that anybody
18  at Bayhealth ever approached Miss Fulcher and told her
19  to file a false report against you, do you?
20    A.  No.
21      MR. WARD: Please mark this as Morris 12.
22      (Morris Exhibit No. 12 was marked for
23  identification.)
24    Q.  Now, Mr. Morris, it's true that Mr. Lands and

---

**73**

1  Mr. Freeman met with you on April 13th, 2005, correct?
2    A.  Yes.
3    Q.  And the meeting took place in Mr. Lands'
4  office?
5    A.  Yes.
6    Q.  Mr. Lewin was not present at that meeting, was
7  he?
8    A.  I don't recall. I don't believe he was. I
9  believe it was just Mr. Lands, Mr. Freeman, I believe.
10    Q.  And this meeting on April 13th with Mr. Freeman
11  and Mr. Lands was the only meeting you had with
12  anybody in Bayhealth management on April 13th,
13  correct?
14    A.  As far as I can recall.
15    Q.  So there wasn't any April 13, 2005 interview
16  with Mr. Lewin in his office, correct?
17    A.  Again, I'm not familiar with the dates.
18    Q.  Now, directing your attention to the April 13th
19  meeting with Mr. Lands and Mr. Freeman, it's true that
20  they began the interview by asking you questions about
21  the purchase of your meal in the cafeteria on the
22  previous evening, correct?
23    A.  Correct.
24    Q.  Previous evening being April 12th, 2005, right?

---

19 (Pages 70 to 73)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

74

1    A.   Correct.
2    Q.   And you immediately asked if there was a
3  problem of some kind, correct?
4    A.   Well, by them calling me in the office like
5  that, of course, yeah, I want to know what's going on.
6    Q.   And Mr. Lands then explained to you that you'd
7  been accused of taking a soda from the cafeteria
8  without paying for it, correct?
9    A.   (Nodded affirmatively.)
10        MR. NOLTE:  You have to say yes or no.
11    A.   I'm sorry.  Correct.
12    Q.   And you denied the accusation saying, "I am a
13  child of God and won't steal anything," correct?
14    A.   Correct.
15    Q.   And then you gave Mr. Freeman and Mr. Lands an
16  account of your actions on the previous evening,
17  correct?
18    A.   The best of my ability.  I also explained to
19  them that, they had asked me these questions because,
20  like I said, I do a lot of overtime.  And the times
21  that I would go to the kitchen and the shift may be
22  two times sometimes.  So when they asked me about a
23  certain time what happened, what I feel happened was I
24  got crossed up with the time that I was in the kitchen

75

1  when I did.  I believe it got crossed up.  So then
2  they come back and asked me question again where I
3  have to really think, okay, what happened.
4        So I may have gotten the times crossed up
5  within my own time of my long shifts and the dates.  I
6  may have got them crossed up.  But this is somewhat
7  the information that I had given them.
8    Q.   Well, you would agree, wouldn't you, that if
9  Mr. Lands and Mr. Freeman wanted to know what you did
10  on the previous evening, you'd be the logical person
11  to ask, wouldn't you?
12    A.   Correct.
13    Q.   Now, you told Mr. Lands and Mr. Freeman that
14  you had purchased a meal of chicken and dumplings from
15  the hospital gift shop the previous evening; is that
16  correct?
17    A.   Correct.  I told them chicken and dumplings,
18  well, I told them chicken and dumplings or beans or
19  something.  I know I received a cup of a substance
20  from the gift shop because when I came out to work, I
21  recall them being low, and they said they wasn't
22  making any more.  So I asked them to put the item up
23  for me so that I could get it back around dinnertime,
24  and I eat around 6, 6:30?

76

1    Q.   So around 6 or 6:30 you took the meal that you
2  had purchased from the hospital gift shop and then you
3  proceeded to the cafeteria where you bought more food
4  and the bottle of water, right?
5    A.   Correct.
6    Q.   Okay.  And on April 13th when you met with
7  Mr. Lands and Mr. Freeman, you told them that prior to
8  paying for your meal, you got a call on your radio and
9  you had to leave the cafeteria to respond to that
10  call, correct?
11    A.   Correct.  Which may not have happened on that
12  night that they was asking me about.  Once again, I
13  was getting my times in the cafeteria mixed up.  So
14  that may not have been the time that I was called for,
15  I think it was a code gray.  That may not have been
16  the time, and I explained that to them at a later time
17  when they asked me about it.  I say, I'm getting my
18  times mixed up.
19    Q.   You believe as you sit here today that you may
20  have been confused about the facts that occurred on
21  April 12th when you told Mr. Lands and Mr. Lewin what
22  you'd done on April 12, correct?
23    A.   What I was saying, what I am now saying is that
24  on April the 12th, best of my recollection, I received

77

1  a cup, once again, beans or some food from the gift
2  shop.  I took it down to the cafeteria, which
3  Mr. Freeman told me I was seen in the camera with this
4  cup.  He did tell me that much.
5        And so when I went downstairs, I got the
6  tray, I received more food, bottle of water and went
7  out of the cafeteria after paying for it.  Okay, I did
8  proceed back into the cafeteria to get a Styrofoam
9  bowl so I could warm up the substance that I had in a
10  Styrofoam cup that I got from the gift shop.
11    Q.   For right now I just want to concentrate on
12  what you said to Mr. Freeman and Mr. Lands on April
13  13th on that first meeting.  Now you told them that
14  you couldn't recall the location of the dispatch the
15  previous evening, correct?
16    A.   Okay.  If you're going by this statement right
17  here, once again, I'm going to say the same thing.  I
18  was getting my times of going to the kitchen to get
19  food crossed up.
20    Q.   I'm not asking you about that yet.  I'm just
21  asking you what you told them on April 13th.
22    A.   I don't recall exactly what I told them.
23    Q.   Okay.  But you recall that you did tell them
24  that you had been dispatched the previous evening,

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

78

1  correct?
2    A. Yeah, I may have.
3    Q. And this was while you were in the cafeteria
4  you received a call?
5    A. Yes.
6    Q. And it would have been logical for them to ask
7  where you'd been dispatched to, right?
8    A. Yes.
9    Q. And you told them that you gave your tray to a
10  food service employee named Carmetta to hold for you
11  while you responded to the call, right?
12    A. Correct.
13    Q. And then you told them that after you completed
14  your dispatch, your assignment, that you returned to
15  the cafeteria to retrieve your tray and eat your meal,
16  correct?
17    A. This is what I told them.
18    Q. Right.
19    A. This that we are discussing right now was an
20  incident that happened. Once again, I am saying that
21  incident happened, but when it happened, upon the
22  interview with me from Mr. Lands and Freeman, I may
23  have crossed up with another time.
24    Q. You may have been confused about the times,

79

1  right?
2    A. Yes, that's what I mean.
3    Q. Now, Mr. Lands and Mr. Freeman asked you
4  whether you had returned to the serving area, right?
5    A. I recall them asking me that.
6    Q. And you repeatedly insisted that you hadn't
7  returned to the service area, correct?
8    A. At the day that I received the, the day that I
9  went through the line and got the call was a different
10  time than the time that I went through the line with
11  the food from the gift shop. They were two different
12  times.
13    Q. So you're saying that you understand now that
14  the information that you gave to Mr. Lands and
15  Mr. Freeman on April 13th was not accurate, right?
16    A. It may not have been accurate. Once again, I
17  was getting my times crossed up.
18    Q. Now, Mr. Lands asked you to write a statement
19  regarding your version of the events that had taken
20  place on the evening of April 12th, 2005, correct?
21    A. I recall something of that, yes.
22    Q. And you refused to comply with Mr. Lands'
23  request, didn't you?
24    A. I refused to write a statement?

80

1    Q. That's what I'm asking.
2    A. I don't remember. I honestly don't remember
3  refusing to write a statement.
4    Q. It's true, isn't it, that you never did write a
5  statement of the accounts that took place on April 12,
6  2005 and give that statement to Mr. Lands or
7  Mr. Freeman, right?
8    A. I don't recall writing a statement and giving
9  it to them, no, I don't.
10    Q. So your answer is that you didn't write up a
11  statement, correct?
12    A. I don't remember.
13    Q. So you don't know whether one way or the other
14  whether you --
15    A. Whether I wrote a statement, no, I do not
16  recall whether I wrote a statement or not. I have
17  written stuff, I've written a lot of stuff around that
18  time. I can't recall whether I had written a
19  statement to give to them or not, honestly I don't.
20    Q. Do you recall telling Mr. Freeman and Mr. Lands
21  that you would be more than happy to read a statement
22  that they prepared and to let them know whether you
23  felt it was accurate?
24    A. No, I don't remember that neither.

81

1    Q. So you don't remember one way or the other
2  whether you told them that you would read a statement
3  if they prepared one?
4    A. No, I don't. I don't recall that.
5    Q. And at that point Mr. Lands and Mr. Freeman
6  concluded the interview, correct?
7    A. Once again, I mean I see what they have written
8  here. But I'm thinking in my own mind what happened,
9  I recall being in his office and telling him, I mean I
10  was in his office a couple times. He called me in
11  there a couple times. I remember that.
12    Q. Well, I'm talking just about the April 13th
13  meeting. And let me try and clarify my question a
14  little bit. It's true, isn't it, that shortly after
15  you had the discussion with Mr. Lands and Mr. Freeman
16  about whether or not you were going to write a
17  statement, that the meeting was concluded, right?
18    A. Once again, I don't recall, I don't recall
19  that, anything about me writing a statement.
20    Q. You testified earlier that you recalled
21  Mr. Lands asking you to write a statement. Right?
22    A. No, I don't recall saying anything about him
23  having me write a statement. I remember him asking me
24  about the situation, and I explained to him what I

21 (Pages 78 to 81)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

82

1  recall happening at the time that he was asking me
2  about. As far as writing a report, I can't say I
3  recall him telling me to write a report.
4      Q. Now, you met again with Mr. Lands and
5  Mr. Freeman the following day on April 14th, 2005,
6  correct?
7      A. Yes, that's what the report says.
8      Q. Do you recall attending a meeting with
9  Mr. Lands and Mr. Freeman on April 14th?
10     A. Like I said, I recall having a couple meetings
11 with them during the interview. The dates, once
12 again, the day after, I can't say exactly it was the
13 day after. I'm not sure with the date.
14     Q. Okay, but the two meetings could have been on
15 April 13th and then April 14th, correct?
16     A. Could have been the 13th and 15th, I'm not
17 sure.
18     Q. Now, just going back to your April 13th meeting
19 or the first of the two meetings with Mr. Lands and
20 Mr. Freeman, it's true that you stated that you gave
21 your tray to a dietary employee named Carmetta to keep
22 your food warm, correct?
23     A. Correct.
24     Q. Now, in your second meeting, the meeting that

83

1  is listed on Morris 12 as having taken place on April
2  14th, 2005, Mr. Freeman informed you that your
3  allegation that you had been dispatched from the
4  cafeteria to another area at Kent General on April
5  12th, 2005 wasn't supported by Bayhealth's records,
6  correct?
7      A. Correct.
8      Q. And then you told Mr. Freeman that you may have
9  been confused and gotten the dates mixed up, right?
10     A. Correct.
11     Q. You also told Mr. Freeman that you had worked
12 16-hour double shifts on April 11 and 12th, right?
13     A. Correct. I recall telling him that I had
14 worked overtime. The dates again, I'm not really
15 familiar with the dates that I worked overtime.
16     Q. So you may have been confused about those dates
17 as well, right?
18     A. Correct.
19     Q. And during your second meeting with Mr. Freeman
20 and Mr. Lands, you informed them that you had
21 purchased bean soup rather than chicken and dumplings
22 from the hospital gift shop, right?
23     A. I'm sorry, I didn't hear that.
24     Q. During your second meeting with Mr. Freeman and

84

1  Mr. Lands, you told them that you had purchased bean
2  soup, not chicken and dumplings at the gift shop on
3  April 12, 2005, correct?
4      A. Correct.
5      Q. And you also admitted that you had returned to
6  the cafeteria serving area after you paid for your
7  original purchase, correct?
8      A. Correct.
9      Q. And you told them that you went back to the
10 service area to ask a food service employee for a
11 plastic bowl to use to heat your bean soup, right?
12     A. That was the purpose of me getting the bowl was
13 to heat up what I had in the cup. What they did, they
14 put it in a Styrofoam cup in the gift shop. So I went
15 to get a bowl so it would warm up better in a bowl
16 other than eating it out of the cup.
17     Q. Okay. And what you're telling me now is what
18 you told Mr. Freeman and Mr. Lands on April 14th,
19 correct?
20     A. If that was the date, yes.
21     Q. Okay. Your second meeting with Mr. Freeman and
22 Mr. Lands, correct?
23     A. Okay, yes.
24     Q. Now, do you recall one way or the other whether

85

1  you were asked to submit a statement in writing during
2  your second meeting with Mr. Freeman and Mr. Lands?
3      A. Once again, I am not sure. I may have been
4  asked to write a statement. I am not sure.
5      Q. I'm sorry, I didn't quite catch that. You say
6  you're not sure whether you were asked to write a
7  statement?
8      A. Correct, that's what I just said. I don't
9  recall.
10     Q. So you may have been asked to write a
11 statement?
12     A. Seemed like if I was asked to write a
13 statement, seemed like I would have wrote a statement.
14 Whether it was after the first interview or the second
15 interview, I don't, I just don't recall asking to
16 write a statement. I really don't right now.
17        MR. NOLTE: Can we take a break? It's
18 been about two hours.
19        MR. WARD: Sure, that's fine.
20        (A luncheon recess was taken.)
21        MR. WARD: Would you please mark this
22 document as Morris 13.
23        (Morris Exhibit No. 13 was marked for
24 identification.)

22 (Pages 82 to 85)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

86

BY MR. WARD:

1   Q.  Now, Mr. Morris, when you had your interviews
2   with Mr. Lands and Mr. Freeman in mid-April 2005, you
3   informed them that you may have been somewhat confused
4   about the facts regarding your evening meal on April
5   12th, 2005 because you had worked two 16-hour shifts
6   back to back, correct?
7   A.  Yes.
8   Q.  And your testimony now is that you may have
9   been confused about whether or not you in fact worked
10  two 16-hour shifts back to back, right?
11  A.  My time, again, I was getting my times crossed
12  up, my times being in the kitchen, what I ate, what I
13  did.  I was just getting them crossed up.
14  Q.  Directing your attention to Morris 13, if you
15  look down at the bottom of the dates, do you see where
16  the dates that are listed, it starts with 4-01-05 and
17  then at the bottom the document lists the date of
18  4-13-05?
19  A.  Yes.
20  Q.  See that column of dates there?
21  A.  Yes.
22  Q.  And directing your attention to the entry for
23  Monday, April 11, 2005, the document indicates that

87

1   you were scheduled for an eight-hour shift and worked
2   an eight-hour shift, correct?
3   A.  Correct.
4   Q.  And then on Tuesday, April 12, 2005, you were
5   scheduled for an eight-hour shift but worked a 16-hour
6   shift, right?
7   A.  Correct.
8   Q.  So then it's true, isn't it, that you did not
9   work two 16-hour shifts back to back immediately prior
10  to April 12th, 2005, right?
11  A.  Right.
12  Q.  And it's also true, isn't it, that when you
13  entered the cafeteria on April 12th, 2005, in the 6 to
14  6:30 time frame, you were about 10 hours into your
15  16-hour shift that day, right?
16  A.  What date was that, sir?
17  Q.  On April 12th.
18  A.  Correct, something like that, 10 hours, yes.
19  So I had been in the kitchen morning, lunch, the third
20  time at 6, around 6:00.  So it was like three times in
21  that day I had been in the kitchen on the 12th.
22  Q.  Now, Mr. Morris, you are aware that Mr. Lands
23  and Mr. Freeman interviewed several of your co-workers
24  regarding the allegation that you had stolen a soda?

88

1   A.  Correct.
2         MR. WARD:  Please mark this as Morris 14.
3         (Morris Exhibit No. 14 was marked for
4   identification.)
5   Q.  Mr. Morris, have you spoken to any of the
6   individuals listed in Morris 14 regarding the
7   allegation that you had stolen a soda from the
8   Bayhealth cafeteria?
9   A.  Yes, I had spoke with, I had spoke with, at the
10  time that I put in my appeal for refusal of
11  unemployment, figured I may need some witnesses.  So I
12  had talked to Martha Hudson.  And I had spoke with
13  Carmetta, Carmetta, I think she's called, I spoke with
14  her.  Only two people I really spoke with.
15  Q.  And when did you speak with Martha Hudson?
16  A.  Somewhere around the time after they had
17  approached me about the soda, or shortly sometime
18  there after I was accused of taking the soda, because
19  I know that she was sitting down there.
20  Q.  What did you say to Miss Hudson?
21  A.  Excuse me.  I asked her did she recall anything
22  of what I had, what I had to eat or drink that night.
23  Q.  And she told you that she did not recall what
24  you had eaten or had to drink that night, correct?

89

1   A.  Yes, she told me that, she told me that I
2   didn't have no soda, she said that I had water.
3   Q.  She told you that she didn't see you with soda,
4   correct?
5   A.  Right, correct.
6   Q.  And Miss Holding, what did you say to her?
7   A.  I'm trying to think, did I talk to Carmetta at
8   the time of this incident or the time when I was told
9   that she wasn't charging me properly for my food.  I
10  don't remember what I said to her, because she wasn't,
11  she wasn't sitting with us that day.  I don't recall
12  what I may have said to Carmetta, but I do remember
13  speaking to Carmetta when Mr. Lands mentioned to me
14  about her not charging me fully for my food or
15  something.
16  Q.  When did Mr. Lands meet with you and tell you
17  that Miss Holding was not charging you properly for
18  your food?
19  A.  It was, date wise, I could not tell you how
20  long it was prior to my determinate -- my termination.
21  Q.  Do you think it was a month or more prior?
22  A.  Yes.  Yes, I think, I believe it was a month or
23  more.
24  Q.  You think it was more than two months prior to

23  (Pages 86 to 89)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

90

1    your termination?
2    A.  Not sure, sir.
3    Q.  Did Mr. Lands call you to his office or did he
4    speak with you somewhere else?
5    A.  To his office.
6    Q.  And specifically what did he say to you?
7    A.  That it was reported to him that -- I don't
8    know if he said her name, he may have said her name.
9    But wasn't charging me properly for my food when I go
10   down to the cafeteria, something like that.  I can't
11   remember.
12   Q.  I'm sorry, go ahead.
13   A.  I can't remember word for word what he said to
14   me.
15   Q.  Did he allege that you had engaged in any kind
16   of misconduct?
17   A.  Excuse me?
18   Q.  Did he say to you that you had engaged in any
19   misconduct?
20   A.  He just said what he, somebody had told him.
21   He was telling me about it, and I explained my
22   situation to him.  When I go to the cafeteria, I get a
23   tray, I get what I get, go through the line and the
24   person tell me what I owe them.  That's what I do

91

1    every day.
2    Q.  And there were no further discussions with
3    Mr. Lands about the issue of Miss Holding improperly
4    charging you for your food?
5    A.  Not that I recall.
6    Q.  So you weren't disciplined in any way as a
7    result of this allegation that Miss Holding wasn't
8    charging you properly for your food, correct?
9    A.  No, I was not.
10   Q.  Do you know whether Miss Holding was
11   disciplined?
12   A.  No, I do not.
13   Q.  Miss Holding is African-American, isn't she?
14   A.  Correct.
15   Q.  And you're aware that when interviewed, Miss
16   Holding didn't support your story that you had given
17   her your tray of food to hold for you on April 12,
18   correct?
19        MR. NOLTE:  Objection as to form.  You can
20   answer.
21   A.  Could you repeat that?
22   Q.  Okay.  Are you aware that Miss Holding was
23   interviewed regarding the allegation that you had
24   stolen a soda?

92

1    A.  Yes.
2    Q.  And how are you aware of that?
3    A.  From the, from the paperwork that I have read,
4    that she was one of the ones that was interviewed.
5    Q.  Didn't Miss Holding tell you that she was
6    interviewed?
7    A.  I don't recall what the conversation was,
8    whether she told me or not.  I really don't.
9    Everything is like running together.  I don't recall
10   if she told me or not.
11   Q.  Didn't you talk to her because you knew she was
12   interviewed?
13   A.  I talked to her in regards that I was -- that
14   she was accused -- that Marvin Lands told me that she
15   was not charging me properly for my food.
16   Q.  Did you ever talk to her about the allegation
17   against you that you had stolen a soda?
18   A.  I may have, sure.  I may have.
19   Q.  And why would you have spoken to her?
20   A.  Because I felt that I'm being falsely accused
21   of something.  So I was trying to find out what was
22   going on.  I'm trying to put this puzzle together.  I
23   know she worked down there.
24   Q.  Do you know whether she supported your story

93

1    that you had given her your tray of food to hold for
2    you on April 12th?
3    A.  No, I don't know if she supported --
4    Q.  Didn't that come up in your meeting with
5    Mr. Lands regarding termination?
6    A.  Yes, once again, this, to me, the same thing as
7    I said earlier, when Mr. Lands and Mr. Freeman asked
8    me what happened, once again, my time frame had got
9    mixed up.  So what I said and what I did, it happened,
10   it just happened at different times than I said.
11        Did you understand that phrase?
12   Q.  I think I did, yes.  Basically you're saying
13   that you were simply confused about the events and on
14   which dates they took place, correct?
15   A.  Correct.  But they did happen.  I was in the
16   cafeteria line at one time getting something, I recall
17   giving my tray to Carmetta.  It may not have been on
18   the date and time that I said, but once again, these
19   incidents happened.  They were not made-up stuff.
20   They happened.  I just have the time crossed up, mixed
21   up, that's all.
22   Q.  Would you agree that the only day that was
23   really relevant to the allegation against you was
24   April 12, 2005?

24  (Pages 90 to 93)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

94

1    A. Yes.
2        MR. NOLTE: Objection as to form.
3    A. Well, the statement you just made about the
4    only day that important, I mean since we've been here
5    it's been everything else but this day. So now it's
6    this day.
7    Q. Would you agree with me that the only events
8    that Mr. Freeman and Mr. Lands were interested in were
9    the events that took place on April 12, 2005?
10    A. Correct, when I was supposedly been reported of
11    taking something on the 12th, yes.
12    Q. And when they met with you, they asked you only
13    what happened on April 12th, 2005, correct?
14    A. Correct.
15    Q. They didn't want to know what happened on other
16    days, did they?
17    A. Correct.
18    Q. And they didn't ask about what happened on
19    other dates, did they?
20    A. Correct. But I gave them the information that
21    I had caught myself remembering at that time.
22        MR. WARD: Please mark this as Morris 15.
23        (Morris Exhibit No. 15 was marked for
24    identification.)

95

1    Q. Now, Mr. Morris, Mr. Lands met with you to
2    inform you of your termination on April 26, 2005,
3    correct?
4    A. Correct.
5    Q. And does the document we've marked as Morris 15
6    accurately reflect the substance of your conversation
7    with Mr. Lands on that date?
8    A. Somewhat, maybe the words, it's kind of tricky
9    here the way I read it.
10    Q. Is there anything in this document that you
11    feel is inaccurate?
12    A. About this not being serious, the way I'm
13    reading the statement about it not being serious,
14    didn't believe the incident to be serious. That
15    statement was I didn't believe, I didn't believe him
16    when he asked me about, when he made the statement, I
17    didn't think that he was serious about what he said,
18    not about the incident being serious.
19    Q. What was it that you thought he wasn't serious
20    about?
21    A. When he mentioned to me about, that it was
22    reported to him about me taking a soda out of the
23    kitchen.
24    Q. So your testimony is that you initially thought

96

1    that he wasn't serious, but by April 26th, 2005, you
2    did believe the incident was serious?
3    A. I don't understand what you're saying.
4    Q. Okay, let me try a different question. You
5    testified that when you were initially informed that
6    there was an allegation that you had stolen a soda,
7    that you didn't think Mr. Lands was serious, right?
8    A. Correct.
9    Q. Did you think he was joking?
10    A. Yeah.
11    Q. Why would he joke about an allegation that you
12    had stolen something?
13        MR. NOLTE: Objection as to form.
14    Instruct the witness not to answer.
15        MR. WARD: Strike that.
16    Q. Why do you think he was joking?
17    A. I'm not one to steal. I don't have to steal
18    anything. I keep money in my pocket, and once again,
19    I know enough people. I've been working in that
20    hospital for five years. I work a lot of overtime.
21    At any given time I have a dollar in my pocket for
22    soda. I don't have to steal anything. That's why
23    when he said it to me, I was shocked by it. I was
24    very shocked by it. And I did not believe that.

97

1    Q. Is there anything else in Morris 15 that you
2    believe is inaccurate?
3    A. I'm looking at, "Morris blurted out," I'm just
4    looking at some of the words, the way the words was
5    used in these statements. I mean I understand that he
6    is writing a disciplinary action note, but the way
7    that some of the words are written, it's like changing
8    the character of some of the people.
9    Q. Would you agree that you told Mr. Lands,
10    "Didn't Martha tell you I had ordered a drink?"
11    A. I may have. Again, we come into between the
12    13th and the 26th, I'm sure I've talked to Miss Hudson
13    several times. Like I say, every day we sit in the
14    cafeteria, or during my rounds I run across these
15    people. And so yes, it was probably discussed at the
16    time of, you know, between the 12th and the 26th. So
17    at the time when the 26th came, I'm sure if they have
18    interviewed Miss Hudson and she may have said to me
19    that, you know, they asked her a certain question and
20    they reasked me a question, you know, when you
21    interview somebody you expect to get the truth from
22    them. So if Miss Martha said she told them that she
23    say I had water, then why ask me over and over again
24    the question? So that was my answer.

25  (Pages 94 to 97)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

98

1    Q.  So the answer to my question is yes, you did
2  say to Mr. Lands, "Didn't Martha tell you I had
3  ordered a drink," right?
4    A.  Well, by my reading the report, again, we going
5  back to a couple years ago. I may have. I don't
6  remember what all exactly that I said.
7    Q.  So you're not sure one way or the other, right?
8    A.  Correct.
9    Q.  Is there anything else in Morris 15 that you
10  feel is inaccurate?
11    A.  About the incident of Carmetta taking my tray,
12  if it wasn't on the 12th that she could support it
13  that it did happen. And when it did, other than
14  acting like that it didn't really happen. And where
15  in the third paragraph Miss Fulcher said that I took
16  grape juice probably approximately two weeks earlier
17  that was reported.
18    Q.  Well, it doesn't say anything in Morris 15
19  about whether what Miss Fulcher allegedly saw was
20  reported, does it?
21    A.  Well, no, it doesn't. It doesn't say if it was
22  reported or not, no, it doesn't.
23    Q.  And it's true that Mr. Lands informed you that
24  actually Fulcher had said that she was watching you

99

1  because she saw you took a bottle of grape juice
2  approximately two weeks earlier, right?
3    A.  Correct.
4    Q.  And it's true that Mr. Lands informed you that
5  Carmetta had told him that she did not take your tray
6  on April 12th, 2005, correct?
7    A.  Only, correct, she said she did not take it on
8  April 12th, correct.
9    Q.  Anything else in Morris 15 that you feel is
10  inaccurate?
11    A.  No.
12    MR. WARD:  Please mark this as Morris 16.
13    (Morris Exhibit No. 16 was marked for
14  identification.)
15    Q.  Mr. Morris, Morris 16 is the termination notice
16  that you were given when you were advised of the
17  termination of your employment with Bayhealth,
18  correct?
19    A.  Correct.
20    Q.  Do you recall being asked to sign this
21  document?
22    A.  Correct.
23    Q.  Did you refuse to sign it?
24    A.  Correct.

100

1    Q.  Now, I note that the date on this document is,
2  the date in the box for the employee's signature is
3  April 25th, 2005. Is it possible that your
4  termination meeting was held on April 25th, 2005
5  rather than April 26th, 2005?
6    A.  I don't recall what date it was. I'm sure I
7  have it documented somewhere in my paperwork.
8    Q.  Excuse me?
9    A.  I'm sure I have it documented somewhere in my
10  paperwork. I'm not exactly sure what date it was.
11    Q.  Mr. Morris, we served a request for production
12  of documents to you that asked you to produce all of
13  the documents that were related to your charge, to
14  your claim against Bayhealth. Are you telling me that
15  you have paperwork that was not produced?
16    A.  I'm saying I'm sure I wrote it down whatever
17  day it was that I was terminated.
18    Q.  Well, you just told me you have that date
19  written down in your paperwork, right?
20    A.  I mean I say I have it written down somewhere
21  what day it was.
22    Q.  Well, where is that document?
23    A.  I don't know.
24    MR. NOLTE:  Just for purposes of the

101

1  record, the document that we produced to you this
2  morning has the April 25th date on it.
3    MR. WARD:  I am aware of that. But
4  Mr. Morris is talking about paperwork which to me
5  infers that there is more than one document involved,
6  and I'm just trying to find out whether in fact there
7  is more than one document involved.
8    THE WITNESS:  No, there's no more than one
9  document.
10    Q.  So just the document your attorney produced for
11  me this morning, that's the extent of your paperwork?
12    A.  That's where I wrote the truth down at.
13    Q.  That's where you wrote your account of the
14  truth, correct?
15    A.  Account, correct.
16    MR. WARD:  Morris 17, please.
17    (Morris Exhibit No. 17 was marked for
18  identification.)
19    Q.  Mr. Morris, you were aware that under
20  Bayhealth's corrective action policy theft was a
21  terminal offense, correct?
22    A.  Correct.
23    Q.  And Bayhealth's policies, including the
24  corrective action policy that we've marked as Morris

26 (Pages 98 to 101)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

102

1  17 were available to you online, correct?
2    A.  Online?
3    Q.  Yeah.
4    A.  No.
5    Q.  No?  They were available to you in the human
6  resources office, though, weren't they?
7    A.  I remember seeing this pamphlet right here.
8    Q.  Excuse me?
9    A.  I recall seeing this pamphlet right here.
10    Q.  So then you were familiar with --
11    A.  Who gave it to me, I'm not sure who gave it to
12  me.  But I recall this pamphlet here.
13    Q.  So you were familiar with Bayhealth's
14  corrective action policy, correct?
15    A.  Yes.
16    Q.  Mr. Morris, you're also aware that the position
17  of security officer is a position that involves a
18  significant amount of responsibility, correct?
19    A.  Yes.
20    Q.  Are you aware that Bayhealth previously
21  discharged a white male security officer for stealing
22  a pen?
23    A.  Am I --
24    Q.  Are you aware that Bayhealth previously

103

1  discharged a white male security officer for the theft
2  of a pen?
3    A.  Yes, I was aware of that.
4    Q.  Now, you were also aware that you had the right
5  to appeal your termination under Bayhealth's problem
6  resolution policy, right?
7    A.  Correct.
8       MR. WARD:  This is Morris 18.
9       (Morris Exhibit No. 18 was marked for
10  identification.)
11    Q.  Mr. Morris, the first page of the document we
12  have marked as Morris 18 is your step 3 written appeal
13  to Mr. Terry Feinour, Senior Vice President of
14  Corporate Services, correct?
15    A.  Correct.
16    Q.  And the second and third pages of Morris 18 are
17  a letter from Mr. Feinour to you dated May 9th, 2005
18  affirming your discharge, correct?
19    A.  Correct.
20    Q.  And you received a copy of the second and third
21  pages of Morris 18 in the mail, correct?
22    A.  I would have to double check.
23    Q.  Do you live at 107 Davis Circle, Dover,
24  Delaware?

104

1    A.  Correct, correct.
2    Q.  So the address is correct, right?
3    A.  Correct.
4    Q.  So you don't recall one way or the other
5  whether you received the letter from Mr. Feinour
6  marked May 9, 2005?
7    A.  Accurately, no, I cannot say that for sure that
8  I did.  I would have to double check before I sit here
9  and say I did.
10    Q.  Well, you filed a further appeal of your
11  discharge, didn't you?
12    A.  I was told I had three steps to go through, and
13  I went through the three steps.
14    Q.  Well, the only reason to go to the next step is
15  if Mr. Feinour affirms your discharge, right?
16    A.  Could you repeat that?
17    Q.  I said the only reason you would have had to go
18  to the next step of the appeal procedure would be if
19  Mr. Feinour affirmed your discharge, right?
20    A.  Want to make sure I understand what you're
21  saying.  If Mr. Feinour affirmed my appeal, so you're
22  saying that he rejected it?
23    Q.  No, no.  What I'm saying, okay, let me try and
24  make this easy.  At some point after you filed the

105

1  document which is the first page of Morris 18, you
2  learned that Mr. Feinour had affirmed your discharge
3  and denied your appeal, correct?
4    A.  Correct.
5    Q.  Okay.  So then you further appealed your
6  discharge under Bayhealth's problem resolution policy,
7  correct?
8    A.  Correct.
9       MR. WARD:  This is Morris 19.
10       (Morris Exhibit No. 19 was marked for
11  identification.)
12    Q.  Mr. Morris, the first page of the document
13  we've marked as Morris 19 is your step 4 written
14  appeal to the chief operating officer of Bayhealth
15  Medical Center, correct?
16    A.  Correct.
17    Q.  The individual who held that position at the
18  time of your discharge was Terence Murphy, correct?
19    A.  Correct.
20    Q.  And step 4 is the fourth and final step in the
21  appeal procedure at Bayhealth Medical Center, correct?
22    A.  Correct.  Mr. Lewin was there also.
23    Q.  Excuse me?
24    A.  I said Mr. Lewin was there also.

27  (Pages 102 to 105)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

---

**106**

1    Q. Mr. Lewin was where also?

2    A. At this, when I was up at Terry Murphy's. At

3    each one of my levels, second and third, Mr. Lewin was

4    there.

5    Q. Did you meet with Terry Feinour prior to his

6    making the decision on your appeal? Going back to

7    your previous step in discipline, did you meet with

8    Terry Feinour --

9    A. Prior to --

10    Q. -- before he issued a decision on the appeal?

11    A. No, no.

12    Q. Do you recall how you found out that

13    Mr. Feinour had affirmed your discharge and denied

14    your appeal?

15    A. Apparently through the mail, apparently I did

16    get a copy of that to continue my appeal.

17    Q. Did you meet with Mr. Murphy regarding your

18    appeal to him of your discharge?

19    A. Yes, I did, I met with him.

20    Q. And was your testimony earlier that Mr. Lewin

21    was also present at this meeting?

22    A. Yes, Mr. Lewin was present at both hearings.

23    My last two hearings Mr. Lewin was there, yes.

24    Q. I'm sorry? Say that again.

---

**107**

1    A. My last two final hearings at Bayhealth,

2    Mr. Lewin was present at them.

3    Q. Okay. So you're saying then with regard to

4    your step 3 discharge, the previous -- excuse me, your

5    step 3 appeal, there was a meeting with Bayhealth

6    management regarding your step 3 appeal, the one that

7    was ultimately denied by Mr. Feinour?

8    A. I went over to the Charter Building, I believe

9    they call it the Charter Building, with Feinour -- I

10    get the two mixed up. But I went over to the Charter

11    Building, I remember that seemed like step 2 of the

12    appeal, I believe. The first one is like with your

13    director or whatever. The second one was over to the

14    Charter Building where, once again, Mr. Feinour and

15    I'm not sure if it was Terry Murphy or, but then I had

16    to go back to the administrative building for a

17    hearing.

18    And we sat there and talked, and then

19    Mr. Lewin came in later into that one also. So I was

20    before Mr. Lewin on both those appeals. Do you

21    understand?

22    Q. So after your termination meeting with

23    Mr. Lands, how many more meetings did you attend with

24    members of Bayhealth management?

---

**108**

1    A. Two.

2    Q. Total of two.

3    A. That I recall.

4    Q. Mr. Lewin was present at both?

5    A. Yes.

6    Q. Okay. And one of them was to address your step

7    3 appeal, correct?

8    A. My step 2 appeal.

9    Q. No, your step 3. The one with Mr. Feinour,

10    that was the first meeting, correct, or not?

11    A. Step 1 supervisor, okay. Step 2, department

12    director. That would be Mr. Lewin, correct?

13    Q. I believe you testified earlier that your

14    department director was Marvin Lands.

15    A. Was Lands, okay. Okay, right. After those

16    two, the last two, which is division rights president

17    and the CEO, Mr. Lands was present at those last two.

18    MR. NOLTE: Mr. Lands or Mr. Lewin?

19    THE WITNESS: Lewin, I'm sorry. Mr. Lewin

20    was present at those last two.

21    Q. After your step 4 meeting --

22    A. Okay.

23    Q. -- you were advised that your appeal was denied

24    and your termination was affirmed, correct?

---

**109**

1    A. Correct.

2    Q. And that you thought you were advised of this

3    by a letter from Terry Murphy to you, Terence Murphy

4    to you dated June 8, 2005, correct?

5    (A brief recess was taken.)

6    BY MR. WARD:

7    Q. There was a question pending when your attorney

8    left the room. I had asked you whether or not you

9    were advised of the denial of your step 4 appeal by a

10    letter to you from Terence Murphy dated June 8, 2005?

11    A. Correct.

12    MR. NOLTE: I'm sorry, I thought he

13    answered that before, I apologize.

14    MR. WARD: That's okay.

15    BY MR. WARD:

16    Q. Now, Mr. Morris, as you concede in your

17    complaint, the results of the investigation that

18    Bayhealth undertook showed that Bayhealth had one

19    eyewitness, correct?

20    A. Correct.

21    Q. And this is an eyewitness regarding the

22    allegation that you had stolen a soda?

23    A. The one eyewitness that's the accuser?

24    Q. That would be the accuser, yes.

---

28 (Pages 106 to 109)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

110

1    A.  Correct.
2    Q.  And there were no other witnesses, were there?
3    A.  Correct.
4    Q.  So it was pretty much a he-said-she-said
5    situation, wasn't it?
6    A.  That's the way I felt about it, sir.
7    Q.  Now, you had initially claimed that you were
8    dispatched while getting your food on April 12, 2005,
9    right?
10   A.  Correct, once again, other stories got crossed
11   up.
12   Q.  And ultimately you were informed that
13   Bayhealth's record didn't support your story that you
14   had been dispatched on April 12th, right?
15   A.  Correct.
16   Q.  So you changed your version of the events that
17   took place on April 12th, 2005, right?
18        MR. NOLTE:  Objection as to form.  But he
19   can answer.
20   A.  I gave the information that I felt was correct.
21   Q.  Let me ask a different question.  After you
22   were informed that Bayhealth's record didn't support
23   your story that you'd been dispatched on April 12,
24   2005, you indicated to Mr. Lands and Mr. Freeman that

111

1    the dispatch may have occurred on a different date,
2    correct?
3    A.  Correct.
4    Q.  Now, you also claim that you worked two 16-hour
5    overtime shifts in a row on April 11th and April 12th,
6    2005, correct?
7    A.  I made that statement, but once again, my
8    timing was crossed up.
9    Q.  So once again, that turned out not to be true,
10   didn't it?
11   A.  Correct.
12   Q.  And as you're aware, your principal witness,
13   Miss Holding, didn't support your story that you had
14   given her your tray on April 12th, 2005, correct?
15   A.  My what witness?
16   Q.  Your witness, Carmetta Holding.  You are aware
17   that she didn't support your story that you had given
18   her your tray on April 12th, 2005, right?
19        MR. NOLTE:  Objection as to form.  But you
20   can answer.
21   A.  I'm not saying she was my witness.  They
22   requested her.  I'm not saying she was my witness.  I
23   told them what, the information that I thought was
24   correct at the time.

112

1    Q.  Mr. Lands informed you that Miss Holding didn't
2    support your story that you had given her your tray on
3    April 12, 2005, right?
4    A.  Correct.
5        MR. NOLTE:  Objection as to form.
6    Q.  Mr. Lands told you that Miss Holding had told
7    him that you had not given her your tray to hold on
8    April 12th, 2005, correct?
9        MR. NOLTE:  I don't want to -- we covered
10   this once.  It's been asked and answered.
11       MR. WARD:  Well, you've been objecting to
12   form, so I'm trying to ask it in a way that's not
13   objectionable.
14       MR. NOLTE:  My objection as to form is
15   your characterization in terms of support --
16       MR. WARD:  Okay, that's why I asked it
17   differently.  I got you.
18   BY MR. WARD:
19   Q.  Okay, Mr. Morris, I'm just trying to get this
20   one fact on the record.  Mr. Lands told you that he
21   had spoken to Carmetta Holding regarding your
22   allegation that she had taken the tray on April 12,
23   2005, right?
24   A.  Correct.

113

1    Q.  Okay.  And he told you that Miss Holding had
2    denied that she had taken your tray on April 12, 2005,
3    correct?
4    A.  That's what I read that she had said, yes.
5    Q.  And your explanation for the discrepancy was
6    that you may have been confused as to the dates,
7    correct?
8    A.  The time, the exact time that it happened,
9    correct.
10   Q.  So that she may have taken your tray, but it
11   was on a different day than April 12, 2005?
12   A.  Correct.
13   Q.  Okay.  Now, as far as you know, Ashley Fulcher
14   didn't make any statements to Mr. Lands that wound up
15   being contradicted by Bayhealth's records, did she?
16       MR. NOLTE:  Objection as to form.
17   A.  I'm not understanding that.
18   Q.  Okay, let me try a different way.
19       In your complaint you allege that you were
20   replaced by a retired police officer, correct?
21   A.  I was under the -- I guess I was told somewhere
22   by someone that after I was terminated that they had
23   hired an ex-police officer, yes.
24   Q.  Let me try and make this easier for you.

29  (Pages 110 to 113)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

114

1    MR. WARD: Please mark this exhibit as
2  Morris 20.
3        (Morris Exhibit No. 20 was marked for
4  identification.)
5    Q. Mr. Morris, Morris 20 is the complaint that you
6  filed in this lawsuit, correct?
7    A. Correct.
8    Q. And you read this complaint before it was
9  filed, didn't you?
10   A. Correct.
11   Q. Directing your attention to paragraph 17 of the
12  complaint, which is on the third page of the
13  complaint, you indicate in paragraph 17 that, "In
14  early March 2005, at about the same time as the
15  initial questioning, by defendant, of the incidents
16  that occurred prior to plaintiff's time at Bayhealth
17  Medical Center, a retired Caucasian police officer
18  contacted plaintiff's supervisor, Dave Freeman
19  regarding employment." Correct?
20   A. Correct.
21   Q. How did you know that a retired Caucasian
22  police officer contacted your supervisor?
23   A. Well, this date may not be correct. At the
24  time when this Caucasian retired police officer came,

115

1  I was still working. So on March 2055, I wasn't
2  there. So therefore, this was prior. I happened to
3  be down in the control room at the time when this
4  gentleman came in to be interviewed by Dave Freeman.
5  That's how I knew that. So the date, that date is not
6  correct.
7    Q. How do you know that the individual who came in
8  to talk to Mr. Freeman was a police officer -- or
9  excuse me, strike that -- a retired police officer?
10   A. I'm trying to think who gave me that
11  information. One of the officers from down there told
12  me that he was a retired police officer.
13   Q. What was the name of that officer?
14   A. Don't remember who told me.
15   Q. And --
16   A. I don't remember who told me. Excuse me?
17   Q. Go ahead.
18   A. I don't remember who told me.
19   Q. And how do you know that this individual
20  contacted Mr. Freeman regarding employment?
21   A. I was there. I was there at the time that he
22  came in to talk to Dave Freeman.
23   Q. So did you ever overhear the conversation
24  between him and Dave Freeman?

116

1    A. No, after he left Dave Freeman came out and may
2  have stated that he was in for a interview or
3  something, how I retrieved that information. Once
4  again, I was downstairs. I was there.
5    Q. So you were there, correct?
6    A. Yes.
7    Q. And Mr. Freeman told you that the individual
8  had come in for an interview regarding employment, is
9  that what you're saying?
10   A. He may not have told me. I may have overheard
11  the conversation. You understand? Down in the
12  control room people talk, you understand? They don't
13  have to be talking directly to you in order for you to
14  hear.
15   Q. So Mr. Freeman may have told you directly or
16  you may have overheard him talking with someone else?
17   A. Correct, that the gentleman was in to be
18  interviewed for a position, correct.
19   Q. Now, no one told you at that time that this
20  individual was in seeking employment as a control
21  center officer, did they?
22   A. Control center officer --
23   Q. Operator, excuse me. In other words, no one
24  told you that this individual was interviewing for

117

1  your position, did they?
2    A. No.
3    Q. So you don't know what position that person was
4  interviewing for, do you?
5    A. I guess you're correct.
6    Q. Now, you state in paragraph 17 of your
7  complaint, "At the time there were no open positions."
8  Correct?
9    A. When I was there, correct, there was no
10  opening.
11   Q. Now you testified earlier that a constable by
12  the name of Harvey Scott resigned prior to your
13  termination, correct?
14   A. Correct.
15   Q. And you indicated that you agree with me that
16  his resignation would have created an open constable
17  position, right?
18   A. Correct.
19   Q. So in fact, there was at least one open
20  position in March 2005, wasn't there?
21   A. Let me think now. I'm trying to think who else
22  might have came in. Because if you took -- you was
23  telling me who was there and you told me that Harvey
24  left, I'm trying to think who else may have been hired.

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

118

1   around that time for it not to be no openings. Don't
2   remember.
3      Q.  So you're not sure whether there were any open
4   positions or not, are you?
5      A.  I guess you have a point.
6      Q.  Now, you state in paragraph 18 in your
7   complaint that, "After plaintiff was terminated, the
8   same retired police officer was hired and put into
9   plaintiff's position."  Correct?
10     A.  Correct.
11     Q.  What was the name of that retired police
12  officer?
13     A.  Don't know what his name was.  I was gone at
14  that time.
15     Q.  So you can't identify the individual who you
16  allege replaced you?
17     A.  Repeat that question.
18     Q.  So you cannot identify the individual who you
19  claim to have replaced you?
20     A.  If I seen him I probably could identify him.
21     Q.  As you sit here today --
22     A.  By name, by name I could not give you a name.
23     Q.  You cannot give me a name today?
24     A.  No.

119

1      Q.  Now, your only claim in this lawsuit is that
2   you were discharged so that Bayhealth could hire a
3   white retired police officer to replace you, correct?
4      A.  No, no, that's not what it was based upon.  It
5   was based upon not having concrete evidence of me
6   taking the soda and not paying for it.  Pretty much.
7   And --
8      Q.  So it's your -- go ahead.
9      A.  And that everyone from, from the director of
10  security, human resources, the appealing, superiors,
11  everyone not really looking into the situation from
12  one person saying that I took something that they
13  could not identify, don't know anything about it.
14  Just making the statement that I took something that,
15  don't know what it looked like.  Don't have a clue.
16  And for everyone to listen to that side and not
17  justify their reasons for terminating me, okay?
18         Mr. Lands knew my credibility.  That's why
19  I asked him, "Is it true that I've been working for
20  you for four and a half, almost five years?"  He said,
21  "Yes."  That I have perfect attendance, that I come to
22  work, work overtime.  Okay, he knows my credibility.
23  I've been to Mr. Lands' house before and done work for
24  him, and he was actually getting ready to leave his

120

1   house open, because he knows my credibility.  I'm not
2   the type to take anything.  I don't have to, once
3   again.  And a soda, so I just asked that it was looked
4   into properly.
5         Just don't, just don't take somebody's
6   word and you're not sure and decide well, how I'm
7   going to weigh this.  Well, it's possible chance that
8   they could have done it, you know, I mean you don't
9   have no concrete evidence.  So therefore, you throw my
10  life out the window.  My life, my kids' life,
11  everybody's life that's under me by me being the head
12  of my family and my kids, and I just think that a
13  quality decision was not made, a quality investigation
14  was not made.
15         And so I just caught myself sticking with
16  what I could.  That's the only thing I could with what
17  was going on.  And everybody just seemed like they
18  didn't want to listen to me that I did not do it.
19     Q.  So it's your opinion that Miss Fulcher's
20  eyewitness account was not concrete evidence, correct?
21     A.  Oh, I know it wasn't concrete.
22     Q.  But Bayhealth certainly felt that that was
23  concrete evidence, didn't it?
24     A.  Apparently with the outcome, that's what

121

1   Bayhealth's outcome was, once again, I say prior to
2   this happening with the questions, well, hey, hey, all
3   these questions about, "Well, what happened here?
4   What happened here?  Somebody said that you not being
5   fully charged."
6         Seems like things led up to this.  I'm on
7   the receiving end, so this is the way that I perceived
8   it.  I'm on the receiving end.  So this is what
9   happened.  And then all of a sudden, you come in one
10  day and somebody say, "Somebody said you took a soda."
11     Q.  Mr. Morris, you've testified today repeatedly
12  that you changed your story about being dispatched on
13  April 12, 2005, right?
14     A.  I testified that I got my timing crossed up
15  from one way or another.  But the story that I have
16  given, the testimony that I have given did actually
17  happen.  I got them crossed up, but that doesn't make
18  the truth any, any different.
19     Q.  And you also change your story regarding the
20  type of food you bought at the hospital gift shop,
21  right?  First it was chicken and dumplings, then it
22  was bean soup, right?
23     A.  Okay, in the statement it did.  Once again, I
24  got it, got the stories crossed up.  If I was

31 (Pages 118 to 121)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

122

1  getting -- I may have got the beans from the gift shop
2  and the chicken and dumplings downstairs. I don't
3  know.
4        Apparently, like when I was questioned, I
5  was just upset, I don't know. I just -- but my
6  stories got crossed up. But there is not one story
7  that I gave them about giving the tray to Carmetta,
8  about the beans from the gift shop, about eating
9  chicken and dumplings, about having water, none of
10 that that is not true. All that is the truth.
11       The timing, the timing that I got mixed up
12 is what I'm hearing is making people to believe that I
13 actually stole the soda because I got my timings mixed
14 up.
15  Q.  So you were mixed up about the dispatch, you
16 were mixed up about the type of food that you got from
17 the hospital gift shop, and you were mixed up about
18 the overtime shifts that you worked, correct?
19  A.  Oh, that would have been said all in one
20 statement. Yeah.
21  Q.  It's true, isn't it?
22  A.  That's true that I was mixed up, okay.
23  Q.  Are you aware are you aware of Miss Fulcher
24 changing her story at all?

123

1  A.  I don't know what Miss Fulcher did. I only
2  know what I read. I didn't talk to Miss Fulcher.
3  Q.  Given that you repeatedly changed your story,
4  why are you surprised that Bayhealth chose to believe
5  Miss Fulcher instead of you?
6  A.  Why do I believe Bayhealth believe Fulcher
7  instead of me? Is that what your question is?
8  Q.  I'm saying, given the fact that you changed
9  your story about numerous details in your account of
10 the events that took place on April 12, 2005, why are
11 you surprised that Bayhealth chose to believe Miss
12 Fulcher instead of you?
13  A.  Because it's just not me. I don't steal. I
14 didn't steal anything. That's why. I didn't, it
15 didn't happen.
16  Q.  When you repeatedly change your story, do you
17 think that helps your credibility or hurts it?
18  A.  Well, if I, if I said you took something, what
19 do I have to prove and what do you have to prove once
20 I said you took it, it's I said that you took it. You
21 got to prove that you didn't. So regardless what you
22 say, if they don't come up with any evidence, did you
23 or did you not do it? Do you understand what I'm
24 saying? If they don't find what I said that you took.

124

1  Q.  I not only understand what you're saying, I
2  don't believe it's responsive to my question. What I
3  asked you was when you repeatedly change your story,
4  do you believe that helped your credibility or hurt
5  it?
6  A.  Well, you said I changed my story. Once again,
7  I said I was just tired and I got my stories crossed
8  up. I am a human being and I was just tired, I guess,
9  and I got my timing mixed up.
10  Q.  I'll ask the question again. When you
11 repeatedly changed your story regarding the events of
12 April 12, 2005, do you feel that that helped your
13 credibility or hurt it?
14  A.  I feel that it hurt it due to the outcome.
15  Q.  Now, other than the information that you've
16 given us today, do you have any other information
17 supporting your claim that you were discharged on the
18 basis of your race?
19  A.  Once again, once again, a black man's
20 supposedly take a soda, a Caucasian person says that
21 he stole the soda, everybody that gets to hear about
22 the black man taking soda and the Caucasian person
23 report it, everybody is Caucasian also. So who's in
24 favor?

125

1        In fact, I had Mr. Lewin talk to me like
2  he actually seen me take the soda. I really felt
3  bitter about that.
4  Q.  Did Mr. Lewin tell you that he'd seen you take
5  the soda?
6  A.  No, I said I had him talk to me like he
7  actually seen me take the soda.
8  Q.  Did he tell you that he'd been in the hospital
9  cafeteria on April 12, 2005?
10  A.  I don't remember anything whether he said he
11 was there or not.
12  Q.  He never told you saw you take the soda, did
13 he?
14  A.  No, no, no. I say he talked to me as if he saw
15 me take a soda.
16  Q.  Well, how could he do that if he never saw you
17 take the soda?
18  A.  That's what I want to know. I'm sorry you
19 don't favor me either. I'm just saying, I'm just --
20  Q.  Mr. Morris?
21  A.  Yes?
22  Q.  It's true, isn't it, that you were the only
23 uninsurable -- and this is with regard to auto
24 insurance -- the only uninsurable member of the

32 (Pages 122 to 125)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

126

1  security department, correct?
2    A. Correct.
3    Q. Okay. And it's true, isn't it, that you had
4  not been certified as a healthcare security officer,
5  correct?
6        MR. NOLTE: Objection as to form. I think
7  he's already answered that question.
8    Q. You can answer.
9    A. Do I have to?
10   Q. Yes.
11   A. If I haven't received certificate as you said I
12  was supposed to have, I had not received that. So...
13   Q. And you were also denied DELJIS privileges,
14  right?
15   A. Correct.
16   Q. Okay. So those were three reasons that
17  Mr. Lands or Mr. Freeman could have cited as a reason
18  to terminate your employment, correct?
19        MR. NOLTE: Objection as to form.
20   A. I disagree.
21   Q. Well, you testified earlier that you thought
22  the denial of DELJIS privileges was a factor in the
23  termination of your employment, right?
24   A. Prior to the DELJIS, prior to the DELJIS, that

127

1  was, that was part of it maybe. There was other
2  things that led up to that, and once again, I say I
3  was called down prior to somebody not charging me the
4  full amount when I go through the cafeteria. There
5  was other things that led up to that.
6    Q. Now, Mr. Lands could have made the decision to
7  terminate you and replace you with someone who could
8  have been insured with Bayhealth's auto accident
9  insurance carrier, correct?
10        MR. NOLTE: Objection. My client has no
11  way of knowing that.
12   A. I don't know. I guess Mr. Lands could do
13  whatever he wanted to as the director. I just truly
14  feel as if a person in the position of dealing with
15  people and reviewing dealt with a person for four or
16  five years, that you should somewhat know their
17  character and investigate a situation more properly
18  than they did.
19   Q. So what could they have done besides what they
20  did in terms of the investigation?
21   A. Well, because I got my words crossed up, you're
22  standing on that. But the accuser did not know the
23  kind, did not know anything. All she stated that I
24  have something on the side of my leg. And if she was

128

1  over by the coffee machine where she said she was at
2  one time, and then one time she was at the cash
3  register, if I had something to the right side of me,
4  what was it? Was it a bowl or was it a soda? They
5  don't know that. To this day they don't know that.
6    Q. They only know what she told them, right?
7    A. She only know what they told.
8    Q. And if it was a 7-Up instead of a Pepsi, it
9  really wouldn't make a difference would it?
10   A. It would make a difference if it wasn't a soda
11  at all to me and my family.
12   Q. But you aware that Miss Fulcher did report
13  that what you walked out of the cafeteria with was a
14  soda, right?
15   A. That's what she reported. Did that make it
16  right? Sir?
17   Q. I'm the one asking questions today.
18        MR. NOLTE: He doesn't have to answer
19  questions.
20        THE WITNESS: Okay, I'm sorry.
21        MR. WARD: I'm just going to meet with my
22  client very quickly, and then we may have another
23  question or two, we may not.
24        (A brief recess was taken.)

129

1  BY MR. WARD:
2    Q. Now, Mr. Morris, just a couple more questions
3  for you. You testified earlier that you felt that
4  Bayhealth's investigation of the allegation against
5  you was not sufficiently thorough, correct?
6    A. Right.
7    Q. Now, you had two chances to tell your side of
8  the story, right?
9    A. Back on the 13th you're talking about?
10   Q. I'm talking about your two interviews with
11  Mr. Freeman and Mr. Lands.
12   A. Yes, I guess I did have.
13   Q. And you're aware that Bayhealth talked to
14  several other individuals to get their account of the
15  events and to find out what those people saw on April
16  12th, 2005, correct?
17   A. Correct.
18   Q. Can you think of anybody, as you sit here
19  today, that Bayhealth should have interviewed but
20  didn't?
21   A. Well, no, other than the people that I was
22  sitting with. They are the only ones that was there.
23  It's not like the cafeteria was packed at 6:00 in the
24  evening. It's only a chosen few down there. And I

33 (Pages 126 to 129)

Morris v. Bayhealth Medical Center
Nathaniel Morris, Jr.

**130**

1  told them who sat with me. So due to the fact there's
2  only a handful of people, which is ES people and one
3  security officer downstairs, I could not speak of
4  anyone else on the other side of that cash register
5  that was in the cafeteria, like I said, no other than
6  five or six people, the main ones sitting at my table
7  that they could interview, no.
8     Q. And you're aware that Bayhealth did interview
9  several people, correct?
10    A. Correct.
11    Q. So you cannot name anyone as you sit here today
12 that Bayhealth should have interviewed but didn't?
13    A. Well, they interviewed Martha Hudson. She was
14 sitting right there. Jeannine, she was from ES. Of
15 course she said nothing. I can't make anyone say
16 anything.
17    Q. Okay, I don't think you're hearing my question
18 properly. What I'm asking you is, is there anybody
19 that you believe Bayhealth should have interviewed but
20 didn't? I'm not asking you about who Bayhealth did
21 interview.
22    A. Once again, the question that I'm getting from
23 you is the person that they interviewed would have to
24 be somebody on the other side of the cash register

**131**

1  from the time I walked past the cash register with the
2  soda. So therefore, there was nobody else, as I just
3  said, that ES and security, which is myself, that was
4  on that side of what I had. I told them who was
5  sitting with me.
6     Q. So your answer, if I understand it, is that
7  there is no one that Bayhealth should have interviewed
8  but didn't, correct?
9     A. Not that I know of.
10    Q. So isn't it true, Mr. Morris, that your
11 dissatisfaction with the investigation isn't really
12 based on the thoroughness of the investigation, but
13 rather the outcome, correct?
14    A. Yeah, it's still the thoroughness, yeah, it is
15 the thoroughness.
16    Q. You think it's the thoroughness, even though
17 you can't name a single person that Bayhealth should
18 have spoken to and didn't?
19    A. They spoke to who they spoke to. They spoke to
20 who they spoke to. What happened happened. What
21 didn't happen did not. We can sit here and go through
22 another ton of words. I'm just a basic, simple guy.
23 I'm not maybe intelligent like you. I can't sit here
24 and go on and on and on with words. I get burnt out.

**132**

1  What I'm saying is the investigation did not go well
2  at all, because if it did, they would have found out
3  that I did not take a soda.
4     MR. WARD: I have nothing further.
5     MR. NOLTE: I think we will read. That's
6  it.
7     (The deposition concluded at 2:59 p.m.)
8              INDEX
9  Deponent: NATHANIEL MORRIS, JR.        Page
   By Mr. Ward....................................... 2
10             EXHIBITS

Morris:                                     Page
1    4 Pg. Job Offer Confirmation           8
2    General Orientation Record             15
3    3 Pg. Personnel Action Request         17
4    12 Pg. Position Description/Performance 20
     Review, Position No. 8160.328
5    13 Pg. Position Description/Performance 28
     Review, Position No. 8160.339
6    Photocopy of Healthcare Security Patch 46
7    15 Pg. Performance Appraisal, 4/22/03  50
8    15 Pg. Performance Appraisal, 4/22/04  52
9    3/23/05 DELJIS Letter                  58
10   Criminal Record of Nathaniel A. Morris 63
11   4 Pg. Employment Report                66
12   2 Pg. 4/18/05 Letter                   72
13   4 Pg. Pay Category Breakdown           85
14   2 Pg. Employee Interviews              88
15   Disciplinary Action Notes              94
16   2 Pg. Employee Corrective Action Record 99
17   16 Pg. Corrective Action               101
18   3 Pg. Resolution of Work Related Issues/ 103
     Concerns Form, 4/26/05
19   2 Pg. Resolution of Work Related Issues/ 105
     Concerns Form, 5/16/05
20   Complaint                              114

**133**

Replace this page
with the Errata Sheet
after it has been
completed and signed
by the Deponent

34 (Pages 130 to 133)

Morris v. Bayhealth Medical Center

134

```
 1              CERTIFICATE
 2    STATE OF DELAWARE)
                       )
 3    NEW CASTLE COUNTY)
 4            CERTIFICATE OF REPORTER
 5        I, Julie H. Parrack, Registered Professional
      Reporter and Notary Public, do hereby certify that
 6    there came before me on the 5th day of June, 2007, the
      deponent herein, NATHANIEL MORRIS, JR., who was duly
 7    sworn by me and thereafter examined by counsel for the
      respective parties; that the questions asked of said
 8    deponent and the answers given were taken down by me
      in Stenotype notes and thereafter transcribed by use
 9    of computer-aided transcription and computer printer
      under my direction.
10
          I further certify that the foregoing is a true
11    and correct transcript of the testimony given at said
      examination of said witness.
12
          I further certify that I am not counsel,
13    attorney, or relative of either party, or otherwise
      interested in the event of this suit.
14
15              _____
                Julie H. Parrack, RMR, CRR
16              Certification No. 102-RPR
                (Expires January 31, 2008)
17
18    DATED:_____
19
20
21
22
23
24
```

Morris v. Bayhealth Medical Center

**A**

ability 4:3 5:18
71:10 74:18
able 21:21
accepted 40:19
59:19
access 56:13
57:17,19 58:12
58:17 59:2
61:3,7,16 67:4
67:13
accessing 57:10
accident 127:8
account 74:16
101:13,15
120:20 123:9
129:14
accounts 80:5
accurate 3:17
12:6 26:11
79:15,16 80:23
accurately 16:11
21:14 22:4,9
22:19 26:8
28:23 65:12
95:6 104:7
accusation 74:12
accused 74:7
88:18 92:14,20
accuser 109:23
109:24 127:22
acting 98:14
action 1:5 67:2,6
97:6 101:20,24
102:14 132:12
132:19,20
actions 74:16
activities 27:20
address 104:2
108:6
addressing
64:24
administered
3:9 23:16 39:1
47:15
administrative

107:16
admitted 71:5
84:5
adverse 67:2,6
advise 3:22
advised 38:15
59:1 99:16
108:23 109:2,9
affirmatively
13:7 61:23
74:9
affirmed 104:19
104:21 105:2
106:13 108:24
affirming
103:18
affirms 104:15
African-Amer...
34:13 35:4,12
91:13
ago 40:16 44:6
98:5
agree 21:12 22:1
22:7,17,23
23:2,11 26:7
29:7,15 30:21
30:22 33:14
37:13 51:1,7
54:11 75:8
93:22 94:7
97:9 117:15
ahead 48:17
50:1 90:12
115:17 119:8
alcohol 5:23
allegation 83:3
87:24 88:7
91:7,23 92:16
93:23 96:6,11
109:22 112:22
129:4
allege 61:19
90:15 113:19
118:16
allegedly 98:19
Alyn 34:16,18
amount 37:9

102:18 127:4
amounts 11:5
12:4
analysis 11:24
annual 10:14,16
19:16 20:3,6
20:10
answer 4:2,12
4:21 5:8 15:24
19:24 21:20
26:11 29:2,11
30:5 37:21
55:11,13 56:24
57:1 72:7
80:10 91:20
96:14 97:24
98:1 110:19
111:20 126:8
128:18 131:6
answered
109:13 112:10
126:7
answers 3:17
134:8
anybody 71:8,24
72:17 73:12
129:18 130:18
apologize 109:13
apparently 46:2
106:15,15
120:24 122:4
appeal 48:20
49:1 88:10
103:5,12
104:10,18,21
105:3,14,21
106:6,10,14,16
106:18 107:5,6
107:12 108:7,8
108:23 109:9
appealed 105:5
appealing
119:10
appeals 107:20
APPEARANC...
1:12
appears 11:10

12:8 50:15,17
50:20 52:15
53:23
application
58:12,15 59:2
applied 33:24
apply 3:13 33:21
appraisal 51:18
52:9,11 53:9
53:14,19 54:12
56:4 132:15,15
appraisals 55:17
appreciate 8:9
approached
72:18 88:17
approve 20:3
56:7
approved 19:14
20:3 55:8,16
approving 19:24
approximately
98:16 99:2
April 51:6,7
66:12 73:1,10
73:12,15,18,24
76:6,21,22,24
77:12,21 79:15
79:20 80:5
81:12 82:5,9
82:15,15,18
83:1,4,12 84:3
84:18 86:5,24
87:4,10,13,17
91:17 93:2,24
94:9,13 95:2
96:1 99:6,8
100:3,4,5
101:2 110:8,14
110:17,23
111:5,5,14,18
112:3,8,22
113:2,11
121:13 123:10
124:12 125:9
129:15
area 22:15 53:20
67:23 79:4,7

83:4 84:6,10
areas 32:2
arm 47:1,2
arrested 63:16
65:2 68:22
arrests 32:11
arrival 26:21
arrived 26:24
Ashley 69:20
72:1 113:13
asked 13:12,13
19:23 24:2
28:5 40:2,22
48:16,19,19
55:13 59:18,20
61:20 62:6
66:4,17 67:24
74:2,19,22
75:2,22 76:17
79:3,18 85:1,4
85:6,10,12
88:21 93:7
94:12 95:16
97:19 99:20
100:12 109:8
112:10,16
119:19 120:3
124:3 134:7
asking 3:24 4:4
12:14,16 21:17
24:6,10 31:6
49:5 65:6
73:20 76:12
77:20,21 79:5
80:1 81:21,23
82:1 85:15
128:17 130:18
130:20
asset 54:3
assigned 9:14,17
9:19 37:5,14
38:2,5
assigning 37:19
assignment
78:14
assist 32:1
ASSOCIATES

Morris v. Bayhealth Medical Center

136

| | | | | |
|---|---|---|---|---|
| 1:13 | **B** 132:10 | 68:23 69:5,9 | 124:2,4 130:19 | **building** 107:8,9 |
| **Association** 23:9 | **back** 7:12 28:11 | 69:16,20 72:1 | **best** 4:2 20:18 | 107:11,14,16 |
| 23:17 39:2 | 43:24 44:2 | 72:18 73:12 | 26:23 40:14 | **burnt** 131:24 |
| **assume** 4:13,16 | 45:16,22 51:23 | 88:8 99:17 | 47:20 54:14 | |
| **ate** 86:13 | 60:6,7,11 | 100:14 102:20 | 71:9 74:18 | **C** |
| **attend** 14:5,8,19 | 62:11,14 66:14 | 102:24 105:14 | 76:24 | **cafeteria** 67:20 |
| 15:4 107:23 | 66:18,22 69:3 | 105:21 107:1,5 | **better** 84:15 | 69:16,21 73:21 |
| **attendance** | 75:2,23 77:8 | 107:24 109:18 | **bill** 62:10,13,21 | 74:7 76:3,9,13 |
| 15:21 119:21 | 82:18 84:9 | 109:18 114:16 | 62:18 | 77:2,7,8 78:3 |
| **attending** 82:8 | 86:7,7,11,11 | 119:2 120:22 | **birth** 6:17 | 78:15 83:4 |
| **attention** 26:1 | 87:9,9 98:5 | 123:4,6,11 | **bit** 81:14 | 84:6 87:13 |
| 27:15 56:10 | 106:6 107:16 | 129:13,19 | **bitter** 125:3 | 88:8 90:10,22 |
| 73:18 86:15,23 | 129:9 | 130:8,12,19,20 | **biweekly** 9:24 | 93:16 97:14 |
| 114:11 | **background** | 131:7,17 | **black** 124:19,22 | 125:9 127:4 |
| **attorney** 2:23 | 13:3 40:13 | **Bayhealth's** 9:5 | **Blaine** 34:7 | 128:13 129:23 |
| 7:22 8:15 | 43:7 | 35:18 36:18,22 | **blocked** 32:3 | 130:5 |
| 101:10 109:7 | **balance** 38:12 | 83:5 101:20,23 | **blowed** 71:19 | **call** 58:1,3 76:8 |
| 134:13 | **Bancroft** 1:14 | 102:13 103:5 | **blue** 46:23 47:2 | 76:10 78:4,11 |
| **authority** 31:15 | **based** 28:21 | 105:6 110:13 | 49:16,21 50:2 | 79:9 90:3 |
| **Authorization** | 119:4,5 131:12 | 110:22 113:15 | 50:2 | 107:9 |
| 18:18 | **basic** 23:10,15 | 121:1 127:8 | **blurted** 97:3 | **called** 25:22 |
| **authorized** | 32:1 38:16 | 129:4 | **bold** 18:18 22:3 | 31:24 37:6,14 |
| 19:10,16 20:6 | 39:7 40:7 41:6 | **bean** 83:21 84:1 | **book** 49:16,21 | 40:20 48:22 |
| 20:10 32:13 | 41:23 42:18 | 84:11 121:22 | 50:2,3,3 | 55:19 59:15 |
| 50:7 | 44:17 49:20,21 | **beans** 75:18 77:1 | **bottle** 76:4 77:6 | 60:7 66:12,16 |
| **auto** 9:5 125:23 | 131:22 | 122:1,8 | 99:1 | 66:20 67:16,21 |
| 127:8 | **basically** 2:8 | **began** 8:18 | **bottom** 16:4 | 68:1 76:14 |
| **automobile** | 71:6 93:12 | 73:20 | 18:12 86:16,18 | 81:10 88:13 |
| 36:18,22 | **basis** 65:5 | **beginning** 1:10 | **bought** 76:3 | 127:3 |
| **available** 102:1 | 124:18 | 36:6,6 44:9 | 121:20 | **calling** 74:4 |
| 102:5 | **Bayhealth** 1:6 | **behalf** 1:15,18 | **bowl** 77:9 84:11 | **camera** 77:3 |
| **aware** 28:14 | 1:19 2:24 3:2,6 | 58:12,17 | 84:12,15,15 | **cameras** 27:5 |
| 41:11,13 47:17 | 8:18 9:8 12:21 | **believe** 10:22 | 128:4 | **car** 61:22 62:10 |
| 55:16 58:11,14 | 13:1 14:3 15:8 | 11:2 12:4 17:4 | **box** 24:15 44:1 | 62:11,12,17,23 |
| 66:15 71:13 | 16:14 19:3,7 | 17:6 23:23 | 100:2 | 63:1 |
| 87:22 91:15,22 | 21:9 24:11 | 26:15 28:22 | **boxes** 22:16,18 | **card** 13:18,21 |
| 92:2 101:3,19 | 25:14 29:20 | 29:18 42:15 | **break** 5:12,14 | **Carmetta** 78:10 |
| 102:16,20,24 | 30:2 33:2,3,8 | 45:18 47:1 | 85:17 | 82:21 88:13,13 |
| 103:3,4 111:12 | 34:7,16,21 | 51:5 59:6 61:1 | **Breakdown** | 89:7,12,13 |
| 111:16 122:23 | 35:8,24 36:3 | 61:5 64:3,6 | 132:18 | 93:17 98:11 |
| 122:23 128:12 | 36:10,13,14 | 73:8,9,9 75:1 | **brief** 8:12 109:5 | 99:5 111:16 |
| 129:13 130:8 | 37:18 40:6 | 76:19 89:22 | 128:24 | 112:21 122:7 |
| **awhile** 40:16 | 46:8 47:1 | 95:14,15,15 | **briefed** 26:24 | **carrier** 127:9 |
| 44:6 | 58:11,14 59:11 | 96:2,24 97:2 | **briefings** 15:8 | **carries** 22:8 |
| **a.m** 1:10 | 59:11 61:1,6 | 107:8,12 | **Brown** 34:8,11 | **case** 71:20 |
| | 61:14,15 66:3 | 108:13 122:12 | 35:15 | **cash** 128:2 130:4 |
| **B** | 67:2,6 68:20 | 123:4,6,6,11 | **Brown's** 34:13 | 130:24 131:1 |

Morris v. Bayhealth Medical Center

137

70:2,4,7,8
CASTLE 134:3
catch 85:5
categories 53:11
category 24:16
132:18
Caucasian 33:6
114:17,21,24
124:20,22,23
caught 94:21
120:15
causing 12:12
center 1:6 2:24
7:6 8:19 14:13
16:15 18:5
19:11 21:6,15
22:5,11,20
23:1,6,24 25:4
25:8,15 26:9
26:17,21 27:12
31:10,14 32:10
32:22 33:3
34:24 38:8
39:6 47:13,19
56:10 57:21
58:9 105:15,21
114:17 116:21
116:22
CEO 108:17
certain 13:2
28:11,13 41:15
42:23 74:23
97:19
certainly 8:7
120:22
certificate 42:2
42:8 45:21,22
126:11 134:1,4
certificates
41:22
Certification
134:16
certified 1:11
30:10 44:20,21
44:23 45:6,8
45:12,18,23
46:1,12 126:4

certify 134:5,10
134:12
Challenge 56:11
chance 21:1
120:7
chances 129:7
change 70:11
121:19 123:16
124:3
changed 41:19
46:21 60:16
110:16 121:12
123:3,8 124:6
124:11
changes 12:9,15
12:17
changing 32:16
97:7 122:24
character 97:8
127:17
characterizati...
112:15
charge 39:11
44:9 100:13
charged 63:5,7,8
63:15 121:5
charges 63:18
65:20
charging 67:18
89:9,14,17
90:9 91:4,8
92:15 127:3
Charter 107:8,9
107:10,14
chase 65:10
check 13:6,8
27:5 66:14,22
69:3 103:22
104:8
checked 31:21
32:17 43:1
60:6 69:3
checking 32:2
checks 12:23
13:2,5
chicken 75:14
75:17,18 83:21

84:2 121:21
122:2,9
chief 105:14
child 65:18,22
74:13
chose 123:4,11
chosen 129:24
Circle 103:23
cited 126:17
Civil 1:5
claim 100:14
111:4 118:19
119:1 124:17
claimed 110:7
claims 3:6
clarify 48:1
81:13
class 56:12,16,17
56:19 57:8
classified 9:23
clear 4:4,13 6:3
60:12 66:14,19
66:22 69:5
clearance 40:17
40:18
clearances 12:23
13:3
cleared 59:19
69:4
clearer 37:22
client 12:12
127:10 128:22
close 49:3 57:13
closer 42:11
clue 119:15
clutch 71:22
code 31:24 76:15
codes 31:16,16
coffee 128:1
column 86:21
combative 32:6
come 62:11,20
69:3 75:2 93:4
97:11 116:8
119:21 121:9
123:22
coming 43:9

49:4
comment 53:15
54:5
commissioned
25:2,6,11 30:2
30:10,17,23
31:7
company 62:17
complaint 61:19
66:11 109:17
113:19 114:5,8
114:12,13
117:7 118:7
132:22
completed 39:10
43:13 57:5
78:13 133:9
completing 39:9
43:12,16
completion
41:23 42:3,8
comply 79:22
computer 27:4
40:18 41:19
58:2 134:9
computerized
41:20
computer-aided
134:9
Computer/Sof...
24:16
concede 109:16
concentrate 29:3
77:11
Concerns
132:21,22
concluded 81:6
81:17 132:7
conclusion
30:19
concrete 119:5
120:9,20,21,23
conduct 32:14
71:8,9,9
conducted 72:6
72:6
Confirmation

132:11
confused 31:5
76:20 78:24
83:9,16 86:4
86:10 93:13
113:6
confusion 12:12
consequences
65:20
considered 45:6
constable 25:3,7
25:10,13,17,21
25:23 27:16
28:12,21,24
29:9 30:1,2,11
30:17,24,24
31:8 33:3,18
33:21 57:24
117:11,16
constables 27:21
28:4,6 29:15
29:18 33:20
consumed 5:20
contacted
114:18,22
115:20
contend 66:11
contention 54:23
contingent 12:22
13:2
continually
31:20,23 32:2
continue 106:16
continued 31:11
contradicted
113:15
control 16:15
18:5 19:11
21:5,15 22:5
22:11,20 23:1
23:6,24 25:4,7
25:23 26:9,17
26:21 27:1,11
31:10,14 32:9
32:22 34:24
38:7,8 39:5
41:8 44:13

Morris v. Bayhealth Medical Center

138

| | | | | |
|---|---|---|---|---|
| 47:13,19 57:21 | 41:17 42:20 | 103:19,21 | **courtroom** 3:10 | 100:10,18 |
| 57:23 58:8 | 44:17,20,24 | 104:1,1,2,3 | **covered** 112:9 | 101:2 111:1 |
| 61:17 115:3 | 45:7,12 46:1,9 | 105:3,4,7,8,15 | **co-worker** 68:13 | 114:23 115:5,5 |
| 116:12,20,22 | 46:10,13,14 | 105:16,18,19 | **co-workers** 69:9 | **dated** 8:5 11:10 |
| **controller** 56:14 | 47:6,10,15 | 105:21,22 | 87:23 | 103:17 109:4 |
| 57:3 | 48:3,9,15 | 108:7,10,12,24 | **created** 33:18 | 109:10 134:18 |
| **conversation** | 49:20 50:7,18 | 109:1,4,11,19 | 117:16 | **dates** 67:15 |
| 62:4 92:7 95:6 | 50:21 51:2,11 | 109:20 110:1,3 | **credibility** | 73:17 75:5 |
| 115:23 116:11 | 51:13,18,22,22 | 110:10,15,20 | 119:18,22 | 82:11 83:9,14 |
| **conversations** | 52:1,9,19,23 | 111:2,3,6,11 | 120:1 123:17 | 83:15,16 86:16 |
| 70:20 | 53:2,6,11 54:3 | 111:14,24 | 124:4,13 | 86:17,21 93:14 |
| **coordinate** | 54:6,9,21,24 | 112:4,8,24 | **crime** 63:5,7 | 94:19 113:6 |
| 27:20 | 55:5 56:14,15 | 113:3,7,9,12 | **criminal** 13:5 | **Dave** 44:7 51:5 |
| **cop** 63:12 | 57:12,17,21 | 113:20 114:6,7 | 24:18 31:16 | 114:18 115:4 |
| **copies** 8:10 | 58:12 59:13 | 114:10,19,20 | 56:12 64:16,24 | 115:22,24 |
| **copy** 7:21,23 8:8 | 61:3,22 63:20 | 114:23 115:6 | 65:12 66:13 | 116:1 |
| 13:21 14:2 | 64:18,19 65:16 | 116:5,17,18 | 132:16 | **David** 20:9 |
| 46:8 64:5,13 | 65:19,21,22 | 117:5,8,9,13 | **crossed** 74:24 | **Davis** 103:23 |
| 103:20 106:16 | 66:23 67:4 | 117:14,18 | 75:1,4,6 77:19 | **dawned** 60:1 |
| **cordial** 71:6 | 68:13 69:10,22 | 118:9,10 119:3 | 78:23 79:17 | **day** 21:9 27:2 |
| **corner** 29:24 | 69:23 70:2,3,7 | 120:20 122:19 | 86:12,14 93:20 | 68:10 79:8,8 |
| 30:7 | 70:12 73:1,13 | 126:1,2,5,15 | 110:10 111:8 | 82:5,12,13 |
| **Corporate** | 73:16,22,23 | 126:18 127:9 | 121:14,17,24 | 87:15,21 89:11 |
| 103:14 | 74:1,3,8,11,13 | 129:5,16,17 | 122:6 124:7 | 91:1 93:22 |
| **correct** 6:9 8:19 | 74:14,17 75:12 | 130:9,10 131:8 | 127:21 | 94:4,5,6 97:13 |
| 8:20 9:6,9,15 | 75:16,17 76:5 | 131:13 134:11 | **CRR** 134:15 | 100:17,21 |
| 9:18,21 10:1 | 76:10,11,22 | **corrective** | **crystal** 6:3 | 113:11 121:10 |
| 10:15,24 11:10 | 77:15 78:1,12 | 101:20,24 | **cup** 75:19 77:1,4 | 128:5 134:6 |
| 11:12,15,18,21 | 78:16 79:7,20 | 102:14 132:19 | 77:10 84:13,14 | **days** 94:16 |
| 12:1,11,23 | 80:11 81:6 | 132:20 | 84:16 | **dealing** 19:23 |
| 13:3,9 14:6 | 82:6,15,22,23 | **counsel** 134:7,12 | **curious** 71:21 | 127:14 |
| 15:10,18,21 | 83:6,7,10,13 | **County** 59:24 | **current** 51:1 | **dealt** 19:20 |
| 16:15 17:2,9 | 83:18 84:3,4,7 | 134:3 | 62:13 | 127:15 |
| 17:15 18:9 | 84:8,19,22 | **couple** 71:18 | **currently** 6:13 | **December** 65:2 |
| 19:4,12 20:4,7 | 85:8 86:7 87:2 | 81:10,11 82:10 | 6:22 | 65:13,13 |
| 20:11,20 21:6 | 87:3,7,18 88:1 | 98:5 129:2 | **cut** 65:9 | **decide** 120:6 |
| 21:10 23:17 | 88:24 89:4,5 | **course** 23:10,16 | | **decision** 20:20 |
| 24:19,20,23 | 91:8,14,18 | 38:16 39:1,7 | _____ | 61:2,6 106:6 |
| 25:4,8,21 | 93:14,15 94:10 | 40:7 41:24 | **D** | 106:10 120:13 |
| 27:12,17 28:1 | 94:13,14,17,20 | 42:18,19 44:17 | **D** 132:8 | 127:6 |
| 28:2,9 29:21 | 95:3,4 96:8 | 47:14,18 48:14 | **date** 6:17 14:10 | **defendant** 1:7 |
| 30:3,11 33:4 | 98:8 99:3,6,7,8 | 49:6,14 50:7 | 14:11,17,18 | 1:18 114:15 |
| 34:9,17,22 | 99:18,19,22,24 | 74:5 130:15 | 16:16,17 17:4 | **defenses** 3:6 |
| 35:5,10,15,18 | 101:14,15,21 | **court** 1:1 3:2,8 | 21:19 66:15,15 | **Delaware** 1:2,9 |
| 36:15,24 37:3 | 101:22 102:1 | 3:14 4:20 5:3 | 82:13 84:20 | 1:14,23 2:11 |
| 37:4,19 38:6 | 102:14,18 | 15:1 41:1 60:4 | 86:18 87:16 | 3:3 7:8 9:11,12 |
| 38:17 39:3,4,7 | 103:7,14,15,18 | 62:1,15 63:8 | 89:19 93:18 | 13:9,16,17,18 |
| | | | 95:7 100:1,2,6 | |

Morris v. Bayhealth Medical Center

139

13:18 24:18 25:11 31:16 56:11 103:24 134:2
**DELJIS** 24:19 24:21 40:16,18 56:13,17,19 57:4,8,10,16 57:20,24 58:3 58:4,7,12,15 59:2,12,20 61:2,2,11,15 67:3,7,12 68:8 68:21 126:13 126:22,24,24 132:16
**DELJIS's** 61:6
**DEMANDED** 1:7
**denial** 109:9 126:22
**denied** 59:2,12 67:7 68:21 74:12 105:3 106:13 107:7 108:23 113:2 126:13
**deny** 61:2,6
**department** 7:5 8:4,6 9:5 13:24 18:13,20 19:4 19:6,10,16 51:24 52:18 66:4 108:11,14 126:1
**departmental** 41:24 42:9
**depending** 69:18
**deponent** 2:2 132:9 133:10 134:6,8
**deposition** 1:8 3:4,5,11,16,18 6:19 7:9,15 8:16 132:7
**description** 21:4 51:1

**Description/P...** 132:12,13
**designed** 15:20
**details** 123:9
**determinate** 89:20
**determination** 47:22 48:2,7 48:21 49:4
**dietary** 70:24 82:21
**difference** 128:9 128:10
**different** 4:7,17 12:9 28:6,6,8 79:9,11 93:10 96:4 110:21 111:1 113:11 113:18 121:18
**differently** 112:17
**difficult** 5:4
**dinner** 69:8,24
**dinnertime** 75:23
**direct** 27:16,19
**directing** 26:1 56:10 73:18 86:15,23 114:11
**direction** 134:9
**directly** 116:13 116:15
**director** 1:19 19:5,13,15 40:20 52:1,19 107:13 108:12 108:14 119:9 127:13
**director's** 48:22
**disagree** 126:20
**discharge** 17:12 33:9 103:18 104:11,15,19 105:2,6,18 106:13,18 107:4

**discharged** 102:21 103:1 119:2 124:17
**disciplinary** 97:6 132:19
**discipline** 106:7
**disciplined** 91:6 91:11
**discover** 3:5
**discrepancy** 113:5
**discrimination** 3:1
**discuss** 37:10 65:23
**discussed** 16:12 38:11 39:22,22 39:23 40:1,11 40:12,21 43:9 47:21 48:10,19 48:24 49:1,3 60:1 61:12 62:4 72:12 97:15
**discussing** 40:16 41:5 66:2 78:19
**discussion** 40:9 81:15
**discussions** 91:2
**dismissed** 63:19
**dispatch** 77:14 78:14 111:1 122:15
**dispatched** 77:24 78:7 83:3 110:8,14 110:23 121:12
**dispute** 71:1
**disrespect** 71:11
**dissatisfaction** 131:11
**distinguish** 31:2
**distribution** 7:5
**District** 1:1,2 3:2 3:3
**division** 108:16

**doctor** 32:4
**document** 7:19 7:21 8:1,2,5,14 8:22 9:1 11:14 12:1,5 14:13 15:16,20 16:2 16:5,10,17 18:15 21:13,17 25:19 26:2 28:16,22 29:2 30:15,18 31:2 46:7 50:13,18 50:21,24 51:24 52:8,14 58:22 58:24 64:1,7 64:10,12 65:11 65:15 85:22 86:18,24 95:5 95:10 99:21 100:1,22 101:1 101:5,7,9,10 103:11 105:1 105:12
**documented** 100:7,9
**documents** 7:14 8:16 17:21 100:12,13
**dollar** 96:21
**Don** 19:19,20 20:6 23:20,21 39:9,10 41:15 42:22 43:18,19 44:4,7,9
**double** 71:21 83:12 103:22 104:8
**Dover** 6:14,15 6:16 9:11 103:23
**downhill** 60:19
**downstairs** 77:5 116:4 122:2 130:3
**Doyne** 35:9
**drawing** 30:18
**drink** 88:22,24

97:10 98:3
**drive** 1:17 35:24 36:14 37:7,14 37:16 38:1 66:7
**driver's** 13:9,17 14:3 36:24 61:20 65:21,24 66:4
**driving** 62:23,24 63:1 64:6,13
**dropped** 36:18 36:22 37:2
**drove** 36:3,6,9
**drugs** 5:20
**due** 124:14 130:1
**duly** 2:2 134:6
**dumplings** 75:14,17,18 83:21 84:2 121:21 122:2,9
**duties** 21:14 22:4 26:8,16 26:16 27:7,19 27:24 29:8 32:9,22 56:13 57:12,20 58:8
**duty** 29:17 31:22 57:24

---
E
---
**E** 132:8,10
**earlier** 49:12 81:20 93:7 98:16 99:2 106:20 108:13 117:11 126:21 129:3
**early** 114:14
**easier** 113:24
**easily** 4:7
**easy** 104:24
**eat** 69:12 75:24 78:15 88:22
**eaten** 88:24
**eating** 84:16

Morris v. Bayhealth Medical Center

140

122:8
effect 57:13
effective 8:19
eight-hour 87:1
  87:2,5
either 2:18 4:6
  27:16 38:2
  59:8 66:1
  125:19 134:13
eligible 10:6
emergency
  32:20
emotional 5:17
employed 6:22
  33:2,3
employee 9:23
  14:5,8,19 15:4
  69:20 78:10
  82:21 84:10
  132:18,19
employee's
  100:2
employer 6:24
employment
  2:24 8:18
  10:15 12:21
  13:2 19:7
  20:20 21:9
  25:14 33:15
  34:6 35:7
  36:12 38:20,21
  44:5 48:9,13
  99:17 114:19
  115:20 116:8
  116:20 126:18
  126:23 132:17
enforce 31:15
enforcement
  23:8
engaged 70:19
  90:15,18
ensure 13:8
entered 87:13
entire 19:7
entirely 28:8
entries 65:17
entry 86:23

equalled 37:11
ER 32:4,15
Errata 133:7
ES 130:2,14
  131:3
ESQUIRE 1:13
  1:16
establishes 72:9
establishing
  71:24
estimate 6:2
evaluated 44:11
evaluation 32:5
  50:15 51:4
evaluations
  55:18
evaluator 52:17
evening 73:22
  73:24 74:16
  75:10,15 77:15
  77:24 79:20
  86:5 129:24
event 134:13
events 79:19
  93:13 94:7,9
  110:16 123:10
  124:11 129:15
everybody 71:12
  120:17 124:21
  124:23
everybody's
  120:11
evidence 119:5
  120:9,20,23
  123:22
exact 14:17,18
  16:16 40:24
  113:8
exactly 20:15
  49:2 77:22
  82:12 98:6
  100:10
examination
  38:17 134:11
examined 2:3
  134:7
example 24:21

excess 10:12
excuse 26:2
  88:21 90:17
  100:8 102:8
  105:23 107:4
  115:9,16
  116:23
exhibit 8:23
  15:14 17:18
  20:23 28:18
  46:5 50:11
  52:6 58:20
  63:23 66:9
  72:22 85:23
  88:3 94:23
  99:13 101:17
  103:9 105:10
  114:1,3
exits 31:21 32:3
expect 97:21
expectations
  51:13,17 53:2
  53:6,10 54:16
  54:19
experience
  24:17
Expires 134:16
explain 40:14
explained 40:24
  41:3 74:6,18
  76:16 81:24
  90:21
explanation
  43:11,15 113:5
expression 60:16
extended 70:19
extent 63:18
  101:11
ex-police 113:23
eyewitness
  109:19,21,23
  120:20

—————————
       **F**
F 1:16
facial 60:16
fact 6:9 10:8

25:10 42:12
  44:10 50:6
  67:14 71:4
  86:10 101:6
  112:20 117:19
  123:8 125:1
  130:1
factor 126:22
facts 76:20 86:5
factual 31:3
factually 30:20
failed 67:12
failure 65:18
fair 2:15 71:12
false 71:14 72:2
  72:10,14,19
falsely 92:20
familiar 27:24
  42:1 47:16
  49:17,24 50:2
  67:15 73:17
  83:15 102:10
  102:13
family 120:12
  128:11
far 14:16 19:21
  19:22 22:21
  45:24 47:2,23
  47:23 58:2
  61:10 73:14
  82:2 113:13
favor 124:24
  125:19
favorable 52:21
Federal 3:2
feel 3:21 23:5
  24:7 26:11
  55:6 67:9,10
  67:11 74:23
  95:11 98:10
  99:9 124:12,14
  127:14
feeling 55:4
Feinour 103:13
  103:17 104:5
  104:15,19,21
  105:2 106:5,8

106:13 107:7,9
  107:14 108:9
felt 24:11 80:23
  92:20 110:6,20
  120:22 125:2
  129:3
FETZER 1:22
figured 88:11
file 8:4 72:2,9,14
  72:19
filed 3:1 104:10
  104:24 114:6,9
fill 27:3
final 105:20
  107:1
find 27:3 92:21
  101:6 123:24
  129:15
fine 2:20 8:11
  85:19
finish 5:7 14:22
  23:14 42:5
finished 9:1
finishes 14:24
fire 31:21 32:3
firm 2:23
first 2:2 12:22
  13:1 14:12
  18:12 36:2
  38:20 44:5
  49:19,22 50:17
  51:23 52:15
  53:3 60:9
  67:16,20,22
  77:13 82:19
  85:14 103:11
  105:1,12
  107:12 108:10
  121:21
five 96:20
  119:20 127:16
  130:6
flexibility 37:18
floors 31:20
follow 12:13
following 82:5
follows 2:4

Morris v. Bayhealth Medical Center

141

food 67:19 69:19
70:1 76:3 77:1
77:6,19 78:10
79:11 82:22
84:10 89:9,14
89:18 90:9
91:4,8,17
92:15 93:1
110:8 121:20
122:16
foot 37:3 38:2,5
38:7
foregoing
134:10
form 2:9,14
13:15 15:23
29:10 30:4
37:20 45:13
55:10 91:19
94:2 96:13
110:18 111:19
112:5,12,14
113:16 126:6
126:19 132:21
132:22
forth 22:18 26:8
26:16
forward 60:18
found 106:12
132:2
foundation 65:7
four 10:20,21
12:9,15,18
119:20 127:15
fourth 105:20
frame 87:14
93:8
free 3:21
Freedom 1:17
Freeman 20:9
20:13 51:6,8
51:16 52:17,21
53:9,14 54:5,8
54:15,19,23
55:1,2,17 59:1
59:5,6,7,9 66:2
71:5,24 72:14

73:1,9,10,19
74:15 75:9,13
76:7 77:3,12
78:22 79:3,15
80:7,20 81:5
81:15 82:5,9
82:20 83:2,8
83:11,19,24
84:18,21 85:2
86:3 87:23
93:7 94:8
110:24 114:18
115:4,8,20,22
115:24 116:1,7
116:15 126:17
129:11
Freeman's 55:19
freshest 40:9
friend 62:9,18
63:3
Fulcher 69:20
70:4,13 71:7
71:14 72:1,9
72:14,18 98:15
98:19,24
113:13 122:23
123:1,2,5,6,12
128:12
Fulcher's 120:19
full 35:2,14
67:18 127:4
fully 57:20 89:14
121:5
full-time 9:23
further 48:1
54:8 91:2
104:10 105:5
132:4 134:10
134:12

__G__

general 9:8,14
15:17,21 16:12
83:4 132:11
gentleman 115:4
116:17
gesture 4:23

getting 76:13,17
77:18 79:17
84:12 86:12,14
93:16 110:8
119:24 122:1
130:22
gift 69:19 75:15
75:20 76:2
77:1,10 79:11
83:22 84:2,14
121:20 122:1,8
122:17
give 3:12,22 5:8
6:2 7:21 24:6
26:10,23 27:8
43:24 65:7
80:6,19 118:22
118:23
given 6:19 8:15
39:8,10,16
40:6 42:2
68:17 75:7
91:16 93:1
96:21 99:16
111:14,17
112:2,7 121:16
121:16 123:3,8
124:16 134:8
134:11
giving 80:8
93:17 122:7
go 2:5 7:12
16:20,21 26:3
26:10 27:17
37:11 40:20
43:20,23 44:7
48:17 50:1
55:20,24 58:1
58:5 67:19
69:12 70:8
74:21 90:9,12
90:22,23
104:12,14,17
107:16 115:17
119:8 127:4
131:21,24
132:1

God 74:13
goes 22:13 55:19
55:24
going 3:24 4:16
5:7 15:1 27:1
37:11 38:12,12
40:11 43:6
63:8 64:21
68:3,4 69:18
74:5 77:16,17
77:18 81:16
82:18 92:22
98:4 106:6
120:7,17
128:21
gotten 75:4 83:9
grade 9:17,19
18:4
grape 98:16 99:1
gray 76:15
grounds 35:18
36:8
guess 11:8 40:8
40:19 45:9
49:21 52:24
113:21 117:5
118:5 124:8
127:12 129:12
guy 42:13
131:22

__H__

H 1:10 132:10
134:5,15
half 10:11
119:20
handed 41:17,23
42:8
handful 130:2
Hang 23:14
happen 93:15
98:13,14
121:17 123:15
131:21
happened 7:20
40:23 41:1
43:8 45:1,2

62:6,9 67:15
67:20 72:4
74:23,23 75:3
76:11 78:20,21
78:21 81:8
93:8,9,10,19
93:20 94:13,15
94:18 113:8
115:2 121:3,4
121:9 131:20
131:20
happening 68:4
82:1 121:2
happens 55:21
55:21
happy 80:21
Harris 35:9,12
Harvey 33:4,6
117:12,23
head 18:13,20
19:3,6,10
120:11
headed 21:13
heading 18:13
18:18,19 22:3
22:17 56:11
health 5:17
healthcare 23:9
23:17 38:16
39:2 44:23
45:19 46:12
126:4 132:14
hear 55:2 83:23
116:14 124:21
heard 45:22
hearing 107:17
122:12 130:17
hearings 106:22
106:23 107:1
heat 84:11,13
held 17:11 21:8
25:13 28:20
34:8 35:23
69:21 100:4
105:17
helped 124:4,12
helps 123:17

Morris v. Bayhealth Medical Center

142

| | | | | |
|---|---|---|---|---|
| **hey** 121:2,2<br>**he-said-she-said**<br>110:4<br>**highly** 54:16,20<br>**hire** 19:18 44:9<br>44:11 119:2<br>**hired** 9:4 12:22<br>13:1,13 15:5<br>17:8 19:12<br>34:15,16,19<br>35:8 38:14<br>44:10 113:23<br>117:24 118:8<br>**history** 13:5<br>66:13<br>**hold** 22:10 23:5<br>23:24 24:12<br>25:7 30:24<br>78:10 91:17<br>93:1 112:7<br>**Holding** 89:6,17<br>91:3,7,10,13<br>91:16,22 92:5<br>111:13,16<br>112:1,6,21<br>113:1<br>**honest** 55:1<br>64:22<br>**honestly** 80:2,19<br>**hospital** 9:9,9<br>31:24 32:6,8<br>35:8 75:15<br>76:2 83:22<br>96:20 121:20<br>122:17 125:8<br>**hospitals** 9:8<br>**hour** 11:15,17<br>**hours** 5:21 9:24<br>10:3,11 85:18<br>87:14,18<br>**house** 119:23<br>120:1<br>**Hudson** 88:12<br>88:15,20 97:12<br>97:18 130:13<br>**human** 1:19<br>13:13,23 15:9 | 72:5 102:5<br>119:10 124:8<br>**hurt** 124:4,13,14<br>**hurts** 123:17<br><br>**I**<br><br>**IAHH** 43:22<br>**IAHS** 49:16<br>**IAHSS** 39:3<br>43:2,11,16<br>44:20 45:7,12<br>45:19 46:12<br>47:15 50:7<br>**ID** 13:13,14,15<br>13:16,18<br>**identification**<br>8:24 13:18,21<br>15:15 17:19<br>20:24 28:19<br>46:6 50:12<br>52:7 58:21<br>63:24 66:10<br>72:23 85:24<br>88:4 94:24<br>99:14 101:18<br>103:10 105:11<br>114:4<br>**identify** 118:15<br>118:18,20<br>119:13<br>**immediately**<br>74:2 87:9<br>**important** 3:11<br>4:21 94:4<br>**improperly** 91:3<br>**inability** 67:3<br>**inaccurate** 10:23<br>11:3 17:5<br>95:11 97:2<br>98:10 99:10<br>**incident** 40:1<br>61:21 62:6<br>78:20,21 89:8<br>95:14,18 96:2<br>98:11<br>**incidents** 93:19<br>114:15 | **include** 32:23<br>**including**<br>101:23<br>**incorrect** 12:5<br>30:20 49:15<br>**increase** 11:8,12<br>11:21 18:4,8<br>**increased** 53:5<br>**increases** 10:14<br>10:17,20,21<br>11:4,5,6,24<br>12:5,10,16,18<br>19:17 20:4,7<br>20:11<br>**indicate** 50:23<br>114:13<br>**indicated** 35:17<br>110:24 117:15<br>**indicates** 17:1<br>21:18 25:20<br>30:1,15 46:11<br>54:8 86:24<br>**individual** 20:19<br>26:8 30:10,23<br>34:7,16 35:8<br>51:17 60:21<br>105:17 115:7<br>115:19 116:7<br>116:20,24<br>118:15,18<br>**individuals**<br>32:11,14 88:6<br>129:14<br>**infers** 101:5<br>**inform** 95:2<br>**informal** 3:10<br>**information** 3:5<br>3:20,22 10:23<br>11:3 14:14<br>22:18 24:18<br>39:16 45:16<br>56:12 58:4,5,8<br>59:12 60:3,5<br>60:10 66:17<br>68:21 71:23<br>72:8,11,13,16<br>72:17 75:7 | 79:14 94:20<br>110:20 111:23<br>115:11 116:3<br>124:15,16<br>**informed** 23:12<br>23:14,19 36:13<br>36:21 39:14<br>44:16 45:10<br>57:16 66:13,22<br>69:5 83:2,20<br>86:4 96:5<br>98:23 99:4<br>110:12,22<br>112:1<br>**initial** 114:15<br>**initially** 9:17<br>42:19 95:24<br>96:5 110:7<br>**initials** 43:22<br>**inserted** 53:15<br>**inside** 31:21,22<br>31:23 35:20<br>**insisted** 79:6<br>**Instruct** 96:14<br>**instructed** 72:1<br>**insurance** 36:18<br>36:23 37:2<br>125:24 127:9<br>**insured** 127:8<br>**intelligent**<br>131:23<br>**interested** 94:8<br>134:13<br>**interfere** 5:17<br>**International**<br>23:9,16 39:2<br>**interrupt** 30:14<br>**interview** 73:15<br>73:20 78:22<br>81:6 82:11<br>85:14,15 97:21<br>116:2,8 130:7<br>130:8,21<br>**interviewed** 71:4<br>87:23 91:15,23<br>92:4,6,12<br>97:18 115:4 | 116:18 129:19<br>130:12,13,19<br>130:23 131:7<br>**interviewing**<br>116:24 117:4<br>**interviews** 86:2<br>129:10 132:18<br>**investigate**<br>127:17<br>**investigation** 8:7<br>109:17 120:13<br>127:20 129:4<br>131:11,12<br>132:1<br>**involve** 32:10<br>**involved** 61:1,6<br>63:10 101:5,7<br>**involves** 102:17<br>**involving** 61:21<br>**issue** 42:18 49:6<br>49:14 57:13<br>91:3<br>**issued** 63:19<br>106:10<br>**Issues** 132:20,21<br>**italicized** 22:3<br>**item** 75:22<br>**items** 70:1<br><br>**J**<br><br>**January** 8:5<br>134:16<br>**Jeannine** 130:14<br>**Jeff** 43:6<br>**JEFFREY** 1:19<br>**job** 51:1 132:11<br>**John** 1:16 2:22<br>**joke** 96:11<br>**joking** 96:9,16<br>**Jose** 42:13,15<br>**JR** 1:3,8 2:1<br>132:9 134:6<br>**juice** 98:16 99:1<br>**Julie** 1:10 134:5<br>134:15<br>**June** 1:10 109:4<br>109:10 134:6 |

Morris v. Bayhealth Medical Center

143

**JURY** 1:6
**Justice** 24:18
  56:12
**justify** 119:17

**K**

**keep** 27:5 82:21
  96:18
**Kent** 9:8,11,14
  83:4
**kept** 32:16
**kids** 120:10,12
**kind** 47:18 67:7
  74:3 90:15
  95:8 127:23
**kinds** 48:21 57:1
**King** 1:17,23
**kitchen** 74:21,24
  77:18 86:13
  87:19,21 95:23
**knew** 92:11
  115:5 119:18
**know** 3:8 4:5 5:6
  5:13 8:3 12:12
  14:14 18:24
  20:2 26:15
  27:4 31:7
  33:11,19,24
  34:3,4,5 38:21
  39:18,24 40:3
  41:14 43:20,23
  44:3,6 45:1,2
  45:24 46:22
  47:24 49:3
  51:4 55:21
  56:1,3,6 57:7
  59:18 61:9,9
  61:11 62:7
  67:20,22 68:15
  70:13,22 71:16
  72:4,4,7 74:5
  75:9,19 80:13
  80:22 88:19
  90:8 91:10
  92:23,24 93:3
  94:15 96:19
  97:16,19,20

100:23 113:13
114:21 115:7
115:19 117:3
118:13 119:13
119:15 120:8
120:21 122:3,5
123:1,2 125:18
127:12,16,22
127:23 128:5,5
128:6,7 131:9
**knowing** 47:23
  127:11
**knowledge**
  20:18 28:22
**known** 39:3
**knows** 119:22
  120:1

**L**

**Labor** 8:4
**Lands** 19:2,3,10
  19:15,21,22,23
  20:3,19 23:19
  42:17,24 43:21
  49:13 51:24
  52:2,18 55:3,4
  55:8,16,24
  56:1 59:4,5,7,9
  59:15,15 60:6
  60:7,22,23,24
  62:5 64:7,8,20
  65:23 66:2,16
  66:21,23 67:16
  68:17 71:5,24
  72:9,24 73:3,9
  73:11,19 74:6
  74:15 75:9,23
  76:7,21 77:12
  78:22 79:3,14
  79:18,22 80:6
  80:20 81:5,15
  81:21 82:4,9
  82:19 83:20
  84:1,18,22
  85:2 86:3
  87:22 89:13,16
  90:3 91:3

92:14 93:5,7
94:8 95:1,7
96:7 97:9 98:2
98:23 99:4
107:23 108:14
108:15,17,18
110:24 112:1,6
112:20 113:14
119:18,23
126:17 127:6
127:12 129:11
**late** 33:8
**laughed** 60:15
**law** 1:9 2:23
  23:7
**lawsuit** 3:1,7
  114:6 119:1
**learned** 105:2
**leave** 27:2 76:9
  119:24
**leaving** 27:8
**led** 121:6 127:2
  127:5
**Lee** 1:9,16 2:23
**left** 18:19 47:1,2
  59:16 64:15,17
  109:8 116:1
  117:24
**leg** 127:24
**letter** 103:17
  104:5 109:3,10
  132:16,17
**letterhead** 18:17
**let's** 11:9 26:2
**levels** 106:3
**Lewin** 1:19 55:3
  55:4 59:23
  60:6,20 64:23
  64:23 73:6,16
  76:21 105:22
  105:24 106:1,3
  106:20,22,23
  107:2,19,20
  108:4,12,18,19
  108:19 125:1,4
**Lewin's** 40:11
  40:21 43:6

48:23 59:17
61:13 62:5
66:12,18,21,24
67:21
**license** 13:9,17
  14:3 36:24
  61:20 65:21,24
  66:5
**life** 120:10,10,10
  120:11
**limited** 37:18
**line** 16:21 65:5
  79:9,10 90:23
  93:16
**list** 16:11
**listed** 11:12
  12:15 83:1
  86:17 88:6
**listen** 4:1 119:16
  120:18
**lists** 24:16 30:9
  86:18
**little** 37:22 81:14
**live** 103:23
**lived** 6:15,16
**located** 9:11,12
**location** 77:14
**locked** 27:6
**log** 27:4,4
**logbook** 27:3
**logical** 75:10
  78:6
**long** 6:15 75:5
  89:20
**longer** 36:13
  66:7
**look** 11:9,14
  14:12 19:1,1
  21:1 22:15,16
  86:16
**looked** 21:3
  119:15 120:3
**looking** 53:18
  56:5 97:3,4
  119:11
**looks** 52:4,24
  53:12 64:14

**lot** 24:22 49:1
  74:20 80:17
  96:20
**Lotus** 24:17
**low** 75:21
**lunch** 87:19
**luncheon** 85:20

**M**

**M** 1:19
**machine** 128:1
**mad** 15:2
**made-up** 93:19
**mail** 103:21
  106:15
**main** 130:6
**making** 32:2,11
  32:21 71:14
  75:22 106:6
  119:14 122:12
**male** 34:13 35:4
  35:12 102:21
  103:1
**man** 124:22
**management**
  73:12 107:6,24
**manager** 27:8
**man's** 124:19
**March** 33:9
  114:14 115:1
  117:20
**mark** 8:21 15:12
  17:17 20:22
  28:16 46:3
  50:9 52:5
  58:19 63:22
  66:8 72:21
  85:21 88:2
  94:22 99:12
  114:1
**marked** 8:23
  12:10,16 15:14
  15:16 16:10
  17:18,21 20:23
  25:20 26:2
  28:18,23 29:4
  29:18 46:5,7

Morris v. Bayhealth Medical Center

144

| | | | | |
|---|---|---|---|---|
| 47:5 50:11,14 | 85:2 93:4 | 86:24 | 101:16,17,19 | 25:20 27:15,23 |
| 52:6 53:14 | 100:4 106:21 | **money** 96:18 | 101:24 102:16 | 43:20 49:9 |
| 58:20,23 63:23 | 107:5,22 | **monitor** 27:11 | 103:8,9,11,12 | 54:9 57:23 |
| 64:2 65:11 | 108:10,21 | **monitoration** | 103:16,21 | 58:4 60:3 |
| 66:9 72:22 | **meetings** 41:24 | 32:7 | 105:1,9,10,12 | **neither** 80:24 |
| 85:23 88:3 | 82:10,14,19 | **month** 33:9 | 105:13 109:16 | **never** 25:10,13 |
| 94:23 95:5 | 107:23 | 89:21,22 | 112:19 114:2,3 | 25:17 28:20 |
| 99:13 101:17 | **meets** 51:13,16 | **months** 17:8 | 114:5,5 121:11 | 30:18 38:13 |
| 101:24 103:9 | 53:2 | 19:12 38:20 | 125:20 129:2 | 40:2 42:2,7,16 |
| 103:12 104:6 | **member** 125:24 | 89:24 | 131:10 132:9 | 44:16 45:10,23 |
| 105:10,13 | **members** 107:24 | **morning** 87:19 | 132:10,16 | 45:24 50:6 |
| 114:3 | **Memorial** 9:9 | 101:2,11 | 134:6 | 55:23 60:16 |
| **Market** 1:9 | **memorialize** | **Morris** 1:3,8 2:1 | **motive** 71:13 | 67:2,6 70:16 |
| **Martha** 88:12 | 15:20 | 2:16,22 6:13 | **Murphy** 105:18 | 70:19 71:1 |
| 88:15 97:10,22 | **memory** 14:15 | 8:14,22,23 9:2 | 106:17 107:15 | 80:4 125:12,16 |
| 98:2 130:13 | **mental** 5:17 | 10:19,23 11:3 | 109:3,3,10 | **new** 11:17 14:5 |
| **Marvin** 19:1,3 | **mentioned** 29:17 | 12:8,14,15 | **Murphy's** 106:2 | 14:8,19 15:4 |
| 19:21,22,23 | 59:23,23 89:13 | 14:12 15:13,14 | | 46:21 134:3 |
| 20:18 43:21 | 95:21 | 15:16,17 16:11 | ————————— | **night** 27:5 32:1 |
| 52:5 55:23 | **merit** 1:10 10:14 | 16:19,20,21 | **N** | 32:8 70:5 |
| 92:14 108:14 | 10:17,20,21 | 17:17,18,20,21 | N 132:8 | 76:12 88:22,24 |
| **Maryland** 40:23 | 11:4,5,6,12,20 | 18:12 20:22,23 | **name** 2:22 13:20 | **Ninety** 69:17 |
| 43:8 61:21 | 11:24 12:5,10 | 21:1,2,4,18,22 | 13:20 16:1,4 | **Nodded** 13:7 |
| **meal** 69:9 73:21 | 12:16,18 19:16 | 22:2 24:14 | 33:4 34:16 | 61:23 74:9 |
| 75:14 76:1,8 | 20:4,6,10 | 25:20 26:2,3,7 | 35:9 40:17,19 | **NOLTE** 1:13,13 |
| 78:15 86:5 | **met** 73:1 76:6 | 26:19 28:17,18 | 40:19 42:14 | 2:7,11,13,17 |
| **meals** 69:15 | 82:4 94:12 | 28:20,23 29:23 | 59:19 61:10,12 | 2:19 8:3,10 |
| **mean** 13:17 54:5 | 95:1 106:19 | 29:23 30:22 | 90:8,8 115:13 | 11:4 12:7 |
| 61:8 69:12 | **Microsoft** 24:17 | 40:5 46:4,5,7,8 | 117:12 118:11 | 14:24 15:23 |
| 79:2 81:7,9 | **middle** 53:15,18 | 47:5 50:10,11 | 118:13,22,22 | 16:18 21:16 |
| 94:4 97:5 | **mid-April** 71:2 | 50:13,14 51:23 | 118:22,23 | 29:10 30:4,14 |
| 100:20 120:8 | 86:3 | 52:5,6,8 53:14 | 130:11 131:17 | 31:1 37:20 |
| **means** 31:8 | **Milford** 9:9,12 | 54:2 55:15 | **named** 34:7 | 45:13 53:17 |
| **meant** 48:3 | 9:12 | 56:9 58:19,20 | 42:13 78:10 | 55:10,13 61:24 |
| **Medical** 1:6 2:24 | **mind** 55:23 81:8 | 58:22,23 63:22 | 82:21 | 65:4 74:10 |
| 8:19 25:14 | **mine** 62:9 | 63:23 64:1,2 | **Nathaniel** 1:3,8 | 85:17 91:19 |
| 33:3 105:15,21 | **misconduct** | 65:11,12,18 | 2:1 132:9,16 | 94:2 96:13 |
| 114:17 | 90:16,19 | 66:8,9,11 69:8 | 134:6 | 100:24 108:18 |
| **meet** 89:16 | **mistaken** 44:1 | 72:21,22,24 | **near** 47:21 | 109:12 110:18 |
| 106:5,7,11 | 59:14 | 83:1 85:22,23 | **necessarily** 23:3 | 111:19 112:5,9 |
| 128:21 | **mixed** 76:13,18 | 86:2,15 87:22 | 23:10 | 112:14 113:16 |
| **meeting** 42:9 | 83:9 93:9,20 | 88:2,3,5,6 | **necessary** 22:19 | 126:6,19 |
| 73:3,6,10,11 | 107:10 122:11 | 94:22,23 95:1 | 23:5 24:4,8,11 | 127:10 128:18 |
| 73:19 77:13 | 122:13,15,16 | 95:5 97:1,3 | 70:10 | 132:5 |
| 81:13,17 82:8 | 122:17,22 | 98:9,18 99:9 | **need** 5:12 22:24 | **normally** 37:8 |
| 82:18,24,24 | 124:9 | 99:12,13,15,15 | 23:3 25:5 58:2 | 57:24 69:11 |
| 83:19,24 84:21 | **Monday** 1:10 | 100:11 101:4 | 58:6,7 88:11 | **North** 1:9,14 |
| | | | **needed** 23:15 | |

Morris v. Bayhealth Medical Center

145

**Notary** 1:11
134:5
**note** 2:13 21:16
53:24 65:4
97:6 100:1
**notes** 24:17
132:19 134:8
**notice** 1:9 99:15
**November** 8:19
14:6,8
**number** 1:5 10:8
12:22 33:19
**numbers** 26:13
51:20
**numerous** 123:9

**O**

**oath** 2:3 3:9,13
**objecting** 112:11
**objection** 2:14
15:23 29:10
30:4 37:20
45:13 55:10
65:4,6,7 91:19
94:2 96:13
110:18 111:19
112:5,14
113:16 126:6
126:19 127:10
**objectionable**
112:13
**objections** 2:8
**obligation** 68:23
**obligations** 28:6
**obscured** 53:23
**observed** 68:13
**obtain** 3:17
**occasionally**
31:11
**occurred** 7:13
61:21 76:20
111:1 114:16
**October** 6:18
**offense** 101:21
**Offer** 132:11
**office** 40:12,21
43:6 48:22,23

48:23 55:19
59:15,16,17
60:7,8 61:13
62:5 66:12,16
66:18,21,21,24
67:17,21 73:4
73:16 74:4
81:9,10 90:3,5
102:6
**officer** 9:4 27:1
27:16 28:7,9
28:15 31:12,14
31:19 32:10,23
33:13 34:8,17
34:21,22 35:9
35:17 36:3
37:5 38:15
41:9 44:8,13
44:23 45:19
54:2 57:3,12
71:10 102:17
102:21 103:1
105:14 113:20
113:23 114:17
114:22,24
115:8,9,12,13
116:21,22
118:8,12 119:3
126:4 130:3
**officers** 27:3,21
37:9,24 40:6
46:9 115:11
**officer/control**
28:15
**offices** 1:9
**off-going** 27:1
**oh** 2:12 23:8,13
36:11 39:13
61:17 63:17
69:1 120:21
122:19
**okay** 2:8,15,20
3:22 4:10,17
5:8,9,14 6:5
11:9,22 12:20
12:21 14:16
16:17 19:18

22:12,16,21
23:4,8 24:9,14
26:6,14 29:6
30:6 38:10
44:21 47:9
48:5 49:5,6,19
51:7 53:4,22
55:7 60:12,24
61:9,19 62:16
62:20 63:10,11
65:23 66:20
67:14 69:7
75:3 76:6 77:7
77:16,23 82:14
84:17,21,23
91:22 96:4
104:23 105:5
107:3 108:6,11
108:15,15,22
109:14 112:16
112:19 113:1
113:13,18
119:17,22
121:23 122:22
126:3,16
128:20 130:17
**once** 16:16 37:2
43:4 44:12
55:18 57:13
70:7 76:12
77:1,17 78:20
79:16 81:7,18
82:11 85:3
93:6,8,18
96:18 107:14
110:10 111:7,9
112:10 116:3
120:2 121:1,23
123:19 124:6
124:19,19
127:2 130:22
**ones** 92:4 129:22
130:6
**ongoing** 32:7
**online** 102:1,2
**open** 117:7,16
117:19 118:3

120:1
**opening** 117:10
**openings** 118:1
**operate** 40:18
**operating**
105:14
**operator** 16:15
18:6 19:11
21:6,15 22:5
22:11,20 23:1
23:6 24:1 25:4
25:8 26:9,17
26:21 31:11,15
32:10 34:24
38:8 39:6
47:13,19 57:21
57:23 58:9
61:17 116:23
**operator/secu...**
32:23
**opinion** 24:6
120:19
**opposed** 3:10
4:22 5:1
**option** 2:17
**order** 22:24 25:3
25:7 27:23
30:1,24 61:17
70:5 116:13
**ordered** 97:10
98:3
**orders** 44:14
**orientation** 14:6
14:8,13,18,20
15:4,7,17,21
16:12 132:11
**original** 84:7
**outcome** 120:24
121:1 124:14
131:13
**outside** 31:22
32:20 35:21,23
70:16
**overall** 51:12
53:3,5 54:11
**overhear** 115:23
**overheard**

116:10,16
**overtime** 10:6,8
54:9 74:20
83:14,15 96:20
111:5 119:22
122:18
**owe** 90:24
**owed** 70:6

**P**

**packed** 129:23
**page** 10:19,23
11:3 12:8,15
14:12 16:19,20
18:12 21:13
22:2,2,8,8,13
24:14 26:1,3,4
29:4,23,24
30:7,9,15,17
50:17,20,23,24
51:23 52:18
53:3,13,15,19
56:9 103:11
105:1,12
114:12 132:9
132:10 133:6
**pages** 51:15,20
51:21 52:15
53:8 103:16,21
**paid** 55:23 62:10
62:12 84:6
**pamphlet** 102:7
102:9,12
**paper** 41:21
**paperwork**
19:22 60:2
69:2 92:3
100:7,10,15,19
101:4,11
**paragraph**
29:17 98:15
114:11,13
117:6 118:6
**parentheses**
16:23
**parking** 24:22
**Parkway** 1:14

Morris v. Bayhealth Medical Center

146

**Parrack** 1:10
134:5,15
**part** 8:6 26:3,7
53:21 57:11
127:1
**parties** 134:7
**party** 134:13
**pass** 38:17 62:20
**passed** 23:9
39:14,20 41:11
42:20,21 44:16
44:19 45:6,8
45:11
**passenger** 62:23
**passing** 40:7
**pat** 32:18
**patch** 46:8,11,15
46:17,19,19,23
47:1,2,4
132:14
**patient** 32:4,16
32:17
**patients** 32:6
**patrol** 35:18
37:3,6 38:2,2,5
38:7
**pay** 9:17,19,24
11:15,17 12:9
18:4 62:18
65:18 70:10
132:18
**paying** 60:14
68:18 74:8
76:8 77:7
119:6
**Pearis** 34:17,18
35:2
**pen** 102:22
103:2
**penalties** 3:13
**pending** 109:7
**Pennsylvania**
1:17
**people** 32:6
42:12,13 46:23
69:12 88:14
96:19 97:8,15

116:12 122:12
127:15 129:15
129:21 130:2,2
130:6,9
**Pepsi** 128:8
**perceived** 24:2,4
121:7
**percent** 40:6,10
41:13 69:17
**perfect** 119:21
**perform** 29:19
57:20
**performance**
21:5 51:12
52:9,11 53:13
53:19 55:16
56:4,13 57:11
132:15,15
**performed**
26:17
**performing** 58:8
**period** 9:24 19:7
34:6,22 35:7
52:12,22 53:1
65:13
**permitted** 32:13
36:14 38:1
**person** 35:23
37:7,14 75:10
90:24 117:3
119:12 124:20
124:22 127:14
127:15 130:23
131:17
**personal** 28:22
32:14,15 71:13
**personally** 24:7
70:13
**personnel** 15:8
132:12
**pertaining** 28:5
**Pg** 132:11,12,12
132:13,15,15
132:17,17,18
132:18,19,20
132:20,21
**Photocopy**

132:14
**phrase** 93:11
**physical** 4:22
5:16
**piece** 60:2
**place** 72:5 73:3
79:20 80:5
83:1 93:14
94:9 110:17
123:10
**plaintiff** 1:4,15
118:7
**plaintiff's**
114:16,18
118:9
**plastic** 84:11
**plates** 24:22
62:21
**please** 3:21 5:7
8:21 15:12
17:17 20:22
26:12,19 46:3
50:9 52:5
58:19 63:22
66:8 72:21
85:21 88:2
94:22 99:12
101:16 114:1
**pocket** 96:18,21
**point** 3:18 5:13
14:2 15:5
36:12 81:5
104:24 118:5
**police** 33:13
113:20 114:17
114:22,24
115:8,9,12
118:8,11 119:3
**policies** 15:8
101:23
**policy** 36:18,23
37:3 101:20,24
102:14 103:6
105:6
**position** 7:4
16:15 17:11
21:4,5,8,13

22:3,9,10,12
22:17 23:5,24
24:12 25:3,7
25:13 26:4
27:6 28:8,21
28:24 29:4,8,9
29:15,18 30:16
30:24 33:12,18
33:22 34:1,8
35:20,21,23
57:21 69:21
102:16,17
105:17 116:18
117:1,3,17,20
118:9 127:14
132:12,13,13
132:14
**positions** 28:1
117:7 118:4
**positive** 54:12
55:8
**possible** 36:8
47:4 66:3
100:3 120:7
**Post-It** 53:24
**preference**
30:23
**Preferred** 30:16
**prejudiced**
54:24 55:5
**preparation**
7:15 8:16
**prepare** 7:9,10
**prepared** 51:4
55:17 80:22
81:3
**present** 1:19
66:18 73:6
106:21,22
107:2 108:4,17
108:20
**president** 103:13
108:16
**pretty** 19:20
20:8 22:6 36:7
54:12,16,20
59:8,10,10

110:4 119:6
**previous** 3:20
11:15 23:7
52:8,14,23
73:22,24 74:16
75:10,15 77:15
77:24 106:7
107:4
**previously** 68:22
102:20,24
**price** 67:18
**principal** 111:12
**print** 16:1
**printer** 134:9
**prior** 6:19 17:21
27:8 33:14
40:11 43:10
44:11 48:6,6
48:21 58:23
64:5 71:1,19
76:7 87:9
89:20,21,24
106:5,9 114:16
115:2 117:12
121:1 126:24
126:24 127:3
**privileges** 59:3
59:12 61:3,7
67:4,8 68:8,22
126:13,22
**probably** 63:13
65:9 97:15
98:16 118:20
**problem** 38:13
74:3 103:5
105:6
**procedure**
104:18 105:21
**proceed** 6:11
70:2 77:8
**proceeded** 76:3
**produce** 100:12
**produced**
100:15 101:1
101:10
**production**
100:11

Morris v. Bayhealth Medical Center

147

| | | | | |
|---|---|---|---|---|
| **professional** 71:6 134:5 | **Q** | **R** 1:13 | 55:7 59:18 | 121:7,8 |

professional 71:6 134:5
proffer 65:8
promoted 16:14
18:5 31:10
39:5 41:8
47:12,18
promotion 17:1
17:8 19:11,14
properly 89:9,17
90:9 91:8
92:15 120:4
127:17 130:18
property 29:20
protocol 28:13
prove 123:19,19
123:21
provide 6:4 8:7
Prussia 1:17
psych 32:5
psychiatric 32:5
Public 1:11
134:5
pulled 62:21
63:11
purchase 73:21
84:7
purchased 75:14
76:2 83:21
84:1
purpose 3:5,16
84:12
purposes 12:7
100:24
pursuant 1:9
put 21:16 40:17
40:19 70:1
75:22 84:14
88:10 92:22
118:8
putting 44:1
61:10
puzzle 92:22
puzzled 59:21
p.m 17:14,14
132:7

**Q**
qualification
22:13 23:24
25:23 30:9
40:3
qualifications
22:9,10,17,19
22:22,24 23:2
23:4 24:3,7,11
30:16
qualified 25:3
quality 120:13
120:13
question 2:9
3:21 4:3,6,6,8
4:12,15,17 5:8
6:1 11:1 12:11
12:13 15:1
20:1 21:23
24:2,4 28:5
29:2 40:22
45:4,5 55:15
56:24 72:7
75:2 81:13
96:4 97:19,20
97:24 98:1
109:7 110:21
118:17 123:7
124:2,10 126:7
128:23 130:17
130:22
questioned
122:4
questioning 65:5
114:15
questions 3:17
3:20 4:1,2,20
4:22 5:5 6:11
19:23 21:20
73:20 74:19
121:2,3 128:17
128:19 129:2
134:7
quickly 128:22
quite 85:5

**R**

R 1:13
race 124:18
racially 54:24
55:5
radio 76:8
raise 10:17 40:7
41:11,13
raised 49:14
ran 62:11
rated 51:16 53:1
53:9 54:15,19
rater's 53:20
rating 51:12
52:22 53:3,5
ratings 26:11
51:17
read 2:16 7:16
11:7,8 26:12
29:1 50:3,3
80:21 81:2
92:3 95:9
113:4 114:8
123:2 132:5
reading 22:21
29:14 95:13
98:4
ready 119:24
real 68:6,15
really 4:4 11:7
17:23,23 24:10
31:5 32:21
45:14 46:21
55:2 56:20
58:6 66:15
67:15 70:22,23
71:19 75:3
83:14 85:16
88:14 92:8
93:23 98:14
119:11 125:2
128:9 131:11
Realtime 1:11
reasked 97:20
reason 10:22
11:2 12:4 17:4
17:6 32:7
36:17,21 45:18

55:7 59:18
61:1,5 63:11
68:6,15 104:14
104:17 126:17
reasons 61:13
67:11 119:17
126:16
recall 6:8,9 8:1
13:12 19:20
20:13,16 29:14
32:21 34:20
36:9 40:20,22
41:6 42:21,22
44:1 46:17
48:16 50:8
56:19,20 58:24
63:7,9,13,14
64:20,23 66:1
66:2 73:8,14
75:21 77:14,22
77:23 79:5,21
80:8,16,18,20
81:4,9,18,18
81:22 82:1,3,8
82:10 83:13
84:24 85:9,15
88:21,23 89:11
91:5 92:7,9
93:16 99:20
100:6 102:9,12
104:4 106:12
108:3
recalled 81:20
receive 7:24
41:11
received 10:11
10:14 11:20
15:7 17:7 18:4
18:8 19:13
20:11 42:12,15
42:16 44:13
45:16,21 68:21
75:19 76:24
77:6 78:4 79:8
103:20 104:5
126:11,12
receiving 7:5

121:7,8
recess 8:12
85:20 109:5
128:24
recognize 18:11
recollect 26:23
41:5 43:5 57:5
recollection 6:2
31:3,4 40:9
47:20 76:24
recollections 6:4
record 2:14 12:8
13:6 15:17
21:16 43:3
48:1 64:6,14
64:16,24 65:12
66:14,22 101:1
110:13,22
112:20 132:11
132:16,19
records 43:12,16
83:5 113:15
referring 16:18
53:2,17
reflect 95:6
refreshes 14:14
refusal 88:10
refuse 99:23
refused 79:22,24
refusing 80:3
regard 5:10
107:3 125:23
regarding 79:19
86:5 87:24
88:6 91:23
93:5 106:17
107:6 109:21
112:21 114:19
115:20 116:8
121:19 124:11
regardless
123:21
regards 92:13
register 128:3
130:4,21 131:1
Registered 1:10
134:5

Morris v. Bayhealth Medical Center

148

| | | | | |
|---|---|---|---|---|
| **regular** 28:7,14 | 123:16 124:3 | 33:14,17 | 9:12 10:4,6,12 | 109:8 115:3 |
| **rejected** 61:12 | 124:11 | 117:12 | 11:14,22 12:19 | 116:12 |
| 104:22 | **rephrase** 4:6 | **resolution** 103:6 | 13:6 17:12 | **rotating** 27:7 |
| **relate** 65:18 | **replace** 37:6 | 105:6 132:20 | 18:21,22 22:14 | **roughly** 48:18 |
| **related** 100:13 | 119:3 127:7 | 132:21 | 24:15 25:15 | **rounds** 31:20,23 |
| 132:20,21 | 133:6 | **resource** 13:13 | 27:21 31:12 | 32:2 97:14 |
| **relating** 67:3 | **replaced** 34:3,4 | **resources** 1:19 | 36:19 37:1,16 | **row** 111:5 |
| **relationship** | 51:10 113:20 | 13:24 15:9 | 37:17 38:3,20 | **rule** 32:16 |
| 71:6 | 118:16,19 | 102:6 119:10 | 38:23 41:18 | **run** 24:21 62:21 |
| **relative** 134:13 | **report** 7:16,18 | **respect** 71:11 | 44:5 47:12 | 97:14 |
| **relevancy** 65:6 | 68:16 71:14 | **respective** 134:7 | 51:10 52:12,15 | **running** 49:2 |
| **relevant** 3:6,19 | 72:2,10,15,19 | **respond** 76:9 | 53:24 56:4,5 | 92:9 |
| 15:8 93:23 | 82:2,3,7 98:4 | **responded** 78:11 | 58:9,17 60:11 | |
| **relief** 34:11 | 124:23 128:12 | **response** 6:8 | 61:7,16 62:18 | **S** |
| 35:15 | 132:17 | 7:24 | 63:21 64:17 | s 49:22 132:10 |
| **remember** 7:12 | **reported** 60:13 | **responses** 4:24 | 65:24 66:14,24 | **Safety** 9:5 23:10 |
| 13:20 14:10,18 | 62:17 67:17 | **responsibilities** | 67:8 69:6,16 | 23:17 39:2 |
| 16:17 17:23 | 71:21 90:7 | 21:15 22:5 | 70:6,11,17 | **salary** 18:8 |
| 34:18 40:24 | 94:10 95:22 | 26:9 27:24 | 71:7,12 72:10 | **Salisbury** 62:7 |
| 42:13 43:4 | 98:17,20,22 | 28:24 29:9 | 73:24 76:4 | **sample** 21:5 |
| 47:22 49:10 | 128:15 | **responsibility** | 77:11,16 78:7 | **sat** 107:18 130:1 |
| 50:5 56:21 | **reporter** 1:10,11 | 43:19 102:18 | 78:11,18,19 | **save** 29:3 |
| 59:20 63:8 | 3:8 4:21 5:3 | **responsive** 3:21 | 79:1,4,15 80:7 | **saw** 27:14 42:2,7 |
| 64:8,10,12 | 15:1 62:1 | 124:2 | 81:17,21 83:9 | 98:19 99:1 |
| 65:1 80:2,2,12 | 134:4,5 | **restate** 21:22 | 83:12,17,22 | 125:12,14,16 |
| 80:24 81:1,11 | **represent** 2:24 | **result** 18:5 63:5 | 84:11 85:16 | 129:15 |
| 81:23 89:10,12 | **request** 8:1 | 91:7 | 86:11 87:6,10 | **saying** 24:5 |
| 90:11,13 98:6 | 79:23 100:11 | **results** 109:17 | 87:11,15 89:5 | 39:12 44:21 |
| 102:7 107:11 | 132:12 | **retired** 113:20 | 96:7 98:3,7 | 45:14,20 48:12 |
| 115:14,16,18 | **requested** | 114:17,21,24 | 99:2 100:19 | 49:8,10,11,22 |
| 118:2 125:10 | 111:22 | 115:9,12 118:8 | 102:7,9 103:4 | 60:20 74:12 |
| **remembered** | **require** 61:10 | 118:11 119:3 | 103:6 104:2,15 | 76:23,23 78:20 |
| 62:8 | **required** 22:10 | **retrieve** 60:3 | 104:19 108:15 | 79:13 81:22 |
| **remembering** | 25:2,6 38:16 | 78:15 | 110:9,14,17 | 93:12 96:3 |
| 14:16 40:10 | 39:6 45:15 | **retrieved** 116:3 | 111:18 112:3 | 100:16 104:21 |
| 94:21 | 47:13 57:2 | **returned** 78:14 | 112:23 117:17 | 104:22,23 |
| **rental** 61:22 | **requirement** | 79:4,7 84:5 | 121:13,21,22 | 107:3 111:21 |
| 62:10,16 | 30:19 41:14 | **review** 7:14 8:15 | 126:14,23 | 111:22 116:9 |
| **rented** 62:12 | 61:10 | 21:5,18 55:8 | 128:3,6,14,16 | 119:12 123:8 |
| **repeat** 11:1 | **requirements** | 132:13,14 | 129:6,8 130:14 | 123:24 124:1 |
| 12:24 25:5 | 61:9 | **reviewed** 50:24 | **rights** 108:16 | 125:19 132:1 |
| 30:6 43:14 | **requires** 6:1 | **reviewing** 9:1 | **right-hand** | **says** 14:13 18:19 |
| 58:13 61:4 | **reserved** 2:9 | 127:15 | 24:15 29:24 | 22:21,22 23:7 |
| 67:5 91:21 | **reside** 6:13 | **revised** 21:18 | 30:7 | 30:12,17 31:2 |
| 104:16 118:17 | **resignation** | **revocation** 64:14 | **ring** 70:5,8 | 51:6 56:11 |
| **repeatedly** 79:6 | 33:17 117:16 | **rid** 55:9 | **RMR** 134:15 | 60:8 64:15,19 |
| 121:11 123:3 | **resigned** 33:8,12 | **right** 3:24 4:9,12 | **room** 32:20 | 65:15,15 82:7 |

124:20
scale 12:9
scene 27:17
scheduled 9:24
  10:3 14:5,7
  87:1,5
school 28:10
Scott 33:4,6,8
  34:3,4 117:12
screens 27:11,15
searches 32:14
  32:15,21
second 12:8
  16:18,20 24:15
  30:14 47:18
  48:14 49:7,9
  49:11,14,23,24
  50:6 60:13
  82:24 83:19,24
  84:21 85:2,14
  103:16,20
  106:3 107:13
section 21:12
  22:1,7 29:4,7
security 9:4,5
  19:4,15 23:10
  23:17 27:16,20
  28:7,9,14
  31:12,14,19
  32:10 34:8,17
  34:20,22 35:9
  35:17 36:3,3
  36:10,14 37:5
  37:24 38:1,15
  38:17 39:3
  40:6 44:23
  45:19 46:8,12
  56:14 57:3,12
  66:4 71:10
  102:17,21
  103:1 119:10
  126:1,4 130:3
  131:3 132:14
see 4:19 10:21
  14:16 25:22,24
  26:4 40:9
  42:11 48:19

55:2 64:4 81:7
  86:16,21 89:3
  131:4
seeing 17:24
  58:24 102:7,9
seeking 116:20
seen 8:1 17:20
  18:3 30:18
  32:4 42:11
  50:13 58:22
  60:14 64:1
  68:2,17 71:18
  77:3 118:20
  125:2,4,7
select 69:24
Senior 103:13
sent 60:10
series 4:1
serious 60:17,17
  95:12,13,14,17
  95:18,19 96:1
  96:2,7
served 100:11
service 78:10
  79:7 84:10,10
Services 9:6
  103:14
serving 32:23
  79:4 84:6
set 22:18 26:16
sets 26:8
setting 3:10
Sheet 133:7
she'd 70:11
shift 17:14 26:20
  31:19 37:9
  74:21 87:1,2,5
  87:6,15
shifts 10:9 25:17
  31:12 34:11
  75:5 83:12
  86:6,11 87:9
  111:5 122:18
shocked 96:23
  96:24
shop 69:19
  75:15,20 76:2

77:2,10 79:11
  83:22 84:2,14
  121:20 122:1,8
  122:17
shortly 15:5
  41:8 48:8,8,12
  49:13 81:14
  88:17
show 12:8 13:15
  14:2 64:7
showed 13:14,19
  64:10 109:18
showing 64:8,20
shows 10:20
  11:15,17,20
sick 37:6,15
side 11:14 24:15
  119:16 127:24
  128:3 129:7
  130:4,24 131:4
sign 2:16 16:4
  55:20 56:3
  60:2 69:2
  99:20,23
signature 16:8
  18:11,14,17,22
  18:24 50:17
  52:15 100:2
signed 51:24
  52:2,4,17,18
  55:24 56:2
  133:9
significant
  102:18
signing 19:24
simple 67:14
  131:22
simply 4:5 58:5
  93:13
single 131:17
sir 4:9,11,14,18
  5:15,19,22,24
  6:6,10,12,21
  6:23 8:17 9:3,7
  20:8 25:5 29:2
  51:19 87:16
  90:2 110:6

128:16
sit 14:17 32:16
  45:17 69:11,13
  69:13 76:19
  97:13 104:8
  118:21 129:18
  130:11 131:21
  131:23
sitting 32:3
  88:19 89:11
  129:22 130:6
  130:14 131:5
situation 7:13,20
  43:7 60:1
  61:13 62:9
  81:24 90:22
  110:5 119:11
  127:17
six 12:9 17:8
  19:11 130:6
sleeping 32:7
SLR 1:5
Smyrna 7:8
socialized 70:16
soda 60:14,22
  68:2,5,13,17
  71:15,18 72:2
  74:7 87:24
  88:7,17,18
  89:2,3 91:24
  92:17 95:22
  96:6,22 109:22
  119:6 120:3
  121:10 122:13
  124:20,21,22
  125:2,5,7,12
  125:15,17
  128:4,10,14
  131:2 132:3
somebody 69:11
  90:20 97:21
  121:4,10,10
  127:3 130:24
somebody's
  120:5
somewhat 53:23
  55:6 67:14

75:6 86:4 95:8
  127:16
sorry 7:2 14:23
  15:3 42:6
  48:17 50:1
  59:5 62:2,3
  74:11 83:23
  85:5 90:12
  106:24 108:19
  109:12 125:18
  128:20
sort 15:9
sounds 4:23
soup 83:21 84:2
  84:11 121:22
speak 5:5,10
  88:15 90:4
  130:3
speaking 48:6
  89:13
specifically 26:3
  90:6
speeding 63:12
  63:14
spoke 42:17,24
  88:9,9,12,13
  88:14 131:19
  131:19,19,20
spoken 88:5
  92:19 112:21
  131:18
Standards 26:4
standing 127:22
start 114:16
started 28:4
  36:2 44:12
  49:4
starting 26:21
starts 22:8 54:2
  86:17
state 25:11
  65:12 117:6
  118:6 134:2
stated 12:4
  47:22 67:17
  82:20 116:2
  127:23

Morris v. Bayhealth Medical Center

150

| | | | | |
|---|---|---|---|---|
| statement 71:17 77:16 79:18,24 80:3,5,6,8,11 80:15,16,19,21 81:2,17,19,21 81:23 85:1,4,7 85:11,13,13,16 94:3 95:13,15 95:16 111:7 119:14 121:23 122:20 | stories 110:10 121:24 122:6 124:7 story 91:16 92:24 110:13 110:23 111:13 111:17 112:2 121:12,15,19 122:6,24 123:3 123:9,16 124:3 124:6,11 129:8 | 47:14 supplied 8:6 support 65:18 65:22 91:16 98:12 110:13 110:22 111:13 111:17 112:2 112:15 supported 83:5 92:24 93:3 supporting | System 24:19 56:12 _____ **T** T 132:10 table 130:6 tags 62:11 take 3:4 4:24 5:12,13 14:12 19:21 23:15 | tell 26:19 31:18 48:17 57:4 70:5,8 77:4,23 89:16,19 90:24 92:5 97:10 98:2 125:4,8 129:7 telling 14:11 42:22 43:4 80:20 81:9 |
| statements 97:5 113:14 states 1:1 22:9 22:19 28:23 station 70:2 steal 74:13 96:17 96:17,22 123:13,14 | Street 1:9,23 strike 96:15 115:9 stuff 19:24 43:9 49:1 80:17,17 93:19 Styrofoam 77:8 77:10 84:14 | 124:17 supposed 38:19 45:20 47:17 126:12 supposedly 94:10 124:20 sure 4:4 7:23,23 9:19,20 14:21 | 38:16 39:6,12 42:23 43:24 45:1,15 47:14 47:17 48:14 49:9,17 50:4,6 56:11,16 85:17 99:5,7 120:2,5 124:20 125:2,4 | 82:3 83:13 84:17 90:21 100:14 117:23 Terence 105:18 109:3,10 term 31:7 terminal 101:21 terminate 20:20 |
| stealing 60:22 68:13 102:21 stems 40:13 Stenotype 134:8 step 103:12 104:14,18 105:13,20,20 106:7 107:4,5 107:6,11 108:6 108:8,9,11,11 108:21 109:9 | subject 3:12 6:5 submit 85:1 submitted 58:11 58:14 subpoenas 32:24 substance 75:19 77:9 95:6 sudden 121:9 sufficiently 129:5 | 14:24 18:1,2,2 27:6 29:12,13 32:17,19 33:11 36:11 38:4 40:8,15 43:15 44:8,15 45:9 46:22,24 47:3 47:8,9,24 49:2 49:7,8 57:5 | 125:7,12,15,17 132:3 taken 1:8 4:20 8:12 23:8 39:8 41:4,4,20 42:19,22 43:3 56:21 57:1,3 79:19 83:1 85:20 109:5 | 126:18 127:7 terminated 67:9 67:12 68:4,7,9 68:11,12 100:17 113:22 118:7 terminating 119:17 termination |
| steps 104:12,13 Stevens 1:9,16 2:23 sticking 120:15 stipulations 2:6 STOKES 1:13 stole 122:13 124:21 | suit 134:13 Suite 1:14,17 summarizes 21:14 22:4 29:8 summary 21:14 22:4 29:5,8,16 29:18 | 58:10 59:4,7,8 63:13 69:1 82:13,17 85:3 85:4,6,19 90:2 92:18 97:12,17 98:7 100:6,9 100:10,16 102:11 104:7 | 112:22 113:2 113:10 128:24 134:8 talk 89:7 92:11 92:16 115:8,22 116:12 123:2 125:1,6 | 21:20 33:15 42:11 43:10 48:3,8,13,20 48:24 49:13 55:3 57:14 89:20 90:1 93:5 95:2 99:15,17 100:4 |
| stolen 61:22 62:11,17 71:15 72:2 87:24 88:7 91:24 92:17 96:6,12 109:22 stop 63:6 | superiors 119:10 supervisor 19:18 19:19 20:9,14 44:4,12,13 51:8 61:15 108:11 114:18 114:22 supervisors | 104:20 107:15 118:3 120:6 surprised 123:4 123:11 suspected 60:21 suspended 65:21 suspensions 36:23 61:20 | talked 42:14 88:12 92:13 97:12 107:18 125:14 129:13 talking 5:11 8:4 18:14 29:20 49:16 81:12 101:4 116:13 | 103:5 107:22 108:24 117:13 126:23 terms 112:15 127:20 Terry 103:13 106:2,5,8 107:15 109:3 |
| stopped 63:16 store 7:7 | 57:15 supervisory | 65:24 66:5 suspicious 24:22 sworn 2:3 134:7 | 116:16 129:9 129:10 technically 12:11 television 27:11 | test 39:8,9,10,11 39:12,15,17,21 40:10 41:3,7 41:12,16,17 |

Morris v. Bayhealth Medical Center

151

43:3,12,17,18
43:24 45:2,2,6
45:8,11,15,16
45:23 47:23
49:7,9,11,16
49:17,19,20,22
50:4
**testified** 2:3
81:20 96:5
108:13 117:11
121:11,14
126:21 129:3
**testify** 5:18
**testifying** 3:14
42:7,10 46:18
62:16
**testimony** 3:12
4:19 5:4 41:10
41:16 44:16
49:12 50:1
86:9 95:24
106:20 121:16
134:11
**tests** 57:2,4
**theft** 101:20
103:1
**thick** 50:2
**thing** 15:9 60:10
60:13 77:17
93:6 120:16
**things** 7:12
27:10 28:13
32:5 41:3
48:10,18,21
49:3,4 60:8
121:6 127:2,5
**think** 3:19 5:6
21:17 24:3
28:3,3 30:19
36:5,7 39:23
46:22 55:7
56:23 59:21
75:3 76:15
88:13 89:7,21
89:22,24 93:12
95:17 96:7,9
96:16 115:10

117:21,21,24
120:12 123:17
126:6 129:18
130:17 131:16
132:5
**thinking** 46:21
48:18 64:13
81:8
**third** 22:2 87:19
98:15 103:16
103:20 106:3
114:12
**thorough** 129:5
**thoroughness**
131:12,14,15
131:16
**thought** 27:14
54:16,20,22,22
95:19,24 109:2
109:12 111:23
126:21
**three** 11:24
12:17 87:20
104:12,13
126:16
**throw** 120:9
**thrown** 41:1
60:4 62:14
63:9,10
**ticket** 63:12,14
**time** 5:4,5,13
10:11 13:13
14:2 19:18
25:14 28:11
29:3 33:11
34:21 35:2,14
37:10 39:11,24
41:2,5,15,18
41:19 42:23
43:1,5,6,10
47:21 48:2,23
57:14 59:15,17
59:22 60:5,18
62:13 63:3,16
66:6 67:16,23
69:17 72:5
74:23,24 75:5

76:14,16,16
78:23 79:10,10
80:18 82:1
86:12 87:14,20
88:10,16 89:8
89:8 93:8,16
93:18,20 94:21
96:21 97:16,17
105:18 111:24
113:8,8 114:14
114:24 115:3
115:21 116:19
117:7 118:1,14
128:2,2 131:1
**times** 36:1 57:22
58:7 69:18
74:20,22 75:4
76:13,18 77:18
78:24 79:12,17
81:10,11 86:12
86:13 87:20
93:10 97:13
**timing** 111:8
121:14 122:11
122:11 124:9
**timings** 122:13
**Tinnel** 19:19,19
19:21 20:6
23:20,21 39:9
39:10 43:18
44:4,7,9 51:10
**Tinnel's** 43:19
**tired** 124:7,8
**title** 28:12
**titled** 15:17 22:3
22:9 29:7
**today** 3:4,16,24
5:13,18 6:3,20
17:22 30:18
45:17 58:23
76:19 118:21
118:23 121:11
124:16 128:17
129:19 130:11
**told** 15:1 38:21
38:23 40:8
42:18,21,23

43:1,24 48:13
49:9,10 59:9
59:11 60:11,21
61:12 62:8,19
66:6,17 68:1
68:12 72:9,14
72:18 75:13,17
75:18 76:7,21
77:3,13,21,22
78:9,13,17
81:2 83:8,11
84:1,9,18
88:23 89:1,1,3
89:8 90:20
92:8,10,14
97:9,22 99:5
100:18 104:12
111:23 112:6,6
112:20 113:1
113:21 115:11
115:14,16,18
116:7,10,15,19
116:24 117:23
125:12 128:6,7
130:1 131:4
**ton** 131:22
**top** 11:9 16:1
22:2 56:10
**topics** 15:9
16:11
**Total** 108:2
**traffic** 31:16
**training** 23:15
38:16 39:7
40:7 41:6,23
42:18,19 44:17
47:14 49:5,20
49:21 50:7
**transcribed**
134:8
**transcript**
134:11
**transcription**
134:9
**tray** 70:1 77:6
78:9,15 82:21
90:23 91:17

93:1,17 98:11
99:5 111:14,18
112:2,7,22
113:2,10 122:7
**treat** 71:11
**trial** 1:6 2:10
**tricky** 95:8
**tried** 7:12 36:7,7
54:13 57:2
**true** 17:7 40:5
41:22 42:24
51:16 53:9
57:15,19 59:1
61:14 65:2,17
72:24 73:19
80:4 81:14
82:20 87:8,12
98:23 99:4
111:9 119:19
122:10,21,22
125:22 126:3
131:10 134:10
**truly** 127:13
**truth** 97:21
101:12,14
121:18 122:10
**truthful** 3:17
**truthfully** 5:18
**try** 37:22 71:9
71:11 81:13
96:4 104:23
113:18,24
**trying** 12:12
28:2,3 31:1
33:12 36:5
39:23 40:13
46:22 59:21
68:9,10 89:7
92:21,22 101:6
112:12,19
115:10 117:21
117:24
**Tuesday** 87:4
**turn** 10:19 29:23
43:19,22 51:15
56:9
**turned** 43:18,21

Morris v. Bayhealth Medical Center

152

111:9
**turning** 51:23
53:8,13
**two** 9:8 23:7
28:1 42:12
44:5 49:23
60:8 65:7
71:18 74:22
79:11 82:14,19
85:18 86:6,11
87:9 88:14
89:24 98:16
99:2 106:23
107:1,10 108:1
108:2,16,16,17
108:20 111:4
128:23 129:7
129:10
**type** 120:2
121:20 122:16
**typical** 26:20
31:19
**typically** 2:13
69:8

**U**
**uh-uh** 4:23 5:2
**ultimately** 20:19
63:18 107:7
110:12
**um-hum** 4:23
5:1 35:1
**unable** 68:7
**understand** 3:11
3:14 4:5,15,16
6:7 7:20 11:7
12:17 22:12,22
24:5,24 28:20
38:14 44:15
45:4 68:14,14
68:16,19,20
69:1 71:22
79:13 93:11
96:3 97:5
104:20 107:21
116:11,12
123:23 124:1

131:6
**understandable**
69:15
**understanding**
45:14 49:15
113:17
**understood** 4:7
4:13 45:5,11
49:12 57:10
**undertook**
109:18
**unemployment**
88:11
**uniform** 46:15
46:24 47:3,5
**uniforms** 46:9
46:22
**uninsurable**
125:23,24
**UNITED** 1:1
**untrue** 68:15
**untruthful** 6:8
**upper** 29:24
30:7 64:15,17
**upset** 122:5
**use** 24:21 84:11
134:8
**usual** 2:5

**V**
**v** 1:5
**vacant** 33:18,21
**valid** 13:9
**various** 16:11
26:8 57:4
**vehicle** 34:22
35:24 36:4
37:6,7,14,16
38:2
**vehicles** 36:10
36:14 38:1
66:7
**verbally** 4:22
**version** 79:19
110:16
**Vice** 103:13
**VII** 26:3,7

**W**
**wait** 5:7
**walk** 36:7
**walked** 128:13
131:1
**Wal-Mart** 7:1,3
7:4,4,7
**want** 5:1 8:10
22:15 26:10,12
47:7 68:15
74:5 77:11
94:15 104:20
112:9 120:18
125:18
**wanted** 55:9
57:16 61:15
75:9 127:13
**Ward** 1:16 2:5,8
2:12,15,18,20
2:21,22 7:24
8:9,13,21
15:12 17:17
20:22 28:16
30:21 46:3
50:9 52:5
53:18 58:19
63:22 65:9
66:8 72:21
85:19,21 86:1
88:2 94:22
96:15 99:12
101:3,16 103:8
105:9 109:6,14
109:15 112:11
112:16,18
114:1 128:21
129:1 132:4,9
**warm** 77:9
82:22 84:15
**wasn't** 12:16
19:8 23:23
35:2 42:1
67:18 71:20
73:15 75:21
83:5 89:9,10
89:11 90:9

91:7 95:19
96:1 98:12
110:5 115:1
117:20 120:21
128:10
**watching** 98:24
**water** 71:20 76:4
77:6 89:2
97:23 122:9
**way** 9:20 10:24
18:1 20:2 24:4
24:24 29:13
40:14 47:9
52:24 53:12
55:6 56:6 57:7
61:2 62:14
67:10 80:13
81:1 84:24
91:6 95:9,12
97:4,6 98:7
104:4 110:6
112:12 113:18
121:7,15
127:11
**weapons** 32:18
32:19
**wear** 46:18
**wearer** 46:11
**wearing** 46:17
**week** 10:3,12
**weeks** 71:18
98:16 99:2
**weigh** 120:7
**went** 28:10 40:1
43:20 44:3
48:19 59:16
60:8,19 69:24
77:5,6 79:9,10
84:9,14 104:13
107:8,10
**weren't** 23:12,15
25:2 36:21
91:6 102:6
**we'll** 2:5 5:13
**we're** 3:4 31:1
**we've** 15:16
16:10 17:21

25:19 26:2
28:23 46:7
47:5 50:14
53:14 58:23
64:2 94:4 95:5
101:24 105:13
**white** 46:23 47:2
102:21 103:1
119:3
**Wicomico** 59:24
62:7
**WILCOX** 1:22
**willing** 54:9
**Wilmington** 1:9
1:14,23
**window** 120:10
**wise** 89:19
**witness** 15:3
55:12 96:14
101:8 108:19
111:12,15,16
111:21,22
128:20 134:11
**witnesses** 88:11
110:2
**wonder** 68:2,3,5
68:6,9,10
**word** 24:17
90:13,13 120:6
**words** 4:24
10:17 26:20
31:18 95:8
97:4,4,7
116:23 127:21
131:22,24
**wore** 46:9,15,23
**work** 7:5,7 9:14
10:8 25:23
26:22,24 31:11
38:13 54:9,17
54:20 70:16
75:20 87:9
96:20 119:22
119:22,23
132:20,21
**worked** 10:12
13:23 25:17

Morris v. Bayhealth Medical Center

28:11,12 34:11
34:20,22 83:11
83:14,15 86:6
86:10 87:1,5
92:23 111:4
122:18
**worker** 70:24
**working** 27:3
32:9 36:2
37:12 70:4
96:19 115:1
119:19
**worn** 46:19
**wouldn't** 33:18
37:13 56:21
71:16 75:8,11
128:9
**wound** 113:14
**write** 16:7 79:18
79:24 80:3,4
80:10 81:16,21
81:23 82:3
85:4,6,10,12
85:16
**writing** 80:8
81:19 82:2
85:1 97:6
**written** 7:16,18
41:18 80:17,17
80:18 81:7
97:7 100:19,20
103:12 105:13
**wrote** 7:19 80:15
80:16 85:13
100:16 101:12
101:13
**www.wilfet.com**
1:24

**X**

**X** 132:8,10

**Y**

**yeah** 53:21
56:23 66:7,7
70:7 74:5 78:2
96:10 102:3

122:20 131:14
131:14
**year** 20:16 28:3
34:15 40:23,24
44:7,8 52:23
**years** 6:16 23:7
44:5 96:20
98:5 119:20
127:16

**$**

**$10.66** 11:15,21
**$11.03** 11:17,21

**0**

**05** 21:19
**06-290** 1:5

**1**

**1** 8:22,23 10:19
10:23 11:3
12:8,15 14:12
16:19,21 18:12
21:13 22:2,8
26:10,13 29:4
30:15 51:20
52:18 108:11
132:11
**10** 53:13,15,19
56:9 63:22,23
64:2 65:12,18
87:14,18
132:16
**10:31** 1:10
**101** 132:20
**1010** 1:14
**102-RPR** 134:16
**103** 132:20
**105** 132:21
**107** 103:23
**11** 8:19 50:24
53:21 66:8,9
83:12 86:24
132:17
**11th** 111:5
**11-13-00** 16:7
**11:45** 17:14

**1105** 1:9
**114** 132:22
**12** 38:20 72:21
72:22 76:22
80:5 83:1 84:3
87:4 91:17
93:24 94:9
110:8,23 112:3
112:22 113:2
113:11 121:13
123:10 124:12
125:9 132:12
132:17
**12th** 73:24 76:21
76:24 79:20
83:5,12 86:6
87:10,13,17,21
93:2 94:11,13
97:16 98:12
99:6,8 110:14
110:17 111:5
111:14,18
112:8 129:16
**13** 73:15 85:22
85:23 86:15
132:13,18
**13th** 14:6,9 73:1
73:10,12,18
76:6 77:13,21
79:15 81:12
82:15,16,18
97:12 129:9
**1330** 1:23
**14** 53:10 88:2,3
88:6 132:18
**14th** 82:5,9,15
83:2 84:18
**15** 66:13 94:22
94:23 95:5
97:1 98:9,18
99:9 132:11,15
132:15,19
**15th** 82:16
**16** 8:5 99:12,13
99:15 132:19
132:20
**16-hour** 83:12

86:6,11 87:5,9
87:15 111:4
**17** 26:13 53:10
101:16,17
102:1 114:11
114:13 117:6
132:12,20
**18** 51:20 103:8,9
103:12,16,21
105:1 118:6
132:20
**19** 9:17 105:9,10
105:13 132:21
**19406** 1:17
**1958** 6:18
**19801** 1:23
**19805** 1:14
**1995** 65:3,13
**1998** 65:14

**2**

**2** 10:19,23 11:3
12:15 15:13,14
15:17 16:11
22:8,13 24:14
29:23,24 30:7
30:9,17 107:11
108:8,11 132:9
132:11,17,18
132:19,21
**2nd** 11:10 52:12
52:22
**2:59** 132:7
**20** 114:2,3,5
132:12,22
**200** 1:17
**2000** 8:19 14:6,9
**2001** 16:14 17:1
21:8 34:15
**2003** 51:6,8 53:1
**2004** 11:10
52:12,22 53:6
53:19
**2005** 33:9 66:13
71:2 73:1,15
73:24 79:20
80:6 82:5 83:2

83:5 84:3 86:3
86:6,24 87:4
87:10,13 93:24
94:9,13 95:2
96:1 99:6
100:3,4,5
103:17 104:6
109:4,10 110:8
110:17,24
111:6,14,18
112:3,8,23
113:2,11
114:14 117:20
121:13 123:10
124:12 125:9
129:16
**2006** 8:5
**2007** 1:10 134:6
**2008** 134:16
**2055** 115:1
**21** 1:14
**22nd** 51:7 65:13
**23rd** 65:3,13
**24** 5:20 6:16,18
**25th** 100:3,4
101:2
**26** 95:2
**26th** 96:1 97:12
97:16,17 100:5
**28** 132:13

**3**

**3** 17:17,18,21
103:12 107:4,5
107:6 108:7,9
132:12,12,20
**3/23/05** 132:16
**3:45** 17:14
**302** 1:23
**31** 134:16

**4**

**4** 1:10 20:22,23
21:1,4 22:2
24:14 25:20
26:2,3,7 27:9
105:13,20

Morris v. Bayhealth Medical Center

154

| | |
|---|---|
| 108:21 109:9 132:11,12,17 132:18 | **72** 132:17 |
| **4-01-05** 86:17 | **8** |
| **4-13-05** 86:19 | **8** 52:5,6 53:14 56:9 109:4,10 132:11,15 |
| **4/18/05** 132:17 | **80** 9:24 |
| **4/22/03** 132:15 | **8160.328** 132:13 |
| **4/22/04** 132:15 | **8160.339** 132:14 |
| **4/26/05** 132:21 | **85** 132:18 |
| **40** 10:3,12 | **88** 132:18 |
| **46** 132:14 | |

**5**

**5** 21:19 26:1,10
  28:17,18,23
  29:24 40:6,10
  41:13 51:15,19
  51:20 53:8
  132:13
**5th** 134:6
**5/16/05** 132:22
**5:00** 27:9
**50** 132:15
**52** 132:15
**58** 132:16

**9**

**9** 58:19,20,23
  104:6 132:16
**9th** 103:17
**94** 132:19
**99** 132:19

**6**

**6** 16:14,21 17:1
  26:3,5 46:4,5,8
  47:5 75:24
  76:1 87:13,20
  132:14
**6:00** 87:20
  129:23
**6:30** 75:24 76:1
  87:14
**620** 1:17
**63** 132:16
**655-0477** 1:23
**66** 132:17

**7**

**7** 50:10,11,14
  51:15,20,24
  53:8 132:15
**7-Up** 128:8
**7034** 7:8



Tel 302 674-4700

Bayhealth Medical
Kent General Hosp
640 South State St
Dover, DE  19901

## JOB OFFER CONFIRMATION

| | |
|---|---|
| **NAME:** | Nathaniel  Morris |
| **JOB TITLE:** | Security Officer |
| **DEPARTMENT:** | Security |
| **SUPERVISOR:** | Don Tinnel |
| **PAY RATE PER HOUR:** | $8.98 |
| **DIFFERENTIALS:** | $1.10 evening/night/weekend |
| **SHIFT❖:** | 4 - 12 pm |
| **STATUS:** | FT 80 |
| **STARTING DATE●:** | November 11, 2000 |
| **BENEFIT STATUS:** | Eligible for full benefits |
| **PAY DAY:** | Bi-weekly (EVERY OTHER FRIDAY IN YOUR HOME DEPARTMENT) |
| **SPECIAL COMMENTS:** | NA |

### ORIENTATION INFORMATION

You will attend General Orientation on November 13, 2000 in Kent - PDR 1-2-3 from 8 a.m. to 4:30 p.m.  Please arr
7:50 a.m.  Business casual dress is permitted *(Denim scrubs and jeans are not permitted.)*  You may attend orientati
listed date providing you have been <u>fully cleared</u> by Employee Medical Services.

**Please note:**

➢ New Employees must be cleared by Employee Health before starting work.

➢ You may be scheduled to work other shifts and/or locations according to policy.

➢ Employment offers are contingent on clearance by Employee Health, the receipt of satisfactory work references, state ___
Letters, Abuse Registry checks, security clearances, including OIG sanction reports, verification of required licensure, r
certification and proof of educational requirements.

➢ Falsification of any Bayhealth document, including, but not limited to:  application, pre-employment health history for
records completed during the workday will result in immediate disciplinary action, which may include termination.

➢ Employment and compensation may be terminated with or without cause, and with or without notice, at any time, at t
either Bayhealth Medical Center, Inc., or the employee.

_Nathaniel Morris_     11/7/2000
Employee Signature     Date

_Linda Choce_     11/7/00
Human Resources Signature     Date

Copy to:  Employee, Personnel File, Department Director

rev. 06/1999, 11/1999



P5

DEPOSITION EXHIBIT
Morris  (
6/4/07

12- 9-05;10.20    ;bayhealth    hh

## Bayhealth Medical Center Salary History Processor

Tue Jul 05, 2005 10:53 am

| Ent | Emp No | Employee Name | Div Fac Department | Soc Sec |
|---|---|---|---|---|
| 10 | H121999 | MORRIS,NATHANIEL A | IS   KG 8160 | 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 |

ge:01    Position----------------- Salary Chg Type    Hourly Rate-------

| | Eff Date | Ent | Department | JC | Nbr | | New | Previous |
|---|---|---|---|---|---|---|---|---|
| ( 1) | 05/02/04 | 10 | 8160 | 0324 | 010 | MERIT INCREASE | 11.0300 | 10.6600 |
| ( 2) | 05/02/04 | 10 | 8160 | 032B | 010 | MERIT INCREASE | 10.5300 | 10.1600 |
| ( 3) | 07/13/03 | 10 | 8160 | 0324 | 010 | ALTERNATE POSIT | 10.6600 | 0.0000 |
| ( 4) | 05/04/03 | 10 | 8160 | 032B | 010 | MERIT INCREASE | 10.1600 | 9.8600 |
| ( 5) | 05/05/02 | 10 | 8160 | 032B | 010 | MERIT INCREASE | 9.8600 | 9.5700 |
| ( 6) | 05/06/01 | 10 | 8160 | 032B | 010 | PROMOTION | 9.5700 | 8.9800 |
| ( 7) | 11/11/00 | 10 | 8160 | 0329 | 010 | NEW HIRE | 8.9800 | 0.0000 |

Enter choice--

12-9-05;18:26 ;Bayhealth HR

## Bayhealth Medical Center Position Control Processor

Tue Jul 05, 2005 10:53 am

| | | | Div Fac Department | Soc Sec |
| | | | IS   KG 8160 | 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 |

Ent   Emp No        Employee Name
10   H121999        MORRIS,NATHANIEL A                                    4 Priority
¬   Entity  2 Department           3 Job Class/Position Number          1
    10      8160 SECURITY            0328/010 OPERATOR, CONTROL CEN

------------------------- CURRENT PAY INFORMATION ----------------------------

 5 Shift Rate Code        6 Primary Shift          7 Pay Grade   8 Pay Step
   03 PAY GRADES 19-23       01 WEEKDAY DAY           21 PAY GRA    MAX MAXIMUM
 9 Hrs - Last Incr  10 Ben Elig  11 OT Elig  12 Shift Elig 13 Highly Comp Ind
                       Yes         Yes         Yes            No
14 Rate Effect Date    15 Effect CY  16 Effect PP  17 Salary Type
   05/02/2004             2004          11            MI MERIT INCREASE
18 Hourly Rate                     19 Annual Salary          20 Supplemental Rate
   10.5300                            0.00                      0.0000
21 On-Call Rate                    22 Charge Rate            23 Float Rate
   3.5000                             0.0000                    0.0000
24 Additive Rate Codes                Grp  Basis  Amount   Percent


Press NL--

12- 9-05;18:26    ;Bayhealth  HH

## Bayhealth Medical Center Location/Hire Processor

Tue Jul 05, 2005 10:52 am

| Ent | Emp No | Employee Name | Div Fac Department | Soc Sec |
|-----|--------|---------------|--------------------|---------|
| 10 | H121999 | MORRIS,NATHANIEL A | IS   KG 8160 | 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 |

```
 ┐ Employee Status          2 Employee Status Reason      3 Status Change Date
   T TERMINATED                IN INVOLUNTARY                 05/05/2005
 . Work Status              5 Edit By                     6 Edit Date/Time
   F FULL TIME                 NORWOOD,DEBBIE                 05/19/2005 1756
 7 Hire Date       8 Rehire Date     9 Cont Serv Date    10 Prob End Date
   11/11/2000                          11/11/2000            02/11/2001
11 Term Date       12 Prev Term Date  13 LOA From Date    14 LOA To Date
   04/25/2005
15 Contract Dt     16 Co Sen Dt    17 User Date 1    18 User Date 2  19 User Date 3
                   11/11/2000
```

| 20 Benefit Plan | Bene Serv Plan | Serv Dt | Earn Dt | P/I | Avail Hr |
|------------------|----------------|---------|---------|-----|----------|
|  |  |  |  |  | 0.00 |
| PTO PAID TIME OFF | NON MANAGEMENT | 11/11/2000 | 02/09/2001 | No | |
| SIC EXTENDED SICK | NON MANAGEMENT | 11/11/2000 | 02/09/2001 | No | 250.40 |

Press NL--

12- 9-05;18:26   ;Bayhealth   HR

## GENERAL ORIENTATION RECORD

NAME: Nathaniel Morris
(Please print)

This orientation record will become a part of your Human Resources file.

### KEY HUMAN RESOURCES INFORMATION and PROCEDURES

_____ Mission Statement
_____ Confidentiality Statement
_____ Patient Rights
_____ JCAHO Information
_____ Time Sheet
_____ Bi-weekly pay period and Over-time
_____ Personnel Action Request and Change of Address
_____ Exit Interview and Clearance Procedure

### POLICIES

_____ Location of Bayhealth Policies and Procedures
_____ Employee's Rights in the Provision of Patient Care
_____ Corrective Disciplinary Procedure
_____ Problem Resolution
_____ Sexual Harassment
_____ Substance Abuse
_____ Personal Appearance & Dress Code
_____ Paid Time Off
_____ Meal/Coffee/Smoking Policy
_____ Work Related Injuries
_____ Leave of Absence - FMLA (Family & Medical Leave Act)
_____ Probation Period, Evaluation Process & Annual Pay increases
_____ Job Posting/Transfer

### HUMAN RESOURCE BENEFITS & GENERAL INFORMATION

_____ (EAP) Employee Assistance Program
_____ Employee Recognition
_____ Bayhealth Communication Tools

DEPOSITION
EXHIBIT
Morris 2
6/4/07   JR
PENGAD 800-631-6989

I acknowledge that a Human Resources' Representative discussed each of the above items in General Orientation. I understand that policies may be revised at any time without notice at the discretion of Bayhealth Medical Center.

Questions regarding any of the topics covered should be addressed to either my supervisor or Human Resources for clarification.

Nathaniel Morris                    11/13/00
Signature and date

(word\gocklst rev12/99)

P61

# PERSONNEL ACTION REQUEST

EMPLOYEE'S NAME _MORRIS_ _NATHANIEL_ _A_
LAST          FIRST          M.I.

EMPLOYEE # _121999_

DEPARTMENT NAME _SECURITY_

DEPT. # _8160_

POSITION TITLE _OFFICER_

FACILITY _KENT_

EFFECTIVE DATE _6 MAY 01_

DATE COMPLETED _24 APR 01_

| | FROM: | TO: |
|---|---|---|
| ☐ RATE CHANGE | 8.98 | 9.57 |
| ☒ GRADE | 19 | 20 |
| ☑ POSITION # | 329 | 328 |
| ☑ TITLE | Security Officer | Security Controller |
| ☐ BASIC HOURS | | |
| ☐ SHIFT | | |
| ☐ DEPARTMENT | | |
| ☐ NAME | | |
| ☐ ADDRESS | | |
| ☐ TELEPHONE | | |
| ☐ OTHER | | |
| ☐ LEAVE OF ABSENCE | | |
| ☐ FMLA | | |
| REASON/REMARKS: | Promotion—Change review date to 05/06/02. | |

| ☐ TERMINATION | FAR BELOW | BELOW | MEETS | ABOVE | FAR ABOVE |
|---|---|---|---|---|---|
| Work Quality | | | | | |
| Work Quantity | | | | | |
| Job Knowledge | | | | | |
| Interpersonal Skills | | | | | |
| Attendance | | | | | |
| ELIGIBLE FOR REHIRE? ☐ Yes ☐ No | | | | | |
| REASON/REMARKS: | | | | | |

## AUTHORIZATION:

DEPARTMENT HEAD _____

HUMAN RESOURCES _____

VICE PRESIDENT _____

EMPLOYEE SIGNATURE _____

Copies to: Human Resources, Accounting, Department Head
FORM #991605 (10/99)

P62

DEPOSITION EXHIBIT
Morris 3

# Bayhealth Medical Center, Inc.
## Promotional Increase Worksheet

Employee Name __NATE Morris__

Employee # __121999__

**FROM:**

__Security__      __8160__

Dept. Name      Dept. Number

__Security Officer__  __329__

Job Title      Job Code

Present Hourly Rate __8.98__

Pay Grade __19__

**TO:**

__Security__      __8160__

Dept. Name      Dept. Number

__Security Controller__  __328__

Job Title      Job Code

New Hourly Rate __9.57__

Pay Grade __20__

---

### (For Promotional Increase Only)

| | | |
|---|---|---|
| 1. | Current Rate | $ __8.98__ |
| 2. | Performance Rating | __meets__ |
| 3. | Recommended Merit Increase Percent (using merit guidelines) | __3__ % |
| 4. | # of Months Since Last Increase | __6__ |
| 5. | Prorated Merit Increase Percent | |
| | [(Line 3 Divided by 12 mos.) x Line 4] | __.015__ % |
| 6. | Current Pay Rate Plus Prorated Merit Increase | __9.11__ |
| | [(100% + Line 5) x Line 1] | |
| 7. | New Zone of New Grade | __2__ |
| 8. | Number of Grades from Current Grade to New Grade | __1__ |
| 9. | Refer to Promotional Increase Guidelines | |
| 10. | Promotional Increase Percent | __5__ % |
| 11. | New Rate [(100% + Line 10) x Line 6] | __9.57__ |
| 12. | Next Review Date | __5-6-02__ |

_(signature)_ 5-7-01

Department Director      Date

_(signature)_ 5-8-01

Vice President      Date

Manager, Compensation/Benefits      Date

Vice President, Human Resources      Date

_(signature)_ 05/15/01

P63

## Bay*health* Medical Center, Inc.
### New Hire/Interim - Transfer/Job Classification Change
### Performance Appraisal

| Employee Name: Nathaniel Morris | Review Occasion | ✓ |
| | Promotion | X |
| Department: Security | Transfer & Job Class Change | |
| Position Title: Officer | New Hire | |
| | Other | |

Review Period:  From ___ / / ___  To ___ / / ___

| Performance Factors (1) | 5 Far Above/ Exceptional | 4 Above/ Commendable | 3 Meets/ Competent | 2 Below/Needs Improvement | 1 Far Below | Numerical Equivalent (1-5) |
|---|---|---|---|---|---|---|
| Required Factors | | | | | | |
| Quality | | | X | | | |
| Quantity | | | X | | | |
| Job Knowledge | | X | | | | |
| Interpersonal Skills | | | X | | | |
| Cooperation and support of organization and dept. mission, values and objectives | | | X | | | |
| Optional Factors | | | | | | |
| Leadership | | | | | | |
| Other | | | | | | |
| Attainment of Individual Goals | | | | | | |
| | | | | | Subtotal | 16 |
| | | | (Subtotal divided by number of factors) | | Average | 3.2 |
| Punctuality and Attendance (2) (only used as factor if far above or below) | | | | | | |
| | | | | | Total | |
| | | | (Total divided by number of factors) | | Average | |

Evaluator Comments:  Mr. Morris has earned his promotion through hard work, attention to details in reports and his dedication to the job.

Supervisory Comments:

Employee Comments:

_____     _____     _Clint T__ 9 may 01_     _Ma____ 5-10-01_
Employee Signature     Date          Signature of Evaluator  Date      Department Director  Date

(1)  *Definitions based on department and position needs; attach backup covering competency evals and other*
(2)  *Requires perfect attendance or reliability excessively beyond norm for Far Above.  Far Below expectations requires concurrent disciplinary action.*

# BAYHEALTH MEDICAL CENTER

## POSITION DESCRIPTION/PERFORMANCE REVIEW

### CONTROL CENTER OPERATOR

**Bayhealth Medical Center, Inc.**
Dover, Delaware

**Position Number 8160.328**

## PART 1 - JOB IDENTIFICATION

**Position Summary:** Supervises all on duty Security Officers/Constables at the Kent Campus and St. Jones. Monitors fire alarm systems, infant abduction systems, and duress alarms for both hospital campuses, including alarms at eleven off site facilities and dispatches Security Officers/Constables or notifies the appropriate outside agency as necessary. Monitors surveillance cameras for both campuses and off site facilities. During activation of the Emergency Operation Center, the Controller assumes duties as the senior Security representative until relieved by the Director or Manager of the department. Directs the transportation of psychiatric patients, equipment and other materials between the hospital campuses and off site locations. Controls the issue and assignment of Bayhealth vehicles. Processes Bayhealth identification badges, fingerprints new and tentative employees, registers employee vehicles and issues parking decals.

*nployee Status: EMPLOYEE*

*Reports to: Security/Auto Services Manager*

*FLSA Overtime Exempt [ ]  FLSA Overtime Non-Exempt [X]*

*Subject to Bloodborne Pathogens?*       Yes [X]          No [ ]

*Position Qualifications (insert minimum and preferred qualifications)*

|  | Minimum | Preferred |
|---|---|---|
| Education: | High school graduate or equivalent | Basic college courses |
| Experience: | 2 years previous Law Enforcement or Security experience. (Minimum six month experience working as Bayhealth Security or equivalent experience as 911 Operator or Emergency Dispatcher) <br><br> At least 6 months supervisory experience | Criminal justice, law enforcement, or related fields <br><br> 2 years supervisory experience |



DEPOSITION
EXHIBIT
Morris 4
6/4/07  JR

| Certification/Registration: | Must have taken and passed the International Association Healthcare Security & Safety Basic course and Supervisor course examination within 12 months of employment. | CPR – Certification within 6 months of employment. AED – Automated External Defibrillator within 6 months of employment. PEAT – Psychiatric Emergency Assistance Training within 6 months of employment. |
|---|---|---|
| Computer/Software: | Basic Computer literacy, working knowledge of word-processing. Must complete training for Delaware Criminal Justice Information System (DELJIS) within six months of employment. | Experience with Microsoft word/Lotus Notes and the Delaware Criminal Justice Information System (DELJIS). |
| Special Knowledge, Skills or Abilities: | Must be at least 21 years of age. Must not have been convicted of any felony or crime involving moral turpitude.  Current Delaware Drivers License with less than 6 points. | |

## Physical Demand Functions (insert "X" as appropriate)

| Physical Demand | Tasks Not Required | Occasional (1-33%) | Frequent (34-66%) | Constant (67-100%) | Essential Function Yes | No | Additional Comments |
|---|---|---|---|---|---|---|---|
| Standing | | X | | | X | | |
| Walking | | X | | | X | | |
| Sitting | | | | X | X | | |
| Bending | | | X | | | | |
| Kneeling | | X | | | | | |
| Crawling | X | | | | | | |
| Climbing | X | | | | | | |
| Reaching | | X | | | | | |
| Gripping | X | | | | | | |
| Lifting | | | X | | X | | 50 pounds or more. |
| Carrying | | | | | X | | 50 pounds or more. |
| Pushing | | | | | X | | 50 pounds or more. |
| Pulling | | | | | X | | 50 pounds or more. |

*Required Protective Equipment*
None

*Non-Essential Functions*

*Working Conditions*
Ability to defend oneself and/or protect others from injury, and may be occasionally involved in physical confrontation up to and including life threatening situations.

*Age Specific Patient Population (highlight or circle)*
Neonate (birth - 28 days)
Child (1 month - 12 years)
Adolescent (13-17 years)
Adult (18 - 64 years)
Geriatric (65+ years)
Not Applicable

*Required Mandatory Education (highlight or circle)*
Fire Safety Infection Control Right to Know
Managing Change
Delivering Performance
Creating Successful Working Relationships
Problem Solving for the Individual
Corporate Compliance
5 Star Customer Service
Code Red Response-Fire Extinguisher
Back Safety Competency
Latex Allergy SLP

Control Center Operator 8160.328 revised 5-5-05

CPR-Patient Care Areas (every two years)
ACLS-Patient Care Areas (every two years)
    LS-Patient Care Areas (every two years)
_GM-Patient Care Areas (yearly)
NRP-Women's Services & Emergency (every four years)
PEAT-St Jones & Security (initial & yearly update)
CBE-Competency Based Evaluation (yearly)
TNCC-Trauma Nurse Core Course (every four years)
ENPC-Emergency Nurse Pediatric Course (every four years)

**PART II– EMPLOYEE IDENTIFICATION (insert)**

| | |
|---|---|
| Employee Name: | Employee No.      Hire Date: |
| Department Name: Security | Department Number: 8160 |

**PART III– REASON FOR EVALUATION (insert "X" as appropriate)**

_____ Orientation Period (Initial 60-Day Period) _____ Probationary
_____ Annual–Review Period_____ _____ Other: _____

**PART IV– MERIT INCREASE ELIGIBILITY REQUIREMENTS (highlight or circle)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Yes** | No | N/A | Hazardous Waste | **Yes** | No | N/A | Age Specific Competencies |
| **Yes** | No | N/A | Mandatory Education | **Yes** | No | N/A | Corporate Compliance |
| **Yes** | No | N/A | Confidentiality | Yes | **No** | N/A | Current License |

*Note: Failure to complete any of the above items will result in the employee's salary increase being delayed until all mandatory requirements are completed. The salary increase will become effective upon completion of the requirements. An employee's salary increase will not be retroactive.*

**PART V– PERFORMANCE SUMMARY (highlight or circle)**

| | FA | A | M | B | FB |
|---|---|---|---|---|---|
| Part VII – Position Standards (60%) | 24 | 18 | 12 | 6 | 0 |
| Part VIII – 5 Star Service (30%) | 12 | 9 | 6 | 3 | 0 |
| Part IX – Other Performance Factors (10%) | 4 | 3 | 2 | 1 | 0 |
| Far Above Expectations | | | | 38 to 40 | |
| Above Expectations | | | | 29 to 37 | |
| Meets Expectations | | | | 20 to 28 | |
| Below Expectations | | | | 10 to 19 | |
| Far Below Expectations | | | | Less than 10 | |
| | | | TOTAL POINTS | | |
| | | | PERFORMANCE RATING | | |

**PART VI– REVIEW OF CURRENT EVALUATION**

All reviews require Director review and approval. Ratings of "FB", "B", and "FA" require review by VP/SVP.

| | |
|---|---|
| Evaluator: | Date: |
| Dept. Director: | Date: |
| VP/SVP: | Date: |
| Human Resources: | Date: |

## PART VII – POSITION STANDARDS

Rating for each Standard should be evaluated based on the following: (1) the amount of work completed; (2) the quality/accuracy of the work completed; (3) the timeliness of the work completed; (4) consistency in getting the job done with minimal supervision.

Insert goals and objectives and comments as appropriate.

The following standards are ranked in order of importance (highest to lowest).

1. Prepares work schedules, supervises and directs all on duty Security Officers and Constables to include Officers at St. Jones.

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

2. Makes recommendations to the Director/Manager for employee performance appraisals and disciplinary actions. [1] [3] [5][6]

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

3. Monitors fire alarm systems, infant abduction systems, and duress alarms for both campuses. In addition, monitors alarms specific to the Kent campus, boiler pressure low steam, O2 reserves, CHEMPACK storage, medical gases, bone freezer and dispatches appropriate staff or outside agency as necessary. [1][3][5][6]

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

4. Acts as the senior security representative during emergencies until relieved by the department director or manager. Makes notifications to appropriate hospital staff and assigns security personnel to locations in the hospital to effectively handle the situation. [1][3][5][6]

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

5. Receives telephone request such as emergency (222), code gray (violent patient/visitor intervention), Code blue/pink/yellow and makes notification for appropriate handling of the situation. [1] [2] [5][6]

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

6. Responds to numerous telephone requests, prioritizes requests and assigns staff to perform services such as helicopter arrivals, pharmacy runs, courier runs, employee transports/escorts, meal transports, opening doors and opening buildings. [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

7. Monitors surveillance cameras to ensure the security of the hospital campuses and off site facilities. Dispatches Security Officers/Constables to investigate any suspicious activity. Controls access to the hospital after visiting hours.[2] [5] [6]

**Goals & Objectives:**

**Comments:**

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

8. Completes employee identification badges, employee vehicle registration, issues appropriate parking decals and enters the information into the automated computer system. [1] [3] [5] [6]

**Goals & Objectives:**

**Comments:**

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

9. Prepares Security Department shift logs, safety reports, and incident reports and makes notifications to the appropriate department manager for action if warranted. [2] [6]

**Goals & Objectives:**

**Comments:**

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

10. Collaborates with local and State agencies relative to Medical Center security investigations; directs and/or has agency personnel escorted to hospital buildings and premises [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

11. Enhances professional growth and development through participation in educational programs, current literature, in-service meetings and workshops [5] [6]

**Goals & Objectives:**

**Comments:**

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

12. Attends meetings as required and participates on committees as directed [6]

**Goals & Objectives:**

**Comments:**

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

13. Expected to be an active contributing team member within the department as well as the medical center [5] [6]

**Goals & Objectives:**

**Comments:**

| | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

14. Exhibits excellent interpersonal skills during interactions with employees, other departments and all other hospital employees [5] [6]

**Goals & Objectives:**

**Comments:**

| | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

15. Performs all duties in accordance with performance improvement principles and philosophy of the organization.

**Goals & Objectives:**

**Comments:**

| | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

16. Actively supports the Bayhealth medical centers mission to improve the health status of all its members of the communities within our service area.

**Goals & Objectives:**

**Comments:**

| | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

17. Provides services consistent with the Medical Centers philosophy statement of delivering compassionate, competent care while assuming person responsibility, promoting wellness resection diversity and maintaining confidentiality.

**Goals & Objectives:**

**Comments:**

| | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

**Position Standards Overall Rating (highlight or circle)**

| | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

## PART VIII – FIVE STAR SERVICE

### Five Star Standards (See Five Star Service Booklet and Employee Pledge)

1. Treats everyone as if he or she is the most important person in the facility.

2. Grooming and dress reflect our respect for others and the organization. Complies with Bayhealth Personal Appearance and Dress Policy B9065.11.

3. Committed to listening attentively to others who are speaking in order to fully understand their needs. Pays close attention to both verbal and nonverbal messages. Speaks in a caring and thoughtful manner, always showing respect.

4. Operates the telephone correctly in work area. Transfers telephone calls correctly, always asking permission to transfer the call. Identifies self and department when answering calls. Sounds pleasant, helpful and listens with understanding. Returns calls promptly. Answers with a smile in voice.

5. Provides exceptional service to all internal and external customers.

6. Committed to providing the highest quality of service and meeting our customers' needs with utmost care and courtesy.

7. Works together with a common purpose – serving our customers and our community. Treats every co-worker as a professional. Channels negative emotions appropriately and privately.

8. Ensures all rights to privacy and modesty by creating and maintaining a secure and trusting environment. When entrusted with others' affairs, treats all information as confidential. Restricts the discussion of confidential matters to situations where the information is necessary to meet the patients' health needs. Concern for patient privacy promotes peace of mind and lessens their anxiety.

9. Ensures an accident free environment.

10. Takes pride in the job and the Bayhealth organization.

11. Committed to creating and supporting a Five-Star Service culture.

Comments:

### Overall Rating Five Star Service Standards (highlight or circle)

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

## ART IX – OTHER PERFORMANCE FACTORS (highlight or circle)

### Job Knowledge: Utilization of job-related information, technical skills and procedures, including continuous quality improvement

**Goals & Objectives:**

**Comments:**

| | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

### Adaptability/Flexibility: Ability to grasp and adjust to new ideas, procedures and situations comfortably and effectively.

**Goals & Objectives:**

**Comments:**

| | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

### Attendance/Punctuality: Consistency in adhering to the work schedule.

**Goals & Objectives:**

**Comments:**

| | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

### Overall Rating Other Performance Factors (highlight or circle)

| | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

## PART X - GOALS AND OBJECTIVES FOR NEXT APPRAISAL

Both the employee and supervisor should list goals to be accomplished for the next appraisal. The goals indicated below will be carried forward to PART VII for the next appraisal.

| Position Standard Number | Challenge | Goal |
|---|---|---|
| | | |
| | | |

## PART XI - RATER'S OVERALL SUMMARY

As appropriate, include comments regarding employee's overall progress, growth potential, and potential for promotion, employee development needs and recommended training.

☐

**PART XII - EMPLOYEE'S RESPONSE - EVALUATION/HIGHLIGHTS OF APPRAISAL DISCUSSION**

**Comments:**

I have read and agree to practice Bay health's Five Star Service Guidelines.
I have reviewed my job description and agree that it is current.

_____          _____
Employee's Signature                                          Date

**PART XIII-SUPERVISOR'S RESPONSE-EVALUATION/HIGHLIGHTS OF APPRAISAL DISCUSSION**

_____          _____
Supervisor's Signature                                       Date

# BAYHEALTH MEDICAL CENTER

## POSITION DESCRIPTION/PERFORMANCE REVIEW

### CONSTABLE

**Commissioned by the State of Delaware**

*Bayhealth Medical Center, Inc.*
**Dover, Delaware**

**Position Number 8160 339**

## PART I - JOB IDENTIFICATION

**Position Summary:** Exercise the same powers as any Law Enforcement Officer enforcing all Delaware Criminal and Traffic Codes, Laws as necessary. Responsible for the protection of life and property, prevention of crime, and apprehension of criminals. Execute all lawful orders, warrants and other processes directed to the constables by any Court or Judge of the State of Delaware. Assist other local Law Enforcement Agencies when need. Patrol Bayhealth property for trespassers, vandalism, theft and alert for fire and safety hazards. Submit written reports, investigate incidents, follow up investigations, observe/transport psychiatric patients, and make recommendations to prevent and correct incidents.

*Employee Status:* EMPLOYEE

*Reports to:* Safety/Security Manager

**FLSA Overtime Exempt [ ]   FLSA Overtime Non-Exempt [X]**

**Subject to Bloodborne Pathogens?**          Yes  [X]          No []

**Position Qualifications**

|  | Minimum | Preferred |
|---|---|---|
| Education: | High School or equivalent. | Basic college courses in Law Enforcement or related field preferred. |
| Experience: | Prior Law Enforcement or Security experience. |  |



DEPOSITION
EXHIBIT 5
Morris
6/4/07 UP

Constable 8160.339 4-5-05

| | | |
|---|---|---|
| Certification/Registration: | Must have been a law enforcement officer or constable within the past five years or have completed the training for Commissioned Constables. If more than five years must have successfully completed the Minnesota Multiphasic Personality Inventory and completed a comprehensive police officer exam. Complete the International Association Healthcare Security & Safety course within 12 months of employment. Current Delaware drivers license with less than 6 Valid Drivers License with less than 6 points. | Commissioned Constable |
| Computer/Software: | Basic Computer literacy, working knowledge of word-processing | Experience with Microsoft word/Lotus Notes and the Delaware Criminal Justice Information System (DELJIS). |
| Special Knowledge, Skills or abilities: | Must be at least 21 years of age. Must not have been convicted of any felony or crime involving moral turpitude. | |

## Physical Demand Functions

| Physical Demand | Tasks Not Required | Occasional (1-33%) | Frequent (34-66%) | Constant (67-100%) | Essential Function Yes | No | Additional Comments |
|---|---|---|---|---|---|---|---|
| Standing | | | X | | X | | |
| Walking | | | | X | X | | |
| Sitting | | | X | | X | | |
| Bending | | | X | | X | | |
| Kneeling | | X | | | | X | |
| Crawling | | X | | | | X | |
| Climbing | | X | | | | | |
| Reaching | | | X | | X | | |
| Gripping | | | X | | X | | |
| Lifting | | | X | | X | | 50 pounds or more. |
| Carrying | | X | | | X | | 50 pounds or more. |
| Pushing | | X | | | X | | 50 pounds or more. |
| Pulling | | X | | | X | | 50 pounds or more. |

## Required Protective Equipment

ABA Body Armor and ASP 21" Baton

## Non-Essential Functions

## Working Conditions

Must be able to overcome resistance of a subject resisting arrest, ability to defend oneself and/or protect others from injury. Employee may be occasionally involved in physical confrontation up to and including life threatening situations.

## Age Specific Patient Population (highlight or circle)

Neonate (birth - 28 days)
Child (1 month – 12 years)
Adolescent (13-17 years)
Adult (18 – 64 years)
Geriatric (65+ years)
Not Applicable

## Required Mandatory Education (highlight or circle)

Fire Safety Infection Control Right-to-Know
Managing Change
Delivering Performance
Creating Successful Working Relationships
Problem Solving for the Individual
Corporate Compliance
5-Star Customer Service

Constable 8160.339 4-5-05                      P79



Code Red Response-Fire Extinguisher
Back Safety Competency
ex-Allergy SLP
R-Patient Care Areas (every two years)
ACLS-Patient Care Areas (every two years)
PALS-Patient Care Areas (every two years)
BGM-Patient Care Areas (yearly)
NRP-Women's Services & Emergency (every four years)
PFAT-St. Jones & Security (initial & yearly update)
CBE-Competency Based Evaluation (yearly)
TNCC-Trauma Nurse Core Course (every four years)
ENPC-Emergency Nurse Pediatric Course (every four years)

**PART II – EMPLOYEE IDENTIFICATION (insert)**

| Employee Name: | Employee No. | Hire Date: |
|---|---|---|
| Department Name: | Department Number: | |

**PART III – REASON FOR EVALUATION (insert 'X' as appropriate)**

_____ Orientation Period (Initial 60-Day Period) _____ Probationary

_____ Annual–Review Period_____ _____ Other: _____

**PART IV – MERIT INCREASE ELIGIBILITY REQUIREMENTS (highlight or circle)**

| Yes | No | N/A | Hazardous Waste | Yes | No | N/A | Age Specific Competencies |

| Yes | No | N/A | Mandatory Education | Yes | No | N/A | Corporate Compliance |

| Yes | No | N/A | Confidentiality | Yes | No | N/A | Current License |

_Note:  Failure to complete any of the above items will result in the employee's salary increase being delayed until all mandatory requirements are completed.  The salary increase will become effective upon completion of the requirements.  An employee's salary increase will not be retroactive._

**PART V – PERFORMANCE SUMMARY (highlight or circle)**

| | FA | A | M | B | FB |
|---|---|---|---|---|---|
| | 24 | 18 | 12 | 6 | 0 |
| Part VII – Position Standards (60%) | 12 | 9 | 6 | 3 | 0 |
| Part VIII – 5 Star Service (30%) | 4 | 3 | 2 | 1 | 0 |
| Part IX – Other Performance Factors (10%) | | | | | |
| Far Above Expectations | | | | | 38 to 40 |
| Above Expectations | | | | | 29 to 37 |
| Meets Expectations | | | | | 20 to 28 |
| Below Expectations | | | | | 10 to 19 |
| Far Below Expectations | | | | | Less than 10 |
| | | | TOTAL POINTS | | |
| | | | PERFORMANCE RATING | | |

**PART VI – REVIEW OF CURRENT EVALUATION**

All reviews require Director review and approval. Ratings of "FB", "B", and "FA" require review by VP/SVP.

| Evaluator: | Date: |
|---|---|
| Dept. Director: | Date: |
| VP/SVP: | Date: |
| Human Resources: | Date: |

## PART VII – POSITION STANDARDS

Rating for each Standard should be evaluated based on the following: (1) the amount of work completed; (2) the quality/accuracy of the work completed; (3) the timeliness of the work completed; (4) consistency in getting the job done with minimal supervision.

Insert goals and objectives and comments as appropriate.

The following standards are ranked in order of importance (highest to lowest).

1.  Observe patients in the Emergency Department who are receiving a psychiatric evaluation to prevent them from harming themselves or others.

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

2.  Transport high-risk and dangerous psychiatric patients to other medical facilities throughout the state.

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

3.  Conduct daily inspections at off site facilities to create a visual deterrent to prevent crime.

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

4.  Ensure the off site facilities are secure at all times, immediately summoning aid to search the premises when evidence of tampering or forced entry is found, and apprehending any trespassers.

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

5.  Note and record the license number and description of vehicles under questionable circumstances, querying individuals through Delaware Justice Information System and National Criminal Information Center for wants and warrants, where applicable and taking appropriate action when necessary.

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

Constable 8160.339 4-5-05                                    P82

6. Observe and recognize suspicious behavior of individuals which may indicate involvement in criminal offenses, stopping and interviewing a suspicious person, and successfully completing field interrogation cards.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| Comments: | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

7. Make arrests, forcibly if necessary, using handcuffs and other restraints. Subdue resisting suspects using maneuvers and weapons and other approved methods of self-defense as necessary. If appropriate, PEAT must be the first consideration when attempting to control a volatile situation.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| Comments: | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

8. Immediately take control of crime scene and preserve evidence, secure witnesses to the crime, interview witnesses, obtaining complete information, including written statements when appropriate.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| Comments: | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

9. Perform searches of people, arrestees, vehicles, buildings and outdoor areas.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| Comments: | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

10. Investigate and interview arrestee, properly completely filling out the necessary paperwork as required by the state court system and departmental guidelines.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| Comments: | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

11. Secure the perimeter in fire scenes, assist with hazardous material spills.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| Comments: | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

12. Perform crowd control at labor disputes or other events maintaining a professional image to ensure the safety of persons and property.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| **Comments:** | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

13. Serve outstanding subpoenas and warrants as required.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| **Comments:** | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

14. Serve as liaison between the courts, victim(s) and witness (es) and testify in court when necessary.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| **Comments:** | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

15. Notify the full service police agency which has primary law enforcement jurisdiction in every instance in which a custodial detention, an arrest, a search of a person or place, or when the occurrence of a criminal act is reported.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| **Comments:** | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

16. Maintain compliance with all Bayhealth department policies, state regulations/laws and JCAHO standards.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| **Comments:** | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

17. Follow the instructions of the Security Controller and keep the Security Controller informed of any unusual circumstances at all times. The Security Controller will be notified before any outside law enforcement agency is contacted.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| **Comments:** | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

Constable 8160.339 4-5-05

18. Complete and fill out the required reports on all incidents you investigate. The Security Controller will review and approve all of your paperwork prior to submitting it.

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | Meets Expectations | Below Expectations | Far Below Expectations |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | | |

19. Exhibit excellent interpersonal skills and create positive relationships with employees, other law enforcement agencies, and all hospital patients/visitors. Effectively meet the needs of those served in a compassionate, responsive and courteous manner.

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | Meets Expectations | Below Expectations | Far Below Expectations |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

20. Perform all duties in accordance with performance improvement principles, mandatory education and philosophies of the organization.

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | Meets Expectations | Below Expectations | Far Below Expectations |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | | |

21. Responsible for training new Security Officers in Law Enforcement Duties.

**Goals & Objectives:**

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | Meets Expectations | Below Expectations | Far Below Expectations |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

**Position Standards Overall Rating (highlight or circle)**

| | | | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | | |

Constable 8160.339 4-5-05                    P85

## PART VIII – FIVE STAR SERVICE

### Five Star Standards (See Five Star Service Booklet and Employee Pledge)

1. Treats everyone as if he or she is the most important person in the facility.

2. Grooming and dress reflect our respect for others and the organization. Complies with Bayhealth Personal Appearance and Dress Policy B9065.11.

3. Committed to listening attentively to others who are speaking in order to fully understand their needs. Pays close attention to both verbal and nonverbal messages. Speaks in a caring and thoughtful manner, always showing respect.

4. Operates the telephone correctly in work area. Transfers telephone calls correctly, always asking permission to transfer the call. Identifies self and department when answering calls. Sounds pleasant, helpful and listens with understanding. Returns calls promptly. Answers with a smile in voice.

5. Provides exceptional service to all internal and external customers.

6. Committed to providing the highest quality of service and meeting our customers' needs with utmost care and courtesy.

.   Works together with a common purpose – serving our customers and our community. Treats every co-worker as a professional. Channels negative emotions appropriately and privately.

8. Ensures all rights to privacy and modesty by creating and maintaining a secure and trusting environment. When entrusted with others' affairs, treats all information as confidential. Restricts discussion of confidential matters to situations where the information is necessary to meet the patients' health needs. Concern for patient privacy promotes peace of mind and lessens their anxiety.

9. Ensures an accident free environment.

10. Takes pride in the job and the Bayhealth organization.

11. Committed to creating and supporting a Five-Star Service culture.

Comments:

### Overall Rating Five Star Service Standards (highlight or circle)

| | | | | | |
|---|---|---|---|---|---|
| | | | Meets Expectations | Below Expectations | Far Below Expectations |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | |

# PART IX – OTHER PERFORMANCE FACTORS (highlight or circle)

**Job Knowledge:** Utilization of job related information, technical skills and procedures, including continuous quality improvement.

**Goals & Objectives:**

**Comments:**

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

**Adaptability/Flexibility:** Ability to grasp and adjust to new ideas, procedures and situations comfortably and effectively.

**Goals & Objectives:**

**Comments:**

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

**Attendance/Punctuality:** Consistency in adhering to the work schedule.

**Goals & Objectives:**

**Comments:**

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

## Overall Rating Other Performance Factors (highlight or circle)

| | | | | |
|---|---|---|---|---|
| Self Rating (optional): Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

## PART X – GOALS AND OBJECTIVES FOR NEXT APPRAISAL

th the employee and supervisor should list goals to be accomplished for the next appraisal.  The goals indicated below will be carried forward to PART VII for the next appraisal.

| Position Standard Number | Challenge | Goal |
|---|---|---|
| | | |
| | | |

## PART XI – RATER'S OVERALL SUMMARY

As appropriate, include comments regarding employee's overall progress, growth potential, potential for promotion, employee development needs and recommended training.

☐

**PART XII - EMPLOYEE'S RESPONSE - EVALUATION/HIGHLIGHTS OF APPRAISAL DISCUSSION**

Comments:

I have read and agree to practice Bayhealth's Five Star Service Guidelines.
I have reviewed my job description and agree that it is current.

_____     _____
Employee's Signature                          Date

**PART XII-SUPERVISOR'S RESPONSE-EVALUATION/HIGHLIGHTS OF APPRAISAL DISCUSSION**

_____     _____
Supervisor's  Signature                         Date

Constable 8160.339 4-5-05                              1389





DEPOSITION
EXHIBIT
Morris 6
6/4/07 JP
PENGAD 800-631-6989

# Bayhealth Medical Center

**Bay**health
*Medical Center*

**Performance Appraisal Summary Sheet**

## Section 1

RECEIVED
APR 23 2003
BAYHEALTH MEDICAL CENTER
HUMAN RESOURCES

**Due Back in H/R:** 04/22/2003

Review Date:

Effective Date: 3 1 03

**New Hire:**
*(Do not complete Section 2)*

Annual: xxx

**Employee Name:** MORRIS, NATHANIEL A

Status:

RECEIVED
APR 23 2003
BAYHEALTH MEDICAL CENTER

**Employee Number:** 121999

Facility:

**Department:** 8160   SECURITY

Date of Hire: 11/11/2000

**Job Title:** OPERATOR, CONTROL CENTER

Job Grade: 20

## Section 2

| 5.0 – 5.5 | 4.0 – 4.99 | 3.0 – 3.99 | 2.0 – 2.99 | Under 2.0 |
|---|---|---|---|---|
| Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| 4.50% | 3.60% | 3.00% | 0.00% | 0.00% |

**Overall Performance Rating:** *Meets-20*

**Current Rate:** 9.860

**New Rate:** $10.16
*(To be completed by H/R)*

**The current maximum for your paygrade is:** 12.82 **per hour**

## Section 3

**Signatures:**

_____  04/22/08
Evaluator                Date

_____
Vice President           Date

_____  04/22/08
Department Director      Date

_____  04/24/03
Human Resources          Date

**I have seen and reviewed this appraisal rating with my evaluator. My signature does not imply agreement or disagreement with the evaluation.**

_____  04/22/08
Employee Signature       Date

A copy of this form summarizing your evaluation and indicating your new rate, if applicable, will be sent to you by the Human Resources Department. The full evaluation will be maintained in your personnel file and will be available for your review in accordance with hospital policy.

DEPOSITION EXHIBIT
P 9
Morris 7

# BAYHEALTH MEDICAL CENTER, INC.
## CONFIDENTIALITY AGREEMENT

**IMPORTANT**
Read all sections. If you have questions, please ask them before signing. A copy of this agreement will be placed in your personnel file.

## DISCLOSURE OF PATIENT/EMPLOYEE/HOSPITAL INFORMATION

I recognize that the services provided by Bayhealth Medical Center for its patients are private and confidential; that to enable the Hospital to perform those services, patients must furnish information to the Hospital with the understanding that it will be kept confidential and used only by authorized persons as necessary in providing these services; that the good will of the Hospital depends upon keeping services and information confidential; that certain legal obligations are attached to this information and that by reason of my duties or in the course of my employment I may receive or have access to verbal, written or electronic media information concerning patients and services performed by the Hospital even though I do not furnish the services performed for these patients.

I recognize that by reason of my duties, or in the course of my employment I may receive or have access to verbal, written or electronic media information concerning employees of Bayhealth Medical Center and the facilities themselves. This information includes, but is not limited to, salaries, benefits, personnel information and financial information.

I hereby agree, except as directed by the Hospital or by legal process, I will not, at any time during or after my employment by or during my duties at the Hospital, access any information that I do not have a need to know in order to conduct legitimate hospital business or disclose any information whatsoever to any person or entity by any means, or permit any such person or entity to examine or make copies of any reports or other documents prepared by me, coming into my possession or my control, or to which I have access, that concerns in any way the patients, employees or services performed by the Hospital, including, but not limited to, census reports, demographic information, diagnosis or treatment information, summaries of such information, any business or consultation report, planning documents, financial information of any kind, business reports, correspondence, vendor/supplier information, contract price or terms. I agree that I will not attempt to use any such information for my own advantage. I understand that printed confidential information will be disposed of in accordance with Bayhealth policy.

I recognize that the unauthorized disclosure of information by me may violate State or Federal laws and do irreparable injury to the Hospital or to the patient or employee that the unauthorized release of information will result in disciplinary action, including termination or legal action being taken against me.

I have read all of the above sections of this agreement, and I understand them.

_Nathaniel Me_____       _04/22/08_____
Signature                          Date

_Nathaniel A. Morris_____     _# 121999_____
Printed/Typed Name                  Employee #

P# 7772 Rev. 1-02



# Acknowledgement and Understanding of
## Proper Handling/Disposal of Hazardous/Infectious Waste

I understand the importance of proper disposal of hazardous and infectious waste and realize the potential hazard to human health or the environment when improperly handled, stored, disposed of or otherwise managed.

I understand that handling of hazardous and infectious waste is one of the responsibilities of my job.

I have had proper training and education on handling and disposal of hazardous and infectious waste. I have had the opportunity with my department manager to ask questions if further clarification is needed. I will be held personally responsible for improper handling, storage or disposal due to my neglect or performance.

I have read the Hazardous/Infectious Waste Management policy, B8160.04, and understand the procedures for the proper handling and disposal of hazardous/infectious waste generated by Bayhealth Medical Center. I agree to adhere to the practice outlined in this procedure. Failure to adhere to this policy, or report violations of this policy, will result in disciplinary action to include suspension/termination.

My signature below confirms that I understand and agree to the above statements.

_Nathaniel M____ 04/22/03_
**Signature  (full name)**        **date**

_Nathaniel A. Morris  04/22/03_
**Printed name**        **date**

KL  - STAFF DEVELOPMENT DEPARTMENT
INDIVIDUAL SUMMARY REPORT

For the Period 05/01/2002 thru 03/14/2003

Page:      1

Report Date: 03/14/2003
======================================================================
NATHANIEL A   MORRIS ID: 121999     Department: 8160

| COURSE NO | DATE | COURSE NAME | HOURS | CEU | CLASS TEST |
|---|---|---|---|---|---|
| MAN020701B | 07/01/2002 | BACK SAFETY COMPETENCY | 0.00 | 0.00 | BKSAF |
| CBE020701B | 07/01/2002 | TRANSFER TECHNIQUES | 0.00 | 0.00 | CBE |
| SLP020801F | 08/01/2002 | LATEX ALLERGY SLP | 0.00 | 0.00 | LATEX |
| MAN020901L | 09/01/2002 | CORPORATE COMPLIANCE/HIPPA UP | 0.00 | 0.00 | CC |
| SLP021001D | 10/01/2002 | HIPAA QUIZ SLP | 0.00 | 0.00 | SLP |
| MAN030101O | 01/01/2003 | CODE RED RESPONSE | 0.00 | 0.00 | FIRE |

Summary for     NATHANIEL A    MORRIS      Id: 121999

.6 Total Course(s)        0.00 Total Hour(s)        0.00 Total CEU(s)

P94

## BAYHEALTH MEDICAL CENTER

### POSITION DESCRIPTION/PERFORMANCE REVIEW

### CONTROL CENTER OPERATOR

*Bayhealth Medical Center, Inc.*
**Dover, Delaware**

**Position Number 328**

## PART I    JOB IDENTIFICATION

**Position Summary:** Supervises, monitors and provides protection and security for Bayhealth Medical Center buildings and premises and for employees, patients, and visitors. Directs the transport of patients, equipment and materials between the hospital and off site locations.

**Employee Status: EMPLOYEE**

**Reports to: Security/Auto Services Manager**

**FLSA Overtime Exempt [ ]   FLSA Overtime Non-Exempt [X]**

**Subject to Bloodborne Pathogens?**        Yes  [X]              No []

**Position Qualifications (insert minimum and preferred qualifications)**

|  | Minimum | Preferred |
|---|---|---|
| Education: | High school or equivalent | Basic college courses |
| Experience: | Previous experience in security operations | Criminal justice, law enforcement, or related fields |
| Certification/Registration: |  |  |
| Computer/Software: | Working Knowledge of computers | Experience with Microsoft word |
| Special Knowledge, Skills or Abilities: |  |  |

1

## Physical Demand Functions (insert "X" as appropriate)

| Physical Demand | Tasks Not Required | Occasional (1-33%) | Frequent (34-66%) | Constant (67-100%) | Essential Function Yes | No | Additional Comments |
|---|---|---|---|---|---|---|---|
| Standing | | X | | | X | | |
| Walking | | X | | | X | | |
| Sitting | | | | X | X | | |
| Bending | | | X | | | | |
| Kneeling | | X | | | | | |
| Crawling | X | | | | | | |
| Climbing | X | | | | | | |
| Reaching | | X | | | | | |
| Gripping | X | | | | | | |
| Lifting | | X | | | | | |
| Carrying | | X | | | | | |
| Pushing | X | | | | | | |
| Pulling | X | | | | | | |

### Required Protective Equipment
None

### Non-Essential Functions

### Working Conditions
Exposed to dangers of assaults/ hazards from investigating alarms

### Age Specific Patient Population (highlight or circle)
Neonate (birth - 28 days)
Child (1 month – 12 years)
Adolescent (13-17 years)
Adult (18 – 64 years)
Geriatric (65+ years)
Not Applicable

### Required Mandatory Education (highlight or circle)
Fire Safety, Infection Control Right-to-Know
Managing Change
Delivering Performance
Creating Successful Working Relationships
Problem Solving for the Individual
Corporate Compliance
5 Star Customer Service
Code Red Response-Fire Extinguisher
Back Safety Competency
Latex Allergy SLP
CPR-Patient Care Areas (every two years)

2

ACLS-Patient Care Areas (every two years)
PALS-Patient Care Areas (every two years)
BGM-Patient Care Areas (yearly)
NRP-Women's Services & Emergency (every four years)
PEAT-St. Jones & Security (initial & yearly update)
CBE-Competency Based Evaluation (yearly)
TNCC-Trauma Nurse Core Course (every four years)
ENPC-Emergency Nurse Pediatric Course (every four years)

## PART II – EMPLOYEE IDENTIFICATION (insert)

| | | |
|---|---|---|
| **Employee Name:** Nathaniel A Morris | **Employee No.** 121999 | **Hire Date:** 01/13/1992 |
| **Department Name:** Security | **Department Number:** 8160 | |

## PART III – REASON FOR EVALUATION (insert "X" as appropriate)

_____ **Orientation Period (Initial 60-Day Period)**  _____ **Probationary**

__X__ **Annual–Review Period** _____  _____ **Other:** _____

## PART IV – MERIT INCREASE ELIGIBILITY REQUIREMENTS (highlight or circle)

(Yes)  No   N/A   **Hazardous Waste**        (Yes)  No   N/A   **Age Specific Competencies**

(Yes)  No   N/A   **Mandatory Education**      (Yes)  No   N/A   **Corporate Compliance**

(Yes)  No   N/A   **Confidentiality**         (Yes)  No   N/A   **Current License**

**Note:  Failure to complete any of the above items will result in the employee's salary increase being delayed until all mandatory requirements are completed.  The salary increase will become effective upon completion of the requirements.  An employee's salary increase will not be retroactive.**

## PART V – PERFORMANCE SUMMARY (highlight or circle)

| | FA | A | M | B | FB |
|---|---|---|---|---|---|
| Part VII – Position Standards (60%) | 24 | 18 | (12) | 6 | 0 |
| Part VIII – 5 Star Service (30%) | 12 | 9 | (6) | 3 | 0 |
| Part IX – Other Performance Factors (10%) | 4 | 3 | (2) | 1 | 0 |
| Far Above Expectations | | | | | 38 to 40 |
| Above Expectations | | | | | 29 to 37 |
| Meets Expectations | | | | | 20 to 28 |
| Below Expectations | | | | | 10 to 19 |
| Far Below Expectations | | | | | Less than 10 |
| | | | **TOTAL POINTS** | | 20 |
| | | | **PERFORMANCE RATING** | | M |

## PART VI – REVIEW OF CURRENT EVALUATION

All reviews require Director review and approval. Ratings of "FB", "B", and "FA" require review by VP/SVP.

| | |
|---|---|
| **Evaluator:** David W. Freeman | **Date:** 04/22/03 |
| **Dept. Director:** Marvin E. Lands | **Date:** 04/22/03 |
| **VP/SVP:** | **Date:** |
| **Human Resources:** | **Date:** |

4

## PART VII - POSITION STANDARDS

Rating for each Standard should be evaluated based on the following: (1) the amount of work completed; (2) the quality/accuracy of the work completed; (3) the timeliness of the work completed; (4) consistency in getting the job done with minimal supervision.

Insert goals and objectives and comments as appropriate.

The following standards are ranked in order of importance (highest to lowest).

1. Prepares work schedules, assigns and makes recommendation for personnel actions [1][3][5][6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

2. Maintains departmental polices and procedures, objectives a, quality assurance program and safety standards [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

3. Schedules daily routine services and assigns transporters [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

4. Responds to telephone requests and assigns staff to perform services such as patient transport, mail messenger services [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

5. Ensures that services are performed as required by department [1] [3] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

6. Supervises, schedules and monitors security activities in assigned areas to ensure secure and safe conditions for employees, patients, and visitors and to protect medical center buildings, assets and premises [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

7. Prepares written documentation as required by the department [1] [3] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

8. Conduct investigations; maintains records and prepares incident reports and other documents pertaining to security [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|

5

| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|

9. Issuers employee identification parking privileges and handles registration and vehicle identification [2] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

10. Collaborates with local, state and national agencies relative to medical center security investigations; directs and/ or escorts agency personnel to hospital buildings and premises [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

11. Enhances professional growth and development though participation in educational programs, current literature, inservice meetings and workshops [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

12. Attends meetings as required and participates on committees as directed [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

13. Expected to be an active contributing team member within the department as well as the medical center [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

14. Exhibits excellent interpersonal skills during interactions with employees, other departments and all other hospital employees [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

15. Exhibits excellent interpersonal skills during interactions with employees, other departments and all other hospital employees [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

16. Performs all duties in accordance with performance improvement principles and philosophy of the organization

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

6

17. Actively supports the Bayhealth medical centers mission to improve the health status of all its members of the communities within our service area.

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| **Comments:** | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

18. Provides services consistent with the medical centers philosophy statement of delivering compassionate, competent care while assuming person responsibility, promoting wellness resection diversity and maintaining confidentiality

| Goals & Objectives: | | | | | |
|---|---|---|---|---|---|
| **Comments:** | | | | | |
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

| Position Standards Overall Rating (highlight or circle) | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

7

## PART VIII – FIVE STAR SERVICE

### Five Star Standards (See Five Star Service Booklet and Employee Pledge)

1. Treats everyone as if he or she is the most important person in the facility.

2. Grooming and dress reflect our respect for others and the organization. Complies with Bayhealth Personal Appearance and Dress Policy B9065.11.

3. Committed to listening attentively to others who are speaking in order to fully understand their needs. Pays close attention to both verbal and nonverbal messages. Speaks in a caring and thoughtful manner, always showing respect.

4. Operates the telephone correctly in work area. Transfers telephone calls correctly, always asking permission to transfer the call. Identifies self and department when answering calls. Sounds pleasant, helpful and listens with understanding. Returns calls promptly. Answers with a smile in voice.

5. Provides exceptional service to all internal and external customers.

6. Committed to providing the highest quality of service and meeting our customers' needs with utmost care and courtesy.

7. Works together with a common purpose – serving our customers and our community. Treats every co-worker as a professional. Channels negative emotions appropriately and privately.

8. Ensures all rights to privacy and modesty by creating and maintaining a secure and trusting environment. When entrusted with others' affairs, treats all information as confidential. Restricts discussion of confidential matters to situations where the information is necessary to meet the patients' health needs. Concern for patient privacy promotes peace of mind and lessens their anxiety.

9. Ensures an accident free environment.

10. Takes pride in the job and the Bayhealth organization.

11. Committed to creating and supporting a Five-Star Service culture.

Comments:

### Overall Rating Five Star Service Standards (highlight or circle)

| | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | Above Expectations | (Meets Expectations) | Below Expectations | Far Below Expectations |

## PART IX – OTHER PERFORMANCE FACTORS (highlight or circle)

**Job Knowledge:** Utilization of job related information, technical skills and procedures, including continuous quality improvement.

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

**Adaptability/Flexibility:** Ability to grasp and adjust to new ideas, procedures and situations comfortably and effectively.

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

**Attendance/Punctuality:** Consistency in adhering to the work schedule.

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

**Overall Rating-Other Performance Factors (highlight or circle)**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

**PART X - GOALS AND OBJECTIVES FOR NEXT APPRAISAL**

9

Both the employee and supervisor should list goals to be accomplished for the next appraisal.  The g
indicated below will be carried forward to PART VII for the next appraisal.

| Position Standard Number | Challenge | Goal |
|---|---|---|
| 328 | keep up with coure system change | 6 months |
| 328 | update shepard cave system | 6 months |

**PART XI   RATER'S OVERALL SUMMARY**

As appropriate, include comments regarding employee's overall progress, growth potential, and potential for
promotion, employee development needs and recommended training.

10

## PART XII - EMPLOYEE'S RESPONSE - EVALUATION/HIGHLIGHTS OF APPRAISAL DISCUSSION

Comments:

I have read and agree to practice Bay health's Five Star Service Guidelines.
I have reviewed my job description and agree that it is current.

_____          ____04/22/03_____
          Employee's Signature                      Date

## PART XIII SUPERVISOR'S RESPONSE-EVALUATION/HIGHLIGHTS OF APPRAISAL DISCUSSION

_____          ____04/22/03_____
          Supervisor's  Signature                    Date

**Bayhealth** Medical Center

**Bayhealth Medical Center**

**Performance Appraisal Summary Sheet**

## Section 1

Due Back in H/R:    04/22/2004

RECEIVED

Review Date:    05/06/2004

Effective Date:    5 / 2 / 04

PFI

New Hire:
*(Do not complete Section 2)*

Annual:    XXX

Employee Name :    MORRIS, NATHANIEL A

Employee Number: 121999

Department:    8160    SECURITY

Job Title:    OPERATOR, CONTROL CENTER

Status:    F1    / 80

Facility:    KG

Date of Hire:    11/11/2000

Job Grade:    20

DEPOSITION EXHIBIT
Morris 8
6/4/07

## Section 2

| 38 – 40 | 29 – 37 | 20 – 28 | 10 – 19 | Less than 10 |
|---|---|---|---|---|
| Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| 4.50% | 3.60% | 3.00% | 0.00% | 0.00% |

Overall Performance Rating: *Above*

Current Rate:    10.160

FOR HR USE ONLY
NEW RATE:    $10.53
REVIEW DATE ADVANCED TO: 5|6|05
HR SIGNATURE    M. Cullen

The current maximum for your paygrade is:    13.08    per hour

## Section 3

Signatures:

_____    04/21/04
Evaluator    Date

_____    04/21/04
Department Director    Date

_____    _____
Vice President    Date

Melissa A Cullen 4/30/04
Human Resources
R. Warner 4/30/04

**I have seen and reviewed this appraisal rating with my evaluator. My signature does not imply agreement or disagreement with the evaluation.**

_____    04/21/04
Employee Signature    Date

A copy of this form summarizing your evaluation and indicating your new rate, if applicable, will be sent to your supervisor by the Human Resources Department. The full evaluation will be maintained in your personnel file and will be available for your review in accordance with hospital policy.

P106

# BAYHEALTH MEDICAL CENTER, INC.
# CONFIDENTIALITY AGREEMENT

## IMPORTANT
Read all sections. If you have questions, please ask them before signing. A copy of this agreement will be placed in your personnel file.

## DISCLOSURE OF PATIENT/EMPLOYEE/HOSPITAL INFORMATION

I recognize that the services provided by Bayhealth Medical Center for its patients are private and confidential; that to enable the Hospital to perform those services, patients must furnish information to the Hospital with the understanding that it will be kept confidential and used only by authorized persons as necessary in providing these services; that the good will of the Hospital depends upon keeping services and information confidential; that certain legal obligations are attached to this information and that by reason of my duties or in the course of my employment I may receive or have access to verbal, written or electronic media information concerning patients and services performed by the Hospital even though I do not furnish the services performed for these patients.

I recognize that by reason of my duties, or in the course of my employment I may receive or have access to verbal, written or electronic media information concerning employees of Bayhealth Medical Center and the facilities themselves. This information includes, but is not limited to, salaries, benefits, personnel information and financial information.

I hereby agree, except as directed by the Hospital or by legal process, I will not, at any time during or after my employment by or during my duties at the Hospital, access any information that I do not have a need to know in order to conduct legitimate hospital business or disclose any information whatsoever to any person or entity by any means, or permit any such person or entity to examine or make copies of any reports or other documents prepared by me, coming into my possession or my control, or to which I have access, that concerns in any way the patients, employees or services performed by the Hospital, including, but not limited to, census reports, demographic information, diagnosis or treatment information, summaries of such information, any business or consultation report, planning documents, financial information of any kind, business reports, correspondence, vendor/supplier information, contract price or terms. I agree that I will not attempt to use any such information for my own advantage. I understand that printed confidential information will be disposed of in accordance with Bayhealth policy.

I recognize that the unauthorized disclosure of information by me may violate State or Federal laws and do irreparable injury to the Hospital or to the patient or employee that the unauthorized release of information will result in disciplinary action, including termination or legal action being taken against me.

I have read all of the above sections of this agreement, and I understand them.

| | |
|---|---|
| _Nathaniel Morris_ | _4/21/04_ |
| Signature | Date |
| _Nathaniel Morris_ | _14999_ |
| Printed/Typed Name | Employee # |

P-7772 Rev. 1-02



## Acknowledgement and Understanding of
## Proper Handling/Disposal of Hazardous/Infectious Waste

I understand the importance of proper disposal of hazardous and infectious waste and realize the potential hazard to human health or the environment when improperly handled, stored, disposed of or otherwise managed.

I understand that handling of hazardous and infectious waste is one of the responsibilities of my job.

I have had proper training and education on handling and disposal of hazardous and infectious waste. I have had the opportunity with my department manager to ask questions if further clarification is needed. I will be held personally responsible for improper handling, storage or disposal due to my neglect or performance,

I have read the Hazardous/Infectious Waste Management policy, B8160.04, and understand the procedures for the proper handling and disposal of hazardous/infectious waste generated by Bayhealth Medical Center. I agree to adhere to the practice outlined in this procedure. Failure to adhere to this policy, or report violations of this policy, will result in disciplinary action to include suspension/termination.

My signature below confirms that I understand and agree to the above statements.

Nathaniel Moss          4/21/04
**Signature  (full name)**          **date**

Nathaniel Morris          4/21/04
**Printed name**          **date**

```
                    For the Period 01/01/2003 thru 12/31/2003
Report Date: 02/26/2004                                        Page:     1
================================================================================
    NATHANIEL A    MORRIS ID: 121999     Department: 8160

COURSE NO     DATE    COURSE NAME                      HOURS    CEU   CLASS TEST
================================================================================
MAN030101O 01/01/2003 CODE RED RESPONSE                 0.00    0.00 FIRE
MAN030301S 03/01/2003 FIRE, SAFETY, INFECTION CONTR     0.00    0.00 FSICH
MAN030401B 04/01/2003 BACK SAFETY COMPETENCY            0.00    0.00 BKSAF
CBE030401J 04/01/2003 TRANSFER TECHNIQUES               0.00    0.00 CBE
MAN030901M 09/01/2003 EMTALA REGULATIONS                0.00    0.00 MTALA
MAN031101L 11/01/2003 CORPORATE COMPLIANCE/HIPAA UP     0.00    0.00 CC
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

    Summary for     NATHANIEL A    MORRIS    Id: 121999

       6 Total Course(s)       0.00 Total Hour(s)        0.00 Total CEU(s)
                  ---------------------------------
```

# BAYHEALTH MEDICAL CENTER

## POSITION DESCRIPTION/PERFORMANCE REVIEW

### CONTROL CENTER OPERATOR

*Bayhealth Medical Center, Inc.* *
**Dover, Delaware**

**Position Number 328**

## PART 1 — JOB IDENTIFICATION

*Position Summary:* **Supervises monitors and provides protection and security for Bayhealth Medical Center buildings and premises and for employees, patients, and visitors. Directs the transport of patients, equipment and materials between the hospital and off site locations.**

*Employee Status: EMPLOYEE*

*Reports to: Security/Auto Services Manager*

*FLSA Overtime Exempt [ ]    FLSA Overtime Non-Exempt [X]*

*Subject to Bloodborne Pathogens?*        Yes [X]              No []

*Position Qualifications (insert minimum and preferred qualifications)*

| | Minimum | Preferred |
|---|---|---|
| Education: | High school or equivalent | Basic college courses |
| Experience: | Previous experience in security operations | Criminal justice, law enforcement, or related fields |
| Certification/Registration: | | |
| Computer/Software: | Working Knowledge of computers | Experience with Microsoft word |
| Special Knowledge, Skills or Abilities: | | |

1

*Physical Demand Functions (insert "X" as appropriate)*

| Physical Demand | Tasks Not Required | Occasional (1-33%) | Frequent (34-66%) | Constant (67-100%) | Essential Function Yes | No | Additional Comments |
|---|---|---|---|---|---|---|---|
| Standing | | X | | | X | | |
| Walking | | X | | | X | | |
| Sitting | | | | X | X | | |
| Bending | | | X | | | | |
| Kneeling | | X | | | | | |
| Crawling | X | | | | | | |
| Climbing | X | | | | | | |
| Reaching | | X | | | | | |
| Gripping | X | | | | | | |
| Lifting | | X | | | | | |
| Carrying | | X | | | | | |
| Pushing | X | | | | | | |
| Pulling | X | | | | | | |

*Required Protective Equipment*
None

*Non-Essential Functions*

*Working Conditions*
Exposed to dangers of assaults/ hazards from investigating alarms

*Age Specific Patient Population (highlight or circle)*
Neonate (birth - 28 days)
Child (1 month – 12 years)
Adolescent (13-17 years)
Adult (18 – 64 years)
Geriatric (65+ years)
Not Applicable

*Required Mandatory Education (highlight or circle)*
Fire, Safety, Infection Control Right-to-Know
Managing Change
Delivering Performance
Creating Successful Working Relationships
Problem Solving for the Individual
Corporate Compliance
5 Star Customer Service
Code Red Response-Fire Extinguisher
Back Safety Competency
Latex Allergy $LP
CPR-Patient Care Areas (every two years)
ACLS-Patient Care Areas (every two years)
PALS-Patient Care Areas (every two years)

2

BGM-Patient Care Areas (yearly)
NRP-Women's Services & Emergency (every four years)
PEAT-St. Jones & Security (initial & yearly update)
CBE-Competency Based Evaluation (yearly)
TNCC-Trauma Nurse Core Course (every four years)
ENPC-Emergency Nurse Pediatric Course (every four years)

3

## PART II – EMPLOYEE IDENTIFICATION (insert)

| | | |
|---|---|---|
| *Employee Name:* Morris, Nathaniel A. | *Employee No.* 121999 | *Hire Date:* 11/11/2000 |
| *Department Name:* Security | *Department Number:* 8160 | |

## PART III – REASON FOR EVALUATION (insert "X" as appropriate)

_____ *Orientation Period (Initial 60-Day Period)* _____ *Probationary*

__X__ *Annual–Review Period* _____ _____ *Other:* _____

## PART IV – MERIT INCREASE ELIGIBILITY REQUIREMENTS (highlight or circle)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| (Yes) | No | N/A | *Hazardous Waste* | (Yes) | No | N/A | *Age Specific Competencies* |
| (Yes) | No | N/A | *Mandatory Education* | (Yes) | No | N/A | *Corporate Compliance* |
| (Yes) | No | N/A | *Confidentiality* | (Yes) | No | N/A | *Current License* |

*Note: Failure to complete any of the above items will result in the employee's salary increase being delayed until all mandatory requirements are completed. The salary increase will become effective upon completion of the requirements. An employee's salary increase will not be retroactive.*

## PART V – PERFORMANCE SUMMARY (highlight or circle)

| | FA | A | M | B | FB |
|---|---|---|---|---|---|
| Part VII – Position Standards (60%) | 24 | 18 | 12 | 6 | 0 |
| Part VIII – 5 Star Service (30%) | 12 | 9 | 6 | 3 | 0 |
| Part IX – Other Performance Factors (10%) | 4 | 3 | 2 | 1 | 0 |
| Far Above Expectations | | | | | 38 to 40 |
| Above Expectations | | | | | 29 to 37 |
| Meets Expectations | | | | | 20 to 28 |
| Below Expectations | | | | | 10 to 19 |
| Far Below Expectations | | | | | Less than 10 |
| | | | | *TOTAL POINTS* | 30 |
| | | | | *PERFORMANCE RATING* | A |

## PART VI – REVIEW OF CURRENT EVALUATION

All reviews require Director review and approval. Ratings of "FB", "B", and "FA" require review by VP/SVP.

| | |
|---|---|
| *Evaluator:* David W. Freeman | *Date:* 04/21/04 |
| *Dept. Director:* Marvin E. Lands | *Date:* 04/21/04 |
| *VP/SVP:* | *Date:* |
| *Human Resources:* | *Date:* |

4

## PART VII - POSITION STANDARDS

Rating for each Standard should be evaluated based on the following: (1) the amount of work completed; (2) the quality/accuracy of the work completed; (3) the timeliness of the work completed; (4) consistency in getting the job done with minimal supervision.

Insert goals and objectives and comments as appropriate.  . . .

The following standards are ranked in order of importance (highest to lowest).

1. Prepares work schedules, assigns and makes recommendation for personnel actions [1][3][5][6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

2. Maintains departmental polices and procedures, objectives a, quality assurance program and safety standards [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

3. Schedules daily routine services and assigns transporters [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

4. Responds to telephone requests and assigns staff to perform services such as patient transport, mail messenger services [1] [2] [5] [6]

**Goals & Objectives:** ·

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

5. Ensures that services are performed as required by department [1] [3] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

6. Supervises, schedules and monitors security activities in assigned areas to ensure secure and safe conditions for employees, patients, and visitors and to protect medical center buildings, assets and premises [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

7. Prepares written documentation as required by the department [1] [3] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

8. Conduct investigations; maintains records and prepares incident reports and other documents pertaining to security [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|

5

Final Rating:   Far Above Expectations   (Above Expectations)   Meets Expectations   Below Expectations   Far Below Expectations

9.  Issues employee identification, parking privileges and handles registration and vehicle identification [2] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

10. Collaborates with local, state and national agencies relative to medical center security investigations; directs and/ or escorts agency personnel to hospital buildings and premises [1] [2] [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

11. Enhances professional growth and development though participation in   educational programs, current literature, in-service meetings and workshops [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

12. Attends meetings as required and participates on committees as directed [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

13. Expected to be an active contributing team member within the department as well as the medical center [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

14. Exhibits excellent interpersonal skills during interactions with employees, other departments and all other hospital employees [5] [6]

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

15.  Performs all duties in accordance with performance improvement principles and philosophy of the organization

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

16. Actively supports the Bayhealth medical centers mission to improve the health status of all its members of the communities within our service area.

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |

6

## PART VIII — FIVE STAR SERVICE

### Five Star Standards (See Five Star Service Booklet and Employee Pledge).

1. Treats everyone as if he or she is the most important person in the facility.

2. Grooming and dress reflect our respect for others and the organization. Complies with Bayhealth Personal Appearance and Dress Policy B9065.11.

3. Committed to listening attentively to others who are speaking in order to fully understand their needs. Pays close attention to both verbal and nonverbal messages. Speaks in a caring and thoughtful manner, always showing respect.

4. Operates the telephone correctly in work area. Transfers telephone calls correctly, always asking permission to transfer the call. Identifies self and department when answering calls. Sounds pleasant, helpful and listens with understanding. Returns calls promptly. Answers with a smile in voice.

5. Provides exceptional service to all internal and external customers.

6. Committed to providing the highest quality of service and meeting our customers' needs with utmost care and courtesy.

7. Works together with a common purpose – serving our customers and our community. Treats every co-worker as a professional. Channels negative emotions appropriately and privately.

8. Ensures all rights to privacy and modesty by creating and maintaining a secure and trusting environment. When entrusted with others' affairs, treats all information as confidential. Restricts discussion of confidential matters to situations where the information is necessary to meet the patients' health needs. Concern for patient privacy promotes peace of mind and lessens their anxiety.

9. Ensures an accident free environment.

10. Takes pride in the job and the Bayhealth organization.

11. Committed to creating and supporting a Five-Star Service culture.

Comments:

### Overall Rating Five Star Service Standards (highlight or circle)

| | | | | | |
|---|---|---|---|---|---|
| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
| Final Rating: | Far Above Expectations | (Above Expectations) | Meets Expectations | Below Expectations | Far Below Expectations |

## PART IX — OTHER PEFORMANCE FACTORS (highlight or circle)

8

**Job Knowledge:** Utilization of job related information, technical skills and procedures, including continuous quality improvement.

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | (Above Expectations) | Meets Expectations | Below Expectations | Far Below Expectations |

**Adaptability/Flexibility:** Ability to grasp and adjust to new ideas, procedures and situations comfortably and effectively.

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | Above Expectations | (Meets Expectations) | Below Expectations | Far Below Expectations |

**Attendance/Punctuality:** Consistency in adhering to the work schedule.

**Goals & Objectives:**

**Comments:**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | (Above Expectations) | Meets Expectations | Below Expectations | Far Below Expectations |

**Overall Rating Other Performance Factors (highlight or circle)**

| Self Rating (optional): | Far Above Expectations | Above Expectations | Meets Expectations | Below Expectations | Far Below Expectations |
|---|---|---|---|---|---|
| Final Rating: | Far Above Expectations | (Above Expectations) | Meets Expectations | Below Expectations | Far Below Expectations |

**PART X – GOALS AND OBJECTIVES FOR NEXT APPRAISAL**

9

Both the employee and supervisor should list goals to be accomplished for the next appraisal.  The goals indicated below will be carried forward to PART VII for the next appraisal.

| Position Standard Number | Challenge | Goal |
|---|---|---|
| 328 | Take a Delaware Criminal Justice Information System class, so you may access DELJIS in your performance of you duties as a Security Controller. | 1-6 months |
| 328 | Take over the Fire Drill Program for KGH, MMH, and St. Jones. You will be responsible for monitoring all fire drills for each quarter and the upkeep of the Fire Drill Book.  You will need to make sure that MMH, St. Jones and KGH send you all required paperwork monthly.  Coordinate with Lead Officer Boyce monthly with the results of all fire drills. | 1 month (To take over the program) **(Continuing Task)** Fire Drill Program Primary – Officer Morris Alternate – Officer Boyce |

**PART XI – RATER'S O**

As appropriate, include comm[...]ll progress, growth potential, and potential for promotion, employee develop[...]ining.

Officer Morris is an asset [...] and the Security Department and is always willing to work over time when needed.

10

## PART XII - EMPLOYEE'S RESPONSE - EVALUATION/HIGHLIGHTS OF APPRAISAL DISCUSSION

Comments:

I have read and agree to practice Bay health's Five Star Service Guidelines.
I have reviewed my job description and agree that it is current.

_____    04/21/04_____
Employee's Signature                           Date

## PART XII - SUPERVISOR'S RESPONSE - EVALUATION/HIGHLIGHTS OF APPRAISAL DISCUSSION

_____    04/21/04_____
Supervisor's Signature                          Date

11



STATE OF DELAWARE
DELAWARE CRIMINAL JUSTICE INFORMATION SYSTEM (DELJIS)
802 Silver Lake Boulevard
Suite 101
Dover, Delaware 19904

Telephone: 302-739-4856

Fax: 302-739-6285

March 23, 2005

Mr. David Freeman
Bayhealth Medical Center
Security & Safety Dept
640 S. State Street
Dover, DE  19901

Dear Mr. Freeman,

In review of Mr. Nathaniel Morris' background, we are unable to approve his access to DELJIS at this time.  This decision is in accordance to DELJIS Policy #4.  If you still require Mr. Morris to have access, we can present his request to the DELJIS Executive Committee for Review.

If you have any further questions, feel free to contact me at 302-739-4856.

Sincerely,

Mary Hansen
DELJIS Security Manager

Cc:  Margaret Bell, Executive Director



P120

State Bureau of Identification
State Police Headquarters
Dover, DE 19903

Page        1

12/07/00
11:15:44

Director

This is the criminal record of:
  NATHANIEL  A MORRIS          J  DOB 10/24/58    SBI 00001995 FBI

| Contributor of Charges | Name (INCLUDING ALIASES) | Date of ARREST | Complaint/ DUC/Charge | Disposition |
|---|---|---|---|---|
| DOVER PD DOVER | NATHANIEL A MORRIS J | 12/22/98 | 5098027250 9812014690 CONTEMPT OF COURT CCP | Disposition Unobtainable |
| DOVER PD DOVER | NATHANIEL A MORRIS J | 01/29/98 | 5098001991  CONTEMPT OF COURT CCP | Disposition Unobtainable |
| DOVER PD DOVER | NATHANIEL A MORRIS J | 09/05/97 | 5097016813  CONTEMPT OF COURT CCP | Disposition Unobtainable |
| CAPITOL PD 1  ER | NATHANIEL A MORRIS J | 02/21/97 | 9697000282  FAMILY COURT CAPIAS | Disposition Unobtainable |
| WILMINGTON PD WILMINGTON | NATHANIEL A MORRIS J | 02/21/97 | 3093012263 9702013642 CRIMINAL CONTEMPT OFFENDER FAILURE TO | GUILTY ORIGINAL CHARGE CC:$20.00 |
| DOVER PD DOVER | NATHANIEL A MORRIS J | 12/23/95 | 5095021611  FAMILY COURT CAPIAS | Disposition Unobtainable |

The use of this SBI record is regulated by law (11 Dela. code, Sec 8513).
All Delaware entries may be certified by the Director of the State Bureau
of Identification.  All other entries are copied from a Federal Bureau
of Investigation record of arrest. Delaware law prohibits the release of
non-conviction data for the purpose of non-criminal justice employment.

Not valid if signature page removed.



P121        OK per linda
                    12/19/00

ChoicePoint

ChoicePoint 

MORRIS, NATHANIEL ALBERT
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
CID 0001438700

*[handwritten: File in Record jmm 4/4]*

*[handwritten: Contacted Marvin Vanlill 4/4 and released info. jmm]*

# Records Only Series
# Employment Report

# CONFIDENTIAL

BAYHEALTH MEDICAL CENTER
ATTN: HUMAN RESOURCES REPRESENTATIVE
640 S. STATE ST
DOVER, DE 19901-

||111|11|1|1|1|1|1||1|1||111

ACCT NO: 135826 HQ



DEPOSITION
EXHIBIT
*Morris 11*
*6/4/07 VP*
PENGAD 800-631-6989

**Caution to Customer:** Under the terms of our service agreement, this report is submitted with the understanding that it is to be held in strict confidence and to be used for an employment decision only. If the requestor intends to take adverse action based in whole or in part on the contents of this report, the requestor must provide the consumer with a copy of the report and a summary of consumer rights as prescribed by FCRA section 1681g(c)(3). ChoicePoint has provided your company with copies of the consumer rights statements for this purpose. **In addition:** Remember the pre- and post-notification requirements and applicant authorization prescribed by FCRA section 1681b and section 1681m. *We appreciate your business!*

For Consumer Disclosure, contact ChoicePoint Consumer Center at (800) 845-6004.
For information concerning the preparation of this report, contact ChoicePoint Customer Service at the St Petersburg Employment Service Center at (800)749-9556.
P.122
Copyright © 1997, ChoicePoint, Inc. Alpharetta, Georgia. All Rights Reserved

Choicepoint

CHOICEPOINT

MORRIS, NATHANIEL ALBERT
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
CID 0001438700

## GENERAL INFORMATION

| | | | | |
|---|---|---|---|---|
| Account | 135826 HQ | File | Requester | HUMAN RESOURCES REPRESENT... |
| Name | MORRIS, NATHANIEL ALBERT | | SSN | 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 |
| Address | 107 DAVIS CIRCLE | | DOB | 10/24/XXXX |
| | DOVER, DE | | Report date | 04/04/2005 |
| Position applied for | | | | |

## OPTION INFORMATION

| | | | | |
|---|---|---|---|---|
| Report option | 2112 | Report name | OPTION 01 | |

| Components | Remarks | Consideration | Score |
|---|---|---|---|
| Felony And Misdemeanor | | YES | |
| Database Searches | | NO | |

## IDENTIFICATION

### SOCIAL SECURITY NUMBER VALIDATION

SSN 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 IS VALID. ISSUED BETWEEN 1970-1971 IN MARYLAND

DISCLAIMER: THESE RESULTS REPRESENT A VALIDATION OF ONLY THE NUMBER AND NO OTHER INFORMATION

### IDENTITY VERIFICATION

| Name verified | Address verified | DOB verified | SSN verified |
|---|---|---|---|
| YES | | | |

## PUBLIC RECORDS

Search results    CLEAR

| | |
|---|---|
| Record ordered | CRIMINAL RECORDS |
| Type of search | FELONY & MISDEMEANOR RECORD SEARCH |
| Date of search | 04/01/2005 |
| Search period | 04/03/1998 - 03/18/2005 |
| Address covered | 107 DAVIS CIRCLE DOVER, DE |
| Court name/type | KENT COUNTY SUPERIOR AND COMMON PLEAS COURTS |
| Location | 38 THE GREEN DOVER, DE KENT COUNTY |
| Name searched | NATHANIEL ALBERT MORRIS |

03/28/2005 03/28/2005 03/31/2005
BAYHEALTH MEDICAL CENTER  135826 HQ

Choicepoint

4/4/2005 8:08    PAGE 004/006    Fax Server

CHOICEPOINT

MORRIS, NATHANIEL ALBERT
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
CID 0001438700

Source Status History

| Status Date | Action Date | Status Description |
|---|---|---|
| 04/01/2005 | 04/06/2005 | Search in Progress expected completion by Action Date |

Process History

| Event Date | Action Date | Event Description |
|---|---|---|
| 04/01/2005 09:36:39 | 04/01/2005 09:36:39 | ELECTRONICALLY ORDERED |
| 04/01/2005 09:38:47 | 04/01/2005 09:38:47 | RECORD ORDERED |
| 04/01/2005 17:24:02 | 04/01/2005 17:24:02 | RECORD JUDGED |

Search results    CLEAR

| | |
|---|---|
| Record ordered | CRIMINAL RECORDS |
| Type of search | FELONY & MISDEMEANOR RECORD SEARCH |
| Date of search | 04/02/2005 |
| Search period | 04/03/1998 - 03/18/2005 |
| Address covered | SALISBURY, MD |
| Court name/type | WICOMICO COUNTY 1ST JUDICIAL CIRCUIT AND DISTRICT COURTS |
| Location | PO BOX 198 SALISBURY, MD WICOMICO COUNTY |
| Name searched | NATHANIEL ALBERT MORRIS |
| Comments | NOTE; CHOICEPOINT HAS NOT LOCATED THE CHILD SUPPORT OFFENSE LISTED BY THE APPLICANT. FURTHER INVESTIGATIVE ATTEMPTS WILL BE MADE, WITH ADDITIONAL INFORMATION, UPON REQUEST. |

Source Status History

| Status Date | Action Date | Status Description |
|---|---|---|
| 04/01/2005 | 04/11/2005 | Search in Progress expected completion by Action Date |

Process History

| Event Date | Action Date | Event Description |
|---|---|---|
| 04/01/2005 09:37:04 | 04/01/2005 09:37:04 | ELECTRONICALLY ORDERED |
| 04/01/2005 09:38:51 | 04/01/2005 09:38:51 | RECORD ORDERED |
| 04/02/2005 14:07:12 | 04/02/2005 14:07:12 | RECORD FULFILLED |
| 04/04/2005 07:51:19 | 04/04/2005 07:51:19 | RECORD JUDGED |

03/28/2005 03/28/2005 03/31/2005
BAYHEALTH MEDICAL CENTER 135826 HQ

2

Choicepoint                4/4/2005 8:08    PAGE 005/005    Fax Server

CHOICEPOINT

                                                    MORRIS, NATHANIEL ALBERT
                                                    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
                                                    CID 0001438700

## DATABASE SEARCH

AS OF 03/28/2005, CHOICEPOINT HAS CONDUCTED A SEARCH OF THE GSA/HHS-OIG LIST OF EXCLUDED
INDIVIDUALS/ENTITIES, AND THE LIST OF EXCLUDED PARTIES WITH THE FOLLOWING REPORTED RESULTS:

Name Ordered    **MORNS, NATHANIEL**                    Search Results    CLEAR

Process History

| Event Date | Action Date | Event Description |
|---|---|---|
| 03/28/2005 09:43:07 | 03/28/2005 09:43:07 | ELECTRONICALLY ORDERED |
| 03/28/2005 09:43:07 | 03/28/2005 09:43:07 | RECORD JUDGED |

End of Report

                                    03/28/2005 03/28/2005 03/31/2005
                                    BAYHEALTH MEDICAL CENTER 135826 HQ



**Revision Information:** This revision reflects a change in administrative processing of the Corrective Action Record, improving efficiency and timeliness. Please see addition at section 7.8.

**Kent General Hospital**
640 S. State St., Dover, Delaware 19901

**Milford Memorial Hospital**
21 W. Clarke Avenue, Milford, Delaware 19963

| Title: **CORRECTIVE ACTION** | No: **B9065.18**<br>Replaces: B9065.18 of Sept 04 |
|---|---|
| | Originated: 01/09/79 |
| Department: **HUMAN RESOURCES** | |
| Standard Precautions? ___ Yes ___ No | **\*Effective Date This Revision: June 9, 2005** |

**\*All policies effective on date of Administration's approval.**

Purpose:

Bayhealth has adopted a progressive approach to corrective action in order to correct and improve conduct and/or performance which does not satisfy organizational standards. The underlying principle of sound progressive corrective action is to use the least severe action necessary to correct the undesirable situation. The purpose of the corrective action process is to inform employees of behavior which must be corrected, communicate the measures the employee must undertake to correct unacceptable behavior, and to give the employee an opportunity to correct the situation.

Certain violations or infractions may be so serious that the supervisor may elect to bypass steps in the progressive process. Under these circumstances, any step in the corrective action process may be imposed up to and including termination of employment.

1.    **POLICY STATEMENT**

    1.1 This policy sets forth guidelines for imposition of corrective action upon employees who do not satisfy Bayhealth established standards for performance and conduct.

    1.2 Supervisors, Managers, Directors and Executive Staff are charged the responsibility for taking corrective action.

    1.3 Supervisors, Managers, Directors, and Executive Staff will impose corrective actions using a "just cause" standard.

2.    **AREAS INVOLVED**

    All Departments

3.    **FORMS INVOLVED**



DEPOSITION
EXHIBIT
Morris  17
6/4/07  JP

Employee Corrective Action Record

Performance Improvement Form

4.  **DEFINITIONS**

4.1 <u>Corrective Action:</u> An action imposed by a supervisor, upon an employee, to facilitate the correction of misconduct or performance deficiency.

4.2 <u>Just Cause:</u> A substantiated reason for imposing corrective action. Just cause is established when an employee violates a policy and/or is deficient in the performance of his/her duties.

4.3 <u>Due Process:</u> Protections afforded employees during the disciplinary process; e.g., timeliness of action, established policy, thorough investigation, and the opportunity for redress.

4.4 <u>Misconduct:</u> Behavior which is inconsistent with established organizational standards of conduct or generally accepted work behaviors.

4.5 <u>Insubordination:</u> An employee's failure or refusal to obey a reasonable order or directive issued by one serving in a position of authority over the employee, unless the order or directive is unlawful. Insubordination may also take the form of defiant, rebellious, and/or disrespectful behavior.

4.6 <u>Performance Deficiency:</u> Failure to demonstrate competence in a specific aspect or aspects of the employee's job responsibilities.

4.7 <u>Performance Improvement Plan:</u> A written plan developed for employees either experiencing difficulty with, or failing to demonstrate, competency in any one or more performance expectations. The plan identifies areas of deficiency, acceptable standards of performance, actions necessary, a finite time parameter for completion, and supervisory feedback for the duration of the plan.

5.  **CORRECTIVE ACTION GUIDELINES**

5.1 <u>Just Cause</u> Standard The following should be considered when determining justification for corrective action.

5.1.1 Provide adequate notice to the employee relative to rule violations and performance deficiencies,

5.1.2 Apply fair and equitable application of rules and penalties,

5.1.3 Investigate before determining whether corrective action is warranted,

5.1.4  Conduct comprehensive, fair, and objective investigations,

5.1.5  Establish that probability exists that the act occurred,

5.1.6  Determining whether deficiencies are a result of either aptitude or attitude, and

5.1.7  Impose corrective actions reasonably related to the action and past record.

5.2  <u>Practical Considerations:</u>  Before taking corrective action supervisors should consider the following:

5.2.1  Seriousness, gravity and impact of the offense,

5.2.2  Employee's past record of performance,

5.2.3  Any extenuating circumstances to include communication, resources available, and intent of the employee, and

5.2.4  Past practice with similarly situated cases.

5.3  <u>Components of the Corrective Action Meeting:</u>  The following components should be addressed in a meeting, or over a series of meetings, relative to corrective actions.

5.3.1  State the problem;

5.3.2  Explain the policy, performance, or rule infraction;

5.3.3  Allow employees to provide their version of events;

5.3.4  Explain the requirements necessary to comply with standards;

5.3.5  Obtain commitment from the employee;

5.3.6  Inform the employee of the consequences of repeated misconduct; and

5.3.7  Document the proceedings.

5.4 Informal Corrective Action

    5.4.1 <u>Verbal Counseling/Coaching:</u>  Verbal Counseling/Coaching is an opportunity for the employee and supervisor to discuss work-related issues in a non-threatening environment.  Documentation will be informal using a memorandum or anecdotal note format.

5.5 <u>Levels of Formal Corrective Action:</u>

    5.5.1 <u>Verbal Warning:</u>  A formal counseling session initiated when a policy violation or performance issues occur must be directly addressed.  This level of corrective action should be documented using the Employee Corrective Action Record.

    5.5.2 <u>Written Warning:</u>  A more directive corrective action which addresses unresolved, previously addressed misconduct or performance deficiencies, or addresses a first occurrence of misconduct or performance deficiency which warrants such a corrective action.  This level of corrective action should be documented using the Employee Corrective Action Record.

    5.5.3 <u>Suspension:</u>  A severe sanction imposed after either exhaustive counseling efforts have not produced satisfactory results, or a single act of misconduct which is so severe that future misconduct will likely result in discharge from employment.  Such a sanction shall be applied judiciously, only after coordinating with the Human Resources Department and obtaining approval from the respective Division Vice President. This level of corrective action should be documented using the Employee Corrective Action Record.

        5.5.3.1  Suspension without pay may be imposed for a duration of 1-5 scheduled days.

        5.5.3.2  Suspensions will be imposed by a Department Manager or above and coordinated with the Human Resources Department.

        5.5.3.3  Suspensions with or without pay may be imposed pending the completion of an investigation. The nature of the investigation, the degree of probable cause, and the level of disruptive influence will determine whether the suspension will be with or without pay.

        5.5.3.4  A Final Written Warning may be issued in lieu of suspension in highly unusual circumstances, or when additional absence from work is contrary to the corrective action being taken, i.e. corrective action for attendance or performance related problems.

5.5.4  <u>Discharge from Employment:</u>

    5.5.4.1  The final component of the corrective action model.

    5.5.4.2  Discharge from employment is warranted when previous corrective actions have not led to a positive outcome and it is not foreseeable that the employee will improve either performance or conduct to a satisfactory standard.

    5.5.4.3  Discharge may be imposed without any previous corrective action in the event of gross misconduct.

6.   <u>PERFORMANCE IMPROVEMENT PLANS (PIP):</u>  A formally documented plan designed to improve employee performance illustrating specific deficiencies, expected standards of performance, methods for improvement, time table for completion, and a feedback loop.  Each PIP should contain the following components:

6.1  <u>Problem Definition</u>:  A statement which describes the deficiencies with particular specificity as to the event(s) which prompted implementation of the plan.

6.2  <u>Specific Behaviors Addressed:</u>  Address specific task behaviors requiring modification; refer to the position description relative to the deficient performance area.

6.3  <u>Standards or Measurements of Success</u>:  Illustrate the standards used to gauge success; standards should be measurable, attainable, and realistic.

6.4  <u>Goals and Timetables</u>:  Identify the goal of the plan, and when the employee is expected to be compliant with performance standards.

6.5  <u>Develop the Action Plan</u>:  The operational section of the plan determines how the employee will achieve success; e.g., additional training, demonstration/performance, testing, and/or direct application.

6.6  <u>Provide Feedback</u>:  Providing routine and frequent feedback is essential for both gauging progress and instilling confidence in the employee.  At a minimum, feedback must be provided weekly.

7.   <u>GENERAL GUIDELINES REGARDING THE IMPOSITION OF CORRECTIVE ACTIONS</u>

7.1 The imposition of corrective actions to include performance improvement plans shall be conducted in a private setting.  It is acceptable to have a witness or note taker present when meeting with the employee.  The witness must be in a supervisory position or be a representative from the Human Resources Department.

7.2  Use of recording devices is strictly prohibited.

7.3  Imposition of corrective action must be timely.  Corrective action should normally be imposed within three to five business days after the supervisor becomes aware of an infraction.

7.4  All final written warnings, suspensions, or discharges must be reviewed by the Division Vice President and Human Resources prior to the imposition of the action.

7.5  Any step in the corrective action model, with the exception of discharge, may be repeated or omitted dependent upon the seriousness of the infraction and/or the period of time elapsed between documented infractions.

7.6  Documentation of corrective action should be processed using the Employee Corrective Action Record, following the chain of command and shall permanently remain in the employee's personnel file.  Verbal Counseling/Coaching shall not be placed in the employee's personnel record; rather such shall be maintained by the supervisor in the work place.

7.7  For purposes of progressive discipline, written counseling and written warnings will remain active for a period not to exceed one year, whereas a suspension or final written warning in lieu of suspension shall remain active for a period not to exceed two years.

7.8  Upon informing the employee of the corrective action to be issued, the supervisor shall engage the following process:

  7.8.1  The corrective action record will be issued to the employee;

  7.8.2  In the presence of the supervisor, the employee will be granted a reasonable period of time to review the document, submit comments, and acknowledge receipt of the action.  In the event that the employee requests additional time to submit comments, the supervisor will assess the circumstance surrounding such a request and rule accordingly; additional time will normally not exceed 24 hours.

  7.8.3  Employee will be issued a completed copy of the corrective action record; and

  7.8.4  The issuing authority shall send the original document to Human Resources for filing in the employee's personnel record.

7.9  The following pertains to corrective action retention:

7.9.1 All notes and documents related to corrective action(s) are to be retained by the employee's supervisor.

7.9.2 All formal corrective actions (written counseling and above) are to be forwarded to Human Resources to be filed in the employee's official personnel record.

7.9.3 All informal documents (anecdotal notes/memoranda) should be retained by the supervisor until the employee terminates employment at Bayhealth, at which time, such should be forwarded to Human Resources for inclusion in the employee's official personnel record.

7.10 Employees should be informed of the following at the time corrective action is imposed:

7.10.1 The employee's signature on the Corrective Action Record does not indicate agreement with the action, rather the signature indicates that the employee acknowledges that an action was imposed, and

7.10.2 The employee's right to engage in the problem solving process to appeal corrective action rising to the level of a written warning or above.

7.11 Performance Improvement Plans should be developed for employees when the supervisor has determined that remediation is necessary in order to correct serious performance deficiencies.

7.11.1 Performance Improvement Plans should be formally documented consistent with the provisions set forth in Section 6.

7.11.2 A letter should be issued to the employee who indicates the reason for the plan, employee expectations, a synopsis of the action plan, the time parameter for completion, and consequences of continued performance deficiencies.

7.12 A report of investigation should accompany any corrective action which results in an immediate suspension or discharge.

8.  **EMPLOYEE PROTECTIONS**

8.1 Relative to the corrective action process, employees should be treated consistent with the following principles:

8.1.1 Fair, consistent and respectful treatment;

8.1.2  An explanation of the misconduct or performance deficiency and the rule/standard which governs;

8.1.3  A warning relative to the consequences of continued misconduct or performance deficiencies;

8.1.4  A reasonable amount of time, subject to the judgment of the supervisor, to correct misconduct or performance deficiencies;

8.1.5  A fair and comprehensive investigation;

8.1.6  The imposition of corrective action which is reasonable related to the offense committed;

8.1.7  The opportunity to respond, via written statement, to the imposition of corrective action; and

8.1.8  The opportunity to appeal a corrective action rising to the level of a written warning or above, in accordance with Bayhealth Problem Resolution Policy B9065.30.

8.2  Non-management employees undergoing an investigatory interview when there is a reasonable expectation that corrective action will be imposed may **request** that a Bayhealth employee is present during such an interview.

9. **CATEGORIES OF OFFENSES AND ACTIONS:** The following causes for corrective actions and suggested penalties shall not be construed, or conveyed, as guarantees, or all inclusive, rather, such are general guidelines relative to the imposition of corrective action. The seriousness of the infraction may warrant a higher level of corrective action than is illustrated below. As previously stated, actions may be omitted or repeated predicated upon the prevailing circumstances. Supervisors should consider the severity of the offense, the intent of the employee, past performance, and organizational practice prior to imposing any form of corrective action.

9.1  Group I Offenses and Actions:

9.1.1  First Offense:         Verbal Warning

Second Offense:     Written Warning

Third Offense:       Suspension

Fourth Offense:     Discharge from Employment

9.1.2  Examples of Offenses:

9.1.1.1    Excessive absenteeism

P133

9.1.1.2    Excessive tardiness

9.1.1.3    Repeated predictable unscheduled absences without substantiation; e.g., Mondays/Fridays/days after holidays

9.1.1.4    Unauthorized absence from work areas

9.1.1.5    Conducting personal work on work time

9.1.1.6    Failure to exhibit customer service while interacting with employees, patients, or visitors

9.1.1.7    Engaging in practical jokes and/or horseplay, without intent to harm, causing a disruption in work place operations

9.1.1.8    Excessive personal calls received or made while on work time

9.1.1.9    Parking personal vehicles in patient parking areas

9.1.1.10    Failure to comply with established departmental procedures and/or policies

9.1.1.11    Failure to report, or engaging in, an unsafe act

9.1.1.12    Creating, contributing to, or failure to report an unsafe condition

9.1.1.13    Performing overtime without permission from the supervisor

9.1.1.14    Use of profane language in the workplace, not directed toward any one individual

9.1.1.15    Failure to use identification badge for time and attendance

9.2  Group II Offenses and Actions

9.2.1    First Offense:        Written Warning

            Second Offense:      Suspension

            Third Offense:        Discharge from Employment

9.2.2  Examples of Offenses:

9.2.2.1   Discourteous treatment of visitors, patients, and/or employees

9.2.2.2   Misrepresenting facts during an internal investigation whether the accused or a witness

9.2.2.3   Solicitation or Distribution on work time and in patient care areas

9.2.2.4   Inadvertent breach of confidentiality

9.2.2.5   No-call/No-show of one day in duration

9.2.2.6   Rude and offensive behavior in the workplace

9.2.2.7   Failure to comply with a supervisor's directive in a timely and efficient manner

9.2.2.8   Violation of Patient Rights, the Corporate Compliance Agreement, or Code of Conduct

9.2.2.9   Inappropriate and unauthorized use of Bayhealth owned/leased equipment to include electronic facilities (computer systems, facsimile machines, telephones, etc.)

9.3   Group III Offenses and Actions

9.3.1   First Offense:              Suspension

        Second Offense:   Discharge from Employment

9.3.2   Examples of Offenses:

9.3.2.1   Reporting for duty in an impaired state

9.3.2.2   Sleeping on Duty

9.3.2.3   Falsification of documents

9.3.2.4   Mishandling of funds

9.3.2.5   Unscheduled absence from duty, requested in advance and not approved, yet the employee did not report for duty

9.3.2.6   Allowing licensure, necessary for the performance of duty, to expire

9.3.2.7   Negligence in the performance of assigned duties or patient care

9.3.2.8    Willful violation of established safety policy resulting in harm to employees, affiliate Bayhealth members, volunteers, patients, visitors, or contractors

9.3.2.9    Leaving Bayhealth premises, while on duty, without authorization

9.3.2.10   Conduct reflecting unfavorably on the reputation of BHMC or conduct that adversely affects or interferes with the normal operation of Bayhealth

9.4   Group IV Offenses and Action

9.4.1   First Offense:  Discharge

9.4.2   Examples of Offenses:

9.4.2.1    Engaging in physical violence, intimidation, or physically threatening behavior while on Bayhealth property

9.4.2.2    Engaging in unlawful work stoppages, slowdowns or strikes

9.4.2.3    Theft, actual or attempted

9.4.2.4    Falsification or alteration of documents used to calculate pay

9.4.2.5    Refusal to cooperate with investigations or answer a work-related question

9.4.2.6    Use of profane language directed at any patient, visitor or employee

9.4.2.7    Discriminatory Conduct in violation of Title VII of the Civil Rights Act; e.g., race, gender, age, religion, nationality/ethnicity, disability, marital status, veteran status

9.4.2.8    Insubordination

9.4.2.9    Willfully accessing and/or distributing protected health information of patients or employees when such access and/or distribution is outside the scope of employment and serves no legitimate purpose

9.4.2.10   Conduct violating morality or common decency

9.4.2.11   Wanton or willful falsification or alteration of any Bayhealth documents to include pay, medical, or insurance records

9.4.2.12   Selling, possessing, or consuming illegal or unauthorized substances; e.g., alcohol or drugs, while on Bayhealth property

9.4.2.13  Possession of a firearm, weapon or explosives while on Bayhealth property

9.4.2.14  Willful neglect in the performance of assigned duties

9.4.2.15  Sexual Harassment

9.4.2.16  Intentional breach of Patient or Employee Confidentiality

9.4.2.17  Any accumulation of 3 offenses within a period of one year, when the first offense calls for a written warning or above.

10.  **EMPLOYEE APPEALS:** Employees may appeal written warnings, suspensions, and discharge from employment action in accordance with Bayhealth Problem Resolution Policy B9065.30



# EMPLOYEE CORRECTIVE ACTION RECORD

| EMPLOYEE NAME: | |
|---|---|
| EMPLOYEE NUMBER: | DEPARTMENT: |
| JOB TITLE: | SECTION/UNIT: |
| DATE OF EMPLOYMENT: | DATE OF CONFERENCE: |

**1. Category and Level of Action (Complete Items 2 through 6 before completing this section.)**

☐ MISCONDUCT
- o   Verbal Warning
- o   Written Warning
- o   Suspension
- o   Final Written Warning in Lieu of Suspension
- o   Discharge

☐ PERFORMANCE DEFICIENCY
- o   Verbal Warning
- o   Written Warning
- o   Performance Improvement Plan
- o   Discharge

**2. Statement of Facts (What occurred, when did it occur, who was involved, and where did it occur?):**

**3. Rule, Policy, or Standard of Performance Violated (Cite the specific governing policy/standard):**

**4. Reason for Action (Apply the facts to the governing rule/policy to validate that the action imposed is appropriate for the infraction):**

**5. Specific Expectation for Improvement (Indicate expectations, time parameter for improvement, if applicable, and consequences for continued misconduct/deficiency):**

**6. Prior Corrective Actions Imposed (Include date, subject and level of action):**

| DATE | REASON FOR ACTION | CORRECTIVE ACTION |
|------|-------------------|-------------------|
|      |                   |                   |
|      |                   |                   |
|      |                   |                   |
|      |                   |                   |

**7. Employee Comments (Employee comments are optional; the signature of the employee merely indicates acknowledgement that the conference took place. The employee signature does not indicate agreement with the contents of the document.)**

EMPLOYEE SIGNATURE                          DATE

SUPERVISOR SIGNATURE                        DATE

DEPARTMENT DIRECTOR SIGNATURE               DATE

DIVISION VP SIGNATURE                       DATE

HR VP (OR DESIGNEE) SIGNATURE               DATE

**NOTES**

1. Department Directors are required to sign all actions consisting of a written warning or above; Division Vice Presidents are required to sign all actions consisting of a final written warning and above.
2. Employees are entitled to appeal corrective actions rising to the level of a written warning and above in accordance with Human Resources Policy B9065.30, Problem Resolution. Matters must be submitted to the appropriate Manager, Director, or Vice President within three (3) business days of the imposition of corrective action.



# EMPLOYEE CORRECTIVE ACTION RECORD

| | |
|---|---|
| **EMPLOYEE NAME:** | |
| **EMPLOYEE NUMBER:** | **DEPARTMENT:** |
| **JOB TITLE:** | **SECTION/UNIT:** |
| **DATE OF EMPLOYMENT:** | **DATE OF CONFERENCE:** |

**1. Category and Level of Action (Complete Items 2 through 6 before completing this section.)**

☐ **MISCONDUCT**
- o Verbal Warning
- o Written Warning
- o Suspension
- o Final Written Warning in Lieu of Suspension
- o Discharge

☐ **PERFORMANCE DEFICIENCY**
- o Verbal Warning
- o Written Warning
- o Performance Improvement Plan
- o Discharge

**2. Statement of Facts (What occurred, when did it occur, who was involved, and where did it occur?):**

**3. Rule, Policy, or Standard of Performance Violated (Cite the specific governing policy/standard):**

**4. Reason for Action (Apply the facts to the governing rule/policy to validate that the action imposed is appropriate for the infraction):**

P140

**5. Specific Expectation for Improvement (Indicate expectations, time parameter for improvement, if applicable, and consequences for continued misconduct/deficiency):**

**6. Prior Corrective Actions Imposed (Include date, subject and level of action):**

| DATE | REASON FOR ACTION | CORRECTIVE ACTION |
|------|-------------------|-------------------|
|      |                   |                   |
|      |                   |                   |
|      |                   |                   |
|      |                   |                   |

**7. Employee Comments (Employee comments are optional; the signature of the employee merely indicates acknowledgement that the conference took place. The employee signature does not indicate agreement with the contents of the document.)**

EMPLOYEE SIGNATURE                 DATE

SUPERVISOR SIGNATURE               DATE

DEPARTMENT DIRECTOR SIGNATURE      DATE

DIVISION VP SIGNATURE              DATE

HR VP (OR DESIGNEE) SIGNATURE      DATE

**NOTES**

1. Department Directors are required to sign all actions consisting of a written warning or above; Division Vice Presidents are required to sign all actions consisting of a final written warning and above.
2. Employees are entitled to appeal corrective actions rising to the level of a written warning and above in accordance with Human Resources Policy B9065.30, Problem Resolution. Matters must be submitted to the appropriate Manager, Director, or Vice President within three (3) business days of the imposition of corrective action.

# THE JUST CAUSE STANDARD
# (7 CARDINAL RULES)

1. Was the employee adequately warned of the consequences of his/her conduct?

2. Were the rules and penalties for violation of said rules reasonably applied in a fair and equitable manner?

3. Did a fair and impartial investigation take place prior to imposing corrective action?

4. Was the investigation fair and objective?

5. Did the investigation produce evidence which suggests that it was probable that the employee did commit the offense for which he/she was accused?

6. Is this a case of aptitude or attitude?

7. Was the penalty reasonably related to the infraction and the past record of the employee?



**Bayhealth**
*Medical Center*

*Kent General Hospital, Dover, Delaware and Milford Memorial Hospital, Milford, Delaware*

| Title:  **CORRECTIVE ACTION** | No:  B9065.18<br>Replaces: Current B9065.18 |
|---|---|
| Department:  **HUMAN RESOURCES** | Originated: 01/09/79 |

*Effective on date of Administration's approval:*   __06-09-05__  *New:*☐     *Revised:* ☑

Originating Department
Approval:
_____
Jon C. McDowell, VP, Human Resources

Review Dates:     _____
                  _____

### Administration's Approvals

_____  date signed
Terry V. Feinour, Senior Vice President, Corporate Services

_____  date signed
William A. Rosenfeld, M.D., Senior Vice President, Clinical Integration

_____  date signed
Judith B. Martin, Senior Vice President, Patient Care Services

_____
Marshall A. Campanello, Senior Vice President, Strategic Planning/Development  date signed

_____  date signed
Earl P. Tanis, Senior Vice President, Financial Services/CFO

_____  date signed
Deborah Watson, Vice President, Southern Division

_____  date signed
Alfred Pilong, Vice President, Ambulatory Services

_____  date signed
Paul E. Lakeman, President, Bayhealth Foundation

_____  date signed
Terry Murphy
Executive Vice President / COO

_____  date signed
Dennis E. Klima
President / CEO



RECEIVED
APR 2 6 2005
BAYHEALTH RESOLUTION
HUMAN RESOURCES

# Bayhealth Medical Center



## RESOLUTION OF WORK RELATED ISSUES/CONCERNS FORM

| Step | Level | Employee Time Limits | Resolution |
|---|---|---|---|
| Step 1 – Verbal | Supervisor | Within 3 working days | |
| Step 2 – Written | Department Director | Within 3 working days | 5 working days* |
| Step 3 – Written | Division Vice President | Within 3 working days | 5 working days* |
| Step 4 – Written | COO/CEO | Within 3 working days | 5 working days* |
| | | | 10 working days* |

Employee shall complete this form as thoroughly as possible to ensure that the issues/concerns are evaluated.

If the Employee does not invoke the next step within the prescribed time frames, the complaint will be considered resolved.

*Copies of Employee Problem Solving Procedure to Human Resources.

## EMPLOYEE ISSUES/CONCERNS

Name **Nathaniel Morris**    Date **April 26, 2005**

Title **Control Officer**    Dept. **Security**

Issue(s) **Falsely Accused of Theft**

Applicable Policy, Work Rule, or Practice _____

DEPOSITION EXHIBIT
Morris 18
6/4/07 JP

Date of Issue **April 12, 2005**    Time **Approx. 1800**    Location **Cafeteria**

Witnesses **Martha Hudson, Janean Francios, Joe Stewart**

Other Pertinent Facts **There is a supervison on duty at all times in the Kitchen, why wasn't I approached by them?**

A fair solution to this problem is **This case be thrown out because it is not true. I'm a christian and stealing is far from my mind I have Kids to Feed why would I put a soda before them ???**

**Nathaniel Mor**

P144



**Bay**health
*Medical Cente*

Human Resources Department
Tel 302 744-7143 - Kent General Hospital
Tel 302 430-5708 - Milford Memorial Hospital

Bayhealth Medical Center
640 South State Street
Dover, DE 19901

---

_**SENT REGULAR AND CERTIFIED U.S. MAIL**_                    May 9, 2005
Mr. Nathaniel A. Morris
107 Davis Circle
Dover, Delaware 19904

---

Dear Mr. Morris:

Please accept this letter as formal notification of my decision regarding your appeal filed on April 26, 2005 related to your discharge of employment issued on April 25, 2005. Your appeal was timely; accordingly, I granted you an audience with me on May 4, 2005, at 11:00 a.m. Our conference was convened in accordance with Bayhealth Human Resources Policy B9065.30, Problem Resolution, § 5.3.

As a matter of background, you were discharged from your employ with Bayhealth Medical Center because your Director found [through an internal investigation] that it was probable that you removed a beverage from the Kent General Hospital cafeteria without remitting payment for such. In so doing, your actions constituted theft, an offense which warrants discharge from employment in accordance with Bayhealth Human Resources Policy B9065.18, § 9.4.2.3.

In reviewing your appeal, I carefully considered the evidence presented through the internal investigation, your written appeal, your verbal comments during our conference, and your personnel record. Because you identified witnesses within the construct of your written appeal, I did interview both the witnesses you identified and witnesses identified by the investigator.

Based upon the available information before me, I find the direct witness statement persuasive wherein you were observed to have removed the beverage from the cafeteria without payment. Accordingly, I find no error in the assessment proffered by your Director. In so doing, I _**AFFIRM**_ the discharge action issued.

If you are dissatisfied with my decision you are entitled to continue the appeal process by asserting such to the Chief Operating Officer. In order to do so, you must complete the appended form and return such to the Department Human Resources, Kent Campus, within three (3) business days of your receipt of this letter.

If you have any questions about the appellate process, you may contact Mr. Jeffrey M. Lewin, Manager, Employee/Labor Relations at 744-7145.

Sincerely,

Terry V. Feinour
Senior Vice President, Corporate Services

cc:    Jon C. McDowell, VP, Human Resources
       Terrence Murphy, EVP/COO

# Bayhealth Medical Center



RECEIVED
MAY 16 2005
BAYHEALTH MEDICAL CENTER
HUMAN RESOURCES

## RESOLUTION OF WORK RELATED ISSUES/CONCERNS FORM

| Step | Level | Employee Time Limits | Resolution |
|------|-------|---------------------|------------|
| Step 1 – Verbal | Supervisor | Within 3 working days | 5 working days* |
| Step 2 – Written | Department Director | Within 3 working days | 5 working days* |
| Step 3 – Written | Division Vice President | Within 3 working days | 5 working days* |
| Step 4 – Written | COO/CEO | Within 3 working days | 10 working days* |

Employee shall complete this form as thoroughly as possible to ensure that the issues/concerns are evaluated.

If the Employee does not invoke the next step within the prescribed time frames, the complaint will be considered resolved.

*Copies of Employee Problem Solving Procedure to Human Resources.

## EMPLOYEE ISSUES/CONCERNS

Date _5/16/05_

Name _Nathaniel Morris_    Title _Control/Security_    Dept. _Security_

Issue(s) _Falsely Accused of Stealing_

Applicable Policy, Work Rule, or Practice _____

DEPOSITION
EXHIBIT
PENGAD 800-631-6989
Morris  19
6/4/07  JP

Date of Issue _4/12/05_    Time _1800-1830_    Location _Cafeteria_

Witnesses _____

Other Pertinent Facts _I did not happen, no concrete facts has been presented to me to prove this termination._

A fair solution to this problem is _That this investigation be seriously looked at and that some other grown people stop playing games. The truth will have to be told in court._



**Bay***health*
Medical Center

SENT REGULAR AND CERTIFIED U.S. MAIL

Terry M. Murphy, FACHE
*Executive Vice President/COO*

Tel 302 744-7014

Bayhealth Medical Center
640 South State Street
Dover, DE 19901

June 8, 2005

Mr. Nathaniel A. Morris
107 Davis Circle
Dover, Delaware 19904

Dear Mr. Morris:

Under the provisions set forth in Bayhealth Medical Center Human Resources Policy, B9065.30, Problem Resolution, § 5.4, you appealed your discharge from employment issued by your Department Director on April 25, 2005 and affirmed by the Senior Vice President, Corporate Services on May 9, 2005. The stated reason for your discharge was that it was found, through investigation, that you removed a beverage from the Kent General Hospital Cafeteria without paying for such. Your appeal was timely; accordingly, I met with you to hear the matter on May 27, 2005.

In determining whether to affirm, reverse, or commute the discharge action, I considered your written statements, your oral presentation before me, the direct witness statements, the statements of witnesses you identified, the results of the internal investigation, and I reviewed your personnel record.

After careful review, I affirm the discharge decision issued by your Director.

In accordance with Bayhealth policy, your meeting with me constitutes the final step in the problem resolution process.

If you have further questions, you may contact Mr. Jeff Lewin, Manager, Employee/Labor Relations at (302) 744-7145.

Sincerely,

Terence M. Murphy, FACHE
Executive Vice President/COO

TMM/cm
:008

cc:    Jon McDowell, VP, Human Resources
       Terry Feinour, SVP, Corporate Services

24- 5-06;12:24    ;Bayhealth  HR    ;302  674  7469    #  7/ 11

RECEIVED
RISK MANAGEMENT DEPARTMENT

MAY 2 4 2006

BAYHEALTH MEDICAL CENTER-KGH

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NATHANIEL MORRIS, JR.,                )
                                       )        C.A. NO.:    0 6 - 2 9 0
          Plaintiff,                   )
                                       )
     v.                                )
                                       )        TRIAL BY JURY DEMANDED
BAYHEALTH MEDICAL CENTER,              )
                                       )
          Defendant.                   )

## COMPLAINT

1.   Plaintiff, Nathaniel Morris, Jr., is an adult African American individual who resides at

     107 Davis Circle, Dover, Delaware 19901.

2.   Defendant, Bayhealth Medical Center, is a Delaware corporation with an address of 640

     South State Street, Dover, Delaware, 19904.

## JURISDICTION AND VENUE

3.   This is a proceeding for declaratory and injunctive relief and monetary damages to redress

     the deprivation or rights secured to plaintiff by Title VII of the Civil Rights Act of 1964,

     as well as a common law claim brought pursuant to state law.

4.   Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1343(3) and 1343(4),

     conferring original jurisdiction upon this Court of any civil action to recover damages or

     to secure equitable relief under any Act of Congress providing for the protection of civil

     rights. The Court's pendent jurisdiction of claims arising under Delaware law is invoked

     pursuant to 28 U.S.C. 1367(a).

5.   Venue lies in this Court pursuant to 28 U.S.C. §1391 because defendant is subject to



DEPOSITION
EXHIBIT

Morris 20

24- 5-06;12:24   ;Bayhealth  HR                                              ;302 874 7469           #  8/ 11

personal jurisdiction in this district.

## FACTS

6.    Plaintiff was working with Bayhealth Medical Center as a Security Officer for four years when his employment was terminated.

7.    Plaintiff was given keys to everything in the Medical Center and he worked many double shifts as a Security Officer.

8.    In or around the end of March 2005, Plaintiff was brought into the Office of Jeff Lewin, The Human Resources Director, by Mr. Marvin Lands, The Director of Security.

9.    At that time, Plaintiff was questioned regarding an incident with his license that occurred prior to his start as a Security Officer.  Plaintiff informed Mr. Lewin that the suspension of his license was for failure to pay his child support.  His child support was garnished directly out of his check and had been for the past four years and that the license problem had been resolved.

10.   Plaintiff was then questioned regarding another incident that occurred in Maryland, prior to his start at Bayhealth regarding a stolen rental car.

11.   Plaintiff informed Mr. Lewin that the case had been dismissed against him because he did not steal the rental car.  Mr. Lewin requested Plaintiff sign a form so they could investigate this incident.  Plaintiff signed the form and an investigation was conducted.

12.   On or about April 13, 2005, Plaintiff was again called into Mr. Lewin's Office.  Mr. Lewin acknowledged that the Maryland incident was cleared as Plaintiff said, however, he then informed Plaintiff that he was seen taking a soda from the cafeteria without paying for it.

13.   Mr. Lewin and Mr. Lands informed Plaintiff that they would conduct an investigation.

14.   Two days later Plaintiff went on a prescheduled vacation.

15.   On or about April 25, 2005, upon his return from his vacation, Plaintiff was informed that the investigation has been completed and that he was terminated.

16.   The results of the investigation indicated that Defendant had one witness who claims she saw the Plaintiff take a soda, but the employer had no substantial evidence.

17.   In early March 2005, at about the same time as the initial questioning, by Defendant, of the incidents that occurred prior to Plaintiff's start at Bayhealth Medical Center, a Retired Caucasian Police Officer contacted Plaintiff's supervisor, Dave Freeman regarding employment.  At the time there was no open positions.

18.   After Plaintiff was terminated, the same Retired Police Officer was hired and put into Plaintiff's position.

## COUNT I.

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

19.   The averments of paragraphs 1 through 18 are incorporated be reference as if fully set forth at length.

20.   Defendants actions constitute a violation of Title VII of the Civil Rights Act of 1964.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendant awarding Plaintiff damages arising as a result of the violation, including punitive damages, attorneys fees and costs and such other relief ans the Court deems just and necessary under the circumstances.

## COUNT II.

### BREACH OF THE STANDARD OF GOOD FAITH AND FAIR DEALING

21.    Paragraphs 1 through 20 are incorporated herein by reference.

22.    Defendants discharge or termination of Mr. Morris was a breach of the public policy of the State of Delaware and was therefore, a breach of the covenant of good faith and fair dealing implied in his employment contract.

23.    As a direct and proximate result of the breach of the covenant of good faith and fair dealing implied in its contract with Mr. Morris by defendant, Mr. Morris has suffered, is presently suffering and will continue to suffer lost income and benefits, lost future wages, loss of professional stature, emotional pain and suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life and other pecuniary and non-pecuniary losses.

24.    Defendants wrongful misconduct was malicious, reckless, willful and wanton. Defendants are therefore liable to Mr. Morris for punitive damages

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendant awarding Plaintiff damages arising as a result of the breach, including punitive damages, attorneys fees and costs and such other relief ans the Court deems just and necessary under the circumstances.

## COUNT III.

### BREACH OF THE DELAWARE DISCRIMINATION IN EMPLOYMENT ACT

25.    Paragraphs 1 through 24 are incorporated herein by reference.

26.    Defendants actions constitute a violation of the Delaware Discrimination of Employment Act.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against

Defendant awarding Plaintiff damages arising as a result of Defendant's conduct, including

punitive damages, attorneys fees and costs and such other relief ans the Court deems just and

necessary under the circumstances.

NOLTE & ASSOCIATES


**R. STOKES NOLTE, ESQUIRE**
ID No. 2301
Nolte & Associates
1010 N. Bancroft parkway Suite 21
Wilmington, DE  19805
(302) 777-1700
Attorney for Plaintiff

STATE OF DELAWARE          :
                                 :   ss.

COUNTY OF KENT            :

## AFFIDAVIT

I, MARVIN LANDS, being duly sworn, depose and make the following statement:

1.     I am employed by Bayhealth Medical Center ("Bayhealth"), 640 South State Street, Dover, Delaware. My title at Bayhealth is Director, Department of Security, Safety, and Auto Services. I held that title during the entire period of Nathaniel Morris' employment at Bayhealth.

2.     As Department Director, I authorized the hiring of Mr. Morris effective November 11, 2000.

3.     I also authorized the promotion of Mr. Morris to the position of Control Center Operator effective May 6, 2001.

4.     Bayhealth employed three other African-American males in the Security Department at Kent General Hospital during the period of Mr. Morris' employment. Alyn Pearis, Blaine Brown and Doyne Harris were employed as Security Officers. Brown also held the position of Control Center Operator.

5.     Mr. Morris was the only one of the four African-American employees terminated for cause. Harris voluntarily resigned from his position to pursue another opportunity. Brown and Pearis remain employed by Bayhealth.

6.     As a Security Officer, Mr. Morris was required to take a basic training course in healthcare security and pass the course examination. The basic training course is administered by

the International Association of Healthcare Safety and Security ("IAHSS"). An individual who takes the basic training course and passes the course examination is considered certified by the IAHSS as a healthcare security officer. Bayhealth security department personnel are awarded a five percent raise upon becoming IAHSS-certified. IAHSS certification is a requirement of both the Security Officer and Control Center Operator positions.

7.    In 2005, I asked Mr. Morris whether he had taken the IAHSS basic training examination and Mr. Morris responded in the affirmative.

8.    I subsequently checked with the IAHSS to determine the results of the examination. The IAHSS informed me that it had no record of Mr. Morris having ever taken the examination.

9.    When I discussed this with Mr. Morris, he was unable to offer any explanation for the fact that the IAHSS had no record of his examination results.

10.    After his promotion to Control Center Operator, Mr. Morris was required to take a supervisory training course administered by the IAHSS within twelve months of employment in that position. Upon completion of the course, Mr. Morris was entitled to a five percent raise. Mr. Morris never took the supervisory training course.

11.    At some point during Mr. Morris' employment, Bayhealth's automobile insurance carrier refused to include Mr. Morris as a covered driver because Mr. Morris' Delaware driver's license had been suspended on multiple occasions.

12.    After I was advised that Mr. Morris had been dropped from Bayhealth's automobile insurance policy, I checked Mr. Morris' personnel file in the Human Resources department to determine whether Bayhealth had  run a criminal background record check on Mr. Morris at the time of his hire.

P155

13.     I found a criminal background record check, dated 12/07/00, in the personnel file that showed that Mr. Morris had been arrested six times during the three year period from December 1995 to December 1998.

14.     Concerned by my discovery of Mr. Morris' criminal record, I called Mr. Morris into my office and asked Mr. Morris to explain why he had been arrested.

15.     Mr. Morris explained that each of the arrests was for failure to pay child support due to financial problems. Mr. Morris further explained that he had resolved his financial problems and remained current with his child support obligations since 1998.

16.     I could have discharged Mr. Morris immediately, either because he had failed to disclose his criminal record on his application or because he could no longer perform outside patrol duty. However, I made the decision to accept Mr. Morris' explanation and, from that time going forward, accommodated him by assigning him only to inside patrol.

17.     In late March 2005, Bayhealth received a letter from the Delaware Criminal Justice Information System ("DELJIS") denying Mr. Morris' application for DELJIS access.

18.     Shortly after Bayhealth received the DELJIS letter, Jeffrey M. Lewin and I met with Mr. Morris in Mr. Lewin's office to discuss DELJIS's denial of his application for access privileges.

19.     During the discussion, Mr. Morris volunteered that he had been arrested in Wicomico County, Maryland on charges of stealing a rental car, but stated that he had not been convicted of the charges.

20.     Mr. Morris explained to us that the charges against him had been dismissed because he did not steal the rental car.

21.    Mr. Lewin asked Mr. Morris to sign a release so that Bayhealth could conduct a criminal background record check.

22.    Mr. Morris signed the release and the criminal background record check was conducted.

23.    On or about April 4, 2005, Mr. Lewin contacted me and informed me that the criminal background record check indicated that Mr. Morris' criminal record was clear.

24.    Shortly thereafter, I met with Mr. Morris and informed him that his criminal record was clear. I also informed Mr. Morris that I would make an exception for him and allow him to continue working as a Control Center Operator despite his inability to obtain DELJIS access privileges.

25.    Harvey Scott (Caucasian), who held the position of Constable at Kent General Hospital, submitted his resignation from employment effective March 23, 2005. Scott's resignation created a vacant Constable position.

26.    On April 4, 2005, a retired police officer, Gregory Coughlin (Caucasian), interviewed for the vacant full-time Constable position. Coughlin was given an application to complete and return to Bayhealth. Coughlin submitted the completed application to Bayhealth on April 15, 2005.

27.    After reviewing Coughlin's application, I determined that Coughlin's qualifications met the requirements of the vacant full-time Constable position and hired him to replace Harvey Scott effective May 4, 2005.

28.    Coughlin has never held the position of Security Officer or Control Center Officer while employed by Bayhealth Medical Center.

SL1 732235v1/011425.00106

29.    At or about 7:30 a.m. on April 13, 2005, Ashley Fulcher, Food Service Worker, approached me and informed me that she had observed Mr. Morris enter the food service area in the Kent General Hospital Cafeteria on the previous evening and take a bottle of dark-colored soda from the food service area without paying for it.

30.    Immediately after receiving Ms. Fulcher's report, I conducted a comprehensive internal investigation to determine the credibility of her allegation that Mr. Morris had stolen a soda.

31.    I began my investigation on April 13, 2005 and concluded it on April 18, 2005.

32.    During this period, David Freeman and I conducted a total of ten interviews with Bayhealth employees.

33.    We conducted two separate interviews each with Ms. Fulcher and with Mr. Morris.

34.    The remainder of the interviews were with employees who were present in the cafeteria dining room and/or serving area at the time of the alleged incident.

35.    The interviews are summarized in investigation reports prepared by myself and Mr. Freeman.  (True and correct copies of the reports that I prepared are attached hereto as Exhibits 1 and 2).

36.    Mr. Freeman and I interviewed Ashley Fulcher on April 13, 2005.

37.    Ms. Fulcher denied having any interpersonal conflict with Mr. Morris.

38.    She stated that she had no interaction with Mr. Morris other than exchanging greetings in the Kent General Hospital Cafeteria.

39.    Ms. Fulcher complied with my request that she submit a written statement describing her observations on April 12, 2005.

40.    Mr. Freeman and I interviewed Ms. Fulcher again on or about April 14, 2005 to verify the information she had provided previously.

41.    Ms. Fulcher's account of her observations on April 12, 2005 was consistent with that provided during her first interview and in her written statement.

42.    Mr. Freeman and I conducted interviews with Mr. Morris on April 13 and April 14, 2005. Mr. Freeman prepared an investigation report summarizing the interviews.

43.    Further investigation following the interviews revealed that certain claims by Mr. Morris regarding his work schedule Mr. Morris' claims regarding his work schedule were inconsistent with Bayhealth's records.

44.    Bayhealth's payroll records show that Mr. Morris was scheduled for, and worked, an eight-hour regular shift, rather than a sixteen-hour double shift, on April 11, 2005. (A true and correct copy of Bayhealth's payroll records for Mr. Morris for the period from April 1, 2005 through April 13, 2005 is attached hereto as Exhibit 3). Mr. Morris had worked approximately ten hours of a sixteen-hour double shift at the time he entered the Hospital cafeteria on April 12, 2005.

45.    After review the information obtained pursuant to our departmental investigation, I concluded that it was probable that Mr. Morris had removed a beverage from the food service area of the Kent General Hospital Cafeteria and left the food service area without paying for the beverage, thereby engaging in theft.

46.    I based my conclusion upon the credible statements of Ms. Fulcher, as contrasted with the inconsistent and inaccurate statements made by Mr. Morris. Further, I found

no evidence of any improper motive on the part of Ms. Fulcher. Mr. Morris and Ms. Fulcher both stated during their interviews that they had a professional and cordial relationship and that there was no interpersonal conflict between them.

47.    Having concluded that Mr. Morris had engaged in the theft of the soda, I made the decision to terminate Mr. Morris' employment.

48.    In making my decision, I relied not only on Bayhealth's Corrective Action policy, but also on the standard of behavior expected of security personnel and departmental past practice. I concluded that Mr. Morris' act of theft had breached the public trust and confidence necessary to operate effectively in the security position. I also considered the fact that I had previously made the decision to discharge a Caucasian Security Officer for theft of an ink pen.

49.    Accordingly, I met with Mr. Morris and issued a discharge notice to him on April 25, 2005. (A true and correct copy of the discharge notice issued to Mr. Morris is attached hereto as Exhibit 4).

50.    After Mr. Morris' discharge, I decided to reassign his shifts temporarily to other Security Officers and/or Control Center Operators, including Blaine Brown (African-American), while Mr. Morris' appeal was pending.

51.    After Mr. Morris exhausted his appellate rights and his discharge was upheld, I decided to continue the temporary assignments on an interim basis instead of replacing Mr. Morris with an internal promotion or new hire. (A true and correct copy of Bayhealth's Departmental Staffing Roster Reports for 4/15/2005 and 9/12/2005 are attached hereto as Exhibit 5). Bayhealth did not add a another full-time Control Center Operator to its staff until May 18, 2006, more than one year after the termination of Mr. Morris' employment.

52.     I understand that Mr. Morris has alleged that he was discharged because of his race, which is African-American. I further understand that Mr. Morris has alleged specifically that he was discharged so that Bayhealth could replace him with a Caucasian retired police officer shortly after his discharge. Both allegations are entirely inaccurate and untrue. I made the decision to discharge Mr. Morris solely for the reasons set forth in Paragraphs 48 and 49, above. Mr. Morris' race played absolutely no role in my decision to discharge him. Furthermore, I did not hire Gregory Coughlin as a Security Officer or Control Center Officer to replace Mr. Morris. To the contrary, as discussed above, I hired Mr. Coughlin as a Constable to replace Harvey Scott. (*See* Ex. 5, Departmental Staffing Roster Report for 9/12/2005).

_____

I have read the above statement and swear it is true and correct to best of my personal knowledge, information and belief.

_____
MARVIN LANDS

Sworn to and subscribed before me this 28th day of June, 2007

_____
Notary Public

RENEE A. HOBAYAN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 4, 2010

# EXHIBIT 1

SL1 118656v1/99999.852

12- 9-05;18:57 ;Bayhealth    HH


DEPOSITION
EXHIBIT
Morris 14
6/4/07  JP
PERIOD 000-631-6909

At approximately 7:30 a.m., April 13, 2005, Ashley Fulcher, Dietary employee, reported to Marvin Lands that security officer Nathaniel Morris removed a soda from the cooler without paying for it, at approximately 6:15 a.m. on April 12, 2005. See Ashley's attached statement and interview notes from dietary employees, Dotty Steinruck, Carmetta Holding and Quiana Gray. Interview notes from Environmental Services employees Jeannine Francios, Martha Hudson and security officer Nathaniel Morris.

**Ashley Fulcher** (Dietary employee) was the dietary cashier April 12, 2005

What did Morris buy for dinner? She could not remember, only that he bought a bottle of water and other food items. After paying for his meal at approximately 6:15 p.m., April 12, 2005, Morris sat down with two ES workers, Martha Hudson and Jeannine Francios. He later left the table went to the food serving area removed a bottle of soda (dark color, maybe Pepsi) from the refrigerated cooler, held the soda down by his leg, walked around the area as if he was looking for something and then left the serving area with the soda without paying for it and went back to the table with Martha and Jeannine. Ashley Fulcher was standing at the cash register when Morris removed the soda and she had a clear view of the refrigerated cooler. She could not recall Morris removing anything else from the serving area. She was asked if she saw Morris with a bowl when he came back to the serving line a second time. She indicated she did not. At approximately 6:35 p.m., (the serving area closes at 6:30 p.m.) Ashley Fulcher went to the Dietary Courtyard to smoke a cigarette. As she passed the table where Morris, Martha and Jeannine were sitting, she noticed that it appeared he had eaten his meal, she saw the empty bottle of water, but not the soda. When she came back into the cafeteria, she couldn't remember if he was still at the table or not. Fulcher was asked if Morris went into the serving area more than once after paying for his meal. Fulcher indicated that she only saw him enter the serving area one time after paying for his meal (when he took the soda). Fulcher was asked if she told anybody else about the alleged theft. She responded that she had only told Dotty Steinruck. Fulcher was asked if she made the following statement to anyone "When did security start getting free sodas". She said she did not recall making that statement to anyone.

I asked her if she was that observant of all people coming into the Cafeteria to eat or just Morris. She said that she watched Morris when he came in, because he stole a bottle of grape juice approximately two weeks earlier. Ashley indicated that she told Dotty about both incidents when they happened, and that Dotty told her to report it. Ashley said she did not report it because she did not want to "rat" on anyone.

**Quiana Gray** (Dietary employee) was working the deli line Tuesday April 12, 2005.

She remembered Morris coming in to eat, but she did not serve him and does not remember what items he selected to eat/drink. She does not remember Morris leaving his tray of food with any of the dietary employees. She did not see him come into the serving area a second time after he paid for his meal.

**Dotty Steinruck** (Dietary employee)

What did Ashley tell you? She couldn't remember how long ago, but she remembered Ashley telling her Nate Morris stole a bottle of grape juice. Dotty said she told her to report the incident to Marvin in security. Dotty said Wednesday morning, April 13, Ashley appeared to be upset and told her that Morris had stolen a bottle of soda the night before while she was cleaning/straightening up the serving area. Dotty said Ashley and she were still discussing the incident when Marvin Lands came through the register line and she (Dotty) told her you need to tell him indicating Marvin Lands. At that point in time Ashley came up to Marvin and reported the incident. Dotty said she did not talk to anyone else about the thefts and could not remember any other information.

**Martha Hudson** (ES employee) ate dinner with Morris, April 12, 2005

I explained to Martha that I was looking into allegations of someone taking food and or drinks from the cafeteria without paying for them. I asked her if she recalled eating dinner with Morris Tuesday night and she started shaking her head and saying that Morris did not take anything. I told her to stop shaking her head and listen to the questions before she volunteered any information because she did not know what questions I would be asking. I asked if she recalled what Morris ate Tuesday and she said chicken and dumplings. She did not recall what he drank or see him with a soda.

**Jeannine Francios** (ES employee) ate dinner with Morris April 12, 2005

Jeannine recalled eating dinner with Morris, but could remember what he ate or drank. She did not recall him with a soda saying that he normally drinks juice or water.

**Carmetta Holding** (Dietary employee) was the server at the hot food area, April 12, 2005.

She remembered Morris coming in Tuesday evening, April 12, and asking for apple sauce. She went to the back to get apple sauce because there wasn't any on the serving line. She gave him the apple sauce, plus chicken & dumplings and he went through the serving area paying Ashley for the items. She did not remember if he had anything to drink, but said he normally drinks juice or water. She did not recall him coming back into the service area that evening. Did Morris give you his tray of food to keep behind the line Tuesday during dinner? No. Carmetta indicated that it was not uncommon for a security officer to respond to an emergency and the dietary employees would keep their food behind the line. She remembered keeping Morris' food Wednesday, April 13 during lunch to go upstairs and get a bag of chips. She could not recall the last time she kept Morris's tray prior to Wednesday. Carmetta recalled Ashley coming up to her at the serving line, April 12 and saying "when did security start getting free sodas?" Carmetta said she just looked at Ashley and continued to work without responding.

P164

# EXHIBIT 2

SL1 118656v1/99999.852

## Disciplinary Action Notes
### (Nathaniel Morris)

When talking to Morris, he was asked why he did not write a statement concerning this incident. He said that he didn't take the soda and didn't believe the incident to be serious. However, through the course of the discussion it was learned that he had talked to Martha Hudson about the allegation shortly after he left my office on April 13. Morris blurted out "didn't Martha tell you I had water to drink".   Since he indicated it wasn't serious, I asked him why he talked to Martha and he replied "because I am being falsely accused and I needed a witness". The complainant, Ashley Fulcher substantiated during her interview that Morris had a bottle of water.

I explained to him that his statement about leaving the serving area due too a dispatch was unfounded.  I informed him that there was no entry in the security log, no radio communication recording and no activity on the surveillance cameras that supported his explanation.  He appeared to be receptive of those comments, but when I added that Carmetta said she never took his tray, he got extremely excited and said "that's a lie" and rambled on about working 16 hours on April 12.  I took his comment about working 16 hours as meaning that he may have been mistaken about the tray.  Morris did work a double shift on April 12 and would have worked approximately 10 hours when the incident occurred.  He continued to talk about Carmetta being wrong and working 16 hours.

I explained to Morris how I made my decision based on the creditability of Ashley Fulcher and his explanation of leaving the serving area and returning as being unfounded. I informed him that Fulcher was watching him because she alleged that he took a bottle of grape juice approximately two weeks earlier.  The accusation did not draw any type of response other than why didn't she report it.  He did not deny or respond in any other way to her accusation.



4-26-05

DEPOSITION EXHIBIT
Morris  15
6/4/07

P166

# EXHIBIT 3

SL1 118656v1/99999.852

# J Walk - iSeries History: BAYHEALTH



## iSeries History: BAYHEALTH — KRONOS

### Employee - Rounded

Emp#: 21999 MORRIS NATHANIEL A   Badge:   From 4/01/05 To 4/15/05

| | Date | In | | Out | Hours | Sch | Pcds | Ap | Labor Levels | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| FR | 4/01/05 | 16:00 | L | 23:45 | 7.75 | 8.00 | | 5 | 10.IS.0160.0328.1.033 | |
| MO | 4/03/05 | 23:45 | U | 7:45 | 8.00 | | | 5 | 10.IS.0160.0328.1.033 | |
| MO | 4/04/05 | 15:45 | | 23:45 | 8.00 | 8.00 | | 5 | 10.IS.0160.0328.1.033 | |
| TU | 4/05/05 | 15:45 | | 23:45 | 8.00 | 8.00 | | 5 | 10.IS.0160.0328.1.033 | |
| TH | 4/06/05 | 10:15 | U | 7:45 | 13.50 | | | 5 | 10.IS.0160.0328.1.033 | |
| TH | 4/07/05 | 15:45 | | 23:45 | 8.00 | 8.00 | | 5 | 10.IS.0160.0328.1.033 | |
| FR | 4/08/05 | 15:45 | | 23:45 | 8.00 | 8.00 | | 5 | 10.IS.0160.0328.1.033 | |
| MO | 4/10/05 | 23:45 | U | 7:45 | 8.00 | | | 5 | 10.IS.0160.0328.1.033 | |
| MO | 4/11/05 | 15:45 | | 23:45 | 8.00 | 8.00 | | 5 | 10.IS.0160.0328.1.033 | |
| TU | 4/12/05 | 7:45 | E | 23:45 | 16.00 | 8.00 | | 5 | 10.IS.0160.0328.1.033 | |
| WE | 4/13/05 | 7:45 | E | 23:45 | 16.00 | 8.00 | | 5 | 10.IS.0160.0328.1.033 | |

▶View    ▶Brkdwn    * Exception Codes

### Pay Category Breakdown

| OVT | 37.25 | SHF2 | 77.25 | REG | 80.00 | SHF3 | 24.00 | PTOU | 8.00 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Total | 125.25 |



DEPOSITION
EXHIBIT

Morris 13
6/4/07  JP

# J Walk - iSeries History: BAYHEALTH



## iSeries History: BAYHEALTH — KRONOS

**Employee - Rounded**

Emp# 121999  MORRIS, NATHANIEL A  Badge  From 4/01/05 To 4/15/05

Position To Date

| Date | In | Out | Hours | Scl | Pcd | Ln | Labor Levels | Notes |
|------|------|------|------|------|------|------|------|------|
| TH 4/14/05 | 15:45 | 23:45 | 8.00 | 8.00 |  | 5 | 10.IS.0160.0328.1.033 | |
| FR 4/15/05 | 0:00 |  | 8.00 | 8.00 | PTOU | 5 | 10.IS.0160.0328.1.033 | |

▶View          ▶Brkdwn                    * Exception Codes

### Pay Category Breakdown

| OVT | 37.25 | SHF2 | 77.25 | REG | 80.00 | SHF3 | 24.00 | PTOU | 8.00 |
|------|------|------|------|------|------|------|------|------|------|
| | | | | | | | | Total | 125.25 |

Case 1:06-cv-00290-SLR    Document 20-5    Filed 07/02/2007    Page 30 of 52

DMDMODDX 7/06/05 7:48

EMPLOYEE: 00010331  PULCHER, ASHLEY B

EMPLOYEE: 00010331  PULCHER, ASHLEY B

| DAY | DATE | ROUNDED IN | OUT | DAILY | NOTES | ACTUAL IN | OUT | SCHEDULED IN | OUT | DAY CODE | HRS. | AP | LABOR LVLS | TOTAL HOURS |
|-----|------|-----------|-----|-------|-------|-----------|-----|--------------|-----|----------|------|-----|-----------|-------------|
| | | | | | | | PAY PERIOD RULES | 401 | | 24/7; EVEN SHIFT; 11330 | | | | 8.00 |
| SAT | 4/02/05 | 19:15 | 19:15 | 40 | A | 19:15 | 19:15 | 19:15 | | 8.00 | S | 11.IS.8000.0684.1.090 | 16.00 |
| SUN | 4/03/05 | 10:45 | | 40 | A | 10:45 | 10:45 | 10:45 | | 8.00 | 5 | 11.IS.8000.0684.1.090 | 24.00 |
| SUN | 4/03/05 | 19:15 | 19:15 | 40 | A | 19:16 | 19:15 | 19:15 | | 8.00 | 5 | 11.IS.8000.0684.1.090 | 32.00 |
| TUE | 4/05/05 | 5:30 | 14:00 | 40 | A | 5:30 | 14:00 | 5:30 | 14:00 | 8.00 | 5 | 11.IS.8000.0684.1.090 | 40.75 |
| WED | 4/06/05 | 8:00 | 16:45 | 40 | A | 8:07 | 16:34 | 8:00 | 16:30 | 8.75 | 5 | 11.IS.8000.0684.1.090 | 48.75 |
| THU | 4/07/05 | 14:45 | | 40 | A | 14:38 | | | | 4.00 | 5 | 11.IS.8000.0684.1.090 | 52.75 |
| THU | 4/07/05 | 5:10 | 19:15 | 40 | A | 5:26 | 19:10 | | | 4.00 | 5 | 11.IS.8000.0684.1.090 | 60.75 |
| THU | 4/07/05 | 5:10 | 19:15 | 40 | A | 15:09 | 19:15 | 19:15 | | 4.00 | 5 | 11.IS.8000.0684.1.090 | 68.75 |
| FRI | 4/08/05 | 5:30 | 14:00 | 40 | A | 5:41 | 13:55 | 5:30 | 14:00 | 8.00 | 5 | 11.IS.8000.0684.1.090 | 76.75 |
| MON | 4/11/05 | 14:00 | | 40 | A | 10:41 | 19:14 | 14:00 | | 8.00 | 5 | 11.IS.8000.0684.1.090 | 84.75 |
| TUE | 4/12/05 | 19:15 | | 40 | A | 7:56 | 16:34 | 16:30 | | 8.00 | 5 | 11.IS.8000.0684.1.090 | 92.75 |
| WED | 4/13/05 | 16:30 | | 40 | A | 5:23 | 14:03 | 5:30 | 14:00 | 8.00 | 5 | 11.IS.8000.0684.1.090 | |
| THU | 4/14/05 | 5:30 | 14:00 | 40 | A | 10:43 | 19:14 | 8:00 | 16:30 | 8.00 | 5 | 11.IS.8000.0684.1.090 | |
| SAT | 4/16/05 | 10:45 | 19:15 | 40 | A | 10:45 | 19:16 | 10:45 | 19:15 | 8.00 | 5 | 11.IS.8000.0684.1.090 | 92.75 |

MISSED PUNCH

| DAY | DATE | IN | OUT | | NOTES | IN | OUT | IN | OUT | | | | | |
|-----|------|-----|-----|--|-------|-----|-----|-----|-----|--|--|--|--|--|
| SUN | 4/17/05 | 10:45 | 19:15 | 40 | A | 10:43 | 19:16 | 10:45 | 19:15 | 8.00 | 5 | 11.IS.8000.0684.1.090 | 101.25 |
| TUE | 4/19/05 | 5:30 | 14:30 | 40 | A | 5:25 | 14:37 | 5:30 | 14:00 | 8.50 | 5 | 11.IS.8000.0684.1.090 | 109.25 |
| WED | 4/20/05 | 8:00 | 16:30 | 40 | A | 7:58 | 16:27 | 8:00 | 16:30 | 8.00 | 5 | 11.IS.8000.0684.1.090 | 126.25 |
| WED | 4/20/05 | 8:00 | 16:30 | 40 | A | 8:02 | 14:57 | 8:00 | 16:30 | 9.00 | 5 | 11.IS.8000.0684.1.090 | 126.25 |
| THU | 4/21/05 | 15:00 | 15:30 | 40 | A | 5:28 | 13:50 | 15:30 | 14:00 | 8.00 | 5 | 11.IS.8000.0684.1.090 | 134.25 |
| THU | 4/21/05 | 19:15 | | 40 | A | 15:30 | 14:00 | 19:15 | | 8.00 | 5 | 11.IS.8000.0684.1.090 | 142.25 |
| FRI | 4/22/05 | 19:15 | | 40 | A | 5:30 | 14:00 | 19:15 | | 8.00 | 5 | 11.IS.8000.0684.1.090 | 150.25 |
| MON | 4/25/05 | 14:00 | | 40 | A | 10:45 | 19:15 | 14:00 | | 8.00 | 5 | 11.IS.8000.0684.1.090 | 158.50 |
| TUE | 4/26/05 | 5:30 | 14:30 | 40 | A | 5:30 | 14:00 | 5:30 | 14:00 | 8.25 | 5 | 11.IS.8000.0684.1.090 | 166.50 |
| WED | 4/27/05 | 8:00 | 16:30 | 40 | A | 7:56 | 16:30 | 8:00 | 16:30 | 8.00 | 5 | 11.IS.8000.0684.1.090 | 166.50 |
| THU | 4/28/05 | 5:30 | 14:30 | 40 | C | 5:25 | 14:12 | 5:30 | 14:00 | | | | |
| SAT | 4/30/05 | 10:45 | 19:15 | 40 | C | 10:45 | 19:09 | 10:45 | 19:15 | | | | |

**TOT HRS:** 166.50

MISSED PUNCH

| HOURS BY PAY CODE | WORKED | NON-WORKED | PAID | HRS | AP | | | |
|-------------------|--------|------------|------|-----|-----|--|--|--|
| HOURS BY PAY CODE | REGULAR 164.75 | WKND DAY SHIFT 17.75 | OVERTIME | 69.75 WKND EVE SHIFT | 23.75 | NON-PAID 236.25 WKND EVE SHIFT | .00 WKDAY NGT SHIFT | |

HOURS BY ENTITY

| KENT | OVERTIME 1.75 | REGULAR 23.75 | OVERTIME 1.75 | REGULAR 164.25 WKND EVE SHIFT | 23.75 WKND EVE SHIFT | 236.25 WKND EVE SHIFT | 17.75 WKDAY NGT SHIFT | |

HOURS BY ENTITY

KENT         OVERTIME         WKND DAY SHIFT    1.75          23.75          164.25          16.25          17.75          16.25

** FINAL TOTALS

**TOT HRS:** 166.50

| | OVERTIME | REGULAR | NON-WORKED | PAID | ADJUST | | |
|--|----------|---------|------------|------|--------|--|--|
| | 1.75 | 164.75 | 17.75 | 69.75 | .00 | | |

HOURS BY ENTITY
KENT         OVERTIME         REGULAR          WKND DAY SHIFT
             1.75             23.75            16.25

HOURS BY ENTITY
KENT         OVERTIME         REGULAR          WKND DAY SHIFT
             12.00            12.00            12.00

12- 9-05;18:57    ;Bayhealth    HR

BAYHEALTH
Punch Detail History
Selection Criteria

DNORWOODX
7/06/05  7:48

Select Ranges:
Date & Time Range:     From:              To:
                       3/31/05  23:00     4/30/05  23:00
Employee Number:       103381             103381
Badge Number:
Time Clock:
ENTITY:
DIVISION:
COST CENTR:
JOB CLASS:
POSITION:
DIRECTOR:
ACTIVITY:

Pay Period Rules:
Schedule Codes:
Shift Codes:
Group Codes:
Status:                     B
Pay Frequency:
Pay Type:
Restriction Codes:

Sort Option: I - Alphabetic By Employee
Page Break By Sort Field: Y

CHHC1002L

# EXHIBIT 4

SL1 118656v1/99999.852

12- 9-05;18:57 ;Bayhealth HR





DEPOSITION EXHIBIT

Morris 16
6/4/07 JP

# **EMPLOYEE CORRECTIVE ACTION RECORD**

**EMPLOYEE NAME:** Morris, Nathaniel A.

**EMPLOYEE NUMBER:** 121999

**JOB TITLE:** Operator, Control Center

~~**DATE OF EMPLOYMENT:** 11/11/2000~~

**DEPARTMENT:** Security

**SECTION/UNIT:** KGH

~~**DATE OF CONFERENCE:** 04/25/2005~~

**1. Category and Level of Action (Complete Items 2 through 6 before completing this section.)**

☒ **MISCONDUCT**
- ☐ Verbal Warning
- ☐ Written Warning
- ☐ Suspension
- ☐ Final Written Warning in Lieu of Suspension
- ☒ Discharge

☐ **PERFORMANCE DEFICIENCY**
- ☐ Verbal Warning
- ☐ Written Warning
- ☐ Performance Improvement Plan
- ☐ Discharge

**2. Statement of Facts (What occurred, when did it occur, who was involved, where did it occur?):** It was reported to Mr. Lands that on the 12th April 2005, you took a soda from the cafeteria without paying for it. An investigation was conducted to look into the alleged incident. Six Bayhealth employees and you were interviewed concerning this alleged incident. Your explanation of entering the serving area a second time due to being dispatched was unfounded. The department security logs and the recorded radio transmissions did not substantiate your statement. In addition, Carmetta Holding, the server for the dinner meal on April the 12th remembered serving you, but stated she neither kept your tray nor was aware of you being dispatched.

**3. Rule, Policy, or Standard of Performance Violated (Cite the specific governing policy/standard):** As a Security Officer you are not only responsible for obeying policies, but enforcing those same policies. Your actions on April 12 and explanation of those actions have discredited your position and authority as a security officer. Human Resources policy B9065.18, paragraph 9.4 defines theft as a discharge offense.

**4. Reason for Action (Apply the facts to the governing rule/policy to validate that the action imposed is appropriate for the infraction):** The results of the investigation indicates that you did take a soda from the cafeteria without paying for it. Termination of your employment is warranted in accordance with policy B9065.18

**5. Specific Expectation for Improvement (Indicate expectations, time parameter for improvement, if applicable, and consequences for continued misconduct/deficiency):**

None.

**6. Prior Corrective Actions Imposed (Include date, subject and level of action):**

| DATE | REASON FOR ACTION | CORRECTIVE ACTION |
|------|-------------------|-------------------|
| None |                   |                   |
|      |                   |                   |
|      |                   |                   |

**7. Employee Comments (Employee comments are optional; the signature of the employee merely indicates acknowledgement that the conference took place.  The employee signature does not indicate agreement with the contents of the document.)**

*Employee refused to sign MSL*

_____        04/25/2005
EMPLOYEE SIGNATURE        DATE

_____        04/25/2005
SUPERVISOR SIGNATURE        DATE

_____        04/25/2005
DEPARTMENT DIRECTOR SIGNATURE        DATE

_____        04/25/2005
DIVISION VP SIGNATURE        DATE

_____        4/29/05
HR VP (OR DESIGNEE) SIGNATURE        DATE

**NOTES**

1. Department Directors are required to sign all actions consisting of a written warning or above; Division Vice Presidents are required to sign all actions consisting of a final written warning and above.

2. Employees are entitled to appeal corrective actions rising to the level of a written warning and above in accordance with Human Resources Policy B9065.30, Problem Resolution.  Matters must be submitted to the appropriate Manager, Director, or Vice President within three (3) business days of the imposition of corrective action.

# EXHIBIT 5

SL1 118656v1/99999.852

Date: 04/15/2005                                    BAYHEALTH MEDICAL CENTER, INC

Page  : 13
Time: 1710
04/15/2005                              Department Staffing Roster Report For
                                        Report: HERDRR10

Fiscal Year: 2005
Department: 8160

| Pos Entry/Vac Nmbr PC Date | Hours Assigned Budget Assgnd Hrs-PP FTEs ES WS PS | FTEs Hire Budget Date | Next Assgnd LSRC Review | Employee Name | HEC | Employee Number |
|---|---|---|---|---|---|---|
| | | | | | | |

---

Job Class: 0324 OFFICER, WSP, SECURITY
010  BW   47.20              0.5900              03*VACANCY*
06/24/04

Job Class Totals:   Empl Count:   0    Hours-PP Budget:   47.20    Hours-An Budget:
1227.20     FTEs Budget:   0.5900
                    Vacant Pos:   1              Assgnd:   0.00              Assgnd:
0.00        Assgnd:   0.0000

Job Class: 0326 ZSUPV, SECURITY
010  BW    0.00              0.0000              03

Job Class Totals:   Empl Count:   0    Hours-PP Budget:   0.00    Hours-An Budget:
0.00     FTEs Budget:   0.0000
                    Vacant Pos:   0              Assgnd:   0.00              Assgnd:
0.00        Assgnd:   0.0000

Job Class: 0327 DRIVER
010  BW  240.00   240.00    3.0000    3.0000    01 BELIZAIRE,DAVID         10       123458
07/21/03 80.00  1.0000AC F  N 07/21/03 07/21/05
                                                   KAPPE,BERNARD J          10       121728
09/24/00 80.00  1.0000AC F  N 06/19/00 06/19/05
                                                   MARINE,MARVIN A          10       123071
11/16/03 80.00  1.0000AC F  N 11/11/02 11/16/05

Job Class Totals:   Empl Count:   3    Hours-PP Budget:  240.00    Hours-An Budget:
6240.00     FTEs Budget:   3.0000
                    Vacant Pos:   0              Assgnd:  240.00              Assgnd:
6240.00        Assgnd:   3.0000

Job Class: 0328 OPERATOR, CONTROL CENTER
010  BW  400.00   400.00    5.0000    5.0000    03 BARTLETT,RONALD D        10       100743
09/24/00 80.00  1.0000AC F  N 03/15/95 06/25/05
                                                   BROWN,BLAINE T           10       101172
06/14/04  0.00  0.0000AC R  N 02/06/95

P176

| | | |
|---|---|---|
| DENNIS,TROY G | 10 | 124085 |
| 02/20/05 80.00  1.0000AC F  N 11/01/04 02/20/06 | MORRIS,NATHANIEL A | 10 | 121999 |
| 05/06/01 80.00  1.0000AC F  N 11/11/00 05/06/05 | RANKIN,JOHN W | 10 | 122362 |
| 07/19/04  0.00  0.0000AC F  N 09/10/01 09/10/05 | SHEPPERSON,TIMOTHY | 10 | 121590 |
| 09/24/00 80.00  1.0000AC F  N 04/03/00 04/03/06 | SNELL,DAVID J | 10 | 108318 |
| 02/20/05  0.00  0.0000AC R  N 01/13/92 02/20/06 | TINNEL,DONALD | 10 | 108779 |
| 01/26/03 80.00  1.0000AC F  N 01/05/87 01/26/06 | | | |

Job Class Totals:   Empl Count:   8   Hours-PP Budget:  400.00   Hours-An Budget:
10400.00   FTEs Budget:   5.0000
                          Vacant Pos:   0              Assgnd:  400.00              Assgnd:
10400.00         Assgnd:   5.0000

Job Class:  0329 OFFICER, SECURITY
010  BW 1366.40   960.00   17.0800   12.0000  03 BRADY,RICHARD L   10   123666
02/02/04 80.00  1.0000AC F  N 02/02/04 02/02/06

09/24/00  0.00  0.0000AC R  N 02/06/95 04/26/05   BROWN,BLAINE T   10   101172

11/14/04 80.00  1.0000AC F  N 07/25/94 11/14/05   CARTER,JOSEPH L   10   101451

05/20/02 80.00  1.0000AC F  N 05/20/02 05/20/05   CREECH,DANIEL F   10   122769

07/21/03 80.00  1.0000AC F  N 07/21/03 07/21/05   GREGORY,JOHN O   10   123451

05/05/03  0.00  0.0000AC R  N 05/05/03 05/05/05   HARRIS,DOYNE L   10   123315

04/05/04  0.00  0.0000AC R  N 04/05/04 04/05/06   JOHNSTON,RONALD T   10   123753

06/04/01 80.00  1.0000AC F  N 06/04/01 06/04/05   MAY,RICHARD A   10   122249

02/16/04 80.00  1.0000AC F  N 02/16/04 02/16/06   MAY,RUBON D   10   123631

11/05/01 80.00  1.0000AC F  N 11/05/01 02/05/06   PEARIS,ALYN G   10   122445

11/05/01  0.00  0.0000AC R  N 11/05/01 11/05/05   POMELLA,JOSEPH J   10   122467

11/03/03 80.00  1.0000AC F  N 11/03/03 11/03/05   QUILES,JORGE L   10   123582

03/04/02 80.00  1.0000AC F  N 03/04/02 03/04/06   RAGAN,KAY M   10   122640

09/10/01 80.00  1.0000AC F  N 09/10/01 09/10/05   RANKIN,JOHN W   10   122362

01/31/05  0.00  0.0000AC F  N 01/31/05 03/31/05   RICH,LEONARD   10   124203

```
Date: 09/12/2005                         BAYHEALTH MEDICAL CENTER, INC              Page  : 1
Time: 1710                        Department Staffing Roster Report For 09/12/2005   Report: HERDRR10

Fiscal Year: 2006
Department: 8160


  Pos        Hours            FTEs                              Employee Entry/Vac  Assigned              Hire     Next
 Nmbr PC  Budget  Assgnd    Budget   Assgnd LSRC Employee Name   HEC  Number   Date  Hrs-PP FTEs ES WS PS Date    Review
-----------------------------------------------------------------------------------------------------------------------
Job Class: 0324 OFFICER, WSP, SECURITY
 010  BW   0.00             0.0000            03


Job Class Totals:      Empl Count:   0   Hours-PP Budget:   0.00   Hours-An Budget:     0.00   FTEs Budget:    0.0000
                       Vacant Pos:   0            Assgnd:   0.00            Assgnd:     0.00          Assgnd:    0.0000

Job Class: 0326 ZSUPV, SECURITY
 010  BW   0.00             0.0000            03


Job Class Totals:      Empl Count:   0   Hours-PP Budget:   0.00   Hours-An Budget:     0.00   FTEs Budget:    0.0000
                       Vacant Pos:   0            Assgnd:   0.00            Assgnd:     0.00          Assgnd:    0.0000

Job Class: 0327 DRIVER
 010  BW 240.00  240.00    3.0000   3.0000 01 BELIZAIRE,DAVID    10  123458 07/21/03 80.00  1.0000AC F  N 07/21/03 07/21/06
                                            KAPPE,BERNARD J      10  121728 09/24/00 80.00  1.0000AC F  N 06/19/00 06/19/06
                                            SIMPSON,RICKY I      10  124457 07/25/05 80.00  1.0000AC F  N 07/25/05 09/25/05

Job Class Totals:      Empl Count:   3   Hours-PP Budget: 240.00   Hours-An Budget:  6240.00  FTEs Budget:    3.0000
                       Vacant Pos:   0            Assgnd: 240.00            Assgnd:  6240.00         Assgnd:    3.0000

Job Class: 0328 OPERATOR, CONTROL CENTER
 010  BW 431.20  320.00    5.3900   4.0000 03 BARTLETT,RONALD D  10  100743 09/24/00 80.00  1.0000AC F  N 03/15/95 06/25/06
                                            BRADY,RICHARD L      10  123666 04/30/05 80.00  1.0000AC F  N 02/02/04 02/02/06
                                            BROWN,BLAINE T       10  101172 06/14/04  0.00  0.0000AC R  N 02/06/95
                                            DENNIS,TROY G        10  124085 02/20/05 80.00  1.0000AC F  N 11/01/04 02/20/06
                                            RANKIN,JOHN W        10  122362 07/19/04  0.00  0.0000AC F  N 09/10/01 09/10/05
                                            SHEPPERSON,TIMOTHY   10  121590 09/24/00  0.00  0.0000AC F  N 04/03/00
                                            SNELL,DAVID J        10  108318 02/20/05  0.00  0.0000AC R  N 01/13/92 02/20/06
                                            TINNEL,DONALD        10  108779 01/26/03 80.00  1.0000AC F  N 01/05/87 01/26/06
                                            *VACANCY*

Job Class Totals:      Empl Count:   8   Hours-PP Budget: 431.20   Hours-An Budget: 11211.20 FTEs Budget:    5.3900
                       Vacant Pos:   1            Assgnd: 320.00            Assgnd:  8320.00         Assgnd:    4.0000

Job Class: 0329 OFFICER, SECURITY
 010  BW 1271.20 1120.00  15.8900  14.0000 03 BRADY,RICHARD L    10  123666 02/02/04  0.00  0.0000AC F  N 02/02/04 02/02/06
                                            BROWN,BLAINE T       10  101172 09/24/00  0.00  0.0000AC R  N 02/06/95 04/26/06
                                            CAIN,WILLIAM L       10  124595 09/12/05 80.00  1.0000AC F  N 09/12/05 11/12/05
                                            CARTER,JOSEPH L      10  101451 11/14/04 80.00  1.0000AC F  N 07/25/94 11/14/05
                                            CREECH,DANIEL F      10  122769 05/20/02 80.00  1.0000AC F  N 05/20/02 05/20/06
                                            DOUGHTY,DEBRA L      10  124469 07/11/05 80.00  1.0000AC F  N 07/11/05 09/11/05
                                            GREGORY,JOHN O       10  123451 07/21/03 80.00  1.0000AC F  N 07/21/04 07/21/06
                                            HARRIS,DOYNE L       10  123315 05/05/03  0.00  0.0000AC R  N 05/05/03 05/05/06
                                            JOHNSTON,RONALD T    10  123753 04/05/04  0.00  0.0000AC R  N 04/05/04 04/05/06
                                            MAY,RICHARD A        10  122249 06/04/01 80.00  1.0000AC F  N 06/04/01 06/04/06
                                            MAY,RUBON D          10  123631 02/16/04 80.00  1.0000AC F  N 02/16/04 02/16/06
                                            PEARIS,ALYN G        10  122445 11/05/01 80.00  1.0000AC F  N 11/05/01 02/05/06
                                            QUILES,JORGE L       10  123582 11/03/03 80.00  1.0000AC F  N 11/03/03 11/03/05
```

Date: 09/12/2005
Time: 1710

BAYHEALTH MEDICAL CENTER, INC
Department Staffing Roster Report For 09/12/2005

Page : 2
Report: HERDRR10

Fiscal Year: 2006
Department: 8160

| Pos Nmbr PC | Hours Budget | Assgnd | FTEs Budget | Assgnd | LSRC | Employee Name | HEC | Employee Number | Entry/Vac Date | Assigned Hrs-PP | FTEs ES WS PS | Hire Date | Next Review |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Job Class: 0329 OFFICER, SECURITY | | | | | | | | | | | | | |
| 010 BW | 1271.20 | 1120.00 | 15.8900 | 14.0000 | 03 | RAGAN, KAY M | 10 | 122640 | 03/04/02 | 80.00 | 1.0000AC F N | 03/04/02 | 03/04/06 |
| | | | | | | RANKIN, JOHN W | 10 | 122362 | 09/10/01 | 80.00 | 1.0000AC F N | 09/10/01 | 09/10/06 |
| | | | | | | SHEPPERSON, TIMOTHY | 10 | 121590 | 05/30/05 | 80.00 | 1.0000AC F N | 04/03/00 | 11/03/06 |
| | | | | | | UHEY, PETER D | 10 | 123652 | 02/02/04 | 80.00 | 1.0000AC F N | 02/02/04 | 02/02/06 |
| | | | | | | *VACANCY* | | | | | | | |
| | | | | | | WINTERS, PAUL E | 10 | 122850 | 10/25/04 | 80.00 | 1.0000AC F N | 07/08/02 | 10/25/05 |

Job Class Totals:   Empl Count:   18   Hours-PP Budget: 1271.20   Hours-An Budget: 33051.20   FTEs Budget: 15.8900
                    Vacant Pos:    1              Assgnd: 1120.00              Assgnd: 29120.00              Assgnd: 14.0000

| Job Class: 0331 DIR, SAFETY/SEC/AUTO | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 010 BW | 80.00 | 80.00 | 1.0000 | 1.0000 | 00 | LANDS, MARVIN | 10 | 105539 | 09/24/00 | 80.00 | 1.0000AC F E | 08/31/92 | 09/01/06 |

Job Class Totals:   Empl Count:   1   Hours-PP Budget: 80.00   Hours-An Budget: 2080.00   FTEs Budget: 1.0000
                    Vacant Pos:    0             Assgnd: 80.00             Assgnd: 2080.00             Assgnd: 1.0000

| Job Class: 0332 OFFICER, LEAD SECURITY | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 010 BW | 80.00 | 80.00 | 1.0000 | 1.0000 | 03 | BOYCE, SANDRA L | 10 | 101009 | 09/24/00 | 80.00 | 1.0000AC F N | 01/16/89 | 02/01/06 |

Job Class Totals:   Empl Count:   1   Hours-PP Budget: 80.00   Hours-An Budget: 2080.00   FTEs Budget: 1.0000
                    Vacant Pos:    0             Assgnd: 80.00             Assgnd: 2080.00             Assgnd: 1.0000

| Job Class: 0339 CONSTABLE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 010 BW | 591.20 | 480.00 | 7.3900 | 6.0000 | 03 | BIBBY, JOEN R | 10 | 123686 | 06/27/04 | 80.00 | 1.0000AC F N | 02/02/04 | 06/27/06 |
| | | | | | | BOTTEON, JEFFREY M | 10 | 124339 | 05/02/05 | 0.00 | 0.0000AC R N | 05/02/05 | 05/02/06 |
| | | | | | | COUGHLIN, GREGORY L | 10 | 124338 | 05/02/05 | 80.00 | 1.0000AC F N | 05/02/05 | 05/02/06 |
| | | | | | | GARRISON, RADFORD J | 10 | 123087 | 06/27/04 | 80.00 | 1.0000AC F N | 11/18/02 | 06/27/06 |
| | | | | | | MACFARLAND, KEVIN M | 10 | 122077 | 06/27/04 | 80.00 | 1.0000AC F N | 01/22/01 | 06/27/06 |
| | | | | | | MENDEZ, JOSE R | 10 | 123329 | 06/27/04 | 80.00 | 1.0000AC F N | 05/19/03 | 06/27/06 |
| | | | | | | THOMPSON, DENNIS B | 10 | 123482 | 06/27/04 | 80.00 | 1.0000AC F N | 08/18/03 | 06/27/06 |
| | | | | | | *VACANCY* | | | | | | | |
| | | | | | | VOLK, MARTIN J | 10 | 123581 | 06/27/04 | 0.00 | 0.0000AC R N | 11/03/03 | 06/27/06 |

Job Class Totals:   Empl Count:   8   Hours-PP Budget: 591.20   Hours-An Budget: 15371.20   FTEs Budget: 7.3900
                    Vacant Pos:    1             Assgnd: 480.00              Assgnd: 12480.00             Assgnd: 6.0000

| Job Class: 0882 SUPV, SECURITY/AUTO SVCS | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 BW | 80.00 | 80.00 | 1.0000 | 1.0000 | 03 | KAUFFMAN, TERRY | 10 | 120354 | 07/27/03 | 80.00 | 1.0000AC F N | 03/24/98 | 07/27/06 |

Job Class Totals:   Empl Count:   1   Hours-PP Budget: 80.00   Hours-An Budget: 2080.00   FTEs Budget: 1.0000
                    Vacant Pos:    0             Assgnd: 80.00             Assgnd: 2080.00             Assgnd: 1.0000

| Job Class: 0883 MGR, SECUR, AUTO SVCS&SAFE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 BW | 80.00 | 80.00 | 1.0000 | 1.0000 | 00 | FREEMAN, DAVID W | 10 | 123134 | 01/06/03 | 80.00 | 1.0000AC F E | 01/06/03 | 01/06/06 |

Job Class Totals:   Empl Count:   1   Hours-PP Budget: 80.00   Hours-An Budget: 2080.00   FTEs Budget: 1.0000
                    Vacant Pos:    0             Assgnd: 80.00             Assgnd: 2080.00             Assgnd: 1.0000

Job Class: 0998 OVERTIME/ON CALL WORKED

Date: 09/12/2005
Time: 1710

BAYHEALTH MEDICAL CENTER, INC
Department Staffing Roster Report For 09/12/2005

Page  : 3
Report: HERDRR10

Fiscal Year: 2006
Department: 8160

| Pos Nmbr PC | Hours Budget Assgnd | FTEs Budget | Assgnd LSRC Employee Name | HEC | Employee Number | Entry/Vac Date | Assigned Hrs-PP FTEs ES WS PS | Hire Date | Next Review |
|---|---|---|---|---|---|---|---|---|---|
| Job Class: 0998 OVERTIME/ON CALL WORKED | | | | | | | | | |
| 010  BW | 87.20 | 1.0900 | *VACANCY* | | | 08/23/00 | | | |

Job Class Totals:    Empl Count:    0       Hours-PP Budget:   87.20    Hours-An Budget:   2267.20    FTEs Budget:    1.0900
                     Vacant Pos:    1                Assgnd:    0.00              Assgnd:      0.00              Assgnd:    0.0000

Department Totals:   Empl Count:   41       Hours-PP Budget: 2940.80    Hours-An Budget:  76460.80    FTEs Budget:   36.7600
                     Vacant Pos:    4                Assgnd: 2480.00              Assgnd:  64480.00              Assgnd:   31.0000

Entity Totals:       Empl Count:   41       Hours-PP Budget: 2940.80    Hours-An Budget:  76460.80    FTEs Budget:   36.7600
                     Vacant Pos:    4                Assgnd: 2480.00              Assgnd:  64480.00              Assgnd:   31.0000

End of Report

STATE OF DELAWARE                    :
                                      :    ss.
COUNTY OF KENT                        :

## AFFIDAVIT

I, JEFFREY M. LEWIN, being duly sworn, depose and make the following

statement:

1.    I am employed by Bayhealth Medical Center ("Bayhealth"), 640 South

State Street, Dover, Delaware. My title at Bayhealth is Director of Human Resources. I have

held that title since November, 2005.

2.    From August 2001 through October 2005 I was employed by Bayhealth

Medical Center as the Manager, Employment and Employee Relations.

3.    In late March 2005, Marvin Lands and I met with Mr. Morris in my office

to discuss a letter received from the Delaware Criminal Justice Information System ("DELJIS")

denying Mr. Morris' application for DELJIS access.

4.    During the discussion, Mr. Morris volunteered that he had been arrested in

Wicomico County, Maryland on charges of stealing a rental car, but stated that he had not been

convicted of the charges.

5.    Mr. Morris explained to us that the charges against him had been

dismissed because he did not steal the rental car.

6.    I asked Mr. Morris to sign a release so that Bayhealth could conduct a

criminal background record check.

7.    Mr. Morris signed the release and the criminal background record check

was conducted.

SL1 732237v1/011425.00106

8.    I received the criminal background record check on April 4, 2005.

9.    On or about April 4, 2005, I contacted Mr. Lands and informed him that the criminal background record check indicated that Mr. Morris' criminal record was clear.

_____

I have read the above statement and swear it is true and correct to best of my personal knowledge, information and belief.

_____
JEFFREY M. LEWIN

Sworn to and subscribed before me this 28th day of June, 2007

_____
Notary Public

RENEE A. HOBAYAN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 4, 2010

P182

STATE OF DELAWARE           :
                             :   ss.

COUNTY OF KENT             :

## AFFIDAVIT

I, ASHLEY FULCHER, being duly sworn, depose and make the following statement:

1.     I am employed by Bayhealth Medical Center ("Bayhealth"), 640 South State Street, Dover, Delaware. My title at Bayhealth is Health Information Assistant, I.

2.     I held the Position of Food Service Worker in the Kent General Hospital Cafeteria from December 2, 1996 through May 6, 2005..

3.     On or about March 29, 2005, I was assigned as the cafeteria cashier for the 10:45 a.m. to 7:15 p.m. shift.

4.     That evening, I observed Plaintiff take a bottle of grape juice from the cafeteria service area without paying for it.

5.     I discussed the incident with a co-worker, Dotty Steinruck, who advised me to report it.

6.     I decided not to report the March 29 incident because I felt uncomfortable filing a complaint on a security officer.

7.     On April 12, 2005, I was again assigned as the cafeteria cashier for the 10:45 a.m. to 7:15 p.m. shift.

8.     At or about 6:15 p.m. that evening, I observed Plaintiff in the Kent General Hospital Cafeteria.

P183

9.    I observed Mr. Morris select various food items and a bottle of water, proceeded to my checkout station and paid for his meal.

10.    Mr. Morris then sat down with two co-workers at one of the cafeteria tables.

11.    Soon thereafter, I observed Mr. Morris return to the cafeteria service area.

12.    Mr. Morris opened the door of the cooler located adjacent to the serving line and removed a bottle of dark-colored soda.

13.    However, he did not enter the checkout line and pay for the soda.

14.    Instead, he held the soda bottle by the bottle cap with his arm fully extended, so that the bottle was positioned below his waist and adjacent to his leg, and briefly walked around service area as though he were looking for something.

15.    He then casually walked out of the service area without paying for the soda and returned to his table.

16.    At or about 7:30 a.m. on April 13, 2005, I approached Marvin Lands, Director, Safety, Security and Auto Services, and reported Mr. Morris' actions on the previous evening.

17.    That same day, Mr. Lands and Mr. Freemen conducted an interview with me.

18.    At Mr. Lands' request, I submitted a written statement describing my observations of Mr. Morris on March 29, 2005 and April 12, 2005.  (A true and correct copy of my written statement is attached hereto as Exhibit 1).

19.    Prior to my report to Mr. Lands on April 13, 2005, I had a professional and cordial working relationship with Mr. Morris.

P 184

20.    I have never had any interpersonal conflict or dispute with Mr. Morris.

21.    In making my decision to report Mr. Morris, I did not consider his race in any way. I would have made the same decision if Mr. Morris had been of my race or any other race.

_____

I have read the above statement and swear it is true and correct to best of my personal knowledge, information and belief.

_____
ASHLEY FULCHER

Sworn to and subscribed before me this _1st_ day of July, 2007

_____
Notary Public

:NEE A. HOBAYAN
NOTARY PUBLIC
:TATE OF DELAWARE
:mission Expires June 4, 2010

P185

# EXHIBIT 1

P185A

On a night that I was 1045-715, I believe the date was 3-29-05. It was a little after 630, we had closed and shut the doors after dinner. I was wiping up my salad bar and I cheard the juice cooler door shut. I looked up and saw Nate walk out with a grape juice.

On 4-12-05, I believe around 6:15 pm, I observed Nate get a soda from the machine and walk around. He had already paid for his meal. He held the soda in his hand down by his leg while he was walking around. I had then gotten busy, he walked out with the soda down by his leg. The soda was taken from the Pepsi cooler, I'm not sure what kind. It was a dark soda like pepsi. I'm the cashier that rang him up for his meal. Ashley Fulcher

P186

STATE OF DELAWARE                :

                                           :   ss.

COUNTY OF KENT                    :

## AFFIDAVIT

         I, DAVID W. FREEMAN, being duly sworn, depose and make the following statement:

1.     I am employed by Bayhealth Medical Center ("Bayhealth"), 640 South State Street, Dover, Delaware. My title at Bayhealth is Manager, Department of Security, Safety, and Auto Services. I have held that title since January 6, 2003.

2.     During the period from April 13, 2005 through April 18, 2005, Marvin Lands and I conducted a comprehensive internal investigation to determine the credibility of an allegation made by Ashley Fulcher, Food Service Worker, that Nathaniel Morris, Control Center Operator, had stolen a soda from the Kent General Hospital Cafeteria.

3.     Mr. Lands and I interviewed Mr. Morris on April 13 and 14, 2005.

4.     The two interviews with Mr. Morris are summarized in an investigation report that I prepared. (A true and correct copy of the investigation report that I prepared is attached hereto as Exhibit 1).

5.     During the second interview with Mr. Morris on April 14, 2005, I informed Plaintiff that his allegation that he had been dispatched from the cafeteria to another area within Kent General Hospital during the evening meal period on April 12, 2005 was unfounded.

6.     I explained that there was no evidence of any such dispatch in any of Bayhealth's security records.

P189

7.     Plaintiff then recanted his statement.

8.     He claimed that he had been confused about the timing of the dispatch during his initial interview.

9.     Plaintiff also commented that he had worked sixteen-hour double shifts on April 11 and 12.

10.     He contended that he had been dispatched at some point during this period, but could not recall the date or time of the dispatch.

_____

I have read the above statement and swear it is true and correct to best of my personal knowledge, information and belief.

DAVID W. FREEMAN

Sworn to and subscribed before me this _29th_ day of June, 2007

Notary Public

RENEE A. HOBAYAN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 4, 2010

P190

# EXHIBIT 1

12– 9-05;18:57  ;Baynealth  HH

18 April 2005

Interviews: Officer Nathaniel Morris

Subject: Alleged Theft



DEPOSITION
EXHIBIT
Morris  12
1/4/07    JP

Both interviews were held in Mr. Lands' office at the Security Department around shift change on the 13th and 14th of April 2005.   Present during the interviews were Officer Nathaniel Morris (Officer/Subject), Mr. Lands (Security & Safety Director), and myself (David Freeman, Security & Safety Manager).

13 April 2005

Mr. Lands started out by asking questions of Officer Morris about the evening of the 12th of April, when he went to dinner at the cafeteria.   Officer Morris asked if there was a problem.   Mr. Lands then explained the situation that was reported to him.   Officer Morris then stated "I am a child of God and won't steal anything".  He then went on to explain that he always has money on himself and he wouldn't do that.  Officer Morris went on to explain that he always eats around 6:30 p.m., and that the night in question was no different. Both Mr. Lands and I understood Officer Morris to say that he had purchased chicken and dumplings from the Gift Shop and then went to the cafeteria, where he purchased more food; the only thing he took to drink was a bottle of water. However, prior to him paying for his food he was dispatched by radio and had to leave. He stated that he gave his tray to Carmetta (Dietary employee/server) to keep his food warm.  Upon returning to the cafeteria he retrieved his tray and paid for his meal.  He stated that he sat with several other employees and that one may have been Martha Hudson from the Environmental Services Department. Officer Morris was asked several times if he ever went back to the serving area.  Each time Officer Morris stated that he never went back into the serving area at all after he paid for his meal.  Officer Morris, further, stated that he didn't take anything and that he would like to talk to his accuser. Mr. Lands asked if Officer Morris would write a statement in reference to our discussion. Officer Morris said that he would not write a statement, but said he would read one we wrote and see if he concurred with it.  The interview was terminated at this point.  The security logs from April 12, 2005 were reviewed and did not show that Morris was dispatched anywhere during the dinner meal. The communication radio recordings were reviewed and there were no dispatches for Morris during the time in question.

14 April 2005

Mr. Lands asked to talk to Officer Morris again.  During this interview, Officer Morris provided information that was different from what Mr. Lands and Freeman understood the day before. One thing that he states was that he did not purchase chicken and dumplings from the Gift Shop, but it was bean soup instead. A copy of the dietary menu showed chicken and dumplings were served on April 12. He now, stated that he did go back into the serving area twice after paying for his meal, but later changed it to only

once. He said he went back to the serving area for bowl to heat up his bean soup. Officer
Morris restated that when this is over that he would like to face his accuser. Asked again
if he would like to make a statement, he said no. The interview was terminated at this
point. Officer Morris was scheduled to work the next day, 15 April 2005, but called out
sick.

## CERTIFICATE OF SERVICE

I, Joseph Grey, hereby certify that on this 2nd day of July, 2007, I caused copies

of the foregoing Appendix to be served by first class United States mail, postage prepaid, upon

counsel for Plaintiff, addressed as follows:

> R. Stokes Nolte, Esquire
> Nolte & Associates
> 1010 N. Bancroft Parkway, Suite 21
> Wilmington, DE  19805

JOSEPH GREY