## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATHANIEL MORRIS, JR., | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 06-290 SLR |
| | : | |
| BAYHEALTH MEDICAL CENTER, | : | |
| | : | |
| Defendant | : | |

## OPENING BRIEF IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated: July 2, 2007

STEVENS & LEE
Joseph Grey (No. 2358)
Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, Seventh Floor
Wilmington, DE 19801
Tel: (302) 654-5180
Fax: (302) 654-5181
E-mail: jg@stevenslee.com
        tgw@stevenslee.com

Kenneth D. Kleinman, Esquire
John F. Ward, Esquire
620 Freedom Business Center
Suite 200
P.O. Box 62330
King of Prussia, Pennsylvania 19406
(610) 205-6000

*Counsel for Defendant Bayhealth Medical Center, Inc.*

I.      INTRODUCTION..................................................................................................1

II.     PROCEDURAL BACKGROUND ........................................................................3

        A.      CHARGE OF DISCRIMINATION................................................................3

        B.      CIVIL ACTION ..................................................................................3

III.    FACTUAL BACKGROUND ................................................................................3

        A.      BACKGROUND ..................................................................................3

        B.      DUTIES & RESPONSIBILITIES ................................................................4

        C.      PERFORMANCE HISTORY ....................................................................4

        D.      FAILURE TO MEET CERTIFICATION REQUIREMENTS ......................5

        E.      LOSS OF COVERAGE UNDER BAYHEALTH'S AUTOMOBILE
                INSURANCE POLICY ..........................................................................6

        F.      INABILITY TO OBTAIN DELJIS ACCESS ................................................7

        G.      HIRING OF CONSTABLE GREGORY COUGHLIN................................9

        H.      CAFETERIA INCIDENT, APRIL 12, 2005 ................................................9

        I.      BAYHEALTH INTERNAL INVESTIGATION ........................................10

        J.      INTERVIEWS OF ASHLEY FULCHER ON APRIL 13 & 14, 2005.........10

        K.      INTERVIEW OF NATHANIEL MORRIS ON APRIL 13, 2005 ..............11

        L.      INTERVIEW OF NATHANIEL MORRIS ON APRIL 14, 2005 ..............12

        M.      RESULTS OF BAYHEALTH'S INVESTIGATION .................................14

        N.      TERMINATION OF EMPLOYMENT ........................................................14

        O.      TEMPORARY REASSIGNMENT OF PLAINTIFF'S DUTIES AS
                CONTROL CENTER OPERATOR ............................................................15

IV.     ARGUMENT ........................................................................................................17

        A.      SUMMARY JUDGMENT STANDARD....................................................17

i

B.    BAYHEALTH IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM  OF DISCRIMINATORY DISCHARGE UNDER TITLE VII AND THE DDEA .......................................................17

    1.    Plaintiff Has Failed to Establish a Prima Facie Case of Discriminatory Discharge..................................................................18

    2.    Plaintiff Has Failed to Show That Bayhealth's Proffered Reasons for His Discharge Were a Pretext for Discrimination.........20

C.    BAYHEALTH IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM  OF BREACH OF THE STANDARD OF GOOD FAITH AND FAIR DEALING UNDER DELAWARE LAW ...........................................................................................................25

V.    CONCLUSION ....................................................................................27

SL1 730921v1/011425.00106

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505 (1986) ....................................................................................17

*Billet v. Cigna Corp.*,
940 F.2d 812 (3d Cir. 1991) ............................................................................................20, 21

*Brewer v. Quaker State Oil Refining Corp.*,
72 F.3d 326 (3d Cir. 1995) ...................................................................................................21

*Bullock v. Children's Hosp. of Philadelphia*,
71 F. Supp. 2d 482 (E.D.Pa.1999) ........................................................................................18

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S. Ct. 2548 (1986) ..................................................................................17

*Drummond v. Philadelphia Gas Works*,
No. 05-5378, 2007 WL 789421 (E.D. Pa. 2007) ..................................................................18

*Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*,
812 F.2d 141 (3d Cir. 1987) ..................................................................................................17

*Fuentes v. Perskie*,
32 F.3d 759 (3d Cir. 1994) .............................................................................................20, 21

*Gallucio's v. Kane*,
No. 94A-12-010, 1995 WL 656818 (Del. Super. 1995) ...................................................24-25

*Giles v. Family Court*,
411 A.2d 599 (1980) .......................................................................................................24-25

*Healey v. New York Life Ins. Co.*,
860 F.2d 1209 (3d Cir. 1988), *cert. denied*, 490 U.S. 1098 (1989) ............................................21

*Lord v. Souder*,
748 A.2d 393 (Del. 2000) .....................................................................................................25

*Martin v. GE Co.*,
891 F. Supp. 1052 (E.D. Pa. 1995) .......................................................................................21

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ........................................................................................................17, 18

*Murphy v. Bancroft Construction Co.*,
No. 02-453-SLR, 2003 WL 22119187 (D. Del. 2003)..............................................26

*Riner v. National Cash Register*,
434 A.2d 375 (Del. Super. 1981) .................................................................... 24-25

*Rizzitiello v. McDonald's Corp.*,
868 A.2d 825 (Del. 2005) ............................................................................26, 27

*St. Mary's Honor Center v. Hicks*,
509 U.S. 502 (1993) ....................................................................................18, 20

*Waldron v. SL Indus. Inc.*,
56 F.3d 491 (3d Cir. 1995) ....................................................................................18

*Wisniewski v. Johns-Manville Corp.*,
812 F.2d 81 (3d Cir. 1987) ....................................................................................17

## STATUTES, RULES & REGULATIONS

19 Del. C. § 710 *et seq.* ..............................................................................................*1*

42 U.S.C. § 2000e *et seq.* .........................................................................................*1*

Fed. R. Civ. P. 56(c) ..............................................................................................17

Title VII of the Civil Rights Act of 1964 .............................................1, 2, 17, 18, 25, 26

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NATHANIEL MORRIS, JR., | : |
| | : |
| Plaintiff | : |
| | : |
| v. | :      CIVIL ACTION NO. 06-290 SLR |
| | : |
| BAYHEALTH MEDICAL CENTER, | : |
| | : |
| Defendant | : |

**OPENING BRIEF IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

This is an action brought by Nathaniel Morris, Jr. ("Plaintiff"), a former

employee of Bayhealth Medical Center, Inc., a non-profit Delaware Corporation

("Bayhealth").  In his Complaint, Plaintiff alleges that Bayhealth violated Title VII of the

Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.,* and the

Delaware Discrimination in Employment Act ("DDEA"), 19 Del. C. § 710 *et seq.,* by

discharging him from his position as a Control Center Operator on the basis of his race

(African American).  Plaintiff also alleges that his discharge was a breach of an implied

covenant of good faith and fair dealing.

Plaintiff's claim of race discrimination is meritless.  Plaintiff concedes in his

Complaint that Bayhealth informed him that he was being discharged for the legitimate, non-

discriminatory reason that that he stole a beverage from the Kent General Hospital Cafeteria.

(*See* P150 - 151 at ¶¶ 12-15).[1]  He further concedes that, in making its decision to terminate

his employment, Bayhealth relied upon the statement of a co-worker who observed him take

---

[1]  Citations to "P" followed by a number refer to the designated pages of the Appendix being
filed with this Opening Brief.

1

a beverage from the Kent General Hospital Cafeteria without remitting payment. (*See* P151 at ¶ 16). Plaintiff acknowledges that Bayhealth conducted an investigation, found the co-worker's statements to be more credible than his own and determined that it was probable that he had engaged in theft. (*See* P151 at ¶¶ 15, 16). In a futile attempt to create an inference of race discrimination, Plaintiff alleges that the real reason that Bayhealth discharged him from employment was to replace him with a Caucasian retired police officer. (*See* P151 at ¶¶ 17, 18). However, Plaintiff is unable to identify the individual who allegedly replaced him. (*See id.*).

Bayhealth's decision to terminate Plaintiff's employment was based solely on the credible testimony of a co-worker who witnessed him engage in theft and Plaintiff's failure to offer consistent and credible testimony in rebuttal. Bayhealth has proffered a legitimate, non-discriminatory reason for Plaintiff's discharge and Plaintiff has failed to show that Bayhealth's proffered reason is pretextual. Accordingly, Bayhealth is entitled to summary judgment on Plaintiff's claim of race discrimination.

Plaintiff's claim for breach of an implied covenant of good faith and fair dealing is likewise meritless. Plaintiff has failed to identify any public interest implicated by his discharge or assert that he held any position with responsibility for advancing or sustaining any recognized public interest. Even if he had done so, Bayhealth would still be entitled to summary judgment because claims for breach of an implied covenant of good faith and fair dealing based on race discrimination are analyzed under the same framework as Title VII claims. Plaintiff's claim would therefore fail for the same reasons that his Title VII fails.

For the foregoing reasons, as explained more fully below, Bayhealth respectfully requests that the Court grant its Motion for Summary Judgment and dismiss the Complaint in its entirety with prejudice.

2

## II.  PROCEDURAL BACKGROUND

### A.  CHARGE OF DISCRIMINATION

Plaintiff filed a Charge of Discrimination against Bayhealth with the Delaware Department of Labor, No. 05060261M, on or about June 27, 2005, alleging race discrimination.  The Charge was cross-filed with the EEOC and assigned No. 17C-2005-00426.  Bayhealth filed its Position Statement on October 5, 2005.  The Delaware Department of Labor conducted an investigation and issued a Determination dismissing Plaintiff's Charge on January 27, 2006.  The EEOC issued a Dismissal and Notice of Rights adopting the findings of the Delaware Department of Labor on May 16, 2006.

### B.  CIVIL ACTION

Plaintiff began this action by filing a Complaint in this Court on May 3, 2006. Bayhealth filed its Answer to the Complaint on July 21, 2006.  Discovery is now closed. There are no material facts in dispute.

## III.  FACTUAL BACKGROUND

### A.  BACKGROUND

Plaintiff began his employment with Bayhealth Medical Center as a Security Officer in the Security Department at Kent General Hospital effective November 11, 2000. (P4, P57-P60). [2]  Marvin Lands, Department Director, authorized the hiring of Plaintiff. (P154 at ¶ 2).  Plaintiff was classified as a full-time employee scheduled for 80 hours per bi-weekly pay period.  (P4-P5, P57-P60).  On November 13, 2000, Plaintiff attended new employee orientation, during which he received briefings about relevant human resources policies and other topics.  (P6, P61).

---

[2]  The oral deposition of Plaintiff took place on June 4, 2007.  The transcript of this deposition is included in the Appendix, which is being filed with this Opening Brief.  (P1-P56).

3

Effective May 6, 2001, Bayhealth promoted Plaintiff to the position of Control Center Operator, a position he held until his discharge.  (P6-P7, P62-P64).  As the result of his promotion, Plaintiff received a five percent pay raise and his pay grade was increased from nineteen to twenty.  (*Id.*).  Marvin Lands authorized the decision to promote Plaintiff.  ( P154 at ¶3, P7, P62-P64).  After his promotion to Control Center Operator, Plaintiff continued to work additional shifts as a Security Officer.  (P10).

Bayhealth employed three other African American males in the Security Department at Kent General Hospital during the period of Plaintiff's employment.  (P11, P154 at ¶ 4).  Alyn Pearis, Blaine Brown and Doyne Harris were employed as Security Officers.  (*Id.*).  Brown also held the position of relief Control Center Operator.  (P154 at ¶ 4).  Plaintiff was the only one of the four African American employees terminated for cause.  (*id.* at ¶5).  Harris voluntarily resigned from his position to pursue another opportunity.  (P154).  Brown and Pearis remain employed by Bayhealth.  (*Id.*).

## B.  DUTIES & RESPONSIBILITIES

As Control Center Operator, Plaintiff was responsible for monitoring the security cameras and alarms located throughout Bayhealth's two main campuses and eleven off-site facilities.  (P8-P9, P65-P76).  Plaintiff was also responsible for dispatching and directing the activities of the Security Officers and Constables patrolling Bayhealth's facilities.  (*Id.*).  Plaintiff also had a variety of other duties, including directing the transportation of patients between Bayhealth's facilities and controlling the issue and assignment of Bayhealth vehicles.  (*Id.*).

## C.  PERFORMANCE HISTORY

Throughout Plaintiff's tenure at Bayhealth, his performance generally met or exceeded the requirements of his position.  (P15-P16, P91-P119).  In Plaintiff's performance evaluation dated April 22, 2003, his immediate supervisor, David Freeman (Caucasian), rated

4

his overall performance as "meets expectations." (P15, P91-P105). In Plaintiff's next (and final) performance evaluation, dated April 21, 2004, Freeman rated Plaintiff's overall performance more favorably as "above expectations." (P15, P106-P119). Freeman also commented that Plaintiff was "an asset" to the Security Department. (P15-P16, P106-P119). Marvin Lands approved and signed both performance evaluations. (P15-P16, P91-P119). Plaintiff's most recent performance appraisals are noteworthy, given Plaintiff's contention that Freeman and Lands were both racially prejudiced against him. (*Id.*).

### D.  FAILURE TO MEET CERTIFICATION REQUIREMENTS

When Plaintiff was hired as a Security Officer, his supervisor advised him that he was required to take a basic training course in healthcare security and pass the course examination. (P12, P154-P155). The basic training course is administered by the International Association of Healthcare Safety and Security ("IAHSS"). (*id.*). An individual who takes the basic training course and passes the course examination is considered certified by the IAHSS as a healthcare security officer. (P13, P154-P155 at ¶6). Bayhealth security department personnel are awarded a five percent raise upon becoming IAHSS-certified. (P12, P154-P155 at ¶ 6). IAHSS certification is a requirement of both the Security Officer and Control Center Operator positions. (P12, P66, P154-P155 at ¶ 6).

Plaintiff contends that he took the basic training course examination and gave the completed examination to his former supervisor, Don Tinnell. (P12). Plaintiff further contends that he never received any information as to whether he had passed the test and never received a certificate of course completion. (P12-P13). Remarkably, Plaintiff admits that he never once inquired as to whether he had passed the IAHSS examination and become certified, even though his certification would have resulted in a five percent salary increase. (P12). Plaintiff further admits that he was never certified by the IAHSS as required under Bayhealth policy. (P12-P13).

5

In 2005, Marvin Lands asked Plaintiff whether he had taken the basic training examination and Plaintiff responded in the affirmative. (P13, P155 at ¶7). Lands subsequently checked with the IAHSS to determine the results of the examination. (P155 at ¶8). The IAHSS informed Lands that it had no record of Plaintiff having ever taken the examination. (*Id.*). When confronted by Lands, Plaintiff could not explain why the IAHSS would have no record of his examination results if he had in fact taken the examination. (P13, P155 at ¶ 9).

After his promotion to Control Center Operator, Plaintiff was required to take a supervisory training course administered by the IAHSS within twelve months of employment in that position. (P155 at ¶10, P66 at 2). Upon completion of the course, Plaintiff was entitled to another five percent raise. (P155 at ¶ 10). Plaintiff concedes that he never took the supervisory training course, even though he held the position of Control Center Operator for almost four years. (P15).

### E.  LOSS OF COVERAGE UNDER BAYHEALTH'S AUTOMOBILE INSURANCE POLICY

Bayhealth's Security Officers at Kent General Hospital were scheduled to work either inside the hospital, patrolling on foot, or outside the hospital, patrolling the hospital grounds in a Bayhealth security vehicle. (P10, P11). At some point during Plaintiff's employment, Bayhealth's automobile insurance carrier refused to include Plaintiff as a covered driver after it learned that Plaintiff's Delaware driver's license had been suspended on multiple occasions. (P11, P18, P121). As the result of being dropped from Bayhealth's insurance policy, Plaintiff could no longer be assigned to outside patrol duties. (P11, P12). Instead, he was restricted to patrolling the inside of the hospital on foot. (*Id.*). Accordingly, if the Security Officer assigned to outside duty called in sick, Bayhealth had to assign someone other than Plaintiff to replace the Officer. (*Id.*).

6

After being advised that Plaintiff had been dropped from Bayhealth's automobile insurance policy, Mr. Lands checked Plaintiff's personnel file in the Human Resources department to determine whether Bayhealth had run a criminal background record check on Plaintiff at the time of his hire. (P155 at ¶ 12). Mr. Lands found a criminal background record check, dated December 7, 2000, in the personnel file that showed that Plaintiff had been arrested six times during the three year period from December 1995 to December 1998. (P156 at ¶ 13, P121). Concerned by the discovery of Plaintiff's criminal record, Mr. Lands called Plaintiff into his office and asked Plaintiff to explain why he had been arrested. (P156 at ¶ 14, P18-P19). Plaintiff explained that each of the arrests was for failure to pay child support due to financial problems. (P156 at ¶ 15, P18). Plaintiff further explained that he had resolved his financial problems and remained current with his child support obligations since 1998. (P156 at ¶ 15).

Mr. Lands could have discharged Plaintiff immediately, either because he had failed to disclose his criminal record on his application or because he could no longer perform outside patrol duty. (P156 at ¶ 16). However, he did not do so. Instead, Mr. Lands accepted Plaintiff's explanation and accommodated Plaintiff by assigning him only to inside patrol. (*Id.*).

### F.   INABILITY TO OBTAIN DELJIS ACCESS

During his 2004 performance review, Plaintiff was assigned a goal of taking a Delaware Criminal Justice Information System ("DELJIS") class within one to six months to enable him to access DELJIS in the performance of his duties as a Control Center Operator. (P16, P118). Bayhealth's Control Center Officers used DELJIS for a variety of reasons, for example, to run a license plate check on any suspicious vehicle observed on Hospital

grounds. (P8). Plaintiff's supervisors advised him that they wanted him to have DELJIS access and submitted an application to DELJIS on his behalf in early 2005. (P8, P17).

DELJIS conducted a review of Plaintiff's background and issued a letter, dated March 23, 2005, denying Plaintiff's application for access. (P120, P156 at ¶17). Shortly thereafter, Mr. Lands and Jeffrey M. Lewin, Human Resources Director, met with Plaintiff in Mr. Lewin's office to discuss DELJIS's denial of his application for access privileges. (P17, P156 at ¶ 18, P181 at ¶ 2).[3] During the discussion, Plaintiff volunteered that he had been arrested in Wicomico County, Maryland on charges of stealing a rental car, but insisted that he had not been convicted of the charges. (P17-P18, P156 at ¶ 19, P181 at ¶ 3). Plaintiff explained to Mr. Lands and Mr. Lewin that the charges against him had been dismissed because he did not steal the rental car. (P17-P18, P156 at ¶ 20, P181 at ¶ 4). Mr. Lewin asked Plaintiff to sign a release so that Bayhealth could conduct a criminal background check. (P17-P18, P157 at ¶ 21, P181 at ¶ 5). Plaintiff signed the release and the criminal background check was conducted. (P17-P18, P157 at ¶ 22, P181 at ¶ 6).

Mr. Lewin received the criminal background check on April 4, 2005. (P181 at ¶ 7, P122-P125). Mr. Lewin contacted Mr. Lands that same day and informed him that the background check indicated that Plaintiff's criminal record was clear. (P182 at ¶ 8, P157 at ¶ 23, P122-P125). Shortly thereafter, Mr. Lands met with Plaintiff and informed him of the results of the background check. (P157 at ¶ 24, P19). Mr. Lands also informed Plaintiff that he would make an exception for him and allow him to continue working as a Control Center Operator despite his inability to obtain DELJIS access privileges. (P157 at ¶ 24).

---

[3] The Affidavit of Jeffrey M. Lewin is included in Bayhealth's Appendix. (P181-P182).

### G.  HIRING OF CONSTABLE GREGORY COUGHLIN

Harvey Scott (Caucasian), who held the position of Constable at Kent General Hospital, submitted his resignation from employment effective March 23, 2005. (P157 at ¶ 25, P10).  Scott's resignation created a vacant Constable position.  (*Id.*).  On April 4, 2005, a retired police officer, Gregory Coughlin (Caucasian), interviewed for the vacant Constable position.  (P157 at ¶ 26).  Coughlin was given an application to complete and return to Bayhealth.  (*Id.*).  Coughlin submitted the completed application to Bayhealth on April 15, 2005.  (*Id.*).  Plaintiff did not apply for the vacant Constable position.  (P10).  After reviewing Coughlin's application, Lands determined that Coughlin's qualifications met the requirements of the vacant Constable position and hired him to replace Harvey Scott effective May 4, 2005.  (P157 at ¶ 27).  Coughlin has never held the positions of Security Officer or Control Center Officer while employed by Bayhealth Medical Center.  (P157 at ¶ 28).

### H.  CAFETERIA INCIDENT, APRIL 12, 2005

On April 12, 2005, at or about 6:15 p.m., Ashley Fulcher (Caucasian), Food Service Worker, observed Plaintiff in the Kent General Hospital Cafeteria.  (P183-P186). [4] Ms. Fulcher was assigned as the cafeteria cashier for the 10:45 a.m. to 7:15 p.m. shift.  (P183 at ¶ 7, P186).  She observed Plaintiff as he selected various food items and a bottle of water, proceeded to her checkout station and paid for his meal.  (P184 at ¶ 9, P186).  Plaintiff then sat down with two co-workers at one of the cafeteria tables.  (P184 at ¶ 10, P186).

Soon thereafter, Ms. Fulcher observed Plaintiff return to the cafeteria service area.  (P184 at ¶ 11, P186).  Plaintiff opened the door of the cooler located adjacent to the serving line and removed a bottle of dark-colored soda.  (P184 at ¶ 12, P186).  However, he did not enter the checkout line and pay for the soda.  (P184 at ¶ 13, P186).  Instead, he held

---

[4]  The Affidavit of Ashley Fulcher is included in Bayhealth's Appendix.  (P183-P186).

the soda bottle by the bottle cap with his arm fully extended, so that the bottle was positioned below his waist and adjacent to his leg, and briefly walked around the service area as though he were looking for something. (P184 ¶ 14, P186). He then casually walked out of the service area without paying for the soda and returned to his table. (P184 at ¶ 15, P186).

At or about 7:30 a.m. on April 13, 2005, Ms. Fulcher approached Mr. Marvin Lands and filed a report regarding Plaintiff's actions on the previous evening. (P184 at ¶ 16, P186, P158 at ¶ 29).

### I.   BAYHEALTH INTERNAL INVESTIGATION

Immediately after receiving Ms. Fulcher's report, Mr. Lands conducted a comprehensive internal investigation to determine the credibility of her allegation that Plaintiff had stolen a soda. (P158 at ¶ 30). Mr. Lands began his investigation on April 13, 2005 and concluded it on April 18, 2005. (P158 at ¶ 31). During this period, both Mr. Lands and Mr. Freeman conducted a total of ten interviews with Bayhealth employees. (P158 at ¶ 32). Mr. Lands and Mr. Freeman conducted two interviews separately with Ms. Fulcher and with Plaintiff. (P158 at ¶ 33). The remainder of the interviews were with employees who were present in the cafeteria dining room and/or serving area at the time of the alleged incident. (P158 at ¶ 34). The interviews are summarized in investigation reports prepared by Mr. Lands and Mr. Freeman. (P158 at ¶ 35, P163-164, P189 at ¶ 4, P192-P193).

### J.   INTERVIEWS OF ASHLEY FULCHER ON APRIL 13 & 14, 2005

During her initial interview on April 13, 2005, Ms. Fulcher stated that she had seen Plaintiff steal a beverage from the cafeteria on two occasions. (P158 at ¶ 36, P163-P164). The first incident occurred on or about March 29, 2005, when Ms. Fulcher observed Plaintiff take a bottle of grape juice from the cafeteria service area without paying for it. (*Id.*). Ms. Fulcher stated that she discussed the incident with a co-worker, Dotty Steinruck,

who advised her to report it. (*Id.*). Ms. Fulcher explained that she did not report the March 29 incident because she felt uncomfortable filing a complaint on a security officer. (*Id.*).

The second incident was the April 12 incident discussed above. (P163-P164). Ms. Fulcher confirmed that she had a clear view of the refrigerated cooler from her position at the cash register. (*Id.*). She explained that she had watched Plaintiff upon his return to the service area because of the March 29 incident involving the theft of the grape juice. (*Id.*). Ms. Fulcher denied having any interpersonal conflict with Plaintiff. (P158 at ¶ 37, *see* P185 at ¶ 20). She stated that she had no interaction with Plaintiff other than exchanging greetings in the Kent General Hospital Cafeteria. (P159 at ¶ 38). Ms. Fulcher complied with Mr. Lands' request that she submit a written statement describing her observations on April 12, 2005. (P159 at ¶ 39, P185 at ¶ 18, P186).

Ms. Fulcher was interviewed again on or about April 14, 2005 to verify the information she had provided previously. (P159 at ¶ 40). Ms. Fulcher's account of her observations on April 12, 2005 was consistent with that provided during her first interview and in her written statement. (P159 at ¶ 41).

## K.   INTERVIEW OF NATHANIEL MORRIS ON APRIL 13, 2005

Mr. Lands and Mr. Freeman conducted their initial interview with Plaintiff on April 13, 2005. (P20-P21, P159 at ¶ 42, P189 at ¶ 3, P192-193). [5] They began the interview by asking Plaintiff questions regarding the purchase of his meal in the cafeteria on the previous evening. (*Id.*). Plaintiff immediately asked if there was a problem. (*Id.*). Mr. Lands then explained to Plaintiff that he had been accused of taking a soda from the cafeteria without paying for it. Plaintiff denied the accusation, stating "I am a child of God and won't steal anything." (*Id.*).

---

[5] The Affidavit of David W. Freeman is included in Bayhealth's Appendix. (P189-P190).

Plaintiff then gave an account of his actions on the previous evening that differed from the account provided by Ms. Fulcher. Plaintiff stated that he had purchased a meal of chicken and dumplings from the Hospital Gift Shop and then proceeded to the cafeteria, where he purchased more food and a bottle of water. (P21-P22, P192-P193). Plaintiff stated that, prior to paying for his meal, he received a call on his radio and had to leave the cafeteria to respond to the call. (*Id.*). Remarkably, he could not recall the location of the dispatch. (*Id.*). Plaintiff stated that he gave his tray to a Food Service employee to hold for him while he responded to the radio call. (*Id.*). Plaintiff then stated that, after completing his assignment, he returned to the cafeteria to retrieve his tray and eat his meal. (*Id.*). When asked whether he had returned to the serving area, Plaintiff repeatedly insisted that he had not done so. (*Id.*).

Plaintiff refused to comply with Mr. Lands' request that he submit a written statement regarding his version of events. (P192-P193). However, he offered to read any statement prepared by Mr. Lands and Mr. Freeman, and to advise them whether he concurred with it. (*Id.*). At this point, Mr. Lands and Mr. Freeman concluded the interview. (*Id.*).

Mr. Freeman subsequently reviewed the Hospital's written security logs for April 12, 2005. (Freeman Aff. Ex. 1). There was no record of any dispatch of Plaintiff during the dinner meal period. (*Id.*). Mr. Freeman also reviewed the Hospital's audio recordings of the radio communications on April 12. (*Id.*). The audio recordings conclusively established that Plaintiff had not received a radio call during the relevant time period. (*Id.*).

### L.   INTERVIEW OF NATHANIEL MORRIS ON APRIL 14, 2005

Because of the disagreement between the statements given by Ms. Fulcher and Plaintiff, Mr. Lands conducted a second interview with each of the two employees. (P158 at ¶ 33, P189 at ¶ 3). As discussed above, Ms. Fulcher's statement remained entirely

consistent.  (P159 at ¶ 41).  However, Plaintiff's version of events changed significantly.  (P23, P32-P33, P192-P193).

Mr. Freeman informed Plaintiff that his allegation that he had been dispatched from the cafeteria to another area within Kent General Hospital during the evening meal period on April 12, 2005 was unfounded.  (P189 at ¶ 5).  Mr. Freeman explained that there was no evidence of any such dispatch in any of Bayhealth's security records.  (P189 at ¶ 6).  Plaintiff then recanted his statement.  (P190 at ¶ 7).  He claimed that he had been confused about the timing of the dispatch during his initial interview.  (P190 at ¶ 8).  Plaintiff also commented that he may have been tired because he had worked sixteen-hour double shifts on April 11 and 12.  (P24, P190 at ¶ 9).  He contended that he had been dispatched at some point during this period, but could not recall the date or time of the dispatch.  (P190 at ¶ 10).

Plaintiff also changed his story regarding both the type of food allegedly purchased at the Gift Shop and his actions in the Hospital cafeteria.  (P192-P193).  Plaintiff claimed that he had purchased bean soup, rather than chicken and dumplings, at the Gift Shop.  (P23, P192-P193).  However, this statement conflicted with Bayhealth's dietary menu, which showed that the Gift Shop had served chicken and dumplings, rather than bean soup, on April 12.  (P192-P193).

Plaintiff also admitted that he had returned to the cafeteria serving area after paying for his original purchase.  (P23, P192-P193).  He claimed that he had returned to the service area to ask a food service employee for a plastic bowl to use to heat the bean soup he had allegedly purchased from the Gift Shop.  (*Id.*).  He continued to deny that he had removed any beverages from the refrigeration unit.  (P192-P193).  Again, Plaintiff was asked to submit a statement in writing.  (*Id.*).  Again, he refused to do so.  (*Id.*).

13

Further investigation revealed that Plaintiff's claims regarding his work schedule were inconsistent with Bayhealth's records.  (P159 at ¶ 43, P165-P166). Bayhealth's payroll records show that Plaintiff was scheduled for, and worked, an eight-hour regular shift, rather than a sixteen-hour double shift, on April 11, 2005.  (P159 at ¶ 44, P165-P171).  He had worked approximately ten hours of a sixteen-hour double shift at the time he entered the Hospital cafeteria on April 12, 2005.  (*Id.*).

## M.   RESULTS OF BAYHEALTH'S INVESTIGATION

Lands concluded that it was probable that Plaintiff had removed a beverage from the food service area of the Kent General Hospital Cafeteria and left the food service area without paying for the beverage, thereby engaging in theft.  (P159 at ¶ 45, P167-P171). Lands based his conclusion upon the credible statements of Ms. Fulcher, as contrasted with the inconsistent and inaccurate statements made by Plaintiff.  (P159-P160 at ¶ 46, P167-P171).  Further, Lands found no evidence of any improper motive on the part of Fulcher. (*Id.*).  Both employees agreed that they had a professional and cordial relationship and that there was no interpersonal conflict between them.  (P159-P160 at ¶ 46, P21).

## N.   TERMINATION OF EMPLOYMENT

Bayhealth Human Resources Policy B9065.18, Corrective Action, is a progressive disciplinary policy.  (P126-P143).  The policy divides improper employee conduct into four categories of offenses.  The discipline for a Group IV Offense, the most serious of the four categories, is immediate discharge.  (P136-P137, § 9.4).  Section 9.4.2 of the Corrective Action policy, which sets forth a non-exclusive list of Group IV Offenses, specifically includes actual or attempted theft as a terminable offense.  (*Id.,* § 9.4.2.3).

Having concluded that Plaintiff had engaged in theft, Mr. Lands made the decision to terminate Plaintiff's employment.  (P160 at ¶ 47).  In making his decision, Mr. Lands relied not only on Bayhealth's Corrective Action policy, but also on both the

14

standard of behavior expected of security personnel and departmental past practice. (P160 at ¶ 48). Mr. Lands concluded that Plaintiff's act of theft had breached the public trust and confidence necessary for him to operate effectively as a member of the security department. (*Id.*). Lands also considered the fact that he had previously discharged a Caucasian Security Officer for theft of an ink pen. (*Id.*). Accordingly, Mr. Lands met with Plaintiff issued a discharge notice to him on April 25, 2005. (P26, P160 at ¶ 49, P172-P174).

Plaintiff appealed his discharge under the provisions of Bayhealth Human Resources Policy 9065.30, Problem Resolution § 5.3. (P28, P144-P146). He met with Terry V. Feinour, Senior Vice President, Corporate Services, on May 4, 2005. (*Id.*). After considering Plaintiff's written and verbal statements, interviewing Ms. Fulcher personally and reviewing the findings of the internal investigation, Mr. Feinour found that the evidence before him validated the results of Bayhealth's investigation. (*See id.*). Accordingly, he affirmed the discharge action. (*Id.*).

Under the fourth and final step of Bayhealth's Problem Resolution policy, Plaintiff appealed his discharge to Terence Murphy, Executive Vice President/Chief Operating Officer. (P28-P29, P147-P148). In determining whether to affirm or reverse the discharge decision, Mr. Murphy interviewed Plaintiff, reviewed his written statement, and interviewed Ms. Fulcher. (*See id.*). Mr. Murphy found Ms. Fulcher's statement persuasive. (*Id.*). Accordingly, he affirmed the discharge action. (*Id.*).

**O.   TEMPORARY REASSIGNMENT OF PLAINTIFF'S DUTIES
        AS CONTROL CENTER OPERATOR**

After Plaintiff's discharge, Lands decided to reassign his shifts temporarily to other Security Officers and/or Control Center Operators, including Blaine Brown (African American), while Plaintiff's appeal was pending. (P160 at ¶ 50). After Plaintiff exhausted his appellate rights, Lands continued the temporary assignments on an interim basis. (P160

15

at ¶ 51).  Bayhealth did not add a another full-time Control Center Operator to its staff until

May 18, 2006, more than one year after the termination of Plaintiff's employment.  (*Id.*).

## IV.   ARGUMENT

### A.   SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the district court must determine whether the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505 (1986).  "Material  facts are those which may affect the outcome of a case under applicable law."  *Anderson*, 477 U.S. at 248.

Although the movant has the initial burden of calling the court's attention to the absence of genuine issues of material fact, the responding non-movant must establish the existence of each element on which it bears the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322; *see also Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 (3d Cir. 1987).

### B.   BAYHEALTH IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM  OF DISCRIMINATORY DISCHARGE UNDER TITLE VII AND THE DDEA

The analytical framework for evaluating employment discrimination cases is well settled.  In cases where the employee is attempting to prove discrimination through indirect evidence and the employee is claiming that the employer's asserted reason for the employment action at issue is false, courts apply a scheme of shifting evidentiary burdens. This scheme, set forth in the context of a Title VII discrimination case, was initially articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  There, the Supreme

17

Court explained that in a discrimination case, the plaintiff employee must carry the initial burden under the statute and establish a prima facie case of discrimination.  (*Id.* at 802.)

If the employee establishes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, non-discriminatory reason for the action of which the employee is complaining.  (*Id.*)  If the employer meets that burden, the burden of production will then shift back to the employee.  (*Id.* at 804.)  The employee must then demonstrate that the reason proffered by the employer is a pretext for discrimination.  (*Id.*); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515-16 (1993).  Furthermore, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Hicks*, 509 U.S. at 518.

### 1.  Plaintiff Has Failed to Establish a Prima Facie Case of Discriminatory Discharge

To establish a prima facie case of discriminatory discharge under Title VII, Plaintiff must establish that:  (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subject to an adverse employment action despite being qualified; and (4) he was discharged under circumstances that give rise to an inference of unlawful discrimination.  *See Waldron v. SL Indus. Inc.*, 56 F.3d 491, 494 (3d Cir. 1995).  "'Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement[,] or the more favorable treatment of similarly situated colleagues outside of the relevant class,' although neither circumstance is required to make out a prima facie case."  *Drummond v. Philadelphia Gas Works*, No. 05-5378, 2007 WL 789421, at *4 (E.D. Pa. 2007) (quoting *Bullock v. Children's Hosp. of Philadelphia*, 71 F. Supp. 2d 482, 487 (E.D.Pa.1999)).

Plaintiff cannot establish the fourth prong of his prima facie case because he has failed to adduce any evidence indicating that he was discharged under circumstances

giving rise to an inference of unlawful discrimination.  Plaintiff has presented no evidence,

other than his own bald assertion, that he was replaced by an individual not in his protected

class and he has failed to identify any other similarly situated employee who was treated

more favorably.  Moreover, Plaintiff has failed to point to any other evidence in the record

that would give rise to an inference of discrimination.

Plaintiff alleges in his Complaint that, in early March 2005, "a Retired

Caucasian Police Officer contacted Plaintiff's supervisor, Dave Freeman regarding

employment.  At that time, there were no open positions."  (P151 at ¶ 17).  Plaintiff further

alleges that, after his termination, "the same Retired Police Officer was hired and put into his

position."  (P151 at ¶ 18).

Plaintiff's allegations are factually inaccurate and legally insufficient.  At his

deposition, Plaintiff testified that in March 2005, he observed a Caucasian individual arrive at

the Security Department and meet with David Freeman regarding employment opportunities.

(P31).  Plaintiff further testified that he subsequently learned from a Security Officer (whom

he could not identify) that the individual was a retired police officer.  (*Id.*).  Plaintiff

conceded that he had no information establishing that the applicant was seeking a position as

a Control Center Operator and, in fact, had no idea which position the applicant was seeking.

(P31).  Plaintiff further conceded that, contrary to the allegations in his Complaint,  a

Constable position may have been vacant at the time.  (P10, P31).  When asked to identify

the "Retired Caucasian Police Officer" who allegedly replaced him, Plaintiff was unable to

do so.  (P31).  Accordingly, Plaintiff has failed to adduce any evidence establishing that he

was replaced by an individual not in his protected class.

Plaintiff has likewise failed to identify any similarly situated individual not in

his protected class who was treated more favorably.  In fact, Plaintiff expressly

acknowledged at his deposition that a Caucasian Security Officer who engaged in the theft of

an ink pen had previously been discharged by Marvin Lands.  (P28, *see also* P160 at ¶ 48).

Plaintiff has provided no evidence that he was subjected to disparate treatment.  Indeed, his

testimony establishes that Caucasian and African American members of the Security

Department who engaged in theft were disciplined in precisely the same manner.

In sum, Plaintiff has failed to demonstrate that he was replaced by an

individual not in his protected class or that a similarly situated employee not in his protected

class was treated more favorably.  Plaintiff has not identified any other circumstance that

would give rise to an inference of discrimination.  Accordingly, he has failed to make out a

prima facie case of discriminatory discharge.

## 2.  Plaintiff Has Failed to Show That Bayhealth's Proffered Reasons for His Discharge Were a Pretext for Discrimination

Even if Plaintiff were able to make out a prima facie case of discriminatory

discharge, Bayhealth would still be entitled to summary judgment on his claim.  Since

Bayhealth has established a legitimate, non-discriminatory reason for its discharge decision,

Plaintiff  bears the burden of either discrediting Bayhealth's proffered reason or adducing

evidence that discrimination was more likely than not a motivating or determinative cause of

the employment action.  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *Billet v. Cigna

Corp.*, 940 F.2d 812, 825 (3d Cir. 1991), *overruled in part on other grounds by St. Mary's

Honor Center,* s*upra*.

The Third Circuit has ruled that in order to discredit an employer's proffered

legitimate reasons for its actions, a plaintiff "must demonstrate such weaknesses,

implausibilities, inconsistencies, incoherences, or contradictions … that a reasonable fact-

finder could rationally find them "unworthy of credence" and hence infer "that the employer

did not act for [the asserted] non-discriminatory reasons."  *Fuentes*, 32 F.3d at 755 (citations

omitted).  As the Third Circuit succinctly stated:

> A decision affecting an employee in the protected class does
> not become a discriminatory decision merely … because a
> younger employee has benefited by the decision. Rather, the
> inquiry is whether the decision was motivated by the affected
> employee's age. If the employer's decision was based on
> legitimate business concerns, … the employee's disagreement
> with this decision does not prove pretext.

*Billet*, 940 F.2d at 827 (*citing Healey v. New York Life Ins. Co.*, 860 F.2d 1209, 1220 (3d Cir.

1988), *cert. denied*, 490 U.S. 1098 (1989)). The Third Circuit and the district courts in this

Circuit have consistently held that courts are not to second-guess the decision-making of an

employer, without evidence of discriminatory motive. *See Brewer v. Quaker State Oil*

*Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("We do not sit as a super-personnel

department that reexamines an entity's business decisions."); *Martin v. GE Co.*, 891 F. Supp.

1052, 1058 (E.D. Pa. 1995) (the court "does not sit as a super human resources office,

judging whether plaintiff indeed possessed better leadership, communications or analytical

skills than other on the same matrix").

      Bayhealth has come forward with a legitimate, non-discriminatory reason for

terminating Plaintiff's employment. Bayhealth informed Plaintiff that his employment was

being terminated because he had engaged in theft. Plaintiff asserts that Bayhealth's proffered

reason is a pretext for discrimination and that Bayhealth actually terminated him so that it

could replace him with a Caucasian retired police officer.

      As discussed above, Plaintiff has failed to adduce any evidence that he was

replaced by a Caucasian retired police officer or any other individual outside of his protected

class. Bayhealth has produced evidence that, after Plaintiff's discharge, the full-time position

of Control Center Operator remained vacant for more than a year. Bayhealth has also

produced evidence that, although a Caucasian retired police officer named Gregory Coughlin

was hired shortly after Plaintiff's discharge, Coughlin was not hired as a Control Center

Operator or Security Officer and did not replace Plaintiff. To the contrary, Coughlin was

hired as a Constable to replace Harvey Scott, a Caucasian who had resigned from that position. Accordingly, the hiring of Coughlin does not provide evidence discrediting Bayhealth's proffered reason for Plaintiff's discharge or showing that discrimination was a motivating or determinative cause for Plaintiff's discharge.

Plaintiff has failed to come forward with any other evidence of pretext. Plaintiff insinuates in his Complaint that Bayhealth's inquiry into the facts underlying the denial of his application for DELJIS access shows that Bayhealth was searching for a reason to terminate his employment. (*See* P150 at ¶¶ 8-12). However, Plaintiff has not produced a shred of evidence establishing a nexus between Bayhealth's inquiry and his discharge. Further, Plaintiff expressly conceded at his deposition that once Bayhealth had received information that he had been denied DELJIS access because he had been previously arrested, Bayhealth had an obligation to discuss the arrest with him. (P19). It is undisputed that Bayhealth conducted a criminal background record check on Plaintiff and that the record check showed no convictions. It is further undisputed that Mr. Lands met with Plaintiff promptly after receiving the results of the record check and advised Plaintiff that his record was clear. (P157 at ¶¶ 23-24).

Plaintiff's sole remaining allegation is that Bayhealth did not have sufficient evidence to make a determination that he had engaged in theft. (P151 at ¶ 16, P32). As discussed above, the Third Circuit and the district courts in this Circuit have consistently held that courts are not to second-guess the decision-making of an employer, *without evidence of discriminatory motive*. Plaintiff has failed to adduce *any* evidence of discriminatory motive on the part of Bayhealth.

It is undisputed that Bayhealth received a eyewitness report from a co-worker, Ashley Fulcher, that Plaintiff had stolen a soda from the Kent General Hospital Cafeteria. (*See* P29-P30). There is no evidence in the record that the Fulcher was motivated

by racial animus.  Bayhealth conducted a thorough investigation of the Fulcher's report,

interviewing Plaintiff, Fulcher and all other potential witnesses.  Indeed, Plaintiff expressly

conceded at his deposition that he could not identify a single person whom he believed that

Bayhealth should have interviewed, but did not.  (P34-P35).

Plaintiff further conceded that, pursuant to Bayhealth's investigation, he was

given two chances to respond to Fulcher's report and give his side of the story.  (P34).

Plaintiff testified that Lands and Freeman conducted their first interview with him on

April 13, 2005 in Lands' office.  (P20).  Plaintiff confirmed that, contrary to the allegations in

the Complaint, the interview did not take place in Jeffrey Lewin's office and that Lewin was

not present at the interview.  (P20, *cf.* P150-P151 at ¶¶ 12, 13).  Lands and Freeman

interviewed Plaintiff a second time on April 14, 2005.  (P159 at ¶ 42, P189 at ¶ 3, P23).

Plaintiff conceded at his deposition that, during his second interview with

Lands and Freeman on April 14, 2005, he significantly changed his account of the events of

the evening of April 12, 2005.  Specifically, Plaintiff conceded that he: (1) recanted his

statement that he had been dispatched after entering the cafeteria on the evening of April 12,

2005 (P23, P32); (2) admitted for the first time that he had re-entered the food service area of

the Cafeteria on the evening of April 12, 2005 (P23); and (3) changed his story regarding the

type of food that he allegedly purchased at the Kent General Hospital Gift Shop (P23, P32-

P33).  Plaintiff further conceded that, during his second interview, he had inaccurately

claimed to have worked two 16-hour double shifts on April 11 and 12, 2005.  (P23, P33).

Finally, Plaintiff conceded that the numerous inconsistencies in his statements to Lands and

Freeman had damaged his credibility.  (P33).

Plaintiff has failed to show that Bayhealth's investigation into the report that

he had stolen a soda was tainted in any way by discriminatory motive.  Plaintiff has likewise

failed to show any deficiencies in Bayhealth's investigation.  Simply put, Fulcher was both

consistent and credible, and Plaintiff – by his own admission – was neither.  Therefore, Lands' determination that Plaintiff had engaged in theft was  adequately supported and reasonable under the circumstances.

Plaintiff's theory that Lands used the theft report merely as an excuse to fire him is not only unsupported, but utterly implausible.  The undisputed record shows that Lands approved Plaintiff's hiring, his promotion and the favorable performance appraisals prepared by Freeman.  Lands could have fired Plaintiff because he failed to pass either of the two required IAHSS examinations and become IAHSS-certified.  Lands also could have fired Plaintiff because he failed to disclose his criminal record, but Lands chose not to do so. Lands also could have fired Plaintiff after he became uninsurable, but instead accommodated Plaintiff by assigning him only to foot patrol.  Lands also could have fired Plaintiff after his application for DELJIS access was denied because the ability to access DELJIS was a requirement of his position as Control Center Operator.  Instead, Lands made an exception for Plaintiff and allowed him to continue work as a Control Center Operator despite his failure to obtain DELJIS access.  In sum, it is readily apparent that Lands had no need to manufacture a reason to discharge Plaintiff because there were already at least *four* legitimate, business-related reasons that he could have used to support a discharge decision.

Plaintiff has failed to meet his burden of either discrediting Bayhealth's proffered reason for his discharge or adducing evidence that discrimination was more likely than not a motivating or determinative cause of the discharge.  Accordingly, Bayhealth is entitled to summary judgment on Plaintiff's claim of discriminatory discharge under Title VII and the DDEA.[6]

---

[6]  The DDEA and Title VII are interpreted in a co-extensive manner because the two statutes deal with similar subject matter and are grounded on similar legislative goals.  Thus, Delaware courts analyzing race discrimination claims arising under the DDEA look to federal court decisions interpreting Title VII for guidance.  *Gallucio's v. Kane*, No. 94A-12-010,

## C.  BAYHEALTH IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM  OF BREACH OF THE STANDARD OF GOOD FAITH AND FAIR DEALING UNDER DELAWARE LAW

Under Delaware common law, employment is presumed to be at-will and an employee can be terminated for any reason and at any time, with or without cause.  *Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000).  However, Delaware courts have recognized an implied covenant of good faith and fair dealing as a narrow exception to the employment at-will doctrine in four situations:

> (i) where the termination violated public policy; (ii) where the employer misrepresented an important fact and the employee relied 'thereon either to accept a new position or remain in a present one'; (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

*(Id.)* (internal citations omitted).  In *Lord*, the Delaware Supreme Court held that these four categories are the exclusive means by which a plaintiff may obtain relief for the termination of an at-will employment contract.  (*Id.* at 401.)  Here, Plaintiff alleges that Bayhealth violated the implied covenant of good faith and fair dealing because his discharge violated public policy.

A discharged employee "must satisfy a two-part test to demonstrate a breach of the covenant of good faith and fair dealing under the public policy category:  (i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest."  *Lord*, 748 A.2d at 401.  "In emphasizing the requirements of the first prong, the implicated public policy must be clearly mandated for this

---

1995 WL 656818, at *3 (Del. Super. 1995) (citing *Riner v. National Cash Register*, 434 A.2d 375, 376-77 (Del. Super. 1981); *Giles v. Family Court*, 411 A.2d 599, 601-602 (1980)).

exception to shield an employee.  Otherwise, the exception would too broadly restrict an employer's freedom to contract." *Murphy v. Bancroft Construction Co.*, No. 02-453-SLR, 2003 WL 22119187, at *3 (D. Del. 2003) (internal citations omitted).

In Count II of his Complaint, Plaintiff fails to assert any recognized public interest.  He also fails to assert that he held any position with responsibility for advancing or sustaining any recognized public interest.  His claim for breach of the implied covenant of good faith and fair dealing should be dismissed for these reasons alone.

Even assuming that Plaintiff had adequately pleaded his claim, Bayhealth would still be entitled to summary judgment.  In *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 829 (Del. 2005), the plaintiff brought a claim for breach of the implied covenant of good faith and fair dealing based in part on an allegation that her former employer had violated public policy by subjecting her to disparate treatment based on her race.  The Delaware Supreme Court held that the analysis of a claim for breach of the implied covenant of good faith and fair dealing based on race discrimination "should proceed under a framework similar to that used to analyze a claim under Title VII."  (*Id.*)  Finding no evidence in the record the former employer had taken an adverse employment action against the plaintiff because of her race, the Supreme Court affirmed the Superior Court's dismissal of her claim. (*Id.* at 830.)

The result here is no different.  As discussed above, Plaintiff has failed to make out a prima facie case of race discrimination.  Even if he were able to make out his prima facie case, Bayhealth has proffered a legitimate, non-discriminatory reason for his discharge and Plaintiff has failed to show that Bayhealth's proffered reason is pretextual.  In sum, there is simply no evidence in the record that Plaintiff was discharged because of his race.  Accordingly, under the standard enunciated in *Rizzitiello*, Bayhealth is entitled to

26

summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

## V.    CONCLUSION

For all of the above reasons, Defendant Bayhealth Medical Center, Inc., respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment in its favor.


Dated:  July 2, 2007

Respectfully submitted,

**STEVENS & LEE, P.C.**


  */s/ Joseph Grey*
JOSEPH GREY (DE Bar No. 2358)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
(302) 654-5181

KENNETH D. KLEINMAN (PA No. 31770)
JOHN F. WARD (PA No. 81350)
**STEVENS & LEE**
620 Freedom Business Center
Suite 200
P.O. Box 62330
King of Prussia, Pennsylvania 19406
(610) 205-6044

Counsel for Respondent
Bayhealth Medical Center, Inc.

27

## CERTIFICATE OF SERVICE

I, Joseph Grey, hereby certify that on this 2nd day of July, 2007, I caused copies

of the foregoing Opening Brief to be served by first class United States mail, postage prepaid,

upon counsel for Plaintiff, addressed as follows:

> R. Stokes Nolte, Esquire
> Nolte & Associates
> 1010 N. Bancroft Parkway, Suite 21
> Wilmington, DE  19805

JOSEPH GREY